UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                  *
MAARTEN N. PELLEGRINI and         *
NICOLA M. PELLEGRINI,             *
              Plaintiffs          *   Case Number:  05CV30077-MAP
                                  *
vs.                               *
                                  *
CENTURY 21, HAROLD DUPEE          *
REALTORS,                         *
              Defendant           *
                                  *
* * * * * * * * * * * * * * * * * * * * * * * *
```

## CONCISE STATEMENT

1.  In late 2003, the plaintiff and his brother were looking for property to purchase in North Adams, Massachusetts. (depo of  plaintiff, pg. 12)

2.  The plaintiff and his brother Nicola were interested in purchasing property to remodel. (depo of  plaintiff, pgs. 11-12)

3.  The plaintiff met with two representatives of the defendant, Dick Shoestock and Mary Jane Delmaso at 56 Liberty Street, North Adams for the purpose of viewing the property. (depo of plaintiff, pgs. 14-15)

4.  At that time, Ms. Delmaso pointed out some chipped paint in certain areas of the house and told the plaintiff that it was probably lead paint.  (depo of plaintiff, pg. 15)

5.  The plaintiff responded that he wasn't concerned about lead paint because no children under six would be living at the property.  (depo of plaintiff, pgs. 15-16)

6.  The plaintiff and his brother signed the Property Transfer Notification Certificate. (Exhibit 1 to the plaintiff's deposition)

7.  The plaintiff read the document before signing.  (depo of plaintiff, pg. 21)

8.  The plaintiff and his brother read the Purchase and Sale Agreement, Exhibit 3 and understood it before signing. (depo of plaintiff, pgs. 22-23)

9.  The plaintiff hired a Neil Segala of North Adams to make an inspection of the property, 56 Liberty Street.  (depo of plaintiff, pg. 28)

10.     The plaintiff read the report of Mr. Segala.  Mr. Sedula informed the plaintiff that there was a good chance that there was lead paint on the premises at 56 Liberty Street.  (depo of plaintiff, pgs. 29-30)

11.     The plaintiff, prior to closing, was told by three people that there was a good chance of lead paint in the property at 56 Liberty Street.  Those people are: Dick Shoestock, Mary Jane Delmaso and Neil Segala.  (depo of plaintiff, pg. 32)

12.     Richard Shoestock gave Nicola Pellegerini a copy of the Property Transfer Lead Paint Notification.  (depo of Richard Shoestock, pgs. 26-29, 34, 66-67)

13.     The plaintiff's only medical records concerning lead paint are the results of a blood test dated 06/07/06 from the North Adams Regional Hospital Laboratory Department and a one page note dated 12/01/04 from a Barbara Holian.  (plaintiff's response to request for production of documents annexed hereto as Exhibits "A" and "B")


THE DEFENDANT
By Its Attorney


/s/ Richard F. Faille
Richard F. Faille, Esquire, BBO#: 157640
Law Offices of Donald E. Phillips
1414 Main Street, Suite 550
Springfield, MA 01144
(413) 730-6350
Richard.Faille@stpaul.com


## CERTIFICATE OF SERVICE

I, Richard F. Faille, Attorney for the Defendants, hereby certify that on February 5, 2007, I copied the foregoing document by mailing a copy of the same, postage prepaid, to:

Maarten N. Pellegrini, Pro Se
56 Liberty Street
North Adams, MA   01247


/s/ Richard F. Faille

**<u>EXHIBIT "A"</u>**

**<u>Plaintiff's Response to Request</u>**
**<u>For Production of Documents</u>**

# NORTH ADAMS
# `f REGIONAL HOSPITAL

A member of the Northern Berkshire Healthcare Family



**Enclosed is the requested information concerning our patient.
If you have *any* questions, or need any further information,
please contact me *at 413-664-5200*.**

Yours sincerely

*[signature: D. Rose]*

**Lorraine M. Rose
Health Information Legal Analyst
Medical Record Department**

FOR RECORDS PROTECTED **BY FEDERAL CONFIDENTIALITY RULES (42** CFR Part 2)
          This information has been disclosed to you from records
     protected by Federal confidentiality rules {42 CFR Part 2). The
     **Federal** rules prohibit you from making any further disclosure of
     this information unless further disclosure is expressly
     permitted by the written consent of the person to whom it
     pertains or as otherwise permitted by 42 CFR Part *2*. A general -
     authorization for the release of medical or other information is
     NOT sufficient for this purpose. The Federal rules restrict any
     use of the information to criminally investigate or prosecute
     any alcohol or drug abuse patient.

71 Hospital Avenue, North Adams, MA 01247
Ph: 413.664:5000. www.nbhealth.org

**NORTH ADAMS REGIONAL HOSPITAL LABORATORY DEPARTMENT**
**NORTH ADAMS, MA 01247**
**413-664-5160**
**OUTPATIENT REPORT** *FOR*
**PHYSICIAN** PHYSICIAN:
Tierney, Jody

PATIENT:  Pellegrini, Maarten     AGE/SEX:  25/M     UNIT = #:
                       N0178591
ACCT #: N02447768          DOB:      02/17/81 LOCATION:   LAB
SUBMITTING  DR:  Tierney, Jody   STATUS:    REG REF  ROOM:
PRIMARY CARE DR;              REG;       06/07/06 BED:
ORDER DR:


 Specimen: 0607:RL00013R COMP   Collected: 06/07/06-1219
                        Received:: 06/07/06-1219


| Test | Result | Flag | Reference |
|------|--------|------|-----------|
| LEAD (QUEST) | 3 | | 0 – 9 UG/DL |

*LEAD SOURCE: VENOUS*
*OSHA CONSIDERS A BLOOD LEAD LEVEL OF >40* UG/DL **IN THE**
**WORKPLACE TO** *BE UNSAFE.*

*TEST* **PERFORMED** *AT:*
*.QUEST DIAGNOSTICS, 415 MASSACHUSETTS AVE, CAMBRIDGE, MA,*
*SALINE,. KABAWAT, M.D.., DIRECTOR*



**RUN DATE:** 06/19/06
**RUN TIME:** 0831                **\*\* END** OF **REPORT \*\***
                        **PAGE:**

| MAARTEN | AGE/SEX: | 25/M | UNIT #: N0178591 |
| | DOB: | 02/17/81 | LOCATION: LAB |
| | STATUS: | REG REF | ROOM: |
| | REG: | 06/07/06 | BED: |

PATIENT: PELLEGRINI„ ACCT #: NO2447768
SUBMITTING DR: Tierney, Jody
PRIMARY CARE DR: **OTHER DR:**

Test

LEAD

4

# EXHIBIT "B"

## Plaintiff's Response to Request
## For Production of Documents

MENTAL HEALTH AND . L .'ANCE ABUSE SERVICES T : BERKSHIRES
PROGRESS NOTES Record all contacts with client(s)-
including phone calls

Client(s) _____ <u>Pei</u> _____ <u>41.14</u> ___ **Case** *n* ____ <u>c *oc. 17*</u>

*3'1*    i~ _____
*********************************74. ******* **.****************************ic*****

............c.crxve 7exxx~xxxxkxic a: is is******ir****ac*****a:*~e is****ticxx*****ar*sir

it**iic**ir**

**Participants:** _____ N4•41.JO"T'1 c•Ca--Q-t.~~

**Date:** ___/0 f o~i _____ **Modaliy!Gt ▶ 'n.al** _____

Symptom Status/Problem List:

t,Q

Ti,e o/P.--cA.-a.L,

o{~ Goal(s)

Addressed and Charfies:

S     1·    t -      -~ "~Y          ~4'tt -> ~✓ '°          **T.u' 'h G-dL0/Y.-c**

**pp v~t-ce**                         **Leo u4..vt.rL**                      **1-o-v¢**

T aL~ient'Plan Bzsed pon Goals) Ad ressed:/-'°

Next Appointment                          Clinician's Signature & Credential

**********sic***************:4******ic******i****:4******* **:k*******tic*=cxiz*:t

Other Contacts:

*They stodial*

*:F?c:'r*** car****i;4*************************** is****** *******ic**vkic********

2

# READABLE ABSTRACT TO*********

## EXHIBIT "B"
## Plaintiff's Response to Request
## For Production of Documents

MENTAL HEALTH AND SUBSTACE ABUSE SERVICES TO BERKSHIRES
PROGRESS NOTES
Record all contacts with client(s) including phone calls

Client(s) Name(s): _Isabel Pellegrini_____    Case# _000173938_____

*********************************************************************

*********************************************************************

Participants: _Isabel, sons Martin & Nicola_____
Date: _12/1/04_____    Modality: _Family_____

**Symptom Status / Problem List:**

*Multiple stressors affecting relationships*
*Financial stress compounding situation Ct & son Nicola*
        *Often have heated arguments.  Son Martin affected by level of tension*

**Goal(s) Addressed and Changes:**
*Sons have tried to accommodate Ct's return to N. Adams.  They*
*Lived in separate households until 2002.  Ct. did no have custodial rights. Validated sons*
*attempts to buy a home, get ahead, home is a health*

**Treatment Plan Based Upon Goal(s) Addressed:** *Risk needs to be de-leaded will*
        *Lose money.  Reviewed ways to decrease arguments*
        *Increased stress management. To keep family together*

*1xwk*

_____12/8/04_____          _Barbara Holian, LWHC_____
Next Appointment                             Clinician's Signature & Credential

*********************************************************************

Other Contacts:

*********************************************************************

3

# EXHIBIT "1"

# To Deposition of Maarten Pellegrini



**Nov. 29. 2003 4:54PN .._ C<sup>f''</sup>`i#RY 21 HAROLD DIKE AGENCY_ ,.................No.4354**

PROPERTY TRANSFER NOTIPICATTONCEMU<sup>T</sup>ICATION

This form is to be signed by the prospective purchaser before signing a purchase and sa).e agreement ora memorandum of **agreement,** or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property **built** *before* 1978, for compliance with federal and Massachusetts lead-based paint disc-()sure requirements.

Required Federal Lead *Whaling Statement:*

Every purchaser of any interest in residential property on which a residential dwelling was built 'riot to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young•children atr~sk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning c isabiliues, reduced intelligence quotient, behavioral problems and impaired memory . Lead poisoning alto pores a particular risk to pregnant women. The *seller* of any interest in residential real property Isrequired to provide the buyer with any information on leas -based paint hazards from *risk* tutus menu or inspections in the relict's possession and notify the buyer of any known **lead-based** paint **hazards.** A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**

**(a) Presence of lead-based paint and/or lead-based paint hazards (check) (I),or4ii) below**

  **(i)     _Known lead-based paint and/or;lead-based;painchazardraxe:piesenrind e housing(explauA)-**

  (V Seller has no knowledge oflead-based paint and/or lead-based paint hazards in the housing.
  _nee _____

.,                                                                        f (b) Records and reports available co the seller. (check (1) or (ii) below):                                                    ,

  (1)         **Seller** has provided the purchaser with all availablc•records and reports pc -raining to lead-based **paint and/or** lead-based paint hazards in the housing (circle documents below).
  **Lead Inspection** Report; Risk Assessment Report, Letter of Interim Control; Letter **of** Compliance (ii)      Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in
  **the housing.**                                                                    **e,;,e**
                              **;ale: e.h^^!d:e-e**                                    ʸ•ᵣᵣ₋

**Purehseer'a or** Lessee Purchaser's Acknowledgment (initial)

(t) _____ , Purchaser or lessee purchaser has received copies of,al1 documents circled above

**(d)        , Purchaser** or lessee purchaser has received no documents. (e) , ✓       Purchaser or lessee purchaser has received the PropertyTrarrsfer Lead 'Paint ilotafication.

(1) _____ Purchaser or lessee purchaser has :(check (i) or (ii) below):

(i)        received a 10-day opportunity (or mutually agreed upon period) co condtjcta risk assessment
 or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
(ii) ___ V _ waived the opportunity to conduct a risk assessment or inspection f o r th9 p r e s e n c e o f p a i n t ti m*,                                              ¡ t

**t's lt-knowlecguent (initial)**

+'ᶠᵢᵣ
___ ✓ Agent has informed the seller of the seller's obligations under federal and stale law for leads die
**based palmy disclosure and** notification, and is aware of his/her responsibility to ensure mpliance.                                              4341
        Agent has verbally informed purchaser or lessee-purchaser of the possible pr eh= of dangerous levels of lead in paint, plaster, putty or other structural materials and his or her obligation to bring a p *operty* into compliance with the Massachusetts Lead Law either through full ddeading or interim control if it was built before 1978 and a child under six years old resides or will reside in the property.
                                                        t
                                              i, ₆

Certi.6cation of Accuracy
ᵀhe foIIowing parties have *reviewed* the information above and *certify,* to the best of their knowic!ige, that the information they *have prow-. is Ern. • •• aerate.*        ~((~... ᵣ
        -riga        cti

                Sc                        D3cC' C_        ₒ
                                              c-f
        .IW;r

**Purchaser**        Nee,        di ®        Dail
A̲⁴̲-et.edd-ᵉ-et,ed 1̲ʲ̲ eV.,        04,        _____ I̲ Agent
Address of Propetty / Unit

   D MASSACHUSETTS
   6 ASSOCIATION                        i:.'
   RRAIYOR' • ᴾᶠ c~1;14'i14 O1~ ▶ I        ;;1;.: 7
   CUM/        , P« 014

        ᴱˣHIBIT



# *READABLE ABSTRACT FOR*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# EXHIBIT "1"

# TO THE

# <u>DEPOSITION OF MAARTEN PELLEGRINI</u>

**Nov. 29. 2003 4:54PM** .._ CENTURY **21 HAROLD DUPEE AGENCY_ , ........... No.4354**
**PROPERTY TRANSFER NOTIFICATION CERTIFICATION**

This form is to be signed by the prospective purchaser before signing a purchase and sale agreement or a memorandum of agreement**,** or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property built ***before*** 1978, for compliance with federal and Massachusetts lead-based paint disclosure requirements.

Required Federal Lead *Waning Statement:*

Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The *seller* of any interest in residential real property is required to provide the buyer with any information on lead -based paint hazards from *risk* assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i) _____Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    (ii) √_____ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available co the seller. (check (i) or (ii) below):

    (i) _____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (circle documents **below**).
Lead Inspection Report; Risk Assessment Report, Letter of Interim Control; Letter of Compliance

    (ii) _____ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

## Purchaser's or Lessee Purchaser's Acknowledgment (initial)

(c) _____ Purchaser or lessee purchaser has received copies of, all documents circled above

(d) _____ Purchaser or lessee purchaser has received no documents.

(e) ✓_____ Purchaser or lessee purchaser has received the Property Transfer Lead Paint Notification.

