UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAARTIN PELLEGRINI, Plaintiff | ) | |
| v. | ) | Civil Action No. 05-30077-MAP |
| CENTURY 21, HAROLD DUPEE REALTORS, Defendant | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO CROSS MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 33 and 34)
June 29, 2007

NEIMAN, C.M.J.

In this case, Maartin Pellegrini ("Plaintiff"), proceeding *pro se*, alleges that Century 21, Harold Dupree Realtors ("Defendant"), in violation of 42 U.S.C. § 4852d, "knowingly failed to disclose information, concerning the real and potential hazards of lead paint, prior to [Plaintiff's] signing a purchase and sale agreement." (Amended Complaint (hereinafter "Complaint") at 1.) Discovery is complete and the parties have filed cross motions for summary judgment which have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons which follow, the court will recommend that both motions be denied.

## I. Standard of Review

When ruling on a motion for summary judgment the court must construe the facts in a light most favorable to the nonmoving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d

166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994). The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The mere fact that both parties move for summary judgment does not change the foregoing analysis. *United Paperworkers Int'l Union, Local 14 v. Int'l Paper Co.*, 64 F.3d 28, 32 n.2 (1st Cir. 1995).

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

As indicated at oral argument, the court finds it easiest to first consider Defendant's motion for summary judgment, even though it was filed second. In the end, the court believes that genuine issues of material fact exist with respect to Defendant's motion and, as a result, will recommend that it be denied.

### A. Background

The following facts are taken mainly from Defendant's Concise Statement (Document No. 36, hereinafter "Def.'s Facts") and the exhibits attached thereto as well as from exhibits attached to Plaintiff's Opposition to Defendant's Motion for Summary

Judgment (Document No. 38, hereinafter "Pl.'s Opp'n").[1] Where a dispute exists, the court has construed the facts in a light most favorable to Plaintiff, the non-moving party, *see Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir. 2005), but has omitted any "conclusory allegations, improbable inferences, and unsupported speculation," *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 26 (1st Cir. 2006).

In late 2003, Plaintiff and his brother -- former-plaintiff Nicola Pellegrini (hereinafter "Nicola") -- were seeking to purchase a house to remodel in North Adams, Massachusetts. (Def.'s Facts ¶¶ 1, 2.) On a particular day, the specific date being unclear from the record, Plaintiff met with two of Defendant's representatives, Dick Shoestock and Mary Jane Delmaso, in order to view a house located at 56 Liberty Street. (*Id*. ¶ 3.) At the time, Delmaso pointed out some chipped paint and told Plaintiff it was "probably lead paint." (*Id*. ¶ 4.) Plaintiff responded that he was not concerned about lead paint because no children under six would be living at the property. (*Id*. ¶ 5.)

Plaintiff later testified at his deposition that he and Nicola eventually read and signed a one-page Property Transfer Notification Certification. (*Id*. ¶¶ 6, 7.) That document (hereinafter "the certification page") contained the following paragraph:

**Required Federal Lead Warning Statement:**

---

[1] Mindful of Plaintiff's *pro se* status, the court has also considered the statement of material facts Plaintiff filed in support of his own motion for summary judgment (Document No. 38 at 2-4, hereinafter "Pl.'s Facts") as well as the exhibits attached thereto (hereinafter "Pl.'s Exs."). *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*pro se* allegations entitled to liberal construction). The court also notes that its references to Defendant's exhibits come from a cleaned-up version Defendant submitted at oral argument.

> Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

(Pl's Ex. D.) The certification page also indicated, with a checkmark, that Plaintiff and Nicola had "waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards." (*Id*.) Further, and perhaps most importantly for purposes here, the certification page indicated, again with a checkmark, that Plaintiff and Nicola had "received the Property Transfer Lead Paint Notification." (*Id*.)

