FILED
IN CLERK'S OFFICE
2007 JUL 18 A 9:48
U.S. DISTRICT COURT
DISTRICT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * *

MAARTEN N. PELLEGRINI *
Plaintiff *
* Case Number: 05CV30077-MAP
*
vs. *
*
CENTURY 21, HAROLD DUPEE *
REALTORS, *
Defendant *
*

* * * * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S OBJECTION TO PORTIONS OF THE MAGISTRATE JUDGE'S RECOMMENDATION**

In accordance with Fed. R. Civ. P. 72(b), Maarten N. Pellegrini ("Plaintiff") respectfully objects to the Magistrate Judge's denial of Plaintiff's Motion For Partial Summary Judgment in his Report and Recommendation ("R&R") entered June 29, 2007.

**Basis Of Plaintiff's Objection**

*1. The issue of whether or not Mr. Shoestock was in fact a seller's agent for purposes of 42 U.S.C. section 4852d is not material since the doctrine of estoppel by representation is applicable in this case.*

- Mr. Shoestock represented to Plaintiff that he was Plaintiff's (the Buyer's) agent in the sale of the property at 56 Liberty Street, North Adams MA ("Property").
- 42 U.S.C. 4852d(a)(4)[1] requires that the seller's agent is the party responsible for lead paint disclosures.
- Elements of estoppel by representation are met in this case.

Mr. Shoestock **represented to the Plaintiff in the Agency Disclosure** that he was exclusively the buyer's agent (See Exhibit A, Agency Disclosure, "undivided loyalty"). This is consistent with his later testimony at his deposition that he at no time acted on behalf of the seller or seller's interests "whatsoever". See Exhibit B, Excerpts from deposition of Richrd Shoestock ("Shoestock Depo."), page 23, lines 22-25; page 24, lines 1-2; page 56, lines 19-22; page 57 line 1.

It is clear from the statutory language that the seller's agent is the party responsible for disclosure of lead hazard information. See R&R page 10. Century 21 knew of the fact, if true, that Mr. Shoestock had entered into a contract, either directly or indirectly, with the seller and could thereby act as the responsible agent for purposes of compliance with 42 U.S.C 4852d(a)(4). See Exhibit C, Mary Jane Delmaso's Affidavit, Nos. 2 and 3. Century 21 knew, or should have known of the Agency Disclosure acknowledgement made by Mr. Shoestock. See Exhibit D, Excerpts from 30(b)(6)

[1] "Whenever a seller or lessor has entered into a contract with an agent for the purpose of selling or leasing a unit of target housing, the regulations promulgated under this section shall require the agent, on behalf of the seller or lessor, to ensure compliance with the requirements of this section."

deposition of Century 21 ("Century 21 Depo."), page. 10, lines 12-16, and Exhibit B, Shoestock Depo., page 50, lines 8-18. Mr. Shoestock was trained by Century 21 in real estate transactions. Exhibit B, Shoestock Depo., page 9, lines 12-25; page 10, lines 1-7; page 13, lines 3-10; page 23, lines 13-21; page 65, lines 7-8. He was surely advised by Century 21 of the Mandatory Agency Disclosures requirements. Mr. Shoestock signed the Mandatory Agency Disclosure form in which he acknowledges being solely a buyer's agent, ***not*** a seller's agent, and ***not*** a dual agent. See Exhibit A, Agency Disclosure. Estoppel may be invoked by acknowledgements of matters of fact. See *McDonald v. Richard*, 13 So.2d 712, 718.

Century 21 **was silent** and did not inform Plaintiff that Richard Shoestock mistakenly identified himself as a buyer's agent to the Plaintiff, if in fact he was not. Such an identification clearly indicated that Mr. Shoestock would not have had any contractual relationship or obligations, either directly or indirectly, to the seller whatsoever. Century 21 **was silent** and did not inform Plaintiff that Richard Shoestock had any form of contractual relationship, either directly or indirectly, with the seller for the purpose of selling the Property, or was a dual agent if in fact he was acting as one. Estoppel may be invoked for false representation or wrongful silence or concealment. See *Noxon v. Cockburn,* 147 S.W.2d 872, 875; *Weber v. Fohl*, 41 N.E.2d 648, 650-1; *McDonald v. Burke*, 288 S.W.2d 363, 368.

Century 21 by their conduct, intentionally or through culpable negligence, deceived and induced Plaintiff into believing that Richard Shoestock acted only as an agent of the buyer and **not** an agent who entered into a contract with the seller, directly or

indirectly, for the purpose of selling the property at 56 Liberty Street North Adams, MA ("Property"), or in any way acted "on behalf of the seller".

Century 21 now claims that Mr. Shoestock was acting as an associate of Century 21 under Century 21's dual agency. See Exhibit C, Mary Jane Delmaso's Affidavit. However, Century 21 admitted that Mr. Shoestock was an "independent contractor" (See Exhibit D, Century 21 Depo., page 38, lines 12-14). Mr. Shoestock never represented **himself** as a dual agent, which was one of the designations on the Types Of Agency Representation sheet that he gave to Plaintiff. See Exhibit A, Agency Disclosure. As any reasonable and prudent person would conclude, Mr. Shoestock's signature on the dual agency form does **not** identify himself personally as a dual agent, only that he has provided the form to the Plaintiff indicating **Century 21** as a dual agency. Under these circumstances Century 21 was obligated to inform Plaintiff of the error made by Mr. Shoestock's representations as to him being a buyer's agent, if in fact he was not, or whether Mr. Shoestock had any contractual relationships for the purpose of selling the Property, directly or indirectly, with the seller.

As any reasonable prudent person would, Plaintiff **relied upon** the signed Agency Disclosure that indicated Mr. Shoestock's "undivided loyalty" to the buyer. Plaintiff did not know of any contractual relationship between Mr. Shoestock and the seller of the Property. Estoppel may be invoked for conduct of such nature that reasonable prudent person would have been deceived. See *Cellized Floors v. Glens Falls Indemnity Co. of New York*, 156 A. 845, 846. Plaintiff's reliance on this representation changed his position to one of more trust regarding his dealings with Mr. Shoestock, since Plaintiff

believed that Mr. Shoestock was under obligations to act in the interests of Plaintiff and none whatsoever to the seller. This placed Plaintiff in a detrimental position.

For all these reasons estoppel should be invoked. Plaintiff's Motion For Partial Summary Judgment should be allowed on the basis that Century 21 cannot now claim that Richard Shoestock was the responsible agent for lead paint disclosure as required by 42 U.S.C. section 4852d(a)(4)..

2. *The issue of whether or not Mr. Shoestock knowingly failed to give pages 1-10 of the Property Transfer Lead Paint Notification ("PTLPN") prior to the December 1, 2003 fax to Plaintiff is not material since the doctrine of estoppel by acknowledgment of facts expressed in a contract is applicable in this case.*

- Century 21 upon entering into a contract with the seller became statutorily obligated to provide the PTLPN to the buyer.
- Century 21, being the responsible party, is bound by representations with respect to lead paint disclosure made in the purchase and sale contract.
- Elements of estoppel by acknowledgement of facts made in a contract are met in this case.

***<u>Under 42 U.S.C. section 4852d(a)(4) (See Footnote 1) statutory responsibility for lead paint disclosure is transferred from the seller to the agent by statute, as was the</u>***

***case here.*** Under these conditions, in which Century 21 had executed a contract with the seller for the sale of target housing, Century 21 was bound by terms in the purchase and sales contract ("Contract") regarding Century 21's lead paint disclosures. Estoppel, pertaining to lead paint disclosure by representations made in a contract, may be invoked against the agent ***since the agent is the only party responsible for such disclosure.***

Century 21 upon executing a contact with the seller removes the seller from being responsible for attaching the PTLPN to the Contract. Therefore, estoppel would be appropriately invoked against the obligated party for making the disclosure and attaching it to the Contract, namely the agency Century 21. Indeed, the Contract itself specifically obligates the Brokers to the Buyers by stating at section 19, "The SELLER and Broker(s) have (a) provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, ***which is attached hereto*** [emphasis added]". See R&R pages 17-18 (referring to purchase and sales Contract).

Century 21 knew that the PTLPN is more than the single certification page (i.e., page II of the PTLPN). See Exhibit E, Defendant's Answers to Plaintiff's Request for Admissions, #4; See Exhibit D, Century 21 Depo., page 18, lines 14-23; page 19, lines 1-17; page 29, lines 2-8. Century 21 knew of the acceptable procedure to attach **only** the certification page of the PTLPN to the purchase and sale Contract. See Exhibit D, Century 21 Depo., page 9, lines 1-3, 12; page 20, lines 6-23. It is without dispute that only the certification page of the PTLPN was attached to the Contract when it was faxed to Plaintiff for signature. See Magistrate Judge's Report and Recommendation ("R&R") pages 15-17. Furthermore, Century 21 **trained** and informed Mr. Shoestock of the

procedure for requesting that the certification page, separated from the PTLPN and attached to the Contract, be signed by the Plaintiff when Mr. Shoestock sent his December 1, 2003 fax. See Exhibit B, Shoestock's Depo., page 64, lines 16-25, page 65, lines 1-8.