(f) _____ Purchaser or lessee purchaser has :(check (i) or (ii) below):

    (i)_____received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii) _____√_____ waived the opportunity to conduct a risk assessment or inspection f o r  t h e  p r e s e n c e  of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment (initial)

(g)✓_____Agent has informed the seller of the seller's obligations under federal and stale law for lead-based paint disclosure **and** notification, and is aware of his/her responsibility to ensure compliance.

(h)_____ Agent has verbally informed purchaser or lessee-purchaser of the possible presence of dangerous levels of lead in paint, plaster, putty or other structural materials and his or her obligation to bring a property into compliance with the Massachusetts Lead Law --either through full deleading or interim control if it was built before 1978 and a child under six years old resides or will reside in the property.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Seller  James Horrigan, executor | Date | Seller | Date |

                                                                            EXHIBIT  1

| | | | |
|---|---|---|---|
| Purchaser | Date | Purchaser | Date |

| | | | |
|---|---|---|---|
| Agent | Date | Agent | Date |

Address of Property / Unit

4

EXHIBIT "2"

TO THE

**DEPOSITION OF MAARTEN PELLEGRINI**



**MITT ROMNEY**
GOVERNOR

**KERRY HEALEY**
LIEUTENANT GOVERNOR

**RONALD PRESTON**
SECRETARY

**CHRISTINE C. FERGUSON**
COMMISSIONER

# The Commonwealth of Massachusetts

Executive Office of Health and Human Services
Department of Public Health
Bureau of Environmental Health Assessment
Childhood Lead Poisoning Prevention Program
56 Roland Street, Suite 100
Boston, MA 02129
(617) 284-8400 / (800) 532-9571          **EXHIBIT   2**

### CHILDHOOD LEAD POISONING PREVENTION PROGRAM (CLPPP) PROPERTY TRANSFER LEAD PAINT NOTIFICATION

Under Massachusetts and federal law, this notification package must be given to prospective purchasers of homes built before 1978. This package must be given in full to meet state and federal requirements. It may be copied, as long as the type size is not made smaller. Every seller and **any** real estate agent involved in the sale must give this package before the signing of a purchase and sale agreement, a lease with an option to purchase, or, under state law, a memorandum of agreement used in foreclosure sales. Sellers and agents must also tell the prospective purchaser any information they know about lead in the home. They must also give a copy of any lead inspection report, risk assessment report, Letter of Compliance or Letter of Interim Control. **This package** is **for compliance with both** state **and federal lead notification requirements.**

Real estate agents must also tell prospective purchasers that under the state Lead Law, a new owner of a home built before 1978 in which a child under six will live or continue to live must have it either deleaded or brought under interim control within 90 days of taking title. This package includes a check list to certify that the **prospective purchaser has** been **fully** notified **by** the real estate agent. This certification should be filled out and signed by the prospective purchaser before the signing of a purchase and sale agreement, a lease with an option to purchase or a memorandum of agreement used in a foreclosure sale. It should be kept in the real estate agent's files. After getting notice, the prospective purchaser has at least 10 days, or longer if agreed to by the seller and buyer, to have a lead inspection or risk assessment if he or she chooses to have one, except in cases of foreclosure sales. There is no requirement for a lead inspection or risk assessment before a sale. A list of private lead inspectors and risk assessors licensed by the Department of Public Health is attached and can also be found on the Childhood Lead Poisoning Prevention Program's website at

2

**www.state.ma.us/dph/clppp.**

Sellers and real estate agents who do not meet these requirements can face a civil penalty of up to $1,000 under state law; a civil penalty of up to $10,000 and possible criminal sanctions under federal law, as well as liability for resulting damages. In addition, a real estate agent who fails to meet these requirements may be liable under the Massachusetts Consumer Protection Act.

The property transfer notification **program** began **in 1988** and **has been** very successful. **It** provides information you need to protect your child, or your tenants' child, from lead poisoning. Massachusetts has a tax credit of up to $1,500 for each unit deleaded. There are also a number of grants and no-interest or low-interest loans **available** for deleading. It's up to you to do your part toward ending lead poisoning.

**PLEASE TAKE THE TIME TO READ THIS DOCUMENT. LEAD POISONING IS THE NATION'S NUMBER ONE ENVIRONMENTAL DISEASE AFFECTING CHILDREN. DON'T GAMBLE WITH YOUR CHILD'S FUTURE.**
CLPPP Form 94-2, 6/30/94, Rev. 2/03

## What is lead poisoning? How do children become lead poisoned?

Lead poisoning is a disease. It is most dangerous for children under six years old. In young children, too much lead in the body can cause permanent harm to the brain, kidneys, nervous system and red blood cells. Even at low levels, lead in children's bodies can slow growth and cause learning and behavioral problems. The main way children get lead poisoned is by swallowing lead paint dust. They do not have to chew on leaded surfaces or eat paint chips to become poisoned. Most childhood lead poisoning is caused by children's normal behavior of putting their hands or other things, such as toys, in their mouths. If their hands or these objects have touched lead dust, this may add lead to their bodies. Children can also be exposed to lead from such other sources as lead-contaminated soil or water, but these sources alone rarely cause lead poisoning. Lead can be found in soil near old, lead-painted houses. If children play in bare, leaded soil, or eat vegetables or fruit grown in such soil, or if leaded soil is tracked into the home and gets on children's hands or toys, lead may enter their bodies.

## What are the symptoms of lead poisoning? How is it detected?

Most lead poisoned children have no special symptoms. The only way to find out if a child is lead poisoned is to have his or her blood tested. The Massachusetts Lead Law requires all children between 9 months and 4 years old to be screened annually for lead. If your child has been exposed to lead, or if you do not know if your child under age six has been screened for lead, ask your child's doctor, other health care provider or your local board of health for a simple screening test of your child.

## What is the treatment for lead poisoning?

Treatment of a lead poisoned child starts with finding and removing the lead hazards to which the child is exposed. This will include a lead inspection of the child's home, and if lead hazards are identified, deleading of the home. Medical treatment depends on the child's blood lead level and the child's response to the removal of the lead source. Parents will be taught about

protecting their child from lead exposure. They will need to watch the child's progress through frequent blood tests. If necessary, the child may receive special drugs to help rid his body of excess lead. With this treatment, drugs are given daily for as long as several weeks. Sometimes this must be done more than once. A child who has been lead poisoned will need a lot of blood tests for a year or more. He or she should be tested for learning problems before starting school.

**Are children under six years old the only ones at risk of lead poisoning?**

No. Young children are usually more easily and seriously poisoned than older children or adults, but lead is harmful to everyone. Lead in the body of a pregnant woman can hurt her baby before birth. Older children and adults who live in older housing with lead paint hazards may become exposed to lead and could potentially develop lead poisoning through home renovation. Most lead poisoning in adults is caused by work-related exposure or home renovation. Even hobby supplies, such as stained glass, bullets and fishing sinkers, can expose people to lead. Lead poisoning in adults can cause high blood pressure, problems having children for both men and women, digestive problems, nerve disorders, memory loss and problems concentrating, and muscle and joint pain. Adults who have any of these symptoms and who have been exposed to lead should consider being screened for lead. Those who are regularly exposed to lead through their work are required by law to have their blood tested once a year for lead.

CLPPP Form 94-3, 6/30/94, Rev. 9/02

**What are the dangers of lead paint in homes, and when was it used?**

Lead paint in homes causes almost all childhood lead poisoning. Lead is so harmful that even a small amount of fine lead dust that cannot be seen can poison a child. Lead paint covered by layers of nonleaded paint can still poison children, especially when it is disturbed, such as through normal wear and tear, or home repair work. When such lead paint is on moving surfaces, such as windows, fine lead dust is released through normal use. This dust settles, where it can be easily picked up on children's toys and fingers. Household paint with poisonous (now illegal) levels of lead was in use in Massachusetts from the 1690s until 1978. In 1978, the U.S. government banned lead from house paint. Lead can be found in all types of pre-1978 homes: homes in cities, suburbs or the countryside; private housing and state or federal public housing; single-family and multi-family homes. The older the house, the more likely it is to contain lead paint. The older the paint, the higher the likely lead content.

**Can routine home repairs cause lead poisoning?**

There can be a danger of lead poisoning whenever painted surfaces inside or outside the home are scraped for repainting, or woodwork is stripped or removed, or windows or walls are removed. This is because lead paint is found in almost all Massachusetts homes built before 1978, and so many of Massachusetts' homes are old. Do not use power sanders, propane torches or heat guns to remove leaded paint, as these methods create a lot of lead dust and fumes. Temporarily move your family (especially children and pregnant women) out of the home while the work is being done and cleaned up, or at a minimum, tape up plastic sheets to completely seal

off the work area. Get a lead inspection done, so that you will know which surfaces have lead paint and need extra care when preparing for and doing home repair work, and during cleanup afterwards. Do not do repairs in older homes without learning about safe ways to do the work to reduce the danger of lead dust. Hundreds of cases of childhood and adult lead poisoning result each year from do-it-yourself home projects.

**How does the owner of a home built before 1978 in which a child under six years old lives meet the requirements of the Massachusetts Lead Law?**

The first step is to have a lead inspection or risk assessment done. A licensed lead inspector will test the surfaces of the home for lead and give the owner a written report that states where there is lead in amounts considered a violation by state law, and record any lead hazards that must be corrected. A risk assessor, who is a specially licensed lead inspector, will do a lead inspection plus a risk assessment, during which he or she checks the home for the most serious lead hazards that must be fixed for interim control. (See question about interim control, below.) Only a licensed deleader may do high-risk work, such as removing lead paint or repairing chipping and peeling lead paint. Either a deleader, the owner or someone who works for the owner (an agent) can do certain other deleading and interim control tasks. (See next question.) An owner or agent must get special training to perform the deleading tasks they may do. After the work is done, the lead inspector or risk assessor returns to check the home. He or she may take dust samples to test for lead and makes sure the home has been properly cleaned up. If everything is fine, he or she gives the owner a Letter of Compliance or a Letter of Interim Control. After getting one of these letters, the owner must take reasonable care of the property, mainly by making sure there is no peeling lead paint.

**Can I do some of the deleading myself?**

In Massachusetts, the owner or someone who works for the owner (an agent) can do certain deleading activities. These include covering surfaces with certain materials; removing certain building parts; capping baseboards; installing vinyl siding on the exterior, and applying encapsulants. Encapsulants are special liquid coatings made to be long-lasting barriers over lead paint. Before any of these deleading tasks are done, the owner must first have a lead inspection done and whoever is going to do the work must get special training. Contact CLPPP for information about this training. In addition, owners or their agents can perform structural repairs and lead dust cleaning for interim control. Before doing this work, owners and agents should get and read CLPPP's interim control booklet.

**Is there financial help for deleading?**

There is a state income tax credit of up to $1,500 per unit for full deleading. A credit of up to $500 per unit is available for interim control work that also contributes to full deleading. There are also grants and no-interest, deferred loans, or low-interest loans available to eligible property owners. These funds are available through the U.S. Department of Housing and Urban Development, the Massachusetts Executive Office of Communities and Development, the Massachusetts Housing Finance Authority, local city and town community development planning departments, and banks.

**Does deleading improve the value of my property?**

Many homeowners have found that the benefits of deleading are not unlike the benefits of other home improvement projects. Replacement windows and doors can save the homeowner money because they are more energy efficient. Having a legally deleaded home, whether it is a single-family or multi-family, owner-occupied or rental unit, can make it easier to sell or rent, often at a better price.

**What surfaces must be deleaded for full compliance with the Massachusetts Lead Law?**

Owners of homes built before 1978 where children under six years of age live must have the following lead hazards corrected to get a Letter of Compliance:
* any peeling, chipping or flaking lead paint, plaster or putty;