It is undisputed that a document entitled the "Childhood Lead Poisoning Prevention Program (CLIPP) Property Transfer Lead Paint Notification" (hereinafter the "PTLPN") is an eleven-page "package" required by federal law and published by the Massachusetts Department of Public Health. (See Pl.'s Ex. F.) Page 11 of the PTLPN is the "certification page" noted above. (*Id*.) Page 1 of the PTLPN describes the certification page as "a check list to certify that the prospective purchaser has been fully notified by the real estate agent"; it also notes that "[t]his certification should be

filled out and signed by the prospective purchaser before the signing of a purchase and sale agreement." (*Id.*) In any event, the very first paragraph of the PTLPN states that the entire package "must be given in full to meet state and federal requirements." (*Id.*) Pages 1 through 10 then go on to provide extremely detailed information about lead paint for prospective purchasers of Massachusetts homes built before 1978; for example, buyers are given information about symptoms and treatment for lead poisoning, deleading, home inspections, penalties, rental property concerns, and insurance. (*Id.*)

As indicated, there is no dispute that Plaintiff and Nicola were provided the certification page. The crux of this case concerns whether they were ever provided the *other* ten pages of the PTLPN. Plaintiff's Exhibit E is key in this regard. It consists of two facsimiles from Defendant to Plaintiff in late 2003.

The first facsimile (albeit the second one attached in Plaintiff's Exhibit E) is dated November 29, 2003, and is eight pages long. Pages 1 through 4 of that facsimile are a blank Purchase and Sale ("P&S") agreement and pages 6 through 8 are a disclosure form. (Pl.'s Ex. E.) The disclosure form was signed by the seller, James Horrigan ("Horrigan"), twelve months earlier, *i.e.*, on November 24, 2002, apparently at the time he listed the property for sale with Defendant. Page 5, the certification page, was signed on December 2, 2002, by Horrigan and the listing agent, Frances Buckley ("Buckley"), another one of Defendant's representatives. (*Id.*) The certification page indicates, with checkmarks, that the seller "has no knowledge of lead-based paint and/or lead-based paint hazards in the housing" and that the agent "has informed the

seller of the seller's obligations under federal and state law for lead-based paint disclosure and notification, and is aware of his/her responsibility to ensure compliance." (*Id*.) The number "11" at the bottom of the certification page is partially obscured. (See *id.*)

The second facsimile was sent to Plaintiff by Shoestock on December 1, 2003, and is seven pages long. (*Id*.) The first page thereof is a cover sheet on which Shoestock wrote the following: "Please call me for instructions on where to initial and sign! You must sign and initial where appropriate. If both buying, both must initial and sign. I believe the offer is too low. Price should be at $74,000. Thanks, Dick." (*Id*.) Pages 2 through 5 are a partially-completed P&S agreement with what appears to be an offer by Plaintiff and Nicola for $65,000. (*Id*.) Page 6 is another copy of the certification page, again with Horrigan and Buckley's signatures and checkmarks as well as a completely obscured number "11." (*Id*.) And page 7 is a blank mandatory agency disclosure statement. (*Id*.)

As is obvious, neither the November 29th nor the December 1st facsimile included pages 1 through 10 of the PTLPN. (See *id*.) However, they both included the certification page and its one-paragraph "Required Federal Lead Warning Statement." (*Id*.) They also both included the P&S agreement -- one a blank, the other a draft -- which included its own paragraph acknowledging that the buyers had been provided "the standard notification form from the Massachusetts Department of Public Health concerning lead paint." (*Id.*) That paragraph reads as follows:

> **19. LEAD PAINT LAW:** BUYER acknowledges that under

> Massachusetts Law, on homes constructed prior to 1978, and whenever a child under six (6) years of age resides in any premises in which paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said material so as to make it inaccessible to children under six (6) years of age. *The BUYER further acknowledges that, prior to signing of this Agreement, the SELLER and Broker(s) have (a) provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, which is attached hereto*; (b) informed the BUYER of the availability of inspections for dangerous levels of lead; and (c) verbally informed the BUYER of the possible presence of dangerous levels of lead and the provisions of the lead paint law and regulations found in 105 CMR 460.100D. Notwithstanding, SELLER is under no obligation to the BUYER to remove lead paint, which may be present in the Premises.

(*Id*. (emphasis added).) Plaintiff and Nicola signed the P&S agreement (which ultimately reflected a sales price of $77,000) on December 4, 2003. (Def.'s Facts, Ex. 3 to Pl.'s Depo.)

That same day, December 4, 2003, Nicola signed the certification page. (Pl.'s Ex. D.) Plaintiff had signed the certification page on December 1, 2003, and Shoestock signed the certification page on December 5, 2003. (*Id*.) As noted, the signed copy of the certification page indicates, with a checkmark, that the buyers had "received the Property Transfer Lead Paint Notification." (*Id*.) As described more fully in the discussion below, however, Plaintiff vehemently disputes that he was ever provided pages 1 through10 of the PTLPN.