The Contract, which was faxed to Plaintiff for his signature, required that the PTLPN was "attached thereto"[2]. This fact is also found not to be in genuine dispute by the Magistrate Judge. See R&R pages 17 (bottom) and 18 (top). In spite of the clear language of the Contract, only the certification page of the PTLPN was attached to the Contract. This misrepresentation indicated to the Plaintiff that the single certification page, being the only attachment, was in fact the PTLPN.

Century 21 by this conduct, intentionally or through culpable negligence, **misrepresented** the true content of the PTLPN and induced Plaintiff into believing that the single certification page **was** the PTLPN by representation of facts expressed in the purchase and sales **Contract**.

Mr. Shoestock's alleged prior disclosure of the entire content of the PTLPN in his office (a disclosure which Plaintiff denies but which is presumed for purposes of summary judgment) is, in any event, not material since as a matter of law Plaintiff **had a right to rely upon** representations made in the purchase and sales contract to **supersede** any previous representations. See *Parish v. United States*, 75 U.S. 489, 491 (1869) ("[h]aving made [a contract], and executed it, their mouths are closed against any denial that it superseded all previous arrangements"). Also, estoppel by contract may be

[2] As described in Plaintiff's Reply To Defendant's Opposition To Plaintiff's Statement Of Material Facts, Concise Statement, And Argument (docket # 39) page 4 (regarding the doctrine of last antecedent).

invoked by settlement of facts in a contract similar to estoppel by deed. See *Aluminum Company Of America v. Essex Group, Inc.*, 499 F.Supp. 53, 84; *Blasland v. City Of North Miami*, 96 F.Supp. 2d 1375, 1382; *Jackson v. United Gas Public Service Co.* 198 S.O. 633, 640; *Mashuda v. Western Beef, Inc.*, 527 F. Supp. 887, 893.

Plaintiff acted in reliance upon this misrepresentation when he signed the Contract, believing he was fully informed of any required information. Furthermore, as grounds for estoppel, this false representation was done in a way where Century 21 could reasonably expect Plaintiff to rely and act upon it since the misrepresentation was made in Mr. Shoestock's fax of December 1, 2003 simultaneously with a request for Plaintiff's signature of the certification page and the Contract. See R&R page 6. Plaintiff's actions in reliance on this deception placed him in a detrimental position (i.e., that of being committed to the purchase of the Property having hazards unbeknown to him.)

**For all these reasons Century 21 should be estopped from asserting that the PTLPN is more than the certification page that was attached to the Contract.** Century 21 cannot now claim that Plaintiff's signature on the certification page is an affirmation that Plaintiff received the **entire PTLPN** as required by 42 U.S.C. section 4852d, and 40 CFR Chapter 1 sections 745.107(a)(1) and 745.113(a)(4), (See Exhibit F, EPA Regulations) and therefore Plaintiff's Motion For Partial Summary Judgment should be allowed.

3. *The issue of whether or not Mr. Shoestock knowingly failed to give pages 1-10 of the PTLPN to Nicola Pellegrini or Gerald Pellegrini, as Mr. Shoestock described (i.e., informally in his office, and not for signature certification), is not material since this fact does not affect the outcome in light of the clear intent of the law.*

- The PTLPN was falsely represented when requesting buyer's signature acknowledgement of receipt.
- Congress and the EPA intended to require the responsible agent for making lead paint disclosures to truthfully represent to the buyer the PTLPN and the certification to be signed by the buyer

It is without genuine dispute that Century 21 made ***false representations of the true content of the PTLPN*** in the purchase and sale Contract that was sent to Plaintiff for signature. See R&R pages 17-18. Century 21 could have easily complied with the law by attaching the PTLPN **in full** to the purchase and sale contract when it was faxed to Plaintiff for his signature, but did not. See R&R pages 16-17, See Exhibit D, Century 21 Depo., page 27, lines 3-5, page 31, lines 3-7. ["The PTLPN] is always available."

Testimony of the real estate agent that the PTLPN was given does not meet statutory criteria that requires a sufficient Certification. If the Court were to adopt Century 21's method of compliance all future cases under similar circumstances would require ***findings of facts*** by a jury

based on the recollection of the disclosing agent, who has an interest in the outcome, and not based on a legitimate Certification acknowledgment. This "method of compliance", made through false and deceptive representations, could not have reasonably been the intent of the statute and the EPA regulations[3] since this circumvents the requirement that evidence of compliance be established by a sufficient affirmation from the Buyer that he has received the PTLPN. Century 21's "method of compliance" would burden the courts unnecessarily.

The EPA would not intend for a certification form disclosed to a purchaser through an act of deception (i.e. disclosure of the certification, with seller's completed signature, as a misrepresented attachment to the official purchase and sales Contract) to be a legitimate Certification and certainly not an affirmation to satisfy the requirement of 40 CFR Chapter 1 Section 745.113(a)(4).

The Magistrate Judge concludes that there is an issue of whether or not the first 10 pages of the PTLPN were given to Plaintiff. See R&R page 19. The fact that such a question exists is proof that the certification page attached to the Contract is an insufficient affirmation. The statute and EPA regulations clearly intended for a seller or their agents to be responsible for obtaining a sufficient affirmation, something Century 21 and Mr. Shoestock admit was easily doable[4], and that there should be no need for a jury to decide whether disclosure was made based on the agent's uncorroborated testimony. It follows that for this reason Century 21 should be found to have failed to meet their obligations as a matter of law. Otherwise, agents would be encouraged to misrepresent the certification page, as was the case here, obtain signatures through

---

[3] 40 CFR Chapter 1 Section 745.113(a)(4) "A statement by the purchaser affirming receipt of the information set out in...[PTLPN]"

[4] Ease of including the entire PTLPN with the Contract. See R&R page 16-17, See Exhibit D, Century 21 Depo., page 27, lines 3-5, page 31, lines 3-7. ["The PTLPN] is always available."

such improper representations, as was the case here, and face low risks from any legal recourse. Plaintiff's understanding of Congress and EPA's intent provides no real stress on real estate brokers while it protects prospective buyers from deception and abuse of lead disclosure law from seller's agents. Plaintiff respectfully attests that most Buyers new to the market of older homes are often lacking knowledge regarding the complexities of lead hazards.    The EPA intended to protect such people and that such protection was clearly the paramount intent of enacting 42 U.S.C. section 4852d and the EPA regulations. The only reasonable interpretation is that Congress and the EPA did not intend for the burden to be placed on Buyers to seek recourse by jury, at their own expense, in a situation where the certification page was indisputably misrepresented when the agent requested that the Buyer sign it, as was the case here, and in light of the fact that this misrepresentation was easily avoidable **through the reasonable diligence of simple compliance with the Contract.**

Consequently, Plaintiff's Motion For Partial Summary Judgment should be allowed on the basis that material facts not in genuine dispute show Century 21 has not complied with 42 U.S.C. section 4852d and EPA regulations as intended.

For The Plaintiff,

Maarten N. Pellegrini, Plaintiff *pro se*
56 Liberty Street
North Adams, Massachusetts 01247
774-364-0081

**CERTIFICATE OF SERVICE**

I, Maarten N. Pellegrini, certify that on July 17, 2007, a copy of the above document was mailed by first class mail, postage prepaid, to counsel of record for Century 21 at the address below:

Law Office of Donald E. Phillips
Attn: Richard F. Faille
One Monarch Place,
1414 Main Street, Suite 550
Springfield, MA 01144

Maarten N. Pellegrini

# DUAL AGENCY DISCLOSURE

The purpose of this disclosure is to enable you to make an informed choice before entering into a dual agency relationship with a real estate firm. Please read this disclosure carefully before signing.

When a Buyer who is represented by CENTURY 21 HAROLD DUPEE, REALTORS, becomes interested in a property which is owned by a Seller who is represented by CENTURY 21 HAROLD DUPEE, REALTORS, this creates a dual agency. If a dual agency occurs, CENTURY 21 HAROLD DUPEE, REALTORS, will provide limited representation to both Buyer and Seller, but can no longer fully represent either party. However, a dual agent must treat both parties fairly and honestly.

If a dual agency occurs, CENTURY 21 HAROLD DUPEE, REALTORS, cannot do the following:

1. Recommend an offer price to the Buyer or a counteroffer price to the seller, or provide advice against the interest of the other party.