* intact lead paint, other coating or putty on moveable parts of windows with sills five feet or less from the floor or ground and those surfaces that come in contact with moveable parts;
* intact lead paint or other coating on "accessible mouthable surfaces." These surfaces generally include woodwork, such as doors, door jambs, stairs and stair rails, and window casings.

**What is interim control?**

Interim control is a set of temporary measures that property owners can take to correct urgent lead hazards, especially peeling or chipping lead paint and lead dust. These steps protect residents from lead poisoning until the home is fully deleaded. Homes in good condition may need little or no work to get interim control status. Owners then have up to two years before they have to fully delead the home. For that period, they are free from strict liability under the state Lead Law should a child become lead poisoned in the home. In addition to the repair of peeling and chipping lead paint and the cleaning of lead dust, other work may be necessary for interim control. This includes fixing water leaks or other damage that makes lead paint peel and chip; making window wells smooth and easy to clean; making windows work properly and deleading any badly chipping and peeling lead-painted surfaces.

CLPPP Form 94-3, 6/30/94, Rev. 9/02

Property owners interested in interim control must hire a licensed risk assessor. He or she will then decide what work, if any, needs to be done to get a Letter of Interim Control. The original Letter of Interim Control is good for one year. The property owner can have the home reinspected before the end of that year, and if all conditions are met, the home can be recertified for another year. By the end of the second year, the home must be deleaded, if a child under six still lives there, for the owner to
remain free of strict liability.

**Does my family have to be out of the house during deleading or interim control work?**

Residents must be out of the house for the entire time that a deleader is doing deleading work inside a home, and for some of the deleading work by owners and their agents. Residents may stay at home, but out of the work area, while a deleader, property owner or owner's agent without a deleader's license does certain other deleading tasks, or such interim control work as structural repairs or lead dust cleaning. Residents who have been out of the house may not return until the deleading work that made it necessary for them to leave is complete, the home is cleaned up, and a lead inspector or risk assessor has checked and found this work has been properly done. For complete details, contact CLPPP.

**Are there any exemptions to the Massachusetts Lead Law?**

The Lead Law applies only to homes built before 1978 in which a child under six lives. Any home or apartment having fewer than 250 square feet of living space, or which is in a rooming house, is exempt, as long as no child under age six is living there. Finally, homes rented for 31 days or less for vacation or recreational purposes are also exempt, as long as there is no chipping or peeling lead paint in the home and the renter has received the Short-Term Vacation Rental Notification.

**What are the requirements of the state Lead Law if there is a lease with an option to buy?**

When there is a lease with an option to buy a home built before 1978 in effect, the owner of the property must have it deleaded or brought under interim control if a child under six lives there. If the tenant with an option to buy such a home proceeds to purchase it, he or she becomes responsible for meeting the requirements of the Lead Law if a child under six lives there after the purchase.

**How can I find out about how lead inspections, risk assessments and deleading should be done?**

All lead inspections, risk assessments and deleading must be done according to the Regulations for Lead Poisoning Prevention and Control, 105 Code of Massachusetts Regulations 460.000 and the Deleading Regulations, 454 CMR 22.00. For full information, homeowners may get these regulations at the State House Book Store, State House, Boston, MA 02133. The phone number is (617) 727-2834.

Lead inspectors and risk assessors licensed by the Department of Public Health have been trained and are experienced in using the state-approved methods for testing for lead paint. These methods are the following: use of a solution of sodium sulfide, a portable x-ray fluorescence machine or lab tests of paint samples removed from the home. Deleaders licensed by the Department of Labor and Workforce Development have been trained to use safe methods to prepare for and do deleading work, and clean up afterwards. They may delead using any of the following methods: removing paint, removing building parts, covering and encapsulating. When removing paint, they cannot use certain very dangerous methods, such as open flame burning, dry abrasive blasting or power sanding without a special vacuum attachment.

**CLPPP** *Form 943, 6/30/94, Rev. 9/02*

### How do I get a lead inspection or risk assessment?

Included as part of this notification package is a listing of private licensed lead inspectors organized alphabetically, and private licensed risk assessors, similarly organized. Ask to see the inspector or risk assessor's license, to make sure it is current. You should arrange for the inspection or risk assessment as quickly as possible after deciding you want one. If you do have an inspection or risk assessment, you must give the seller a copy of the report.

### What is the best time to delead or undertake interim control?

The best time to delead a home or bring it under interim control is when the home is vacant, so that residents will not be exposed to lead and household furnishings will not be contaminated with lead. In addition, it often is efficient, and reduces costs, to combine deleading with other repair work being done to a vacant home.

### What is a Letter of Compliance and a Letter of Interim Control?

Under the state Lead Law, a Letter of Compliance is a legal letter that says either that there are no lead paint hazards or that the home has been deleaded. The letter is signed and dated by a licensed lead inspector. A Letter of Interim Control is a legal letter that says work necessary to make a home temporarily safe from lead hazards has been done. It is signed and dated by a licensed risk assessor. A Letter of Interim Control is good for one year, but can be renewed for one more year. The owner must fully delead the home and get a Letter of Compliance by the end of the second year if a child under six still lives there. The Lead Law does not require the removal of all lead paint from a home. An owner who gets a Letter of Compliance or Letter of Interim Control must take reasonable care to keep up the home, mainly by making sure there is no chipping or peeling lead paint. If an owner fails to take reasonable steps to maintain the home, he or she may become liable for damages to a child lead poisoned as a result of the owner's breach of that duty of reasonable care.

## RENTAL PROPERTY INFORMATION

**What liability do rental property owners have if they don't comply with the state Lead Law?**

If a property owner of a home built before 1978 in which a child under six lives fails to delead or bring the home under interim control, and a child is lead poisoned as a result, the property owner is strictly liable for all damages. An owner is not strictly liable for lead poisoning if a Letter of Compliance or Letter of Interim Control is in effect. Strict liability means owners may be liable even if they did not know lead paint was in the home. Since harm to the kidneys and blood cells, delays in growth, learning disabilities and emotional and behavioral disturbances resulting from lead poisoning can have life-long effects, monetary damages awarded against an owner responsible for a child's lead poisoning can be substantial. Failing to delead or bring under interim control a home to which the Lead Law applies is also an emergency public health matter, and can carry criminal penalties. An owner who is notified by a public agency of Lead Law violation in a property he or she owns, and who willfully fails to correct the dangerous conditions, is also subject to punitive damages, which are three times the actual damages found. These provisions are in addition to any other legal rights the lead-poisoned child may have. CLPPP Forth 94-3, 6/30/94, Rev. 9/02

**Can I avoid state Lead Law requirements by not renting to a family with children under six?**

The Massachusetts Lead Law makes it illegal to refuse to rent to families with children under six, or evicting or refusing to renew the lease of families with children under six, because of lead paint. Discrimination against families with young children is also a violation of the U.S. Fair Housing Act and the Massachusetts anti-discrimination statute. Parents cannot waive the rights of their children to live in lead-safe housing or agree to assume to risks of lead exposure. Owners who violate these laws face heavy penalties. The Massachusetts Commission Against Discrimination investigates and prosecutes cases of discrimination against families with children because of lead paint. It is also illegal for lenders to deny financing because a home has lead paint, or because financing could trigger future duties under the Lead Law. This does not restrict the right of a lender to process or deny a mortgage application in accordance with accepted underwriting practices and criteria.

**If I am considering buying a pre-1978 house to rent out, and a child under six lives in one of the apartments, should I have at least that unit and common areas inspected for lead now?**

Yes. If there are children under six living in such an apartment and the apartment does not have a Letter of Compliance or Letter of Interim Control, buyers should find out whether or not the apartment has lead hazards and will have to be brought into compliance with the state Lead Law. This information will be important in deciding whether to buy the property and at what price. As noted above, new owners have 90 days from the date of taking title to have such

an apartment deleaded or brought under interim control. Therefore, they should arrange deleading or interim control work to begin as soon as possible after taking title, to be sure the work is done within 90 days.

**Can a landlord delay a tenancy to bring a home into compliance with the state Lead Law?**

A landlord who will be deleading a home or bringing it under interim control may delay the start of the tenancy up to 30 days. This can be done as long as a lease between the landlord and the new tenant does not exist. During this delay period, the new tenants are responsible for their living expenses. If there is a signed lease, however, the landlord is responsible for temporary housing during relocation necessary for deleading work.

**Must a landlord arrange temporary housing for a tenant while a rental home is being deleaded?**

Under the state Lead Law, tenants have to be relocated for the time that certain deleading work is taking place inside the home. They may not return until that work is done, the home is cleaned up, and a licensed lead inspector or risk assessor checks and finds it is fine for residents to move back in.

The landlord and tenant are responsible for working out an acceptable plan for alternative housing if it is necessary. The landlord may move the tenant to another place to live, which may be another house, apartment, motel or hotel. The landlord is responsible for paying the tenant's reasonable moving costs and any temporary housing costs over and above the rent of the home being deleaded. During the time the home is being deleaded, the tenant remains responsible for paying the normal rent they would pay for this period as their share of the cost of temporary housing. The Lead Law states the temporary housing must not cause undue economic or personal hardship to the tenant.CLPPP Form 94-3, 6/30/94, Rev. 9/02

**What is tenant notification?**

The goal of the federal and state requirements for tenant notification is to help reduce lead poisoning by giving all tenants of homes built before 1978 information about lead in their home. The program also educates tenants and landlords about the dangers of lead poisoning, its prevention, and the Massachusetts Lead Law. Tenant notification applies to all tenants, whether or not they have a child under six living with them.

Before renting a home, landlords, managing agents or any real estate agent involved in the rental must give new tenants copies of any existing lead forms for the home. These include lead inspection reports, risk assessment reports, a Letter of Compliance (no matter how old) or a Letter of Interim Control. If the landlord or agent does not have any or all of these forms for the home, he or she simply does not give them. In addition, the landlord or agent must give new tenants the Tenant Lead Law Notification. This form addresses lead poisoning, specific prevention tips for parents, the requirements of the Lead Law and an explanation of the lead

forms. Attached to the Tenant Lead Law Notification is the Tenant Certification form. This is to be filled out and signed by both the tenant and the landlord or agent. Each party gets a copy to keep. **These forms have been approved to satisfy both state and federal lead notification requirements.** Landlords or agents may choose to include the Tenant Lead Law Notification/Tenant Certification form in a written lease, instead of using a separate form.

Landlords and agents who fail to carry out their tenant notification obligations are liable for all damages caused by their failure to do so, and are subject to a fine of up to $1,000.

## INSURANCE INFORMATION

**How can an owner of rental housing in Massachusetts built before 1978 get insurance to cover potential lead liability?**

The answer depends on the number of units that the property owner wishes to insure, and whether the property owner lives in the building for which insurance is sought. An owner-occupant who insures four or fewer units may be covered by homeowners insurance. Generally, the property owner who is not an owner-occupant will need to get commercial liability insurance, as will an owner-occupant who wishes to insure more than four units.

Homeowners insurance may be available from several different sources: the regular, "admitted" market, the FAIR Plan or the "surplus lines" market. The regular, "admitted" market is the usual market for insurance. The FAIR Plan offers homeowners insurance to property owners unable to find coverage in the regular market. The "surplus lines" market is a less regulated, and generally more expensive
market. It provides insurance to those who cannot find coverage elsewhere.