There is no dispute, however, that Plaintiff thereafter hired Neil Segala of North Adams to inspect the property. (Def.'s Facts ¶ 9.) In his inspection report dated

December 15, 2003, which Plaintiff concedes to have read, Segala informed Plaintiff that there was "likely" lead paint on the premises. (*Id*. ¶ 10 and Ex. 4 to Pl.'s Depo).) Moreover, Plaintiff testified that, prior to closing, three individuals -- Shoestock, Delmaso and Segala -- all told him that there was a "good chance" of lead paint at the property. (Def's Facts ¶ 11.)

B. Discussion

After first describing the statute upon which Plaintiff bases his one-count complaint, 42 U.S.C. § 4852d, the court will turn to Defendant's main argument that, as a matter of law, it fully provided all required lead-paint disclosures. The court will then turn to Defendant's alternative arguments which address the statute's knowledge standard and Plaintiff's claim for emotional distress damages. In the end, the court will recommend that Defendant's motion be denied.

1. The Statute

In pertinent part, the relevant lead-paint disclosure statute, 42 U.S.C. § 4852d, provides as follows:

> (a) Lead disclosure in purchase and sale or lease of target housing
>
> (1) Lead-based paint hazards
>
> Not later than 2 years after October 28, 1992, the Secretary and the Administrator of the Environmental Protection Agency shall promulgate regulations under this section for the disclosure of lead-based paint hazards in target housing which is offered for sale or lease. The regulations shall require that, before the purchaser or lessee is obligated under any contract to purchase or lease the housing, the seller or lessor shall--
> (A) provide the purchaser or lessee with a lead hazard

information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section 406 of the Toxic Substances Control Act [15 U.S.C.A. § 2686];
(B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor; and
(C) permit the purchaser a 10-day period (unless the parties mutually agree upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

(2) Contract for purchase and sale

Regulations promulgated under this section shall provide that every contract for the purchase and sale of any interest in target housing shall contain a Lead Warning Statement and a statement signed by the purchaser that the purchaser has--
(A) read the Lead Warning Statement and understands its contents;
(B) received a lead hazard information pamphlet; and
(C) had a 10-day opportunity (unless the parties mutually agreed upon a different period of time) before becoming obligated under the contract to purchase the housing to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

(3) Contents of Lead Warning Statement

The Lead Warning Statement shall contain the following text printed in large type on a separate sheet of paper attached to the contract:
"Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning.  Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory.  Lead poisoning also poses a particular risk to pregnant women.  The seller

> of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.”.
>
> (4) Compliance assurance
>
> Whenever a seller or lessor has entered into a contract with an agent for the purpose of selling or leasing a unit of target housing, the regulations promulgated under this section shall require the agent, on behalf of the seller or lessor, to ensure compliance with the requirements of this section.

42 U.S.C. § 4852d(a).

As is evident from the statutory language, the seller’s agent, via subsection (a)(4), must ensure that the seller provides the buyer with a lead hazard information pamphlet (subsection (a)(1)(A)), discloses the presence of known lead-based paint or hazards (subsection (a)(1)(B)), permits the buyer ten days to conduct a lead risk assessment (subsection (a)(1)(C)), includes a lead warning statement and specifically-signed notification with the purchase and sale agreement (subsection (a)(2)), and ensures that the lead warning statement uses certain language (subsection (a)(3)). Here, the only issue appears to be Defendant’s compliance with subsection (a)(1)(A), the requirement that the agent ensure that the buyer be provided a lead hazard information “pamphlet,” *i.e.*, pages 1 through 10 of the PTLPN. Thus, there appears to be no question that Defendant disclosed the presence of lead-based paint or hazards, permitted Plaintiff ten days to conduct a lead risk assessment, included with the P&S agreement a lead warning statement and the specifically-signed notification, *i.e.*, the

certification page, and ensured that the certification page used the statutorily-defined language. Accordingly, the court will focus on subsection (a)(1)(A).