2. Negotiate on behalf of either Buyer or Seller.

3. Disclose any information that the Buyer or Seller requests to remain confidential without that party's consent, except where the disclosure is required by law or the information becomes public from a source other than the real estate licensee or subsequent words or conduct of the client.

A dual agent cannot disclose

a. That the Seller will accept less than the listed price and terms and conditions;
b. That the Buyer will offer more than the offered price, terms, and conditions,
c. The Buyer's or Seller's motivation, need or urgency to seller to buyer,
d. The terms of any prior negotiations in which the Seller or Buyer has been involved

## ACKNOWLEDGMENT

I have provided this dual agency disclosure form to the undersigned Seller(s) and Buyer(s)

CENTURY 21
HAROLD DUPEE, REALTORS

[signature] ______________________ 9C56108 ______________ ______________
Signature of real estate agent License No. Date

We have read this dual agency disclosure form and give our informed consent to enter into a dual agency relationship with CENTURY 21 HAROLD DUPEE, REALTORS.

Seller: ______________________ Date: ______________________

Seller: ______________________ Date: ______________________

Buyer: ______________________ Date: ______________________

Buyer: ______________________ Date: ______________________

# TYPES OF AGENCY REPRESENTATION IN MASSACHUSETTS

## SELLER'S AGENT

When a seller engages in the services of a listing broker, that seller becomes the broker's client. This means the broker, and his/her subagents represent the seller. They owe the seller undivided loyalty, utmost care, disclosure, obedience to lawful instruction, confidentiality and accountability. They must put the seller's interest first and negotiate for the best price and terms for their client, the seller. (the seller may also authorize subagents to represent him/her in marketing the property to buyers).

## BUYER'S AGENT

When a buyer engages in the services of a broker then that broker becomes the broker's client. The broker owes the buyer undivided loyalty, utmost care, disclosure, obedience to lawful instruction, confidentiality and accountability. They must put the buyer's interest first and negotiate for the best price and terms for their client, the buyer. (The buyer may also authorize subagents to represent him/her in locating property).

## DISCLOSED DUAL AGENT

A broker can work for both the buyer and the seller on the same property provided the broker obtains the informed consent of both parties. The broker is then considered a disclosed dual agent. This broker owes the seller and the buyer a duty to deal with them fairly and honestly. In this type of agency relationship the broker does not represent either the seller or buyer exclusively and they cannot expect the broker's undivided loyalty. Also, undisclosed dual agency is illegal.





MASSACHUSETTS BOARD OF REGISTRATION OF REAL ESTATE BROKERS AND SALESPERSONS

# MANDATORY AGENCY DISCLOSURE – AGENCY RELATIONSHIP

The purpose of this disclosure is to enable you to make informed choices before working with a real estate licensee. It must be provided at the first personal meeting that you have with an agent to discuss a specific property. THIS IS NOT A CONTRACT. It is a disclosure notice for your information and protection. BE SURE TO READ THE DESCRIPTIONS OF THE DIFFERENT TYPES OF AGENCY REPRESENTATION IN THIS DISCLOSURE.

## CONSUMER INFORMATION

1. Whether you are the buyer or the seller, you can choose to have the advice, assistance and representation of your own agent. Do not assume that a broker is acting on your behalf unless you have contracted with that broker to represent you.
2. All real estate licensees must, by law, present properties honestly and accurately.
3. If you are a seller you may authorize your listing agent to cooperate with agents from other firms to help sell your property. These cooperating agents may be subagents who work for the seller or buyer's agents.
4. If you are the buyer you have the option of working with sellers' or buyers' agents. This decision will depend on the types of services you want from a real estate agent. A buyer should tell sellers' agents, including subagents, only what he/she would tell the seller directly.

## CONSUMER RESPONSIBILITY

The duties of a real estate licensee do not relieve the consumer of the responsibility to protect his/her own interest. If you need advice for legal, tax, insurance or other matters it is your responsibility to consult a professional in those areas.

---

## ACKNOWLEDGEMENT

I have provided this disclosure form to x [signature] N. Pellegrini, NICOLA M PELLEGRINI

I have informed the above named consumer that I am a: (check one) ☐ Seller's Agent ☒ Buyer's Agent.

[signature] 9056108

(Signature of Real Estate Agent) (License Number) (Date)

I have read this agency disclosure form IN ITS ENTIRETY, INCLUDING THE INFORMATION regarding BUYER'S AGENT, SELLER'S AGENT and DISCLOSED DUAL AGENT. I understand that this form is for agency disclosure and NOT A CONTRACT. It was provided to me by the agent named above.

[signature] 12.4.03 Check Here: ☒ Buyer ☐ Seller

(Signature of Consumer/s) (Date)

☐ As a Consumer, I recognize that I need not select any agency representations at this time. Therefore, I decline to sign this disclosure. Any additional reason for declining to sign:

(Please print name of consumer and reason, if any.)

Could you repeat the answer, please? 10:15:28
A. No. 10:15:29
Q. Okay. Thank you.
So the -- have you ever practiced real estate with any other brokerage other than Century 21? 10:15:33 10:15:36
A. No. 10:15:39
Q. Okay. Are you aware of any obligations under state and federal law of real estate agents to disclose information regarding lead paint hazards to prospective purchasers? 10:15:49 10:15:56 10:15:59 10:16:04
A. Yes, sir. 10:16:06
Q. Where and how did you become first aware of those obligations? 10:16:08 10:16:11
A. Through the real estate course that I took in North Adams prior to getting my license. 10:16:13 10:16:17
Q. And who -- where was that course and who ran that course? 10:16:23 10:16:27
A. Well, it was a course run by Century 21, but it was not -- it was not called Harold Dupee Realtors. It was -- they had another title for the company that ran the course. But it was -- it was actually run by Century 21, Mr. Dupee and Mary Jane Delmaso. 10:16:27 10:16:32 10:16:37 10:16:39 10:16:41
Q. So they actually instructed the course and trained the -- trained the students? 10:16:49 10:16:50
A. That is correct. 10:16:52

Q. And did they go over the obligations of lead paint disclosure? 10:16:59 10:17:03

A. Yes, sir. It was -- I believe it was a four -- a four-day course, went over all of the regulations and what you had to do to be a real estate agent in Massachusetts, prepare you for the real estate test, examination. 10:17:04 10:17:09 10:17:13 10:17:21 10:17:25

Q. Okay. And who has the obligation to disclose this lead paint information? 10:17:33 10:17:39

A. The agent and the agency. The agent representing the client, whether it's the buyer or the seller. 10:17:41 10:17:45 10:17:48

Q. And what are those obligations? 10:17:55

A. Obligations that provide the client with information on the Massachusetts law on lead paint, the documents. 10:17:57 10:18:01 10:18:08

Q. It kind of cut out. Could you please repeat the answer and be more specific? 10:18:15 10:18:17

A. Yeah. The agent has to dispense the property transfer lead paint notification package to the client when they show interest in the property. 10:18:19 10:18:23 10:18:29

Also, the agent has to provide the seller with the same package and information and get a sheet signed by the seller prior to putting the property on the market. 10:18:37 10:18:39 10:18:43 10:18:46

we had on our list of things to do, representing the buyer, our checklist. 10:22:18 10:22:26

Q. Was that a checklist from -- that Century 21 gave, or was that a checklist from another -- another body, or such as a real estate board or regulatory commission? 10:22:29 10:22:33 10:22:37 10:22:42

A. No, that was a Century 21 form that had a checklist of all of the items that you had to do to make sure that -- make sure that they were done and put a date down when it was done. 10:22:42 10:22:45 10:22:48 10:22:51

Q. How were these disclosures made usually, these package disclosures? 10:22:55 10:22:59

A. If you were with the client, it was normally given to them by hand. Once in a while, it would be mailed, depending on if it was someone from out of town. That wouldn't -- I didn't do that very often because most of my clients showed up in the office and I took them to show property. 10:23:02 10:23:05 10:23:11 10:23:13 10:23:16 10:23:20

Q. What was the nature of your business relationship with Century 21? 10:23:41 10:23:43

A. I was an independent contractor. I paid them for the use of office equipment, and they provided a office space and a desk. And I basically worked there on my own and got a commission on property sold. 10:23:46 10:23:53 10:24:00 10:24:05

Q. And did you sign any contracts or agreements 10:24:14

putting the property on the market. 10:41:29

And the buyer obtains a copy of the package prior to putting in an offer on the property. The buyer obtains a copy of the single sheet that has to be signed and submits that with the offer to the property.

Q. So are you saying that the buyer's agent is responsible for providing the buyer or potential buyer with the package --

A. Yes, sir.

Q. -- as their information?

A. Yes, sir.

Q. When did you first become aware or -- of that requirement in your -- in your belief that that was the requirement?

A. During the course that was taken to obtain a real estate license, or to prepare to take the exam for a real estate license.