Under state Division of Insurance regulations, if an insurer in the regular market decides to write homeowners insurance on rental housing for which a Letter of Compliance or Letter of Interim Control is in effect, the insurer must provide coverage of lead paint liability arising from those **premises. Neither the state Lead Law nor the insurance regulations require a regular market insurer to write liability insurance, including homeowners insurance, on a particular property. If** a Letter of Compliance or Letter of Interim Control is in effect for only part of a property, the coverage for lead liability will extend to only that part of the property. Such insurance will also apply to any common areas covered by the Letter of Compliance or Letter of Interim Control. It will not, however, extend to injuries resulting from gross or willful negligence. The FAIR Plan's coverage of lead liability is subject to the same regulations that apply to the regular market.

An insurer in the regular market, or the FAIR Plan, may ask the property owner to prove that there is a Letter of Compliance or a Letter of Interim Control for the home sought to be insured. Once the proof is provided, coverage for lead liability will apply as of the date of the Letter. If the Fair Plan determines that a given property is eligible for insurance, or if a regular market insurer elects to insure certain premises, either may exclude lead liability coverage on any part of the property it ensures to which no Letter of Compliance or Letter of Interim Control applies. If either the Fair Plan or a regular market insurer uses such an exclusion, it must offer the owner of the premises the chance to buy back the excluded coverage. There is an additional charge for the lead liability "buyback" coverage. The amount of this charge is regulated by the Division of Insurance.

In the surplus lines market, there is no requirement to cover lead liability arising from premises to which a Letter of Compliance or Letter of Interim Control applies. Surplus lines insurers generally exclude coverage of lead liability, do not offer the buyback coverage, and charge higher prices than the regular market.

Since the FAIR Plan does not provide commercial liability insurance, property owners who need to get such coverage (as opposed to homeowners insurance) must get it from either the regular market or the surplus lines market. Commercial liability insurance from the surplus lines market, like homeowners insurance from that market, usually will exclude coverage of lead liability, will not include the buyback option, and will cost more than regular market coverage.

While a regular market insurer can decline to write commercial liability insurance on a given property, once such an insurer decides to write such coverage, it must then insure lead liability arising from any part of the property covered by a Letter of Compliance or Letter of Interim Control. If such an insurer chooses to insure a property, it may exclude coverage of lead liability on any part of the premises for which no Letter of Compliance or Letter of Interim Control is in effect. If such insurer applies such an exclusion, it must offer the property owner the opportunity to buy back the excluded coverage. The lead liability insurance regulations described above as applicable to regular market homeowners insurance also apply to commercial liability insurance from the regular market.

Owners of rental housing should try to get coverage for lead liability, whether they have met the requirements of the Lead Law or not, by seeking regular market coverage through insurance agents, or by contacting direct writing companies that are listed in the telephone directory, before resorting either to the FAIR Plan or the surplus lines market.

**If I own and occupy a single-family house, does my homeowners insurance cover lead liability?**

Under the state lead liability insurance regulations, coverage of lead liability cannot be excluded from regular market and FAIR Plan homeowners insurance policies on single-family owner-occupied homes. Instead, lead liability coverage is included in such policies. However, a family member covered by a homeowners policy cannot make a lead liability claim against another family member covered by the same policy. The requirements of the lead liability insurance regulations do not apply to homeowners coverage from the surplus lines market.

**How are new owners affected by the lead liability insurance regulations?**

If a buyer of rental housing built before 1978 meets the state Lead Law's requirements and gets a Letter of Compliance or Letter of Interim Control within 90 days after becoming the owner, then, under certain conditions, they will be able to get coverage for lead liability for the period they owned the property before they deleaded or brought it under interim control. This will happen if a regular market insurer chooses to provide liability coverage on the property. Such an insurer is required to provide lead liability coverage to a new owner who obtains a Letter of Compliance or Letter of Interim Control within 90 days after becoming the owner of the property. Such coverage will go back to the time that the new owner took title to the property, unless the liability insurance went into effect some time after the taking of title. In the latter case, the coverage of lead liability will extend back to the time that the liability insurance

held by the new owner first went into effect

CLPPP Form **94-3,6/30/94**, Rev. 9/02

on the premises. The rule for new owner lead liability insurance coverage for the FAIR Plan is the same as for the regular market. These special rules for lead liability insurance for new owners do not apply to insurance from the surplus lines market.

* * * * * * * * *

### What happens next?

That's up to you. At this point, you should be well informed about lead poisoning, the effects of lead hazards in the home, and your responsibilities under the Massachusetts Lead Law. In the past, the Department of Public Health has had to devote its childhood lead poisoning resources to provide services to the thousands of Massachusetts children who were poisoned, as well as to providing services to children whose blood lead levels are elevated, to prevent them from becoming lead poisoned. Between the Department's work and the preventive deleading, carried out by property owners, we have been successful at reducing the number of lead poisonings among young children in Massachusetts. All of us at the Department are hopeful that we will continue that partnership, in which the correction of lead hazards in the homes of young children *before* those children are lead poisoned is so important.

### Where can I get more information on lead poisoning?

Massachusetts Department of Public Health Agency
Childhood Lead Poisoning Prevention Program (CLPPP)
(For more copies of this form, and full range of lead)
information on owners' and tenants' rights and
3420 responsibilities under the state Lead Law, financial help
for owners, safe renovation work, and soil testing)
617-753-8400, 1-800-532-9571

U.S. Environmental Protection

Region 1 (New England)
(Information about federal laws on

617-565-

National Lead Information Center
(General lead poisoning

information) 1-800-LEAD-FYI Massachusetts Department of Labor
and Workforce Development
(List of licensed deleaders)
617-727-7047, 1-800-425-0004

U.S. Consumer Product Safety Commission
(Information about lead in consumer products)

Massachusetts Housing Finance Agency
(Get the Lead Out loan program information)
617-854-1000

1-800-638-2772

EXHIBIT  "3"

TO THE

**DEPOSITION OF MAARTEN PELLEGRINI**

# STANDARD BERKSHIRE COUNTY MULTIPLE LISTING SERVICE
# PURCHASE AND SALE AGREEMENT

**1.   PARTIES**

|  | **SELLER** | **BUYER** |
|---|---|---|
| Name(s): | James Horrigan, Executor of the Estate | Nicola M. Pellegrini |
|  | of Mr. Walter M. Bronson | Maarten N. Pellegrini |
| Address: | 106 Laurel Circle | 37 Granby Road |
|  | Absecon, NJ 08201 | Worcester, MA 01604 |

**2.   DESCRIPTION**: Subject to the terms and conditions hereinafter set forth, the SELLER agrees to sell and the BUYER agrees to buy the following premises: SELLER'S real property located at **56 Liberty Street. North Adams, MA 01247** as more particularly described in a deed dated     and recorded in the **Northern** Berkshire County Registry of Deeds in Book **454,** Page **424,** or Land Court Certificate #      Assessor's Map **# 79** Section #  Lot **# 63** (the 'Premises`).

**3.   PURCHASE PRICE:** For the Premises, BUYER shall pay the sum of ............................................................................
**$77,000.00**
(the "Purchase Price') of which
.................................................................................................................................................**$1,500.**
**00** .................................................................................................................................................
has been paid this day as the initial deposit and
.................................................................................................................................................**$6,200.**
**00**
will be paid within **14 days** as an additional deposit and balance of
.................................................................................................................................................**$69,30**
**0.00**
is to be paid in **cash,** wired funds, or by certified or bank check at the Closing.

**3.1 Escrow:** All deposits are to be held by the Listing Broker **Century 21 Harold Dupes. Realtors** (Escrow Agent") in a non-Interest bearing escrow account, unless otherwise specified herein.

**4.   CONTINGENCY TERMS:** The following terms and dates apply to paragraphs 5, 6 and 7 as the case may be:
**4.1 Mortgage Terms:** Amount:  **$69,300** _ , Rate:   **Prevailing**   Type: **Fixed,**  Points: **0 ,**  Years:  **30**
**4.2 Mortgage Application Date:** ..............................................................................within **7 days** of signed **acceptance** by SELLER
**4.3 Mortgage Contingency Date:** ..............................................................within 30 days of signed **acceptance by SELLER**
**4.4 Inspection Contingency Date:** ..............................................................within 14 days of signed **acceptance by SELLER**
**4.5 Septic System Inspection Date:** (if **applicable**) ......................................within **NA** days of signed **acceptance by SELLER**

**5.   MORTGAGE CONTINGENCY:** The BUYER'S obligations under this Agreement are contingent upon BUYER'S obtaining a written commitment letter from a conventional mortgage lender for a loan consistent with the contingency term used by the BUYER in purchasing the premises. Should the BUYER be unable to obtain such a commitment letter despite diligent efforts, BUYER may cancel this Agreement by written notice received by the Listing Broker or Seller's Attorney, no later than 5:00 p.m. on the Mortgage Contingency Date, whereupon all obligations of the parties under this Agreement shall cease and BUYER'S deposits shall be promptly returned in full. BUYER'S failure to (a) give such written notice or (b) make a good faith mortgage application by the Mortgage Application Date shall be a waiver of the BUYER'S right to cancel under this Paragraph. If the BUYER cancels the agreement, BUYER shall attach a copy of the mortgage denial to Buyer's cancellation notice.

**6.   INSPECTION CONTINGENCY:** The BUYER'S obligations hereunder are contingent upon BUYER'S receipt, prior to 5:00 p.m. on the Inspection Contingency Date, of written home inspection reports on the Premises satisfactory to the BUYER. Such reports may, at Buyer's option and expense, including but not limited to: inspections for structural and mechanical matters, pests, induding wood-boring insects, lead paint, asbestos, UFFI, radon gas, other hazardous substances, underground tanks, septic system, well water and environmental conditions. Should the results of any such test be unsatisfactory to BUYER, BUYER may cancel this Agreement by written notice received by the Listing Broker or Seller's Attorney no later than 5:00 p.m. on the Inspection Contingency Date, whereupon all obligations of the parties shall cease and BUYER'S deposits shall be promptly returned in full. BUYER'S failure to give such notice shall be a waiver of BUYER'S right to cancel under this Paragraph. The BUYER and Buyer's

2

consultants shall have the right of access to the Premises for the purpose of conducting a home inspection, at reasonable times, upon twenty-four (24) hours advance notice to the Seller's Agent. In consideration of BUYER'S right to inspect and terminate, Buyer acknowledges that by accepting the deed Buyer accepts the condition of the Premises and releases the Seller, Seller's Agents and Buyer's Agents (which include the Selling and Listing Brokers), from any and all liability relating to any defects in the Premises including, without limitation, water seepage from any source.

7.    **SEPTIC SYSTEM:** The SELLER represents that the Premises Is connected to a municipal sewer system. If the premise is not connected to a municipal sewer system, SELLER represents that the Premise is served by a septic system located entirely within the boundaries of the Premises, to the best of their knowledge. (See attached Septic System Addendum [Title 5]) The SELLER shall engage a licensed Septic Inspector to perform a System Inspection and to issue a Septic System Report (the "Report") and deliver the Report to the Buyer on or before the Septic System Inspection Date as defined In paragraph 4.5. Should the Report indicate that the system is a "failed system" as defined by Title 5 of the State Environmental Code (310 CMR 15.301), the BUYER may, within..3,da if receipt of report, cancel this Agreement, and all deposits shall be returned to the BUYER.

8.    **CLOSING DATE:** The Deed. is to be delivered and the Purchase Price paid on _____ **2/10/04** ___ at 2:00 p.m. (the 'Closing Date') at the appropriate Registry of Deeds or such other location within the county in which the Premises is located, as specified by BUYER.

_____  **P** _____

**Seller's Initials** _____  **Buyer's Initials** _____ _____

Pg 1 of 4

© **MULTIPLE LISTI I40 SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE**



EXHIBIT
3
3-21-06  HD0