2. <u>Defendant's Subsection (a)(1)(A) Argument</u>

Defendant argues that there can be no genuine issue that it complied with subsection (a)(1)(A). For one thing, Defendant asserts, Shoestock testified that he gave pages 1 through 10 of the PTLPN to both Nicola, a co-buyer, and to Gerald Pellegrini ("Gerald"), Plaintiff and Nicola's father. (Def.'s Facts, Shoestock Depo. at 34, 66.)[2] In addition, Defendant continues, the P&S agreement indicates that Plaintiff and Nicola had been given "the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, which is attached hereto." (*Id*., Ex. 3 to Pl.'s Depo.) Moreover, Defendant observes, the certification page was signed and checked to indicate that Plaintiff and Nicola had "received the Property Transfer Lead Paint Notification." (Pl.'s Ex. D.)

Plaintiff categorically disputes that either he, Nicola or Gerald were ever given pages 1 through 10 of the PTLPN. Plaintiff himself avers that Shoestock "absolutely did not give [him] the Property Transfer Lead Paint Notification package" either directly or through his father or brother. (Pl.'s Opp'n, Pl. Aff.) For his part, Nicola avers as follows with respect to the meeting he and Gerald had with Shoestock:

> . . . I recall a conversation about a "letter of recommendation" that Mr. Shoestock asked me and my father to give to him so that he could show to other potential customers that we recommended his services as a real

---

[2] Shoestock initially stated that he gave pages 1 through 10 to *Plaintiff* and Gerald, but later corrected himself by stating it was to *Nicola* and Gerald. (*Id.*)

> estate agent. I also recall Mr. Shoestock showing me other real estate listings from the North Adams area on his computer. *I do not remember Mr. Shoestock giving me the "Property Transfer Lead Paint Notification". I believe that I would have remembered such an important event.* Since my brother had more of an investment in the property than myself; weather [sic] it was via phone, E-mail, or fax; he handled all the paperwork and always was the first to deal with Mr. Shoestock directly.

(*Id.*, Nicola Aff. (emphasis added).) Gerald similarly does not recall any such documents being provided. (*Id*., Gerald Aff.)

Moreover, at his deposition, Plaintiff gave the following plausible explanation for the checkmarks he and/or Nocola placed on the certification page:

> A. . . . To my understanding, this sheet was not connected with any other package. I received this sheet by a fax which 11, the number 11, was not visible. So it looks like this was a single page and this was not page 11 to another package. From my understanding this reads as a complete document in and of itself. There is a warning statement here, which I thought I was signing, that I read that statement and there were checks indicating what the seller was disclosing to me and I thought there was my acknowledgment that I received this seller's disclosure.
>
> Q. Did you read this before you signed it, Exhibit 1?
>
> A. Yes.
>
> Q. Did you understand it?
>
> A. I understand it as a single-page entity.
>
> Q. It's your testimony that at no time did you ever see Exhibit 2 [(the PTLPN)] prior to signing the purchase and sale agreement, is that correct?
>
> A. Yes.

(Plaintiff's Depo. at 17-18, 21.)  In other words, Plaintiff, not observing the obscured number "11" at the bottom of the certification page, thought that the reference to the "Property Transfer Lead Paint Notification" was actually a reference to the one-paragraph "Required Federal Lead Warning Statement" and not a reference to the expansive eleven-page PTLPN package, most of which he had not received.

In the court's view, Plaintiff's testimony, when coupled with his affidavit and the affidavits of Nicola and Gerald, raises a genuine issue of material fact as to whether pages 1 through 10 of the PTLPN were actually provided to Plaintiff in compliance with subsection (a)(1)(A) of the statute.  This is not an insignificant issue, given the underlying purpose of subsection (a)(1)(A) that a potential buyer be fully informed of the risks and expenses related to lead-based paint.  Accordingly, the court finds Defendant's main argument insufficiently persuasive to allow its motion for summary judgment.