Q. And that was the class that was conducted by Mr. Dupee. Correct?

A. Mr. Dupee and Ms. Delmaso.

Q. And you were not the seller's agent in the sale of the 56 Liberty Street property. Is that correct?

A. Yes, sir, that is correct.

Q. And who was the seller's agent? 10:43:22

A. Frances Buckley. 10:43:24

Q. In the conversation meeting with Ms. Delmaso and yourself and Mr. Dupee, the first thing they asked you was whether you had disclosed the package. Is that correct? 10:43:36 10:43:49 10:43:53 10:43:58

A. I believe so. 10:43:58

Q. And were there any other discussions at that meeting? 10:44:02 10:44:05

A. No. It just pertained to the lead paint disclosure package. 10:44:09 10:44:12

Q. This meeting in the -- trying to get a general date. Could you give me a general date that your recollection of that meeting was? Maybe March or April of -- I don't know if it was '04, perhaps. Or, what would your recollection of that meeting date be, roughly, if you could? 10:44:17 10:44:23 10:44:26 10:44:30 10:44:33 10:44:36

A. Boy, I really don't remember that. I don't remember the date. 10:44:38 10:44:41

Q. Was it in the springtime of '04? 10:44:47

A. I believe so, but I'm not positive. 10:44:51

Q. And any other discussions? Can you recall any other discussions in that meeting? 10:45:02 10:45:05

A. No, sir. 10:45:07

Q. Did you have any discussions with Ms. Frances 10:45:08

Q. So --

MR. PELLEGRINI: Could I have the question -- I feel like the question wasn't answered. Could I have the stenographer read back the previous question? I'm not sure exactly how I worded it. I just -- if the stenographer could please read back that previous question.

(Thereupon the court reporter read back the requested question.)

BY MR. PELLEGRINI:

Q. So when you went to fax that sheet in the folder, was it already loose or was it attached to something else and needed to be removed in order to be faxed, or which was it?

A. It was probably clipped with a paper clip onto the --

Q. Onto the what?

A. Onto the property transfer lead paint notification package that was in the folder of the property.

Q. So you removed that paper clip and separated that page. Is that correct?

A. That is correct.

Q. So you only faxed page 11?

A. That is correct.

11:17:06 11:17:10 11:17:12 11:17:12 11:17:15 11:17:17 11:17:19 11:17:43 11:17:47 11:17:49 11:17:54 11:17:55 11:17:58 11:18:01 11:18:02 11:18:06 11:18:09 11:18:09 11:18:12 11:18:13 11:18:20 11:18:22

Q. Well, is it a responsibility or is it something that they feel that they can do if they choose to, that -- 11:27:01 11:27:07 11:27:11

A. Each agent is responsible to keep the records that they want on their clients. 11:27:12 11:27:15

Now, the records for properties and -- are kept in a file in the Century 21 file cabinet for -- under the -- for the property. Each agent keeps his own records pertaining to his clients, such as contacting clients. 11:27:18 11:27:22 11:27:28 11:27:32 11:27:37

Q. So are you saying that Century 21 has custody of these documents and they're also responsible for these documents, and not you? Is that -- 11:27:41 11:27:44 11:27:47

A. Not necessarily. 11:27:50

Q. I don't understand the answer. Is the answer not necessarily? 11:28:00 11:28:03

A. That is correct. I mean, I may have kept some documents on clients in my own client folder that didn't pertain to a property. We did not keep folders on all clients. That's the agent's business. We kept folders on -- and records on all of the properties. 11:28:04 11:28:08 11:28:13 11:28:19 11:28:26

Q. And were those within your custody and control, the documents relative -- related to 56 Liberty Street at any time? 11:28:32 11:28:35 11:28:40

A. Those documents are kept in a folder -- 11:28:42

excuse me. A file in a folder in the office of Century 21. 11:28:44 11:28:47

Q. Were they in your custody and control, or no? 11:28:51

A. They're in the Century 21 control. They're not just my control. It's for any agent interested in showing the property and trying to sell it to his client. 11:28:56 11:29:01 11:29:06 11:29:10

Q. Right. So the question is, they're kept in Century 21's office. We understand that. But who's control are they in? Are they considered in Century 21's control, or are they considered in the agent who's dealing with that particular property's control? I don't -- I don't know how these -- 11:29:10 11:29:14 11:29:20 11:29:25 11:29:28 11:29:30

A. It's under the control of Century 21. 11:29:32

Q. And not you, you're saying? 11:29:36

A. Yes, sir. 11:29:38

Q. (Inaudible) control? 11:29:40

A. Yes, sir. 11:29:43

Q. What, if any -- do you feel that that contradicts Mary Jane Delmaso, if she were state that at certain times, the -- the agents are responsible, which would mean that they are to maintain control of certain documents? 11:29:48 11:29:53 11:29:59 11:30:03 11:30:06

MR. FAILLE: I object, and don't answer that question. That's argumentative. 11:30:06 11:30:08

or control of any documents related to 56 Liberty Street?

A. Not for my -- not my own, no. That is correct. I'm stating that that -- those files on that property are the sole purpose -- the sole ownership of Century 21, and they're not to be removed from the office at any time.

Q. So your position is that Century 21 always maintained sole custody and control and that you never had custody and control -- or, control of any documents related to the property? I just wanted to clarify, yes or no?

A. Yes, that's correct. I can go into the file and I can pull the file and I can look at the file, get information on the property disclosure, but I can't take the file out of the office for any purpose. And I can add -- add anything to the file pertaining to the property.

Q. Okay. Thank you.

So the discussions with Mr. Dupee, the other discussions were only related to logistics of scheduling each of the depositions, or did you discuss any other -- any other matters?

A. It pertained just to the logistics of the deposition.

Q. (Inaudible.)

A. Yes, sir. Yes, sir. That is correct. 11:42:50

Q. Okay. Number four on the subpoena attachment, if you could explain, to your best knowledge, where those documents may exist currently. 11:42:55 11:43:01 11:43:06

A. I can only assume that they are in the Century 21 office somewhere. I've never seen those documents. 11:43:11 11:43:14 11:43:19

Q. Did you receive any liability insurance for -- through Century 21, covering any liability that you may incur with lawsuits or things of that nature? 11:43:20 11:43:26 11:43:30

A. I never received anything. It may -- it may exist, but I never received a copy of anything. 11:43:35 11:43:37

Q. To your knowledge, are you -- do you have any liability coverage through Century 21? 11:43:40 11:43:44

A. I'm not positive. I believe so, as one of their agents, but I never received any paperwork on that. 11:43:46 11:43:50 11:43:52

Q. As the -- you represented the buyer. Correct? Myself, you represented myself and my brother in this purchase. Correct? 11:44:04 11:44:09 11:44:11

A. Yes, sir. 11:44:13

Q. Did you ever feel that you were -- had any obligation to represent the seller or any of the seller's interests? 11:44:14 11:44:18 11:44:20

A. None whatsoever. 11:44:22

Q. Would you be surprised to know that the law states that it is the seller or the seller's agent's responsibility to provide disclosure, lead paint disclosure information, to any prospective buyers? 11:44:39 11:44:43 11:44:48 11:44:52

A. No, I wouldn't be surprised, because that was in the folder. That information was in the folder. So that is there in the property folder. 11:44:56 11:44:59 11:45:02

Q. And it doesn't say anything about the buyer's agent has any responsibility or is obligated in any way to conduct the responsibilities of the seller's agent, would you be surprised that the law states that? 11:45:12 11:45:17 11:45:23 11:45:26 11:45:31

A. No. 11:45:32

Q. Isn't it true that you felt some obligation, as the buyer's agent, to provide those documents to your prospective client? Is that correct? 11:45:37 11:45:42 11:45:47

A. Restate the question, please. 11:45:50

Q. Is it true that you felt some obligation, that it was your duty in some form, to provide your client, myself and my brother, with the property transfer notification package? 11:45:51 11:45:56 11:46:01 11:46:05

A. It is my -- it is also my responsibility to provide that to the -- any prospective buyer that I represent. 11:46:08 11:46:10 11:46:15

to be in order to meet proper procedure is that it would be attached. Is that correct? It would remain attached --

A. As long as -- as long as this signed sheet is in the folder, it shows that the seller has acknowledged the disclosure of lead-based paint on that property.

Q. You previously stated that this page 11 would have been attached to the other ten pages in the folder. Is that correct?

A. It could have been, with a paper clip. Yes.

Q. And is it clear to you that it was removed from the other ten pages and faxed by itself in this particular fax, Exhibit 4?