**9. POSSESSION**: Full possession **free of all tenants and occupants** shall be delivered at the Closing Date. The premises shall be free of encroachments burdening the premises and of improvements that encroach on adjoining Premises, including buildings, septic systems, well and driveway, and has sufficient legal access to a public way.

**10. SURVEY:** SELLER represents that **no** new boundaries are being created by the sale of the Premises. If new boundaries are being created, SELLER shall deliver to BUYER at the Closing a survey of the Premises, in recordable form. The SELLER shall pay for the preparation and recording of the survey, unless otherwise provided herein.

**11. FIXTURES**: Included In this sale as part of the Premises, unless expressly excluded, are the usual fixtures belonging to SELLER and used in connection therewith including but not limited to, if any, furnaces, heaters, oil and gas burners and fixtures appurtenant thereto, built-In ranges, dishwashers and disposals, hot water heaters (if not rented), mantels, electric and other lighting fixtures, chandeliers, venetian blinds and window shades, attached mirrors, automatic door openers (with remote controls), installed air conditioners, wall brackets and hangers, built-in bookcases and shelving, all installed stair carpeting and well to wall carpeting, drapery rods, curtain rods, plumbing and electrical covers, screens, screen doors, storm and other detached windows and doors, blinds, awnings, bathroom fixtures, towel bars, medicine cabinets, radio and television antennas, satellite dishes, fences, gates, hardy shrubs, and fire and burglar alarm systems. The following

additional personal property Is Included: _____

Excluded items:_____

**12. ADJUSTMENTS**: Current real estate taxes, water rates, sewer use charges and fuel are to be apportioned as of the Closing Date. Rents are to be apportioned only for the month in which the closing occurs and only when collected by either party. Unpaid rents due SELLER from months prior to the month of the Closing Date, shall be the responsibility of the SELLER to collect. If the real estate tax rate is not set as of the Closing Date, the apportionment of real estate taxes shall be made on the basis of the tax assessed for the most recent preceding year, with a readjustment at the request of either party, when the amount of the current year's tax is set If the amount of the tax is reduced by abatement, the rebate, less the reasonable cost of obtaining it, shall be apportioned between the parties.

**13. TITLE**: The Premises shall be conveyed by a good and sufficient quitclaim deed unless otherwise specified herein (accompanied by a Certificate of Title, if registered), conveying a good, clear record, marketable and insurable title, free of all encumbrances and exceptions, except

    a)   Real Estate Taxes assessed or to be assessed on the Premises to the extent that such taxes then are not yet due and payable.

    b)   Betterment assessments, if any, which are not a recorded lien on the premises, as of the dated of this Agreement.

    c)   Federal, state, and local laws, ordinances, by-laws, and rules regulating the use of land, particularly environmental, building, zoning,

        health, rent control, and condominium conversion laws, if any, applicable as of the date of this Agreement, provided that as of the

        Closing Date, the Premises may be used as of right for single family residential use or, if the Premises is/Is not a single family

        residence, the Premises may be used as of right for _____

    d)   Existing rights, if any, in party or partition walls; and

    e)   Utility easements in the adjoining ways.

**14. USE OF PROCEEDS TO CLEAR TITLE:** To enable SELLER to make conveyance as herein provided, the SELLER may at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, all instruments so procured to be recorded simultaneously with the delivery of said deed or at such later time as shall be reasonably acceptable to BUYER, and provided further, with respect to discharges or mortgages from insurance companies, banks and credit unions, such discharges may be recorded within a reasonable time after the recording of the deed.

**15. EXTENSION:** If, after a reasonable and diligent effort, SELLER is unable to convey title or deliver possession of the Premises as required hereunder, upon notice by either party, prior to the Closing Date, this Agreement shall be automatically extended for 30 days (or if Buyer's mortgage commitment sooner expires to a date one business day before the expiration of such commitment). Seller shall remove all mortgages, attachments and other encumbrances incurred or assumed by SELLER which secure the payment of money, provided the total amount thereof does not exceed the Purchase Price, and SELLER shall use reasonable and diligent efforts to remove other defects in title, or to deliver possession as provided herein, or to make the Premises conform to the provisions hereof. At the end of the extended period, if all such defects have not been removed, or the SELLER is unable to deliver possession, or the Premises do not conform with the requirements of this Agreement, BUYER may elect to terminate this Agreement and to receive back all deposits, upon receipt of which all obligations of the parties hereto shall cease.

**16. STANDARDS:** Any title matter or practice arising under or relating to this Agreement which Is the subject of a Title Standard or a Practice Standard of the Massachusetts Conveyancers Association shall be governed by said Standard to the extent applicable.

**17. WATER**: SELLER represents that the Premises ⌐ served by a municipal water system. If the Premises is not served by a municipal water system, SELLER represents that the Premises Is served by either **SELECT ONE.** (if a well is present, it contains no defects known to SELLER)

**13. MASS. UFFI LAW:** The SELLER represents and warrants that Urea Formaldehyde Foam Insulation (UFFI) **is not** present in the Premises and that UFFI has been declared by the Massachusetts Department of Public Health (DPH) to be a banned substance which may cause personal injury. If UFFI is or once was present in the Premises, BUYER acknowledges receipt of Mass. Disclosure Statement with a copy of the air quality test in possession of the SELLER, which is attached hereto and incorporated herein.

**19. LEAD PAINT LAW:** BUYER acknowledges that under Massachusetts Law, on homes constructed prior to 1978, and whenever a child under six (6) years of age resides in any premises in which paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said material so as to make it inaccessible to children under six (6) years of age. The BUYER

**Seller's Initials** _____     **Buyer's Initials** _____ _____

further acknowledges that, prior to the signing of this Agreement, the SELLER and Broker(s) have (a) provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, which is attached hereto; (b) informed the BUYER of the availability of inspections for dangerous levels of lead; and (c) verbally informed the BUYER of the possible presence of dangerous levels of lead and the provisions of the lead paint law and regulations, found in 105 CMR 460.100D. Notwithstanding, SELLER is under no obligation to the BUYER to remove lead paint, which may be present in the Premises.

**20. ASBESTOS:** The BUYER acknowledges that the Department of Public Health has issued regulations governing the maintenance, repair and removal of asbestos material by any owner of real property and that asbestos material is a common insulation material on heating pipes, boilers, and furnaces.

**21. RADON GAS:** Radon gas is a radioactive gas, which occurs naturally in certain areas and may accumulate in some buildings in a high enough concentration to be a potential health hazard.

**22. UNDERGROUND STORAGE TANKS:** The parties acknowledge that the Massachusetts Board of Fire Prevention has issued regulations governing the maintenance, repair, and removal of underground storage tanks to prevent and detect leakage of tank contents into surrounding soil and water supplies. The SELLER hereby discloses that to the best of Seller's knowledge, there **are not** one or more underground storage tank(s) at the Premises. If there are one or more underground tanks at the Premises, the SELLER further discloses that the tanks **SELECT ONE** been used within the past six (6) months exclusively for the storage of fuel oil for consumption of the Premises and to the best of the SELLER'S knowledge there has been no release or leakage of oil from such tank(s). If the Premises is not in compliance with 527 CMR 9.00 et.seq. and BUYER does not cancel this Agreement, pursuant to paragraph 6, BUYER shall be obligated to purchase the Premises and shall be deemed to have assumed the obligation to bring the Premises into compliance with 527 CMR 9.00 et. seq.

**23. CONDITION OF PREMISES AT CLOSING:** Upon delivery of the Deed, the Premises and all appliances therein and utilities serving the same shall be in their present condition, reasonable use and wear of same excepted. The Premises is to be left broom clean and all personal property and rubbish removed. With respect thereto, BUYER shall have the right to walk-through the Premises within twenty-four hours prior to the closing and if the sale is completed subsequent to said walk-through or if the walk-through is waived by BUYER, the foregoing condition of the Premises shall, as between the BUYER and SELLER and their representatives (if applicable), be conclusively presumed to be acceptable to BUYER regardless of condition.

**24. NOMINEE:** BUYER may require the conveyance to be made to another person, persons, or entity ("Nominee"), upon notification in writing delivered to SELLER at least five days prior to the Date of Closing. The appointment of a Nominee shall not relieve BUYER of any obligation hereunder. Any Note or mortgage or other document to be delivered from BUYER to SELLER shall be executed by or unconditionally guaranteed by BUYER, unless otherwise specified herein.

**25. CLOSING:** Simultaneously with the delivery of the deed, SELLER shall execute and deliver:
   a)   Smoke Detector Certificate of Compliance;
   b)   Wood Stove permit, where applicable
   c)   Affidavits and indemnities with respect to parties in possession and mechanic's liens to induce buyer's title insurance company to issue lender's and owner's policies of title insurance without exception for those matters;
   d)   A bill of sale for all personal property included as part of the sale, if requested by the BUYER.
   e)   In the case of new construction, a Certificate of Occupancy and an assignment of any and all builder's, Sellers, or manufacturer's warranties on the Premises or on any appliances or other property included in the sale.
   f)   FNMA Vendor's affidavit FNMA 1099;
   g)   An affidavit, satisfying the requirements of Section 1445 of the Internal Revenue Code and regulation issued thereunder, which states, under penalty of perjury, the seller's United States taxpayer identification number, that the SELLER is not a foreign person, and the seller's address (the '1445 Affidavit");
   h)   Internal Revenue Service Form W-8 or Form W-9, as applicable, with seller's tax identification number, and an affidavit furnishing the information required for the filing of Form 1099S with the Internal Revenue Service and stating SELLER is not subject to back-up withholding.

**26. RISK OF LOSS-INSURANCE AND DAMAGE PRIOR TO CLOSING:** Prior to the delivery of the Deed, the risk of loss shall be on the SELLER. SELLER shall continue to carry the fire and extended coverage insurance presently maintained on the buildings on the Premises (or, upon the written request of the BUYER, and at the buyer's expense, in such greater amount as BUYER may reasonably request). If the Premises is damaged by fire or other casualty prior to the Closing Date, and SELLER has not restored the Premises to their former condition, the BUYER has the option to take an assignment of SELLER'S insurance proceeds or terminate this Agreement. If BUYER elects to purchase, SELLER shall assign all insurance proceeds to BUYER and the Purchase Price shall be reduced by:
   a)   the net amount of any insurance proceeds which a mortgagee has applied to the mortgage debt, less any amount reasonable expended by SELLER for partial renovation.
   b)   the amount of any insurance proceeds received by SELLER; and
   c)   any deductible amount under SELLER's insurance policy. SELLER will credit BUYER the amount of deductible toward purchase price.

**27. ACCEPTANCE OF DEED:** Acceptance of the deed by BUYER shall be a full performance and shall discharge every agreement and obligation herein except any agreements which by their terms are to be performed after the Closing. THE BUYER FURTHER ACKNOWLEDGES THAT THE BUYER IS PURCHASING THE PREMISES 'AS IS' AND BUYER has not relied upon any statements

or representations, oral or written, regarding the condition or value, present or future, of the Premises made either by the SELLER or the Sellers Agents, which are not otherwise contained in this Agreement and that the Seller's Agents are acting exclusively upon behalf of the SELLER. All oral or written representations between the parties are merged herein. BUYER further acknowledges it is the BUYER'S responsibility prior to closing to obtain any and all governmental permits for any intended use of the Premises including, but not limited to, health or environmental department, planning or zoning board approvals. SELLER and SELLER'S representative(s) make no representations as to the adequacy of the Premises being conveyed for BUYER'S intended purposes, disclosed or undisclosed.

**Seller's Initials** _____    **Buyer's Initials** _____ _/ 1 ˅/ _____ **Pg 3 of 4**

© **MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS© INC - BY CENTURY 21 HAROLD DUPEE**

28.    **MERGER:** The parties agree that this Agreement contains all of the terms and conditions of this transaction. It is mutually agreed that any oral or prior written representation made by either party prior to the execution of this Agreement is null and void. This Agreement shall be construed as a legal contract under seal and Is binding upon the parties, and their respective heirs, successors, and assigns.

29.    **SURVIVAL:** Notwithstanding any presumptions to the contrary, all covenants, conditions, and representations contained in this Agreement, which by their nature, implicitly or explicitly, involve performance in any particular manner after the Closing and delivery of the deed, or which cannot be ascertained to have been full performed until after the Closing and delivery of the deed, shall survive the Closing.

30.    **TERMINATION:** In the event the BUYER terminates this Contract in accordance with the provisions herein relating to "Mortgage Contingency," "Risk of Loss Insurance,' 'Inspection Contingency,' 'Septic System Inspection", default by SELLER, or the failure of any contingency shown under special conditions, the Escrow Agent shall forthwith refund such deposit money together with accrued interest thereon (if applicable) **to** the BUYER.