      3.  <u>Defendant's Alternative Arguments</u>

Defendant next argues that Plaintiff cannot recover under the statute's knowledge-based penalty provision.  Before addressing that issue, the court first briefly discusses, and rejects, yet another argument pursued by Defendant, that Plaintiff's claim for emotional distress damages ought independently be dismissed.

      a.  *Emotional Distress Damages*

Defendant argues that Plaintiff is entitled to no emotional distress damages because there is no evidence to support any physical or emotional harm.  In response, Plaintiff notes that Defendant never deposed his "expert witness," Barbara Holian, a

licensed mental health counselor, who will testify as to his emotional distress. As Defendant notes, only one innocuous note from Ms. Holian has been supplied.[3] Still, in the court's view, it is premature to rule that no emotional distress damages are recoverable. *Cf. Correa v. Hospital San Francisco*, 69 F.3d 1184, 1197 (1st Cir. 1995) (determining emotional distress damages "is a matter largely within the jury's ken").

      b. *Knowledge Standard*

As Defendant points out, the statute's penalty provision requires a *knowing* violation: "Any person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4285d(b)(3). According to Defendant, there can be no such violation because: (1) its representative, Delmaso, early on pointed out some chipped paint and told Plaintiff it was "probably lead paint"; (2) Plaintiff and Nicola checkmarked and signed the certification page; (3) Plaintiff signed the P&S agreement which included its own disclosure; (4) Segala, Plaintiff's inspector, informed Plaintiff in his December 15, 2003, report that there was "likely" lead paint on the premises; (5) Plaintiff testified that, prior to closing, three individuals -- Shoestock, Delmasoaw Segala -- all told him that there was a "good chance" of lead paint on the property; and (6) Shoestock testified that he gave pages 1 through 10 of the PTLPN to Nicola and/or Gerald.

---

[3] That note appears to be from a December 1, 2004, "family" therapy session with Holian's client, Plaintiff's mother, Isabel Pellegrini, and her two sons, Plaintiff and Nicola. At most, the note refers to "multiple stressors affecting relationships," including "home is a health . . . Risk needs to be de-leaded will Lose money [sic]."

Although Defendant makes a strong argument as to knowledge, the court believes that a genuine issue of material fact exists as to whether Defendant “knowingly” violated 42 U.S.C. § 4852d(1)(A). First, as Plaintiff observes, a *knowing* violation is easier to prove than a *willful* violation. *See Smith v. Coldwell Banker Real Estate Servs.*, 122 F. Supp. 2d 267, 273 (D. Conn. 2000). “‘Knowingly’ as commonly used and interpreted means that defendant was aware of his or her conduct and that defendant did not perform it merely through ignorance, mistake or accident.” *Id*. (citing Black’s Law Dictionary 872 (6th ed. 1990)). “Willfully,” by contrast, denotes an act which is “[v]oluntary and intentional, but not necessarily malicious.” Black’s Law Dictionary (7th ed. 1999).

Second, viewing the facts in a light most favorable to Plaintiff, it appears that Shoestock -- his protestations to the contrary -- did *not* give a copy of pages 1 through 10 of the PTLPN to Nicola or Gerald when he met with them. True, this may have been an unfortunate oversight. *See Smith*, 122 F. Supp. 2d at 273 (observing that, under § 4852d, defendants “cannot be liable for their inadvertence or inattentiveness”). But Shoestock’s motivation, in the court’s opinion, should be a question for the factfinder. *See McDonough v. City of Quincy*, 452 F.3d 8, 19 (1st Cir. 2006) (“Determinations of motive and intent . . . are questions better suited for the jury.”) (citations omitted).

Third, it appears that Shoestock knowingly -- indeed, purposefully -- decided not to fax Plaintiff pages 1 through 10 of the PTLPN either on November 29, 2003, or on December 1, 2003. Shoestock explained at his deposition that there was “no sense in faxing the whole thing” because he had already given it to Plaintiff. (Pl.’s Ex. J. at 40-

41.)[4]  As described, the fact remains very much in issue.

---

[4]  In relevant part, Shoestock testified as follows:

> Q. So when you went to fax that sheet in the folder [the certification], was it already loose or was it attached to something else and needed to be removed in order to be faxed, or which was it?
>
> A. It was probably clipped with a paper clip onto the --
>
> Q. Onto the what?
>
> A. Onto the property transfer lead paint notification package that was in the folder of the property.
>
> Q. So you removed that paper clip and separated that page. Is that correct?
>
> A. That is correct.
>
> Q. So you only faxed page 11?
>
> A. That is correct.
>
> Q. And the whole package was in there and available, also, with a paper clip?
>
> A. Yes, sir.
>
> Q. Why did you only send the one page?
>
> A. That is the only page that had to be signed to go along with the purchase and sale agreement, the offer.
>
>     . . . .
>
> Q. If we could look at Exhibit 1 [(the PTLPN)], second sentence, it says, the package must be given in full. Correct?
>
> A. Yes, sir.
>
> Q. And you easily could have done that with this faxed Exhibit 2