A. That is correct.

Q. Did you personally do this? Do you recall -- any further memory of doing that?

A. This page is the page that has to be initialed, checked and signed by the buyer when submitting a purchase and sale agreement offer for the property. So that's why that is the only page that is sent. It's the only page that is required to be submitted with a purchase and sale agreement.

Q. So did you remove that page and fax it with this particular fax?

A. Not necessarily. It may have been -- may have been in the file by itself.

Q. Would you have any knowledge of other people who would have been in that file to possibly remove it from the rest of the package? Does everybody have access to these files or only certain agents?

A. Every person in -- working for Century 21 has access to the files, to the files of every property.

Q. Just to clarify, do you believe that you personally removed this, or do you believe that you did not personally remove this from the folder and fax this?

A. I put this with the blank purchase and sale agreement and a copy of the seller's description of the property and faxed it. I believe I faxed it to you so that you could see and sign and check off on all of the sheets required to submit a purchase and sale agreement, to submit an offer.

Q. And at that time, November 29th, according to this fax, you would have had access as -- I'm sorry.

MR. PELLEGRINI: Could the stenographer repeat up to that point, the last question that was just standing was?

COURT REPORTER: Sure.

(Thereupon the court reporter read back the requested

Q. -- stapled or just loosely right next to each other? 11:57:03 11:57:06

A. Not necessarily. 11:57:07

Q. Have you come across that type of occurrence often, that there -- you were finding page 11's without the entire packages? 11:57:10 11:57:15 11:57:18

A. Yeah. The package could be in the back of the folder. The -- 11:57:23 11:57:25

Q. It would always be the package in the folder? The other ten pages would be there, they wouldn't be missing? 11:57:27 11:57:31 11:57:33

A. That is correct. 11:57:34

Q. Okay. So they're readily available to be sent. Is that correct? 11:57:35 11:57:39

A. Yes, sir. 11:57:40

Q. So you could have faxed those, also, at this time, the November 29th fax? 11:57:45 11:57:49

A. That is correct, but that's not the procedure. The procedure for submitting is just to have that one certification initialed and signed, along with a purchase and sale agreement. 11:57:50 11:57:52 11:57:56 11:57:59

Q. And who told you that procedure? Was that taught to you in the training class of Ms. -- 11:58:02 11:58:08

A. That is what -- the procedure that we go through for each property transaction and each offer. 11:58:12 11:58:13

That sheet has to go -- that sheet has to be submitted with the purchase and sale agreement, has to be signed --

Q. -- that procedure?

A. -- and initialed.

I'm sorry.

Q. Who taught you that procedure?

A. At Century 21.

MR. PELLEGRINI: If we go off the record for about three minutes, just to review. I think we're just about done.

MR. CARLSON: We're off the record at 11:58.

(Thereupon, at 11:58 a.m., a recess was taken in the proceedings, after which, at 12:04 p.m., the proceedings were reconvened and the following proceedings were had:)

MR. CARLSON: We're back on the record at 12:04.

MR. PELLEGRINI: I just want to state that the deposition is concluded.

MR. FAILLE: No, it isn't. I'm asking questions.

MR. PELLEGRINI: I mean, concluded from my questioning. And I would like to thank the witness for his trouble and apologize for

11:58:19 11:58:21 11:58:25 11:58:25 11:58:25 11:58:27 11:58:28 11:58:32 11:58:45 11:58:48 11:58:50 11:58:50 11:58:55 12:04:05 12:04:05 12:08:33 12:08:33 12:08:33 12:08:33 12:08:33 12:08:33 12:08:33 12:08:33

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * *

MAARTEN N. PELLEGRINI and
NICOLA M. PELLEGRINI,
Plaintiffs

Case Number: 05CV30077-MAP

vs.

CENTURY 21, HAROLD DUPEE
REALTORS,
Defendant

* * * * * * * * * * * * * * * * * * * * * * * * *

**AFFIDAVIT OF MARY JANE DALMASO**

Now comes Mary Jane Dalmaso and being duly sworn deposed and say:

1. I am the president of Century 21 Harold Dupee Realtors, Inc.

2. With reference to the present litigation, Century 21 Harold Dupee Realtors, Inc., served in a dual agency capacity as representing both the buyer and the seller. Francis Buckley and Richard Shoestock were both agents associated with the defendant.

3. All interested parties were part of a cooperative brokerage agreement and all compensation paid was a percentage of the selling price paid by the seller.

4. The plaintiff, Maarten Pellegrini, did not pay any compensation to anyone with reference to the purchase of the property.

Signed under the Pains and Penalties of Perjury this 9th day of February 2007.

*/s/ Mary Jane Dalmaso*
Mary Jane Dalmaso

A. Well, I know what the normal procedure for disclosure of property transfer lead paint notification package is.

Q. So, there was no additional preparation undertaken with regards to category 1 to more specifically inform you of perhaps more details than would just be your normal understanding?

A. No.

Q. Were there any files consulted or information with regard to category 1 specially consulted before this deposition for the purpose of preparation?

A. No, we have a standard procedure.

Q. Are you prepared to testify as to matters known or reasonably available to Century 21 covering category 2?

A. Yes.

Q. How were you so prepared to inform yourself to category 2 before this deposition? Was there any additional preparation?

A. No.

Q. Are you prepared to testify as to matters known or reasonably available to Century 21 covering category 3?

A. Yes.

Q. How are you so prepared for questioning with

regards to category 3?

A. I looked in the file.

Q. Which files did you look in?

A. The file for 56 Liberty Street.

Q. Do you recall specifically what documents were in that file, to the best of your recollection? Could you name the documents contained in the file?

A. Certainly. There was a listing agreement with the seller. There was a fact sheet from multiple listing. There was a lead paint disclosure signed by the seller. There was an agency disclosure signed by the seller. There was an agency disclosure signed by the buyer. There was a copy of a signed page 11 of the transfer return -- rather, lead disclosure notification. There was a copy of the purchase and sale agreement signed by both parties. Agency disclosure, signed by buyers.

Q. Were there any other files or information in the preparation for category 3 testimony that you reviewed?

A. Any other files?

Q. Mm-hmm, yes, or information?

A. There was a copy of the home inspection report, a copy of an addendum to the purchase and sale.

Q. Did you talk to anybody about category 3,

Q. So, how is that possible if this --

A. The buyer's signatures were not on the document faxed from Century 21 Harold Dupee Realtors on November 28th -- 29th.

Q. Isn't that what this document says, with these dates and times on top, that this page was faxed from Century 21 on November 9th, 2003, and it's --

A. No, that's not what it says.

Q. Do you agree that the document before you contains the buyer's signatures?

A. It contains the signatures of Maarten P-E-L-L-E-G, I can't read the rest, and I cannot read the other signature.

Q. Is it normal procedure for Century 21 to retain a signed certification page 11 separate from the full document as proof that the prospective buyers were given the full lead paint package?

A. Yes, the lead paint package provided by the Mass. Association of Realtors has only ten pages, one copy of ten pages, and three copies of page 11. So, we give the first ten pages to the buyers, and a copy of the signed page 11, signed by the buyer and the two agents.

Q. So, are you saying that the full notification

package does not come from Massachusetts together with all eleven pages in one package?

A. Yes, it does, but not in triplicate.

Q. Did you just say that there was a ten-page section and then the eleventh page was separated?

A. Yes. Well, no, it's attached, but the eleventh page comes in triplicate.

Q. So, it would really be thirteen pages?

A. Two pages -- three pages say 11 on them.

Q. But at least one copy of page 11 stays attached to the entire package, is that correct?

A. It depends. Originally the only forms that were available for lead disclosure furnished by the Mass. Association of Realtors were the packet that I described to you. It was attached at the top. When we took the listing from Mr. Horrigan, that was the form that was used.

Q. Isn't it true that page 11 is not supposed to be detached?

Could you answer the question, please?

A. Detached? You mean unstapled?

Q. Or any other means of detachment?

A. Well, you have to unstaple to fax. You have to

detach to fax. You can't stick eleven pages that are bound at the top in a fax machine. It's impossible.

Q. So, are you saying that they are not supposed to be detached or --

A. You have to detach it to fax it.

Q. Could you not fax the entirety of the package?

A. It depends. If the entire package stating the entire lead notification law was delivered to a buyer in a separate package, and then one was signed by the seller, then the buyer has been given the entire notification.

Q. But not at one instant in time. You're referring to a portion of the package being given prior and then the --

A. If the buyer has been given the entire package, all eleven pages pertaining to a property, whether they were given it at once or at separate times, he has received the entire package.

Q. So, is it Century 21's policy, then, that it is okay to separate the package and deliver it to the prospective buyer in sections, such as you described, page 11 may be delivered in a separate date?

A. Occasionally that happens.

Q. And that's not against policy, in and of itself?

A. Sometimes you can't help it. Sometimes a buyer will make an offer on a house and not buy that house. He's been given the full lead disclosure law. He has all eleven pages. He didn't buy the house. He buys another house. He gets a new page 11.