31.    **BUYER'S DEFAULT:** If the BUYER defaults, BUYER shall be liable to the SELLER in the amount of 10% of the purchase price, as liquidated damages, which shall be Seller's exclusive remedy in law or in equity. The deposits shall be applied to the payment of said liquidated damages.

32.    **RELEASE OF DEPOSITS:** The deposits (which term shall include all interest earned, If any) made hereunder shall be held in escrow, subject to the terms of this Agreement and shall be duly accounted for at the time for performance of this Agreement. The deposits may not be released from escrow without the assent of both BUYER and SELLER. The recording of the deed to the Premises shall constitute such assent. In the event of any disagreement, the Escrow Agent shall retain the deposits pending written instructions by both the SELLER and BUYER, or by a court of competent jurisdiction. So long as Escrow Agent served in good faith, BUYER and SELLER each agrees to hold harmless Escrow Agent from damages, losses, or expenses, arising out of this Agreement or any action or failure to act, including reasonable attorney's fees, related thereto. BUYER and SELLER acknowledge that the Escrow Agent may be counsel or fiduciary to one of the parties and agree that Escrow Agent may continue to act as such counsel or fiduciary notwithstanding any dispute or litigation arising with respect to the deposits or Escrow Agent's duties.

33.    **AGREEMENT TO MEDIATE DISPUTE OR CLAIMS:** Any dispute or claim arising out of or relating to this Agreement, the breach of this Agreement, or the brokerage services provided in relation to this Agreement shall be submitted to mediation in accordance with the Rules and Procedures of the Homesellers / Homebuyers Dispute Resolution System ('DRS"). Disputes and claims shall specifically include, without limitation, representations made by the SELLER, the BUYER, or the Broker(s) in connection with the sale, purchase, finance, condition, or other aspect of the Premises to which this Agreement pertains, including without limitation, allegations of concealment, misrepresentation, negligence and / or fraud. The mediation conference shall be held within 30 days from the date on which the mediator receives notice of the dispute. If the parties reach a settlement, they shall both sign a settlement agreement. If the parties cannot reach a mutually agreeable settlement, they may arbitrate or litigate the dispute without regard to the mediation procedure. The filing of a judicial action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies shall not constitute a waiver of the right to mediate under this paragraph, nor shall such filing constitute a breach of the duty to mediate. The provisions of this paragraph shall survive the closing.

34.    **GOVERNING LAW:** This Agreement is to be governed by the substantive laws of the Commonwealth of Massachusetts.

35.    **AGENCY:** BUYER and SELLER acknowledge that they have been provided with a completed copy of the 'Mandatory Agency Disclosure—Agency Relationship' form, as mandated by the Massachusetts Board of Registration of Real Estate Brokers and Salespersons.

36.    **SPECIAL CONDITIONS / ADDENDA: <u>Subject to being sold "as is" as of 12/8/03 with no additional work performed on the property. Subject to seller paying closing costs of $3,500. Subject to buyer's attorney' s review of this transaction agreement within ten (10) days of signing.</u>**

37.    **TERMINATION OF OFFER:** This offer is subject to acceptance by SELLER by <u>**5:00 PM on 12/9/03**</u> , after which time this offer is void and terminated, and deposit paid by BUYER shall be returned.

38.    **TIME:** Time is of the essence of all provisions of this agreement, unless otherwise specified elsewhere in this agreement. Any reference to "days" shall mean calendar days and is not intended to mean only business days**.**

39.    **THIS IS A LEGALLY BINDING CONTRACT.** IF NOT UNDERSTOOD, SEEK LEGAL **COUNSEL:** Executed under seal by the Parties hereto as of the latter of all dates set forth below, and incorporating all provisions on pages 1 through 4, together with referenced additions if any.

| | | | |
|---|---|---|---|
| **SELLER: James Horrigan, Executgr_** | **DATE** | **BUYER: Nicola M. Pellegrini** | **DATE** |
| **SELLER: Estate of Walter M. Bronson** | **DATE** | **BUYER: Maarten N. Pellegrini** | DATE |

**SELLER'S Attorney's Name**                                    **BUYER'S Attorney's Name**

**Seller's Initials** _____ Buyer;s Initials _____        **Pg 4 of 4**

© MULTIPLE LISTIN SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE

9

<u>**EXHIBIT "4"**</u>

**TO THE**

<u>**DEPOSITION OF MAARTEN PELLEGRINI**</u>

**Neil Segala**                    ***Massachusetts Home Inspection#372***

*223 1/2* Ashland Street                                         4I3-663-7183

North Adams MA 01247                                        nsegbldr@bcn.net

**EXHIBIT 4**

Martin Pellegrini and

Nicola Pellegrini

37 Granby Road

Worcestor, MA 01604                              12/15/03

---

Home inspection report of real estate located at 56 Liberty Street, North Adams MA

The weather today at 12:30 p.m. was 25 degrees and cloudy and a recent snow has left the grounds and roof fully covered and thus not viewable.

The building inspected today is a 2-story modified colonial structure. Doorways separate the home to create two apartments. The estimated original construction dates from approximately 1885-1890. The home is located in a residential area. There are two off street parking spaces with a shared gravel driveway and concrete walks to entry doors. The face of the building is to the North and the rear is due South with open porches that are in need of repair.

The full depth foundation is mortared stone construction with a cut limestone veneer about 20" thick in functional condition with no visual settlement or failure although there are some wall repairs to be made especially around service entry points and basement windows. There is a concrete floor throughout the West end basement but the East basement has a dirt floor. There was sign of seasonal water seepage from outside and there was no sump hole or pump. There was a walkout door to the rear yard grade from each end of the basement, the West door was nailed closed and not operable but the East door was functional.

The structure is a combination of plank and frame construction, the West end was built with wide flat plank walls and the East end is a frame building. The main floor system has 8"x 8" main beams and sill beams. The support posts are unapproved but typical for this age. There is a 2"x 8"

floor joist system with wide board decking and some hardwood floors above. The frame walls are 2"x 4" balloon framed to a double 2"x 4" plate the roofline and sheathed with 1" board. The plank walls are a double layer of 2"x 12" planks set vertically. The roof is framed with mostly 2"x 6" rafters and 2"x 8" hip members, then sheathed with 1" boarding and roofed with slate. There is some settling and off levelness that is considered typical for a property of this age

A pest inspection was completed at this time and no wood boring insects were found active or inactive.

The roofing system on the house is mostly slate tile and was viewed from the ground. The slate condition aged and reported to be repaired recently. From the attic we could see that the slate roof is installed over wood shakes on the west end of the building. There is considerable staining and ceiling damage especially at the northeast eave. There are also some asphalt roofs at front and rear porches that are aged and deteriorated.  The rear porch roof was not visible but excessive leak signs were evident at the rear porch.

There are two masonry-unlined chimneys located in the East and West ends of the basement. The East chimney presently vents the natural gas fueled water heating tank and the West chimney which is very deteriorated vents the hydronic boiler.

The electrical system is a 1959 installation with 2-60 amp services with 4 fused circuits in functional condition including romex, b-x and knob and tube type wiring independently metered to each apartment. This main service is aged and undersized. Inside the apartments it is evident it has not received many electrical improvements over the years. There are no hard-wired smoke detectors in either apartment. There are no 220 circuits for dryer or range. There arc a limited amount of outlets and most of those were ungrounded. There was no G.F.I. C. protection found on the property. All of this indicates a need for upgrading of the complete system.

The City of North Adams supplies the domestic water through a $^3/4$ "copper supply pipe. The plumbing system in the house has been upgraded over time with mostly copper supplies but some of the original galvanized still exists. There are cast iron, copper and plastic drains in place and there were no obvious leaks but it should be noted that the house is not occupied at this time. There are no water filters or treatment systems in place.

The heating system is served by a hydronic boiler system located in the basement with pipes extending to radiators in each apartment. I estimate this boiler to be about 45 years old and functional at

this time. The boiler was originally oil fired and there is evidence that 2 275-gallon storage tanks located in the basement were recently removed. At some time in the past the burner was converted to natural gas and is fed by a meter located on the East end of the house. The hot water is supplied by a 30-gallon gas fired water-heating tank of unknown age but functional at this time.

The insulation values are as follows:

| | |
|---|---|
| Foundation: | 0" |
| Basement: | 0" |
| Walls: | unknown |
| Attic and stairwells: | 6" cellulose |

The interior finish is plaster and paint in fair condition with vinyl floors and some carpet and some hardwood floors. The kitchens and baths are very old and deteriorated. The kitchens have aged and basic cabinets.

The windows are a mixture of single strength wood windows with triple track aluminum storms & screens and vinyl replacement double hungs with screens. The entry doors arc wood.

The exterior has been sided with pine clapboard siding and is painted with painted trim that is in need of repairs and painting.

There is likely lead paint on the property.

There was a small asbestos insulation found on the property.

Specific problems list

1.    The foundation is in need of repointing and repairs especially around window and door openings,

2.    Some repointing is required at the exterior of the foundation especially at the south side.

3.    A small amount of dryrot has been found in the floor system near the West end door but does not appear excessive.

4.    There are unapproved and deteriorated support posts in the basement.

4

5.      The basement windows are deteriorated and not functional.

6.      There is no G.F.I. protection on the property,

7.      The north wall shows past sign of chronic water infiltration.

8.      The water to the second floor was not on and could not be tested.

9.      <u>The second floor front room over the entry is very settled as evidenced by wall cracking and sloping floors</u> , <u>I suspect an improper foundation support post.</u>

10.     The concrete floor is off-level and deteriorated.

11.     There are 2 fuel fillers in the basement that are improperly terminated.

12.   There are numerous ungrounded electrical outlets.

13.   There is no backflow preventer at the boiler.

14.   The chimney cleanout door was defective.

15.   <u>There are deteriorated brick at the west chimney base.</u>

16.   Flashing at roof to chimney is allowing light into the attic.

17.   There is a 6' deep by 6' wide water cistern in the basement that is loosely covered and may create a hazard.

18.   There are poorly supported plumbing lines in the basement.

19.   It is unlikely that a single 30-gallon water-heating tank will satisfy two apartments.

20.   The water heating tank flue pipe is rusted and deteriorated.

21.   The coal bin in the basement is rotted and deteriorated.

22. <u>The</u> <u>West chimney is deteriorated in the attic and above *the* roofline and</u> <u>in</u> <u>need</u> <u>of repair.</u>

23.  There is deteriorated and missing siding and trim at the south side.


24.    There are numerous broken windows.

25.    The rear porch roof ceiling indicates past leakage and deterioration.

26.    The main roof slate is not visible at the time of the inspection.

27.    There is an improper drain connection at the south wall.

28.    The walkout door to the west is rotted and deteriorated.

29.    <u>The</u> <u>rear</u> <u>porch</u> <u>is</u> <u>sagged</u> <u>and off level,</u> <u>I</u> <u>suspect</u> <u>lack</u> <u>of appropriate</u> <u>foundation.</u>

30.    There is a small amount of asbestos pipe insulation in the basement.

31.    The entry door sill at the east end is loose and poorly attached.

32.  There is excessive past leak staining at the north and south eaves but no active leak was found.


This report has been prepared as carefully as possible but in no way suggests a guaranty or warranty. It is not possible to determine conditions that are buried or covered in any way.


Neil Segala MA lic Home Inspector #372

# DEPOSITION OF MAARTEN PELLEGRINI

## Pages:  11-12; 14-18; 21-23; 28-30; 32

UNITED STATES DISTRICT COURT


I DISTRICT OF MASSACHUSETTS



Case No. 05CV300077-KPN



MAARTEN N. PELLEGRINI and
NICOLA M. PELLEGRINI,
Plaintiffs



v.

CENTURY 21, HAROLD DUPEE REALTORS,


Defendant



DEPOSITION OF: **MAARTEN PELLEGRINI,** taken before
MYREL J. WILLIAMS, Notary Public and Court Reporter,
pursuant to the applicable
Massachusetts Rules of Civil Procedure, at the LAW
OFFICES OF DONALD E. PHILLIPS, 1414 Main Street,
Springfield, Massachusetts, on March 21, 2006.


**Myrel J. Williams
Certified Shorthand Reporter :393595**


Accurate Court Reporting * 1500 Main Street
Springfield, MA            01115 413-747-1806

APPEARANCES:

FOR THE DEFENDANT:

LAW OFFICES OF DONALD E. PHILLIPS

1414 Main Street

Springfield, MA 01144

(413) 730-6350

        BY: RICHARD F. FAILLE, ESQ.


FOR THE PLAINTIFF: MAARTEN N.

PELLEGRINI

    1        56 Liberty Street

    13.        North Adams, MA 01247

    14        (774) 364-0081

    15            BY: MAARTEN N. PELLEGRINI


    16        ALSO PRESENT:      Gerald Pellegrini


    18

    **19 20**

    **22    23**

    **24**
        Accurate Court Reporting * 1500 Main Street
        Springfield, MA        01115 413-747-1806



INDEX

        WITNESS                DIRECT CROSS REDIRECT RECROSS Maarten

        Pellegrini

3