Fourth, Defendant cannot escape the fact that page 1 of the PTLPN prominently stated that it had to be provided "in full," *i.e.*, together with the certification page. Although Shoestock acknowledged that fact, he testified nonetheless that he did *not* attach pages 1 through 10 of the PTLPN to the certification page. (*Id*. at 39-41.) Nor did he affix pages 1 through 10 to the P&S agreement, even though that document also appears to require such attachment. (As indicated, the P&S Agreement states that "the

---

> [(the certification)]. Is that correct?
>
> A. But I already gave it to you. I had already given it to you earlier, and there's no sense in faxing the whole thing.
>
> Q. So you have no evidence of that, do you? There's no acknowledgment. Is that correct?
>
> A. Only my knowledge and my knowing that it was done.
>
> Q. But there's no acknowledgment. There's no acknowledgment of that. Is that correct?
>
> A. You mean something in writing?
>
> Q. Yes.
>
> A. Not that I'm aware of.
>
> Q. No signature from the prospective buyer?
>
> A. That's not required.
>
> Q. And just to clarify, you could have faxed the full package. Is that correct?
>
> A. Oh, sure.

(*Id.* at 39-41.)

SELLER and Broker(s) have . . . provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, *which is attached hereto* (emphasis added).)

In short, the court believes that genuine issues of material fact exist as to whether Defendant knowingly violated the statute. Accordingly, the court is prepared to recommend that Defendant's motion for summary judgment be denied.

Before formalizing this recommendation, however, the court adds one final point. Plaintiff makes much of the fact that Shoestock -- the only representative of Defendant who claimed to have provided Plaintiff and/or Nicola or Gerald with pages 1 through 10 of the PTLPN -- held himself out as a *buyer's* agent. Since the statute places disclosure obligations on *seller's* agents, (*see* 42 U.S.C. § 4852d(a)(4)), Plaintiff argues, it is immaterial whether Shoestock ever disclosed anything to him. As discussed at oral argument, however, the question of agency in a real estate transaction can get nettlesome, particularly when the same firm -- here, Century 21 -- represented both parties. *See*, *e.g.*, 15 Mass. Prac., Legal Forms § 3.1 (4th ed. through 2006). If anything, the unsettled agency issues provide further justification for denying Defendant's motion for summary judgment. *See Foisy v. Royal Maccabees Life Ins. Co.*, 356 F.3d 141, 150 (1st Cir. 2004) ("Whether [and in what capacity] an individual has acted as an agent is a question of fact.") (citing *Pedersen v. Leahy*, 493 N.E.2d 486, 487 (Mass. 1986)).

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's cross motion for summary judgment -- which he styles as a "partial"

motion -- can be dealt with quickly.  Plaintiff provides no compelling argument that the facts are so one-sided as to warrant an entry of judgment in his behalf.

To be sure, in *Smith*, the only decision discussing the statute's knowledge requirement which either party cites, the court held that there was no dispute of fact as to whether a seller's agent and her employer "knowingly" violated the statute when they failed to provide the purchasers with a copy of a lead paint report until the closing.  *Id*., 122 F. Supp. 2d at 274-75.  Here, however, genuine issues of material fact exist at least as to (1) whether Plaintiff, Nicola or Gerald were ever given pages 1 through 10 of the PTLPN, (2) whether such failure (if any) was a *knowing* violation, and (3) whether the intricate agency relationships warrant relief in either party's favor.  Of course, the court does not suggest that these are the only factual issues which need to be resolved. For present purposes, however, the court believes that genuine issues of material fact do exist and, hence, that there are ample grounds to recommend that Plaintiff's cross-motion for summary judgment be denied.

## IV.  CONCLUSION

For the reasons stated, this court recommends that Defendant's motion for summary judgment and Plaintiff's cross-motion for summary judgment each be DENIED.[5]

---

[5] The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to

DATED: June 29, 2007

/s/ Kenneth P. Neiman
KENNETH P. NEIMAN
Chief Magistrate Judge

---

comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.