Q. Could you please read the first two sentences of the Childhood Lead Poisoning Prevention Program Property Transfer Lead Paint Notification?

A. Certainly. Starting with "Under"?

Q. The first two sentences.

A. "Under Massachusetts and federal law, this notification package must be given to prospective purchasers of homes built before 1978. This package must be given in full to meet state and federal requirements. It may be copied, as long as the type size is not made smaller".

Q. Could you read to me what it says in bold at the end of the first paragraph?

A. "This package is for compliance with both state and federal lead notification requirements".

Q. Could you read to me the second sentence in the second paragraph?

A. Beginning with "This package includes a

Century 21 to have two copies of these notification pages?

MR. FAILLE: I object to the form. Don't answer that.

Q. (By Mr. Pellegrini) Does Century 21 not have free access to these packages for copying? Do you have free access to these packages?

A. Packages are readily available.

Q. Does Century 21 have to remove page 11, meaning is it -- there is no way to keep it attached to the package? There's no other choice?

A. I thought I explained how this package came.

Q. It's a simple yes or no question, really.

MR. FAILLE: No, it isn't. Why don't you rephrase the question.

Q. (By Mr. Pellegrini) Do you have to remove page 11? Can't you send the whole copy of the package?

A. We can mail the whole copy.

Q. You can?

A. We can mail the whole copy. We hand the whole thing attached in person. We cannot fax it without separating it.

Q. You can fax eleven consecutive pages, though, correct?

A. You have to separate them to put them in the fax machine.

Q. But you can at least send all eleven pages via fax, correct?

A. Absolutely.

Q. But that's not what was done, was it?

A. I have no evidence that is not what was done.

MR. PELLEGRINI: Would there be any opposition to taking a short break?

MR. FAILLE: Yes. We're going on forever here as it is. Let's go. Come on.

(Off-the-record discussion between Mr. Maarten Pellegrini and Mr. Gerald Pellegrini).

MR. FAILLE: We're not breaking for lunch.

MR. PELLEGRINI: We're not?

MR. FAILLE: No, we're going straight through.

MR. G. PELLEGRINI: Well, suppose we want to break for lunch.

MR. FAILLE: No.

Q. (By Mr. Pellegrini) What percentage of signed certification pages were unattached in the last five years

A. Yes, there's a copy of it in our file.

Q. Can you verify that page 6 of this fax is page -- I'm sorry, can you verify that page 6 of this fax is an unattached page 11 of the lead paint certification notice package?

A. It is an unattached page 11 of the property transfer notification signed only by the seller and the listing agent, yes.

Q. Could you read to me the notes on the front page of the fax written by Mr. Shoestock?

A. "Please call me for instructions on where to initial and sign. You must sign and initial where appropriate. If both buying, both must initial and sign. I believe the offer is too low. Price should be at $74,000. Thanks, Dick".

Q. So, this page 6 was sent to the prospective buyers for their signature, correct?

A. Yes, apparently.

Q. Did Century 21 comply with the stipulation on the package that you have read, that this package must be given in full when they faxed me page 11 by itself?

A. If the buyer had received the full eleven-page packet --

MR. FAILLE: Don't answer. "Is it impossible" is improper.

Q. (By Mr. Pellegrini) Are the other ten pages of this package readily available under normal business practice for Century 21 at the time of this fax on December 1st, 2003?

A. They're always available.

MR. PELLEGRINI: It appeared that counsel had helped the witness to answer that last question.

MR. FAILLE: That is not true. For the record, I told her to go ahead and answer. Now stop this nonsense, or we're going to end this. And your assistant here, if he continues to give you every question to ask, this is about to end. I told you about that in an e-mail yesterday. He's interfering with the conduct of this deposition, so get on with it.

Q. (By Mr. Pellegrini) Do you have any reason to believe that this fax is not genuine?

A. I have no reason to believe.

Q. Could you explain the numbers on top of this fax?

separately or are they attached to an entire package?

A. They are usually attached to an entire package.

Q. Did Mr. Shoestock mention anything of any conversation that he had with Nicola Pellegrini at the time of allegedly delivering the package signed by Mrs. Buckley and Mr. Horrigan?

A. No.

Q. No instructions as to what it was or anything, where to sign or what the obligation of the buyer is? No mention of anything like that?

A. He didn't tell me what he told him.

Q. What is the nature of the relationship between Century 21 and Dick Shoestock?

A. Mr. Shoestock is an independent contractor.

Q. How long has he been employed by Century 21?

A. Since summer of 2003.

Q. Had he practiced real estate in Massachusetts with another agency prior to that?

A. No.

Q. What is his real estate history as far as being involved in real estate business?

A. He's a licensed Massachusetts salesperson.

Q. Did you know when he received that license?

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAARTEN N. PELLEGRINI and NICOLA M. PELLEGRINI,
Plaintiffs

vs.

CENTURY 21, HAROLD DUPEE REALTORS,
Defendant

Case Number: 05CV30077-KPN

## DEFENDANT'S ANSWERS TO PLAINTIFFS' REQUEST FOR ADMISSIONS

1. Century 21 did not send the entire Property Transfer Lead Paint Notification Package ("Package") to the Plaintiffs for their signature prior to Plaintiffs' signing the purchase and sales agreement.

**Answer: Denied.**

2. Century 21 faxed page 11 of the Package together with the purchase and sales agreement to the Plaintiffs for Plaintiffs' signature.

**Answer: Admit.**

3. Century 21 represented the SELLER in the transaction of the property involved in this lawsuit.

**Answer: Admit.**

4.    Century 21 knew of its obligation to provide the Package to the Plaintiffs prior to Plaintiffs' signing of a purchase and sales agreement.

**Answer:    Admit.**


5.    That each of the following documents, a copy of which is attached to these requests, is genuine.

    a.    December 1, 2003 Facsimile Transmittal Sheets

    b.    November 1, 2004 Letter and Enclosures from Harold Dupee to the Plaintiffs.

**Answer:**

    **a.    Admit.**

    **b.    Admit.**

Signed under the pains and penalties of perjury this 27th day of January, 2006.

Mary-Jane Dalmaso

As to all Objections:

The Defendants,
By their Attorney

/s/ Richard F. Faille
Richard F. Faille, Esquire, BBO#: 157640
Law Offices of Donald E. Phillips
1414 Main Street, Suite 550
Springfield, MA 01144
(413) 730-6328
Fax-(413) 730-6361
rffaille@stpaultravelers.com

**CERTIFICATE OF SERVICE**

I, Richard F. Faille, Attorney for the Defendants, hereby certify that on January 30, 2006, I copied the foregoing Answers to Plaintiffs' Interrogatories by mailing a copy of the same, postage prepaid, to:

Maarten N. Pellegrini, Pro Se
Nicola M. Pellegrini, Pro Se
56 Liberty Street
North Adams, MA 01247

/s/ Richard F. Faille

(4) A statement by the lessee affirming receipt of the information set out in paragraphs (b)(2) and (b)(3) of this section and the lead hazard information pamphlet required under 15 U.S.C. 2696.

(5) When any agent is involved in the transaction to lease target housing on behalf of the lessor, a statement that:

(i) The agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d: and

(ii) The agent is aware of his/her duty to ensure compliance with the requirements of this subpart.

(6) The signatures of the lessors, agents, and lessees certifying to the accuracy of their statements to the best of their knowledge, along with the dates of signature.

(c) *Retention of certification and acknowledgment information.*

(1) The seller, and any agent, shall retain a copy of the completed attachment required under paragraph (a) of this section for no less than 3 years from the completion date of the sale. The lessor, and any agent, shall retain a copy of the completed attachment or lease contract containing the information required under paragraph (b) of this section for no less than 3 years from the commencement of the leasing period.

(2) This recordkeeping requirement is not intended to place any limitations on civil suits under the Act, or to otherwise affect a lessee's or purchaser's rights under the civil penalty provisions of 42 U.S.C. 4852d(b)(3).

(d) The seller, lessor, or agent shall not be responsible for the failure of a purchaser's or lessee's legal representative (where such representative receives all compensation from the purchaser or lessee) to transmit disclosure materials to the purchaser or lessee, provided that all required parties have completed and signed the necessary certification and acknowledgment language required under paragraphs (a) and (b) of this section.

### § 35.94 Agent responsibilities.

(a) Each agent shall ensure compliance with all requirements of this subpart. To ensure compliance, the agent shall:

(1) Inform the seller or lessor of his/her obligations under §§ 35.88, 35.90, and 35.92.

(2) Ensure that the seller or lessor has performed all activities required under §§ 35.88, 35.90, and 35.92, or personally ensure compliance with the requirements of §§ 35.88, 35.90, and 35.92.