```
          * By Mr. Faille

          ** By Mr. Pellegrini



10

11        EXHIBITS:


                                    PAGE:
```

```
12 Exhibit 1, notification certification.... .17

   Exhibit 2, CLPP lead paint notification.. .18

13 Exhibit 3, purchase and sale agreement… . .22
   Exhibit 4, inspection . . . . . . . . . .26
14 Exhibit 5, document . . . . . . . . . . .30
```

```
        15 16 17

        18 19 20

        21 22 23

        24
```

**Accurate Court Reporting * 1500 Main Street
Springfield,** MA          01115 413-747-1806

STIPULATIONS

3          It is agreed by and between the parties that

4     all objections, except objections as to the form

5     of the questions, and all motions to strike

6     unresponsive answers are reserved and may be

7     raised at the time of trial for the first time. It is

           further agreed by and between the

9     parties that the sealing, and the notification to

10    all parties of the receipt of the original

11    deposition transcript is hereby waived.

12

13                    MAARTEN PELLEGRINI, Deponent, having

14    first been duly sworn and identified, deposes and

15    states as follows:

16

17        DIRECT EXAMINATION BY MR. FAILLE:

18          Q.       Would you kindly state your name,

19    please?

20          A.       Maarten N. Pellegrini.

21          Q.       Mr. Pellegrini, we just spoke

22    briefly about you reading and signing the

23    deposition transcript.        I believe our agreement

24    __was ___ that you wanted to read and sign and that you

A c c u r a t e C o u r t R e p o r t i n g * 1 5 0 0 M
a i n S t r e e t Springfield, MA    01115 413-747-
1806

11

1.          A.          No.

            Q.              Did your brother have any experience

3    in renovating homes or other real estate?

4           A.              I'm going to object to that for the

5    same reason. I think it could lead to

6    inadmissible evidence.

                            But he did some painting, some

8    landscaping, that's about it.

9           Q.              Prior to your entering into an

10   agreement to purchase 56 Liberty Street in North

11   Adams, did you look at any other homes in the

12   area?

13          A.       Yes.

14          Q.              Do you remember where they were

15   located?

16          A.          Not address-wise. It was located by

17   Route 8, I believe. It was up on a hill, a very

18   small lot. Not a very nice house, driveway was

19   steep, wouldn't work for what we were looking

20   for. That is the only house we looked at before

21   56 Liberty Street. It was all on the same day.

22          Q.          What was it that you were looking

23   for in a house?

24 _____A._____ Something that could be renovated

Accurate Court Reporting * 1500 Main Street

Springfield, MA          01115 4 1 3- 7 4 7- 1 8 0

12

and had a nice yard, just basically what
everybody looks for. Try to get something that you could flip.

Q.      Was it your intention to do the renovations
yourself oh this property?

A.      Yes, as much as possible.

Q.       At 56 Liberty Street?

A.       Yes.

Q.       Was your brother also to be involved
in the remodeling?

A.       Yes, as much as he could.

Q.       How was it that you got to see the property at 56
Liberty Street?

A.       We had called Century 21 and there
were a few houses there. The first house was not -- I'm not sure if it
was Century 21, but it was not Dick who showed it to us, but he met us
at Century 21 after a phone call and telling him we were in the area.

Q.      Who is us?

A.      Myself, my dad. I don't recall my
brother being there, so it was me and my dad.

Q.       Do you remember what the date was that you made
that visit?

14

1          Q.          Is it your testimony that your

2     brother never saw the house before he entered

3     into the purchase and sale agreement?

4          A.          Just from photographs, from -- he

5     definitely saw them from photographs, whether he

6     actually came with us on the trip, I'm not sure

7     whether he did.          It was mostly me, my dad and

8     Dick talking.

9          Q.          Do you know if your brother ever met

10     privately with Mr. Shoestock?

11          A.          Not that I know of.

12          Q.          Did anybody on your first visit to

13     56 Liberty street, did anybody else from Century

14     21 join you at the property?

15          A.          I believe it was the listing agent.

16     Somebody else did, and I believe it was the

17     listing agent who came. Dick called her, I

18     believe.

19          Q.          If I told you it might be Mary Jane

20     Dalmaso, does that ring a bell?

21          A.          I believe it was her. That does

22     ring a bell.

23          Q.          Do you remember having any

24     conversation with her while you were at the

```
 1    property?                                          15

 2            A.          Generally, yes, we, Dick and her

 3    were talking about the property.

 4            Q.          To the best of your recollection,

 5    what did they say?

 6            A.          Going through each room and talking

 7    about general things really.

 8            Q.          Do you remember on that visit, Ms.

 9    Dalmaso pointing out some chipped paint on one of

10    the walls?

11            A.          She had pointed out chipped paint in

12    certain areas.       I don't recall a wall

13    particularly, doors and windows, things like

14    that.

15            Q.          Do you remember her telling you that

16    it was probably lead paint?

17            A.          Yes.

18            Q.          That was on your first visit?

19            A.          Yes.

20            Q.          Do you remember telling her that you

21    weren't concerned about lead paint because you

22    weren't going to have any children under six

23    living in the property?