(b) If the agent has complied with paragraph (a)(1) of this section, the agent shall not be liable for the failure to disclose to a purchaser or lessee the presence of lead-based paint and/or lead-based paint hazards known by a seller or lessor but not disclosed to the agent.

### § 35.96 Enforcement.

(a) Any person who knowingly fails to comply with any provision of this subpart shall be subject to civil monetary penalties in accordance with the provisions of 42 U.S.C. 3545 and 24 CFR part 30.

(b) The Secretary is authorized to take such action as may be necessary to enjoin any violation of this subpart in the appropriate Federal district court.

(c) Any person who knowingly violates the provisions of this subpart shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual.

(d) In any civil action brought for damages pursuant to 42 U.S.C. 4852d(b)(3), the appropriate court may award court costs to the party commencing such action, together with reasonable attorney fees and any expert witness fees, if that party prevails.

(e) Failure or refusal to comply with §§ 35.88 (disclosure requirements for sellers and lessors), § 35.90 (opportunity to conduct an evaluation), § 35.92 (certification and acknowledgment of disclosure), or § 35.94 (agent responsibilities) is a violation of 42 U.S.C. 4852d(b)(5) and of TSCA section 409 (15 U.S.C. 2689).

(f) Violators may be subject to civil and criminal sanctions pursuant to TSCA section 16 (15 U.S.C. 2615) for each violation. For purposes of enforcing this subpart, the penalty for each violation applicable under 15 U.S.C. 2615 shall be not more than $10,000.

### § 35.98 Impact on State and local requirements.

Nothing in this subpart shall relieve a seller, lessor, or agent from any responsibility for compliance with State or local laws, ordinances, codes, or regulations governing notice or disclosure of known lead-based paint and/or lead-based paint hazards. Neither HUD nor EPA assumes any responsibility for ensuring compliance with such State or local requirements.

## 40 CFR Chapter I

1. Part 745 is added to read as follows:

## PART 745–LEAD-BASED PAINT POISONING PREVENTION IN CERTAIN RESIDENTIAL STRUCTURES

**Subparts A—E [Reserved]**

**Subpart F — Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazards Upon Sale or Lease of Residential Property**

Sec.
745.100 Purpose.
745.101 Scope and applicability.
745.102 Effective dates.
745.103 Definitions.
745.107 Disclosure requirements for sellers and lessors.
745.110 Opportunity to conduct an evaluation.
745.113 Certification and acknowledgment of disclosure.
745.115 Agent responsibilities.
745.118 Enforcement.
745.119 Impact on State and local requirements.

Authority: 15 U.S.C. 2615, 15 U.S.C. 2689, and 42 U.S.C. 4852d.

## Subparts A—E [Reserved]

## Subpart F—Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazards Upon Sale or Lease of Residential Property

### § 745.100 Purpose.

This subpart implements the provisions of 42 U.S.C. 4852d, which impose certain requirements on the sale or lease of target housing. Under this subpart, a seller or lessor of target housing shall disclose to the purchaser or lessee the presence of any known lead-based paint and/or lead-based paint hazards; provide available records and reports; provide the purchaser or lessee with a lead hazard information pamphlet; give purchasers a 10-day opportunity to conduct a risk assessment or inspection; and attach specific disclosure and warning language to the sales or leasing contract before the purchaser or lessee is obligated under a contract to purchase or lease target housing.

### § 745.101 Scope and applicability.

This subpart applies to all transactions to sell or lease target housing, including subleases, with the exception of the following:

(a) Sales of target housing at foreclosure.

(b) Leases of target housing that have been found to be lead-based paint free by an inspector certified under the Federal certification program or under a federally accredited State or tribal certification program. Until a Federal certification program or federally accredited State certification program is

in place within the State, inspectors shall be considered qualified to conduct an inspection for this purpose if they have received certification under any existing State or tribal inspector certification program. The lessor has the option of using the results of additional test(s) by a certified inspector to confirm or refute a prior finding.

(c) Short-term leases of 100 days or less, where no lease renewal or extension can occur.

(d) Renewals of existing leases in target housing in which the lessor has previously disclosed all information required under § 745.107 and where no new information described in § 745.107 has come into the possession of the lessor. For the purposes of this paragraph, renewal shall include both renegotiation of existing lease terms and/or ratification of a new lease.

**§ 745.102 Effective dates.**

The requirements in this subpart take effect in the following manner:

(a) For owners of more than four residential dwellings, the requirements shall take effect on September 6, 1996.

(b) For owners of one to four residential dwellings, the requirements shall take effect on December 6, 1996.

**§ 745.103 Definitions.**

The following definitions apply to this subpart.

*The Act* means the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. 4852d.

*Agent* means any party who enters into a contract with a seller or lessor, including any party who enters into a contract with a representative of the seller or lessor, for the purpose of selling or leasing target housing. This term does not apply to purchasers or any purchaser's representative who receives all compensation from the purchaser.

*Available* means in the possession of or reasonably obtainable by the seller or lessor at the time of the disclosure.

*Common area* means a portion of a building generally accessible to all residents/users including, but not limited to, hallways, stairways, laundry and recreational rooms, playgrounds, community centers, and boundary fences.

*Contract for the purchase and sale of residential real property* means any contract or agreement in which one party agrees to purchase an interest in real property on which there is situated one or more residential dwellings used or occupied, or intended to be used or occupied, in whole or in part, as the home or residence of one or more persons.

*EPA* means the Environmental Protection Agency.

*Evaluation* means a risk assessment and/or inspection.

*Foreclosure* means any of the various methods, statutory or otherwise, known in different jurisdictions, of enforcing payment of a debt, by the taking and selling of real property.

*Housing for the elderly* means retirement communities or similar types of housing reserved for households composed of one or more persons 62 years of age or more at the time of initial occupancy.

*HUD* means the U.S. Department of Housing and Urban Development.

*Inspection* means:

(1) A surface-by-surface investigation to determine the presence of lead-based paint as provided in section 302(c) of the Lead-Based Paint Poisoning and Prevention Act [42 U.S.C. 4822], and

(2) The provision of a report explaining the results of the investigation.

*Lead-based paint* means paint or other surface coatings that contain lead equal to or in excess of 1.0 milligram per square centimeter or 0.5 percent by weight.

*Lead-based paint free housing* means target housing that has been found to be free of paint or other surface coatings that contain lead equal to or in excess of 1.0 milligram per square centimeter or 0.5 percent by weight.

*Lead-based paint hazard* means any condition that causes exposure to lead from lead-contaminated dust, lead-contaminated soil, or lead-contaminated paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency.

*Lessee* means any entity that enters into an agreement to lease, rent, or sublease target housing, including but not limited to individuals, partnerships, corporations, trusts, government agencies, housing agencies, Indian tribes, and nonprofit organizations.

*Lessor* means any entity that offers target housing for lease, rent, or sublease, including but not limited to individuals, partnerships, corporations, trusts, government agencies, housing agencies, Indian tribes, and nonprofit organizations.

*Owner* means any entity that has legal title to target housing, including but not limited to individuals, partnerships, corporations, trusts, government agencies, housing agencies, Indian tribes, and nonprofit organizations, except where a mortgagee holds legal title to property serving as collateral for a mortgage loan, in which case the owner would be the mortgagor.

*Purchaser* means an entity that enters into an agreement to purchase an interest in target housing, including but not limited to individuals, partnerships, corporations, trusts, government agencies, housing agencies, Indian tribes, and nonprofit organizations.

*Reduction* means measures designed to reduce or eliminate human exposure to lead-based paint hazards through methods including interim controls and abatement.

*Residential dwelling* means:

(1) A single-family dwelling, including attached structures such as porches and stoops; or

(2) A single-family dwelling unit in a structure that contains more than one separate residential dwelling unit, and in which each such unit is used or occupied, or intended to be used or occupied, in whole or in part, as the residence of one or more persons.

*Risk assessment* means an on-site investigation to determine and report the existence, nature, severity, and location of lead-based paint hazards in residential dwellings, including:

(1) Information gathering regarding the age and history of the housing and occupancy by children under age 6;

(2) Visual inspection;

(3) Limited wipe sampling or other environmental sampling techniques;

(4) Other activity as may be appropriate; and

(5) Provision of a report explaining the results of the investigation.

*Secretary* means the Secretary of Housing and Urban Development.

*Seller* means any entity that transfers legal title to target housing, in whole or in part, in return for consideration, including but not limited to individuals, partnerships, corporations, trusts, government agencies, housing agencies, Indian tribes, and nonprofit organizations. The term "seller" also includes:

(1) An entity that transfers shares in a cooperatively owned project, in return for consideration; and

(2) An entity that transfers its interest in a leasehold, in jurisdictions or circumstances where it is legally permissible to separate the fee title from the title to the improvement, in return for consideration.