24    _____ A. I don't specifically recall saying
```

16

that, but it's plausible that that would have been my reaction taking

into account my current knowledge as to what I knew about the laws at

that time.

Q. What did you know about the laws at that time?

A. I knew that you couldn't have children living there.

Q. You were aware from your first visit that there was

probably lead paint in the property, is that correct?

A. I was aware that she had said that. Whether it's true or

not, I didn't know. But I knew that Mary Jane Dalmaso believed there

was a good chance of it.

Q. I'm going to show you a piece of paper, sir, and ask

you if you recognize it.

A.        It looks familiar, but I don't think this looks

exactly like the copy I have.

Q.        Can you tell me what it is?

A.        It says property transfer notification

certification, page nine of four pages that you haven't handed me

or page five.

_____I'm sorry, five it _ says.

*Accurate Court Reporting * 1500 Main Street*

10

1                    (Exhibit 1, marked)              17

2            Q.          (By Mr. Faille) I'm looking at what

3    has been marked as Exhibit 1. Is that your

4    signature that appears on the second line down,

5    the signature portion at the bottom?

6            A.          Yes, it's a copy of my signature.

7            Q.          Do you know what this agreement

8    says?

9            A.          My understanding of this agreement

10   is that I'm signing that I received a full

11   package, the property transfer lead paint

12   notification, and this is just a certificate.

13   This is page 11 of that notification.

14           Q.          That's your signature?

15           A.          Yes.

16           Q.          You signed saying that you received

17   the package, is that correct?

18           A.          My understanding of that at the time

19   was that that was the full package along with

20   another sheet.

21           Q.          No, my question to you, sir, is you

22   signed this saying that you received the property

23   transfer lead paint notification, did you not?

24           A.          No, I didn't receive a notification.

18

    Q.     My question is: You signed and said

2    you did, didn't you?

3    A.     Understanding my understanding of

4    what that was.

5    Q.     Isn't that what it says?

6    A.     That's what this sheet says.

7    Q.     Is that your brother's signature

8    also?

9    A.     Yes.

10    Q.     I'm going to show you another piece

11    of paper here, sir, and ask you if you ever seen

12    that before?

13    A.  Yes, this is the first 10 pages in

14    the property transfer lead paint notification.

15        MR. FAILLE:  Can we have that

16        marked.

17                   (Exhibit 2, marked)

18    Q.    (By Mr. Faille) I'm going to show

19    you what's marked as Exhibit 2, and ask when and

20    how you first came to see that particular

21    document?

22    A.     I first saw this document when I had

23    contacted the Commonwealth of Massachusetts by

24  mail to send me any documents related to lead

21

closing windows and grinding the paint. It was

not communicated as this was something very dangerous. To my

understanding, this sheet was not connected with any other package. I

received this sheet by a fax which 11, the number 11, was not

visible. So it looks like this was a single page and this was not

page 11 to another package. From my understanding this reads as a

complete document in and of itself. There is a warning statement

here, which I thought I was signing, that I read that statement and

there were checks indicating what the seller was disclosing to me and

I thought there was my acknowledgement that I received this seller's

disclosure.

      Q. Did you read this before you signed

it, Exhibit 1?

      A. Yes.

      Q.  Did you understand it?

      A.  I understand it as a single-page entity.

      Q. It's your testimony that at no time

did you ever see Exhibit 2 prior to signing the   purchase and

      sale agreement, is that correct?

      A.      Yes.

22

Q. Do you know if your brother was ever

given Exhibit 2?

A. I don't know for sure, but he wasn't dealing with
Richard Shoestock as much as I was, so I don't see how
that would have happened.

Q.      The final selling price was $77,000, is that correct?

A.      I believe it was 79. It could have been 77.

Q.      Was that your first offer?

A.      No.

Q.      What was your first offer?

A.      I don't recall. It was something in
the 60s. I believe it might have been in the 50s just to — -
you know, bargaining.

MR. FAILLE: Can I have this marked,

please.          (Exhibit 3, marked)

Q.      (By Mr. Faille) I'll show you what
we've now marked as Exhibit 3 and ask if you-   recognize that?

A.   Yes, I recognize this.

Q               What is it?
A.               Standard Berkshire County Multiple

23

Listing Service Purchase *and* Sale Agreement.

Q.    Does your signature appear on that document?

A.    Yes, it does.

Q.    Does your brother's signature appear

on that document?

A.        Yes, copies of.

Q.    Did you read that document before you signed it?

A.        Yes.

Q.        Can I see that? Did you understand the document

when you signed it?

A.        I believe so.      I understood it to the

best that I knew.

Q.    This document, Exhibit 3, is dated December 4th

2003, correct?

A.    Yes.

Q.        Did you have an attorney that time?

A.        May I see the document? I did not

at the time.      There's a clause in here that says subject to

buyer's review of this transaction, in number 36, special

conditions. At this time I did not, to my recollection, actually

have an

28

same as the copy I have because there was an
issue during discovery where Century 21 had provided me
with this same document that had arrow's drawn in, which
are not on the original document. There are arrows drawn
in here but this is -- other than the arrows, I'm sure
this seems like a copy of the home inspection number 372
by Neil Segala.

     Mr. FAILLE: Mark that, please.

     (Exhibit 4, marked)

     Q. (By Mr. Faille) Now, did you engage Mr. Neil
Segala of North Adams to make an inspection for you at 56
Liberty Street?

     A.       Is that his address?

     Q.       Yes.

     A.       We hired him to do a home
inspection, property home inspection.

     Q. Exhibit 4, the document that you were
just looking at, a copy of his report with the
delineations that you noted before

     A. You mean the arrows?

     Q. Yes.

     A.  This looks like a copy of it, yes.

     Q. Did you have an opportunity to

29

review that after he rendered it to you?


      A. Yes, I had reviewed this and read

      Q. I'm going to show you page three of the report, and the next to the last line at the bottom, could you read that for us?

    A. It says there is likely lead paint on the property.

    Q. So your home inspector told you that there was likely lead paint on the property before you had a closing, is that correct?

    A.      Likely lead paint you mean? Could you restate the question?

    Q.      Sure.    Isn't it true that your home inspector informed you that it was likely that there was lead paint on the property at 56 Liberty Street prior to your closing?

    A.      He had made that statement, but he had also said that he was not doing a lead inspection and that is a separate inspector's job.

    Q.      Did you engage anybody to do a lead paint inspection?

    A.      No.

30

Q.  You knew there was probably lead paint in the

building, didn't you, at the time?

A.  People had stated that there was a
good chance and also Neil too. I did understand that there was

probably a good chance that there was lead.


Q. Now, as a result of Mr. Segala's

inspection, did you ask for and obtain something

way of a reduced price on the property?

A. I don't understand the question.  Did I obtain

something?

Q. Let's do it this way, I'll show you this piece of

paper and ask you if you can identify it?
A.        Yes, this is a document we had drafted,

myself and my brother, to negotiate the price of the 56 Liberty

Street.

MR. FAILLE: Can I have that marked, please.

(Exhibit 5, marked)


Q. (By Mr. Faille) I'm showing you Exhibit 5. You said you

and your brother prepared Exhibit 5?


A. Yes

32

1    expediting things, and I just basically wanted

2    him to close and do whatever he needed. We

3    weren't incurring more fees and attorney costs.

4         Q. Is it fair to say that you knew as

5    early as your first visit to the property that 56

6    Liberty Street contained lead paint?

7         A. That's not fair to say that I knew.

8    No, I didn't know.

9         Q. Were you told it was likely?

10         A. Yes, I was told by three parties,

11   Dick Shoestock, Mary Jane and Neil that there was

12   a good chance. I took that as understanding that

13   there was a good chance that there was lead

14   paint.

15              MR. FAILLE: I have no further

16         questions at this point.

17              MR. PELLEGRINI: Can I take a break

18         before I cross examine?

19                   (A recess is taken)

20              MR. PELLEGRINI: I just want to make

21         some statements. First statement is that I

22         was given the impression by Dick Shoestock

23         and Mary Jane Dalmaso that the only problem

24         with lead would have been if I wanted to rent

COMMONWEALTH OF MASSACHUSETTS
Hampden, ss.


        I, MYREL J. WILLIAMS, a Notary Public in and for
the Commonwealth of Massachusetts, do certify that there
came before me on the 21st day of March, 2006, at the LAW
OFFICES OF DONALD E. PHILLIPS, 1414 Main Street,
Springfield, Massachusetts, the following named person,
to wit: MAARTEN PELLEGRINI, who was by me duly sworn to
testify to the truth and nothing but the truth as to his
knowledge touching and concerning the matters in
controversy in this cause; that he was thereupon examined
upon his oath and said examination reduced to writing by
me; and that the statement is a true record of the
testimony given by the witness, to the best of my
knowledge and ability.


        I further certify that I am not a relative or
employee of counsel/attorney for any of the parties, nor a
relative or employee of such parties, nor am I financially
interested in the outcome of the action.


        WITNESS MY HAND this 24th day of March, 2006.


        M~ J. Williams


         Notary Public


        My Commission expires: July 10, 2009
**Accurate Court Reporting  * 1 5 0 0 Main  S t r e e t**

## DEPOSITION OF RICHARD SHOESTOCK

## Pages:  13-14; 26-29; 34; 66-67;

UNITED STATES DISTRIC COURT
DISTRICT OF **MASSACHUSETTS**

### CASE NO.05CV30077-MAP

4 MAARTEN N. PELLEGRINI,

5        Plaintiff,

6 vs.

1 CENTURY 21, HAROLD DUPEE
   REALTORS,

       Defendant 9


    *********************************************************

11 VIDEOTAPE
   DEPOSITION OF:       RICHARD SHOESTOCK
12
   .DATE TAKEN:       December 28, **2006**
13
   : TIME:       COMMENCED AT 10:09 a.m.
14       CONCLUDED AT 12:05 p.m.
23 24


PLACE:       432 S. Beach Street

      Daytona Beach, Florida

STENOGRAPHICALLY
**REPORTED BY**       **SANDRA NARUP**
      **REGISTERED PROFESSIONAL REPORTER &**
      **FLORIDA PROFESSIONAL REPORTER**
*********************************************************


      **VOLUSIA REPORTING COMPANY**
      432 **SOUTH BEACH** STREET
      **DAYTONA** BEACH, FLORIDA 32114
      386-255-2150
      ***VOLUSIA REPORTING COMPANY***

**13**

we had on our list of things to do, representing the
buyer, our checklist.

Q.    Was that a checklist from - - that century 21
gave, or was that a checklist fro another - - another
body, or such as a real estate board or regulatory
commission ?

A.    No, that was a century 21 form that had a
checklist of all of the items that you had to do to
make sure that  - - make sure that they were done and
put a date down when it was done.

Q.    How were these disclosures made usually,
these package disclosures?

A.     If you were with the client, it was normally
given to them by hand.  Once in a while, it would be
mailed, depending on if it was someone from out of
town.  That wouldn't  - - I didn't do that very often
because most of my clients showed up in the office and
I took them to show property.

Q.    What was the nature of your business
relationship with Century 21?

A.     I was an independent contractor.  I paid them
for the use of office equipment, and they provided a
office space and a desk.  And I basically worked there
on my own and got a commission on property sold.

Q.    And did you sign any contracts or agreements

*VOLUSIA REPORTING COMPANY*                     **14**

with them to initiate that relationship?

      A.    Yes, sir.

      Q.    When was that?

      A.    The moment that I started working for them.

      Q.    Okay.  That would be approximately in 2002.

Correct?

      A.    Yes, sir.  I'm pretty sure it was June.

      Q.    What were the nature of those contract - -  or,

what was the title of those contracts, generally?

      A.    I don't remember off the top of my head.

      Q.    Do you still possess those contracts?

      A.    No, sir.

      Q.    Did you resign your position with Century 21:

      A.    Basically, yes.

      Q.    Could you explain that?

      A.    My wife and I - - well, I was working for

Century 21 during that time period.  And my wife has

arthritis.  And during the wintertime, she would go

down to our place in North Carolina and I would stay

in Massachusetts, continue working, plus help take

care of my mother.

      And in winter, this past winter of - - I

guess it was 2004, we decided that we didn't – we

didn't want to be separated during the wintertime, so

We decided just to come down to Florida to visit or

*VOLUSIA REPORTING COMPANY*                                    *26*

Gerald Pellegrini?  10:47:3(

A. Maarten and who? Would you repeat the          10:47:3S

question?                                                      10:47:41

Q.  -- Pellegrini?                                      10:47:4[1]

A.  Would you please repeat the question?          10:47:4_

Q.  Are you claiming that this package transfer    **10:47:4**

was done in the presence of Maarten Pellegrini and        10:47:51

Gerald Pellegrini?

A.  Yes, sir.

Q.  And what happened during that - what happened during

that time?  Were there any  - - did

12    anything else go on, or did you just give the package,

13   or anything else given? Any discussions, any details?

14   A.  There were a lot of discussions that evening

15 because it was about a -- about a two-hour session,       10:48:2:

16 just sitting there, discussing a lot of different         10:48:3(

17   issues and items and things, some related to real       **10:48:3:**

18   estate, others not related to real estate.              **10:48:3;**

19   Q.  Were there any discussions relative to the          10:48:4;

20 property transfer notification package?

21   A.  Yes. When I handed that package over, I

22 informed them of what it was. Also informed them, if

23 they were interested in the property, that they would

24 have -- we recommend that it would get -- that they

25 would get it inspected, have a home inspection on the

5

**VOLUSIA REPORTING COMPANY**        27

property, and that I could provide them with a list of

names of home inspectors in the area for them to                    10:49:05

choose one.                                                         **10:49:1:**

    Q.    Is it not true that home inspection --or, do

you believe that home inspections are required, in                  110:49:21

fact, before making a offer to purchase, a home                     **10:49:2'**

inspection?                                                         10:49:25

    A.    It is not a requirement. It can be waived by

the buyer.  But we always recommend that a home

inspection be made because most buyers aren't

knowledgeable about a property or a house, all the functions,

plumbing, electrical and construction, to

 13 make a good decision. That's why we recommended,

    14 always recommended that a home inspection be done by a

15  buyer.                                                          10:49:5f

16      Q.    So regarding this talk about or any            10:49:5E

17   discussion about the package, could you be more         10:50:0:

18   detailed as to what was said, what -- what, to your     10:50:0f

   19 recollection, did you say, as specifically as you can

20 recall, regarding when you transferred that package       **10:50:1!**

21 to -- to -- who you transferred it to?                     10:50:1f

22      A. I don't remember the exact discussions, other

   23 than to state that this is a Massachusetts lead paint

   24 disclosure notification, and that it pertained to the

   25 lead paint that was probably on the property. Because

*VOLUSIA REPORTING COMPANY*

28

1 when we toured the property, Mary Jane Delmaso did                    10:50*

2 state that the property had a 99.9 percent probability

3 of having lead paint due to the fact that it was                      10:50:5'

constructed prior to 1975, when lead paint was banned.

Q.    Were there any specific instructions on what

to do with that package given by you?                                  **10:51:4;**

A.    I don't remember, but I always tell clients,

both buyers and sellers, to read it carefully so that

they're knowledgeable about the -- about the                          **10:51:5(**

10 regulations and laws pertaining to lead paint.                      10:51:5E

Q.    Did you inform that he was supposed to sign?

A.    No, sir.

13    Q.    Did you inform them that they had to sign the

14 paper certificate in its -- did you inform them that                 10:52:2'

15 they had to sign the page that was connected to the                  10:52:25

16 package in its entirety?                                             10:52:3:

17    A.    I informed them that if they were going to              10:52:3(

18 put in an offer on the property, they would get a copy

19 of the -- the signed sheet that was signed by the                    **10:52:4;**

20    seller.                                                           10:52:4E

21        The package had a blank sheet on it for                      **10:52:5;**

22 signatures, but only when the buyer is ready to                      **10:52:5!**

23 purchase the property does he sign and submit the same

24    sheet that is signed by the seller. So that sheet                 10:53:0(

25 signed by the seller has to be sent to the buyer or                  **10:53:11**

*VOLUSIA REPORTING COMPANY*

**29**

given to the buyer for them to sign and then returned  with the

offer.                                                                                          10:

MR. PELLEGRINI: We've been talking now for

about an hour. I'd like to take a short break.

MR. FAILLE:   No.

MR. PELLEGRINI: About five minutes.                                 10:

MR. FAILLE:  No. Let's go.                                               10:

MR. PELLEGRINI: Well, if you want to object,            10:

we can note the objection, but I feel that a

 short break is - -

MR. FAILLE:  No, it's not.                                               10:

 MR. PELLEGRINI: -- (inaudible).                                     10:

     MR. FAILLE: No, it's not. Come on, lets

go. Let's get this thing done.                                         10:

     MR. PELLEGRINI: Well, we have a lot of          10:

        questions and there's a lot of new information.

I don't feel this is unreasonable. You can state

an objection for the record.                                         10:

     Be back in five minutes.                                         10

     MR. FAILLE: Are you hanging up?                      10:

MR. PELLEGRINI:  No.                               1o:54:1:

     22 COURT REPORTER: Are we going off the record?

     23MR. FAILLE:       Yeah.         10:54:21

24   MR. PELLEGRINI; Sure. We can go off the

 record for five minutes. Be back at 10:58.


*VOLUSIA REPORTING COMPANY*

*34*

Q.    Time of any -- Mr. Pellegrini, myself, or
Nicola Pellegrini visiting Century 21, we were
never -- were we ever shown the actual signed package
from the seller?

A.    I don't recall.

Q.    Are you sure that you gave Maarten and/or
7 Gerald Pellegrini -- are you sure that you gave
8 Maarten and/or Gerald Pellegrini that package you're
9 stating -- the one you see, Exhibit 1, at that day, at
the visit?

11    A.    Yes, I'm positive.

12    Q.    Are there any records that you possess or Century 21
might possess that

could verify that that
14 package was actually given?

15    A. The only record could be the checklist sheet
16 for -- for buyers, because there are checklist sheets
17 for buyer and seller. That could -- that could
18 possibly exist.

19    Q.    Say that again.

20    A. There is a checklist sheet that I mentioned
earlier for a buyer -for an agent representing a
buyer and an agent representing a seller that we write
23 down what transpired and put a date down on when that
24 transpired. That may or may not exist.

25    Q. So that's not page 11 of the package, that's

*VOLUSIA REPORTING COMPANY*

66

inconvenience for multiple depositions that were

attempted to be scheduled prior.                           12:08:3:

THE WITNESS:                No problem.                     12:08:3:

MR. PELLEGRINI:             Thank you.                      12:08:3:

MR. FAILLE:                 I just have a couple of         12:08:3:

questions for you, Mr. Shoestock.                          12:08:3:

                        CROSS-EXAMINATION                   12:08:3:

BY MR. FAILLE:                                              12:08:3:

        Q. I think you testified earlier you gave what's    12:08:3i

10 been marked as Exhibit 1 to Maarten Pellegrini.          12:08:3:

11   Correct?                                               12:08:3:

12   A.  Would you please repeat?                           12:08:3:

13   Q.  Sure. I think you testified earlier that you       12:08:3:

14 delivered to Maarten Pellegrini what's been marked as

15   Exhibit Number 1.                                      12:08:3!

16   A.  Yes, sir.                                          12:08:3`_

17   Q. If I was to tell you that Maarten Pellegrini

 was a college student, would that change your

testimony as to who you delivered it to?

20   A.  That is correct.          Yes, sir.                12:08:3!

21   Q.  I'm sorry.        What?                            12:08:3!

22   A.  Yes.  12:08:3`_

23   Q. And would it have been not to Maarten, but to

24   Nicola that you delivered that package?                12:08:3`.

25   A.  Gerald. Gerald and Nicola.                         12:08:3`_

*VOLUSIA REPORTING COMPANY*

10

67

1    Q.    Okay. So you made an error earlier in your

2 testimony by saying you delivered it to Maarten?

3    A.                  That is correct.                        12:

MR. FAILLE: Okay. I have no further                              **12:**

questions for you, sir.                                         **12:**

MR. CARLSON: This is the end of the                             **12:**

deposition. We're off the record at 12:05.                      **12:**

8    (Thereupon the deposition was concluded at 12:05 p.m.) 9

*VOLUSIA REPORTING COMPANY*