*Target housing* means any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing) or any 0-bedroom dwelling.

*TSCA* means the Toxic Substances Control Act, 15 U.S.C. 2601.

*0-bedroom dwelling* means any residential dwelling in which the living area is not separated from the sleeping area. The term includes efficiencies, studio apartments, dormitory housing, military barracks, and rentals of individual rooms in residential dwellings.

**§ 745.107 Disclosure requirements for sellers and lessors.**

(a) The following activities shall be completed before the purchaser or lessee is obligated under any contract to purchase or lease target housing that is not otherwise an exempt transaction pursuant to § 745.101. Nothing in this section implies a positive obligation on the seller or lessor to conduct any evaluation or reduction activities.

(1) The seller or lessor shall provide the purchaser or lessee with an EPA-approved lead hazard information pamphlet. Such pamphlets include the EPA document entitled *Protect Your Family From Lead in Your Home* (EPA #747-K-94-001) or an equivalent pamphlet that has been approved for use in that State by EPA.

(2) The seller or lessor shall disclose to the purchaser or lessee the presence of any known lead-based paint and/or lead-based paint hazards in the target housing being sold or leased. The seller or lessor shall also disclose any additional information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces.

(3) The seller or lessor shall disclose to each agent the presence of any known lead-based paint and/or lead-based paint hazards in the target housing being sold or leased and the existence of any available records or reports pertaining to lead-based paint and/or lead-based paint hazards. The seller or lessor shall also disclose any additional information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces.

(4) The seller or lessor shall provide the purchaser or lessee with any records or reports available to the seller or lessor pertaining to lead-based paint and/or lead-based paint hazards in the target housing being sold or leased. This requirement includes records or reports regarding common areas. This requirement also includes records or reports regarding other residential dwellings in multifamily target housing, provided that such information is part of an evaluation or reduction of lead-based paint and/or lead-based paint hazards in the target housing as a whole.

(b) If any of the disclosure activities identified in paragraph (a) of this section occurs after the purchaser or lessee has provided an offer to purchase or lease the housing, the seller or lessor shall complete the required disclosure activities prior to accepting the purchaser's or lessee's offer and allow the purchaser or lessee an opportunity to review the information and possibly amend the offer.

**§ 745.110 Opportunity to conduct an evaluation.**

(a) Before a purchaser is obligated under any contract to purchase target housing, the seller shall permit the purchaser a 10-day period (unless the parties mutually agree, in writing, upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

(b) Not withstanding paragraph (a) of this section, a purchaser may waive the opportunity to conduct the risk assessment or inspection by so indicating in writing.

**§ 745.113 Certification and acknowledgment of disclosure.**

(a) *Seller requirements.* Each contract to sell target housing shall include an attachment containing the following elements, in the language of the contract (e.g., English, Spanish):

(1) A Lead Warning Statement consisting of the following language:

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

(2) A statement by the seller disclosing the presence of known lead-based paint and/or lead-based paint hazards in the target housing being sold or indicating no knowledge of the presence of lead-based paint and/or lead-based paint hazards. The seller shall also provide any additional information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces.

(3) A list of any records or reports available to the seller pertaining to lead-based paint and/or lead-based paint hazards in the housing that have been provided to the purchaser. If no such records or reports are available, the seller shall so indicate.

(4) A statement by the purchaser affirming receipt of the information set out in paragraphs (a)(2) and (a)(3) of this section and the lead hazard information pamphlet required under 15 U.S.C. 2696.

(5) A statement by the purchaser that he/she has either:

(i) Received the opportunity to conduct the risk assessment or inspection required by § 745.110(a); or

(ii) Waived the opportunity.

(6) When one or more agents are involved in the transaction to sell target housing on behalf of the seller, a statement that:

(i) The agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d; and

(ii) The agent is aware of his/her duty to ensure compliance with the requirements of this subpart.

(7) The signatures of the sellers, agents, and purchasers certifying to the accuracy of their statements to the best of their knowledge, along with the dates of signature.

(b) *Lessor requirements.* Each contract to lease target housing shall include, as an attachment or within the contract, the following elements, in the language of the contract (e.g., English, Spanish):

(1) A Lead Warning Statement with the following language:

Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

(2) A statement by the lessor disclosing the presence of known lead-based paint and/or lead-based paint

hazards in the target housing being leased or indicating no knowledge of the presence of lead-based paint and/or lead-based paint hazards. The lessor shall also disclose any additional information available concerning the known lead-based paint and/or lead-based paint hazards, such as the basis for the determination that lead-based paint and/or lead-based paint hazards exist, the location of the lead-based paint and/or lead-based paint hazards, and the condition of the painted surfaces.

(3) A list of any records or reports available to the lessor pertaining to lead-based paint and/or lead-based paint hazards in the housing that have been provided to the lessee. If no such records or reports are available, the lessor shall so indicate.

(4) A statement by the lessee affirming receipt of the information set out in paragraphs (b)(2) and (b)(3) of this section and the lead hazard information pamphlet required under 15 U.S.C. 2696.

(5) When one or more agents are involved in the transaction to lease target housing on behalf of the lessor, a statement that:

(i) The agent has informed the lessor of the lessors obligations under 42 U.S.C. 4852d; and

(ii) The agent is aware of his/her duty to ensure compliance with the requirements of this subpart.

(6) The signatures of the lessors, agents, and lessees, certifying to the accuracy of their statements, to the best of their knowledge, along with the dates of signature.

(c) *Retention of Certification and Acknowledgment Information.*

(1) The seller, and any agent, shall retain a copy of the completed attachment required under paragraph (a) of this section for no less than 3 years from the completion date of the sale. The lessor, and any agent, shall retain a copy of the completed attachment or lease contract containing the information required under paragraph (b) of this section for no less than 3 years from the commencement of the leasing period.

(2) This recordkeeping requirement is not intended to place any limitations on civil suits under the Act, or to otherwise affect a lessee's or purchaser's rights under the civil penalty provisions of 42 U.S.C. 4852d(b)(3).

(d) The seller, lessor, or agent shall not be responsible for the failure of a purchaser's or lessee's legal representative (where such representative receives all compensation from the purchaser or lessee) to transmit disclosure materials to the purchaser or lessee, provided that all required parties have completed and signed the necessary certification and acknowledgment language required under paragraphs (a) and (b) of this section.

**§ 745.115 Agent responsibilities.**

(a) Each agent shall ensure compliance with all requirements of this subpart. To ensure compliance, the agent shall:

(1) Inform the seller or lessor of his/her obligations under §§745.107, 745.110, and 745.113.

(2) Ensure that the seller or lessor has performed all activities required under §§ 745.107, 745.110, and 745.113, or personally ensure compliance with the requirements of §§ 745.107, 745.110, and 745.113.

(b) If the agent has complied with paragraph (a)(1) of this section, the agent shall not be liable for the failure to disclose to a purchaser or lessee the presence of lead-based paint and/or lead-based paint hazards known by a seller or lessor but not disclosed to the agent.

**§ 745.118 Enforcement.**

(a) Any person who knowingly fails to comply with any provision of this subpart shall be subject to civil monetary penalties in accordance with the provisions of 42 U.S.C. 3545 and 24 CFR part 30.

(b) The Secretary is authorized to take such action as may be necessary to enjoin any violation of this subpart in the appropriate Federal district court.

(c) Any person who knowingly violates the provisions of this subpart shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual.

(d) In any civil action brought for damages pursuant to 42 U.S.C. 4852d(b)(3), the appropriate court may award court costs to the party commencing such action, together with reasonable attorney fees and any expert witness fees, if that party prevails.

(e) Failure or refusal to comply with § 745.107 (disclosure requirements for sellers and lessors), § 745.110 (opportunity to conduct an evaluation), § 745.113 (certification and acknowledgment of disclosure), or § 745.115 (agent responsibilities) is a violation of 42 U.S.C. 4852d(b)(5) and of TSCA section 409 (15 U.S.C. 2689).

(f) Violators may be subject to civil and criminal sanctions pursuant to TSCA section 16 (15 U.S.C. 2615) for each violation. For purposes of enforcing this subpart, the penalty for each violation applicable under 15 U.S.C. 2615 shall be not more than $10,000.

**§ 745.119 Impact on State and local requirements.**

Nothing in this subpart shall relieve a seller, lessor, or agent from any responsibility for compliance with State or local laws, ordinances, codes, or regulations governing notice or disclosure of known lead-based paint or lead-based paint hazards. Neither HUD nor EPA assumes any responsibility for ensuring compliance with such State or local requirements.

[FR Doc. 96-5243 Filed 3-5-96; 8:45 am]
BILLING CODE 6560-50-F