UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2007 NOV -9  A 10: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

```
* * * * * * * * * * * * * * * * * * * * * * * *
MAARTEN N. PELLEGRINI            *
        Plaintiff                *
                                 *
                                 *
vs.                              *    Case Number: 05CV30077-MAP
                                 *
CENTURY 21, HAROLD DUPEE         *
REALTORS,                        *
        Defendant                *
                                 *
* * * * * * * * * * * * * * * * * * * * * * * *
```

## PLAINTIFF'S MOTION TO NARROW ISSUES AT TRIAL

Maarten N. Pellegrini ("Plaintiff") hereby requests the Court to narrow the contested issues to be presented at trial. Plaintiff contends that many of the alleged contested factual issues presented by Century 21, Harold Dupee Realtors ("Century 21") in the Parties' Joint Pre-Trial Memorandum ("Joint Mem.") are without evidentiary support and are frivolous defenses.

In support of Plaintiff's motion Plaintiff herein submits the following memorandum.

## MEMORANDUM

Plaintiff contends that the following contested factual issues raised by Century 21 in the Joint Mem. are not supported by the evidence of record and that no reasonable jury could find for Century 21 on these issues. Plaintiff believes that these contested facts are

frivolous defenses and respectfully requests that the Court eliminate them for consideration in order to simplify the issues to be presented at trial.

**Unsupported Factual Issues Raised By Century 21**

- ***Plaintiff was provided with some other lead information pamphlet that is equivalent to the Property Transfer Lead Paint Notification ("PTLPN"). (Defendant's Contested Fact #1).***

As a defense Century 21 wishes to claim that Plaintiff was provided with another pamphlet that is equivalent to the PTLPN. Presumably, Century 21 intends to claim that Plaintiff was given the federal pamphlet "Protect Your Family From Lead In Your Home".

This conflicts with Century 21's answers to interrogatories as well as 30(b)(6) testimony of Mary Jane Delmaso. See Exhibit A, Answers to Interrogatories ("Interr.") Nos. 1 and 4C., Exhibit B, Excerpts from 30(b)(6) Deposition of Mary Jane Delmaso (Century 21 Depo.") page 10, lines 5-16. Further, the required certification that a prospective property buyer has been given the federal pamphlet has a specific form. See Exhibit C, federal certification form for receipt of the pamphlet "Protect Your Family From Lead In Your Home". There is no such certification in evidence and Century 21 does not claim such certification. The only certification that Century 21 claims in this case is the signed certification page 11 of the Massachusetts standard notification or PTLPN.

Additionally, the state of Massachusetts has affirmed use of its own informational disclosure (the PTLPN) in lieu of the default federal disclosure ("Protect Your Family From Lead In Your Home" pamphlet) as prescribed by federal regulations allowing states to design their own disclosure requirements for the purpose of complying with 42 U.S.C. 4852d. See Exhibit D, Federal Register, Rules and Regulations page 9071, 3rd column.

For the above reasons Century 21 should be barred from raising the frivolous defense at trial that Plaintiff has received the federal pamphlet "Protect Your Family From Lead In Your Home".

- ***Century 21 did not know, or should not have known, that Mr. Shoestock directly represented that he was exclusively the buyer's agent. (Not Stipulated By Defendant).***

Century 21 wishes to claim that it did not know, or should not have known, that Mr. Shoestock represented himself to the prospective buyer's of the subject property as the buyer's agent.

This claim is clearly a frivolous defense. Mr. Shoestock had represented himself to the Plaintiff that he was the buyer's agent in the mandatory agency disclosure. See Exhibit E, Mandatory Agency Disclosure. This disclosure is clearly part of the file record of the subject property kept in Century 21 files. Century 21 had access to all of Mr. Shoestock's paperwork in their filing cabinets that are kept in the office of Century 21 (See Exhibit B, Century 21 Depo. page 9, lines 20-23; page 10, lines 1-22.) and

3

specifically knew of the agency disclosure (page 10, lines 8-16). Indeed, Mr.

Shoestock's files were in the sole custody and control of Century 21 and not Mr.

Shoestock. See Exhibit F, Deposition of Richard Shoestock ("Shoestock Depo.") page

46, lines 22-25; page 47, lines 1-14; page 50, lines 8-18.

In light of this evidence and direct testimony of both Century 21 and Mr.

Shoestock, Century 21 should not be allowed to claim and burden the jury that it was

ignorant of Mr. Shoestock's representation regarding his agency relationship with the

Plaintiff.

- ***Century 21 was not knowledgeable, either directly or through reasonably available information, of Mr. Shoestock's activities with respect to the sale of the subject property. (Not Stipulated By Defendant).***

For the same reasons as above, Century 21 should not be allowed to claim and

burden the jury that it was ignorant, either directly or through reasonably available

information, of Mr. Shoestock's activities with respect to the subject property. The

information regarding the subject property was in the sole custody and control of Century

21 and was clearly available to Century 21.

Also, Mary Jane Delmaso testified as representative of Century 21 that she was

the responsible party for everything done by agents under the umbrella of Century 21.

See Exhibit_B, Century 21 Depo. page 5, lines 14-19.

4

- *The correspondence, sent by Mr. Shoestock on November 29, 2003, did not contain two (2) separate documents: (1) a blank copy of a "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement", with a "Property Transfer Notification Certification," as endorsed by James Horrigan on December 2, 2002; and, (2) a "Massachusetts Association of Realtors Seller's Description of Property Form," as endorsed by James Horrigan on November 24, 2002.  (Defendant's Contested Fact #3).*

Century 21 wishes to make a distinction and deny Plaintiff's description that the fax communication sent to Plaintiff on November 29, 2003 contained the purchase and sale contract with the Certification page of the PTLPN attached.

Century 21 wishes to claim that the communication of November 29, 2003 contained 3 "separate documents".  This defense is frivolous since these documents were sent by a single facsimile transmission and the language of the Contract specifically states that the standard notification regarding lead paint is attached.  See Exhibit G, November 29, 2003 fax, Purchase and Sale Agreement ("Contract"), Section 19.   In the case here the Contract along with the PTLPN Certification page immediately following the Contract was faxed in the same November 29, 2003 transmission.

Also, Century 21 has admitted that the certification page 11 was faxed "together with the purchase and sales agreement".  See Exhibit A, Admissions No. 2.

Century 21's claim that the correspondence of November 29, 2003 contained three separate documents would be frivolous, and should not be allowed to unduly burden the jury.

5

- ***The correspondence, sent by Mr. Shoestock on December 1, 2003, did not contain two (2) separate documents: (1) a "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement" with the offered purchase price of $65,000.00, with a "Property Transfer Notification Certification," as endorsed by James Horrigan on December 2, 2002; and, (2) a blank "Mandatory Agency Disclosure – Agency Relationship" form. (Defendant's Contested Fact #4).***

Century 21 wishes to make a distinction and deny Plaintiff's description that the fax communication sent to Plaintiff on December 1, 2003 contained the purchase and sale contract with the Certification page of the PTLPN attached.

Century 21 wishes to claim that the communication of December 1, 2003 contained 3 "separate documents". This defense is frivolous since these documents were sent by a single facsimile transmission and the language of the Contract specifically states that the standard notification regarding lead paint is attached. See Exhibit G, December 1, 2003 fax, Purchase and Sale Agreement ("Contract"), Section 19. In the case here the Contract along with the PTLPN Certification page immediately following the Contract was faxed in the same December 1, 2003 transmission.

Also, in the December 1, 2003 fax, Dick Shoestock states that signatures must be made where appropriate. See Exhibit G, December 1, 2003 fax cover sheet. This clearly

6

indicates that the Certification page was intended to be attached to the Contract since it is required to be signed before the buyer entered into the Contract.

Also, Century 21 has admitted that the certification page 11 was faxed "together with the purchase and sales agreement". See Exhibit A, Admissions No. 2.

Additionally, Mary Jane Delmaso , representing Century 21, testified that the certification page of the PTLPN was *attached* to the purchase and sale contract. See Exhibit B, Century 21 Depo. page 48, lines 10-19.

Similarly, Century 21's claim that it faxed three separate documents on December 1, 2003 would be frivolous, and should not be allowed to unduly burden the jury.

- *Francis Buckley disclosed the Property Transfer Lead Paint Notification ("PTLPN") to the buyer's of the subject property. (Defendant's Contested Fact #7).*

Century 21 wishes to raise the defense that Francis Buckley disclosed the PTLPN and thereby complied with the lead paint disclosure law. This is completely unsupported by the evidence and is contradicted by Century 21's own answers to interrogatories and testimony. See Exhibits_A, Interr. Nos. 1 and 4C., Exhibit B,_Century 21 Depo. page 35, lines 9-16; page 46, lines 6-15. Indeed, Mr. Shoestock testified that when Century 21 was made aware of the question of whether or not the lead paint disclosures were made to

7

the Plaintiff, Century 21, as represented by Mary Jane Delmaso and Harold Dupee,
requested that Mr. Shoestock be contacted. Mr. Shoestock testified that he informed Ms.
Delmaso and Mr. Dupee that he believed he had disclosed the information. Century 21
did not contact Francis Buckley at that time and has never claimed in its pleadings before
the Court that Ms. Buckley was the disclosing agent. See Exhibit F, Shoestock Depo.
page 16, lines 16-25; pages 17-19.

Century 21 should be barred from now making such a frivolous and unsupported
claim and unnecessarily burden the jury at trial.

- _**The language of the purchase and sale contract does not represent that the
  attachment to the purchase and sale contract was the Property Transfer Lead
  Paint Notification ("PTLPN"). (Defendant's Contested Fact #8).**_

Century 21 wishes to raise the defense that the language of the purchase and sale
contract sent to Plaintiff does **not** represent that the PTLPN was attached. This is a
matter of customary language and contract interpretation and not a matter for jury
determination.

The interpretation that the language of the Contract represents that the PTLPN is
attached, is supported by *2A Sutherland Statutory Construction* section 47.33 at 270 (5th
ed. 1992) (commonly referred to as the rule of "last antecedent"). It is obvious that, if the
meaning of the Contract was for the certificate page of the standard notification to be the
only attachment, a comma **would not have been added** *to separate* the phrase "which is
attached hereto" from the immediately preceding antecedent "the certificate…". See

8

Exhibit G, December 1, 2003 fax, Contract section 19. Therefore, the act of inserting the comma preceding "which is attached hereto" has *no other purpose* than to indicate inclusion of the standard notification form as an attachment to the Contract. This is evidence that the qualifying phrase "which is attached hereto" refers to "all antecedents instead of only to the immediately preceding" one (*Id.*). Furthermore, there is a large body of case law in support of Plaintiff's belief. For instance:

See Exhibit H, *WAID v. STATE 2000* WY 15 996 P.2d 18, paragraph 18, "That phrase is set off by commas, and is separated from the preceding language by a comma leading to a grammatical interpretation that the legislature intended the phrase as a modifier for all preceding phrases."

Also see Exhibit H, *Tietema v. State* 1996 WY 149 926 P.2d 952, paragraph 10, "In accordance with traditional rules of grammatical construction, a comma preceding a prepositional phrase denotes that the phrase pertains to all antecedents;".

Also see Exhibit B to docket entry #39, excerpts from *TAKING TEXT AND STRUCTURE REALLY SERIOUSLY* , 74 Tex. L. Rev. 237 (1995) at 246, "It seems most charitable to begin with the presumption that commas were intended to be meaningful, so that the burden of proof should be on the person who wishes to ignore certain commas as superfluous."

Finally, the Magistrate Judge also finds that the language of the Contract "appears to require such attachment". See Magistrate Judge's Report and Recommendation page 17-18.

9

Consequently, Century 21's claim here is a matter of legal interpretation and should be eliminated from jury consideration as contrary to accepted meaning and case law.

- **_Between December 1, 2003 and the date Plaintiff entered into the purchase and sale agreement, Century 21 was not silent as to the Property Transfer Lead Paint Notification ("PTLPN"). (Not Stipulated By Defendant)._**

Century 21 wishes to raise the defense that it was **not** silent regarding the PTLPN after December 1, 2003 and before the date that Plaintiff entered into the purchase and sale agreement. *There is no evidence, or contention by Century 21, in the record to support that Century 21 informed Plaintiff of the PTLPN at any time after December 1, 2003.* Indeed, the 30(b)(6) testimony of Mary Jane Delmaso contradicts this defense. Century 21 contends that page 11 of the PTLPN was given to Plaintiff on three separate occasions none of which were after December 1, 2003. See Exhibit B, Century 21 Depo. page 35, lines 9-16.

Such a defense is frivolous and should be eliminated from jury consideration.

Respectfully Submitted,

Maarten N. Pellegrini, *pro se*
56 Liberty Street
North Adams, MA 01247

10

**CERTIFICATE OR SERVICE**

I, Maarten N. Pellegrini, certify that on November 8, 2007 a copy of the above document was mailed by first class mail, postage prepaid, to counsel of record for Century 21 at the address below:

Andrew Lawendowski
Morrison Mahoney LLP
1500 Main Street, Suite 2400
P.O. Box 15387
Springfield, MA   01115-5387

_____
Maarten N. Pellegrini

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                 *
MAARTEN N. PELLEGRINI and        *
NICOLA M. PELLEGRINI,            *
           Plaintiffs            *  Case Number:  05CV30077-KPN
                                 *
vs.                              *
                                 *
CENTURY 21, HAROLD DUPEE         *
REALTORS,                        *
           Defendant             *
                                 *
* * * * * * * * * * * * * * * * * * * * * * * *
```

## DEFENDANT'S ANSWERS TO PLAINTIFFS' REQUEST FOR ADMISSIONS

1.    Century 21 did not send the entire Property Transfer Lead Paint Notification Package ("Package") to the Plaintiffs for their signature prior to Plaintiffs' signing the purchase and sales agreement.

**Answer:      Denied.**

2.    Century 21 faxed page 11 of the Package together with the purchase and sales agreement to the Plaintiffs for Plaintiffs' signature.

**Answer:      Admit.**

3.    Century 21 represented the SELLER in the transaction of the property involved in this lawsuit.

**Answer:      Admit.**

4.     Century 21 knew of its obligation to provide the Package to the Plaintiffs prior to Plaintiffs'

signing of a purchase and sales agreement.

**Answer:       Admit.**

5.     That each of the following documents, a copy of which is attached to these requests, is

genuine.

      a.     December 1, 2003 Facsimile Transmittal Sheets

      b.     November 1, 2004 Letter and Enclosures from Harold Dupee to the Plaintiffs.

**Answer:**

      **a.     Admit.**

      **b.     Admit.**

Signed under the pains and penalties of perjury this ___ 3 7th day of January, 2006.

Mary-Jane Dalmaso
Mary-Jane Dalmaso

As to all Objections:

The Defendants,
By their Attorney

/s/ Richard F. Faille
Richard F. Faille, Esquire, BBO#: 157640
Law Offices of Donald E. Phillips
1414 Main Street, Suite 550
Springfield, MA 01144
(413) 730-6328
Fax-(413) 730-6361
rffaille@stpaultravelers.com

## CERTIFICATE OF SERVICE

I, Richard F. Faille, Attorney for the Defendants, hereby certify that on January 30, 2006, I copied the foregoing Answers to Plaintiffs' Interrogatories by mailing a copy of the same, postage prepaid, to:

> Maarten N. Pellegrini, Pro Se
> Nicola M. Pellegrini, Pro Se
> 56 Liberty Street
> North Adams, MA   01247

/s/ Richard F. Faille

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                  *
MAARTEN N. PELLEGRINI and         *
NICOLA M. PELLEGRINI,             *
          Plaintiffs              *   Case Number:  05CV30077-KPN
                                  *
vs.                               *
                                  *
CENTURY 21, HAROLD DUPEE          *
REALTORS,                         *
          Defendant               *
                                  *
* * * * * * * * * * * * * * * * * * * * * * * *
```

## DEFENDANT'S ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

1.     Does Century 21 claim that the entire Property Transfer Lead Paint Notification Package ("Package") was sent to the Plaintiffs prior to Plaintiffs' signing the purchase and sales agreement? If so, state the basis of that claim.

**Answer:**     Yes, because it was.


2.     Does Century 21 claim that it is not liable under the law even if Century 21 did not. in fact. send the Package to the Plaintiffs?  If so, state the basis of that claim.

**Answer:**     This calls for a legal opinion which I do not feel qualified to answer.


3.     Specifically identify the information likely to be obtained from each individual identified in Defendant's Initial Disclosure for which Defendant may use to support its claims and/or defenses.

**Answer:**     This question is confusing, overly broad, not in proper form and again calls for legal opinions for which I do not feel qualified to answer.

Signed under the pains and penalties of perjury this 13th day of January, 2006.

Mary Jane Dalmaso
Mary-Jane Dalmaso

As to all Objections:

The Defendants,
By their Attorney

/s/ Richard F. Faille
Richard F. Faille, Esquire, BBO#: 157640
Law Offices of Donald E. Phillips
1414 Main Street, Suite 550
Springfield, MA 01144
(413) 730-6328
Fax-(413) 730-6361
rffaille@stpaultravelers.com

## CERTIFICATE OF SERVICE

I, Richard F. Faille, Attorney for the Defendants, hereby certify that on January 18, 2006, I copied the foregoing Answers to Plaintiffs' Interrogatories by mailing a copy of the same, postage prepaid, to:

Maarten N. Pellegrini, Pro Se
Nicola M. Pellegrini, Pro Se
56 Liberty Street
North Adams, MA  01247

/s/ Richard F. Faille

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|                                   |   |                            |
|-----------------------------------|---|----------------------------|
|                                   | \* |                            |
| MAARTEN N. PELLEGRINI and         | \* |                            |
| NICOLA M. PELLEGRINI,             | \* |                            |
|                    Plaintiffs     | \* | Case Number: 05CV30077-KPN |
|                                   | \* |                            |
| vs.                               | \* |                            |
|                                   | \* |                            |
| CENTURY 21, HAROLD DUPEE          | \* |                            |
| REALTORS,                         | \* |                            |
|                    Defendant      | \* |                            |
|                                   | \* |                            |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S ANSWERS TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

4.    What is the basis of Century 21's answer of "Yes, because it was." To question 1 of

Plaintiff's first set of interrogatories, specifically including:

A.    On what date and time was the Property Transfer Lead Paint Notification Package

("Package") transferred to the Plaintiffs ("Maarten Pellegrini and/or Nicola

Pellegrini")?

B.    Does Century 21 have any evidence to verify this date and time? And if so identify

the evidence.

C.    By whom was the Package transferred to Maarten Pellegrini and/or Nicola

Pellegrini?

D.    Does Century 21 have any evidence to verify by whom it was transferred to Maarten

Pellegrini and/or Nicola Pellegrini? And if so identify the evidence.

H.    Does Century 21 have any evidence to verify to whom the Package was transferred? And if so identify the evidence.

I.    Were any oral, written or electronic communications between Century 21 and Maarten Pellegrini and/or Nicola Pellegrini conduced at the time of the alleged transfer of the Package? If so:

(i)    What was said or communicated in the oral, written or electronic communications at the time of transfer of the Package?

(ii)   Does Century 21 have any evidence to verify any oral, written or electronic communications between Century 21 and Maarten Pellegrini and/or Nicola Pellegrini at the time of transfer of the Package? And if so identify the evidence.

ANSWER:

A.    Date Unknown

B.    No.

C.    Richard Shoestock.

D.    The testimony of Richard Shoestock.

H.    The testimony of Richard Shoestock.

I.

(i)    Oral summarization of lead paint package.

(ii)   Testimony of Richard Shoestock.

2

Signed under the pains and penalties of perjury this __ 13ᵗʰ day of March, 2006.

Mary-Jane Dalmaso

Mary-Jane Dalmaso

As to all Objections:

The Defendants,
By their Attorney

/s/ Richard F. Faille
Richard F. Faille, Esquire, BBO#: 157640
Law Offices of Donald E. Phillips
1414 Main Street, Suite 550
Springfield, MA 01144
(413) 730-6328
Fax-(413) 730-6361
rffaille@stpaultravelers.com

## CERTIFICATE OF SERVICE

I, Richard F. Faille, Attorney for the Defendants, hereby certify that on March 13, 2006, I copied the foregoing Answers to Plaintiffs' Second Set of Interrogatories by mailing a copy of the same, postage prepaid, to:

> Maarten N. Pellegrini, Pro Se
> Nicola M. Pellegrini, Pro Se
> 56 Liberty Street
> North Adams, MA 01247

/s/ Richard F. Faille

1

1           UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

4    MAARTEN N. PELLEGRINI,            )
              Plaintiff               )      CIVIL ACTION NO.
5                                      )      05CV30077-KPN
     VS.                               )
6                                      )
     CENTURY 21, HAROLD DUPEE          )      APRIL 26, 2006
7    REALTORS,                         )
              Defendant               )
8    _____)

9

10

11          DEPOSITION OF:  MARY-JANE DALMASO, taken before
            Laurie A. Monaghan, Certified Shorthand
12          Reporter, Registered Professional Reporter and
            Notary Public, pursuant to Rule 30 of the Federal
13          Rules of Civil Procedure, at the Offices of
            Philbin & Associates, 959 Main Street,
14          Springfield, Massachusetts, on April 26, 2006,
            commencing at 11:00 a.m.

15

16

17

18   APPEARANCES:

19   (SEE PAGE 2)

20

21

22                    Laurie A. Monaghan
23               Certified Shorthand Reporter
                Registered Professional Reporter

5

1              MARY-JANE DALMASO, Deponent, having been first

2         duly sworn, deposes and says as follows:

3

4                   DIRECT EXAMINATION BY MR. PELLEGRINI:

5         Q.    Could you please state your name?

6         A.    Mary-Jane Dalmaso.

7         Q.    And your current address, please?

8         A.    Business or home?

9         Q.    Both.

10        A.    My business address is Century 21, Harold Dupee

11   Realtors, 40 Main Street, North Adams, Massachusetts,

12   01247.  My residence is 80 North Holden, H-O-L-D-E-N,

13   Street, North Adams, Massachusetts, 01247.

14        Q.    And what is your position at Century 21?

15        A.    I am one of the shareholders.  I am the

16   President, Treasurer, and the responsible broker.

17        Q.    By responsible broker, what duties comes with

18   that?

19        A.    The whole thing.

20        Q.    Is that equivalent to a listing agent, or is a

21   listing agent something different?

22        A.    Well, I am also a listing agent.  The sales

23   associates who are licensed in our office can be listing

959 MAIN STREET     PHILBIN & ASSOCIATES, INC.     (413) 733-4078
4TH FLOOR                                                      Phone (413) 499-2251
SPRINGFIELD, MA 01103                                         FAX (413) 734-6588

Serving the legal community of Massachusetts since 1947

9

1          A.   Well, I know what the normal procedure for

2     disclosure of property transfer lead paint notification

3     package is.

4          Q.   So, there was no additional preparation

5     undertaken with regards to category 1 to more specifically

6     inform you of perhaps more details than would just be your

7     normal understanding?

8          A.   No.

9          Q.   Were there any files consulted or information

10    with regard to category 1 specially consulted before this

11    deposition for the purpose of preparation?

12         A.   No, we have a standard procedure.

13         Q.   Are you prepared to testify as to matters known

14    or reasonably available to Century 21 covering category 2?

15         A.   Yes.

16         Q.   How were you so prepared to inform yourself to

17    category 2 before this deposition? Was there any

18    additional preparation?

19         A.   No.

20         Q.   Are you prepared to testify as to matters known

21    or reasonably available to Century 21 covering category 3?

22         A.   Yes.

23         Q.   How are you so prepared for questioning with

959 MAIN STREET
4TH FLOOR
SPRINGFIELD MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
2nd side (413) 499-2284
FAX (413) 734-4588

Serving the legal community of Massachusetts since 1947

1     regards to category 3?

2          A.    I looked in the file.

3          Q.    Which files did you look in?

4          A.    The file for 56 Liberty Street.

5          Q.    Do you recall specifically what documents were

6     in that file, to the best of your recollection?  Could you

7     name the documents contained in the file?

8          A.    Certainly.  There was a listing agreement with

9     the seller.  There was a fact sheet from multiple

10    listing.  There was a lead paint disclosure signed by the

11    seller.  There was an agency disclosure signed by the

12    seller.  There was an agency disclosure signed by the

13    buyer.  There was a copy of a signed page 11 of the

14    transfer return -- rather, lead disclosure notification.

15    There was a copy of the purchase and sale agreement signed

16    by both parties.  Agency disclosure, signed by buyers.

17         Q.    Were there any other files or information in the

18    preparation for category 3 testimony that you reviewed?

19         A.    Any other files?

20         Q.    Mm-hmm, yes, or information?

21         A.    There was a copy of the home inspection report,

22    a copy of an addendum to the purchase and sale.

23         Q.    Did you talk to anybody about category 3,

959 MAIN STREET
FLOOR
SPRINGFIELD MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-1078
phone (413) 499-2231
FAX (413) 731-1588

Serving the legal community of Massachusetts since 1967

11

1     matters related to category 3?

2          A.     Yes, I spoke to Mr. Shoestock.

3          Q.     Did you talk to him in person?

4          A.     Over the phone.

5          Q.     When did you talk to Mr. Shoestock first

6     regarding this matter?

7          A.     I don't remember the date.

8          Q.     Was it while he was in Florida?

9          A.     Yes.

10         Q.     Is there any information when Mr. Shoestock

11    would be returning?

12         A.     I have no idea.

13         Q.     Are you prepared to testify as to matters known

14    or reasonably available to Century 21 covering category 4

15    of the notice?

16         A.     Yes.

17         Q.     How are you so prepared for that category, such

18    as any files reviewed, any persons talked to?

19         A.     No.

20         Q.     So, only from your personal knowledge are you

21    testifying with regards to category 4?

22         A.     Yes.

23         Q.     Are you prepared to testify as to the matters

959 MAIN STREET      **PHILBIN & ASSOCIATES, INC.**      (413) 734-0078
4TH FLOOR                                                           Toll free (413) 499-4251
SPRINGFIELD, MA 01105                                               FAX (413) 734-4588

serving the legal community of Massachusetts since 1947

—34

1      Q.   Without notifying Mr. Shoestock first, they

2   would --

3      A.   No, if Mr. Shoestock asked someone to do it,

4   someone else might have done it.  I can't tell who did it.

5      Q.   Okay.  So you're saying Century 21's policy

6   would require that Mr. Shoestock be aware that this was

7   faxed?  This would not have been done over his head,

8   correct?

9      A.   No.

10     Q.   So, by no do you mean that he is required to be

11  aware of this?

12     A.   Of course he would be aware of it.

13     Q.   Who is the office coordinator?

14     A.   James Debarry.

15     Q.   Did Mr. Shoestock tell you that he gave the

16  entire package to the plaintiff?

17     A.   Yes.

18     Q.   Under what circumstances did he explain?

19     A.   He said he had given it to the plaintiff in

20  person, an entire package.

21     Q.   All eleven pages?

22     A.   All eleven pages.

23     Q.   Signed by Mr. Bronson?

759 MAIN STREET
4TH FLOOR
SPRINGFIELD MA 01105

PHILBIN & ASSOCIATES, INC.

(413) 733-1078
(413) 499-2251
FAX (413) 731-1588

Serving the legal community of Massachusetts since 1947

35

1       A.    Signed by Mr. Horrigan.

2       Q.    So, it was signed by Mr. Horrigan and Frances

3   Buckley?

4       A.    She was the listing agent.

5       Q.    And their signatures were, according to

6   Mr. Shoestock, on the entire package that he gave to me in

7   person, according to what Mr. Shoestock told you?

8       A.    Yes.

9       Q.    So, is it Century 21's testimony that I received

10  page 11 at three different times, all of which were signed

11  by Mr. Horrigan and Mrs. Buckley, referring to, one, the

12  testimony that Mr. Shoestock gave it to me in person as

13  one, two, as in the November 29th fax from persons

14  unknown, and three, from the December 1st fax from

15  Mr. Shoestock?

16      A.    That's correct.

17      Q.    Did Mr. Shoestock tell you that he gave me any

18  instructions about the package itself during the time it

19  was presented to me allegedly in person?

20      A.    No, he did not tell me.

21      Q.    He didn't say that any communications were

22  conducted, verbally or otherwise, about the contents of

23  the package?

959 MAIN STREET
4TH FLOOR
SPRINGFIELD MA 01105

PHILBIN & ASSOCIATES, INC.

(413) 734-4078
Pittsfield (413) 499-2231
FAX (413) 734-4588

Serving the legal community of Massachusetts since 1947

36

1          A.    He said that he spoke with you several times.

2     He met you in person more than once, but I don't know what

3     the content of the conversation was.

4          Q.    So, spoke several times could have referred to

5     just general real estate things and not necessarily

6     anything to do with the package, is that correct?

7          A.    I do not know.

8          Q.    Did he tell you any reason for his faxing me or

9     someone in the office repeatedly faxing me a document

10    which I received prior?

11         A.    No, he did not.

12         Q.    When was the date in which he allegedly

13    delivered the package in person to me?

14         A.    I do not know.

15         Q.    He did not?

16         A.    I do not know.

17         Q.    Did Mr. Shoestock give you any indication as to

18    his recollection as to when that was, even generally?

19         A.    He told me that he thought he had delivered an

20    entire lead package to Nicola on the evening of the Friday

21    that you gentlemen looked at the house, and I was with you

22    earlier in the day.

23         Q.    So this was after you had left, according to

959 MAIN STREET          PHILBIN & ASSOCIATES, INC.          (413) 733-1078
4TH FLOOR                                                          Boston (413) 199-2251
SPRINGFIELD MA 01103                                              FAX (413) 734-1588

Serving the legal community of Massachusetts since 194⁷

47

1        A.    Mm-hmm.

2        Q.    And again, there is no page number on this

3   sheet, correct?

4        A.    Correct.

5        Q.    And on the top it says "Property Transfer

6   Notification Certification", correct?

7        A.    It says "Notification Certification", has

8   received property transfer lead notification.

9        Q.    And the word "notification" is in the top here?

10       A.    That is the certification.

11       Q.    Does this Property Transfer Notification

12   Certification contain the federal lead warning statement

13   and a notice of the federal lead warning statement on this

14   notification certification page itself?

15       A.    It says "Required Federal Lead Warning

16   Statement".

17       Q.    And is that not the same statement in which is

18   referred to in the purchase and sales agreement?

19       A.    It refers to Massachusetts lead disclosure.

20       Q.    The wording of this, does it not say that the

21   seller and brokers have provided to the buyer the standard

22   notification form from the Massachusetts Department of

23   Public Health concerning lead paint, the certificate for

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-1078
(413) 499-2251
FAX (413) 734-4588

Serving the legal community of Massachusetts since 1947

48

1    which the buyer has signed?

2        A.    Yes.

3        Q.    Does this Exhibit 3 page with no identification

4    number refer to that number 19 on the purchase and sales

5    agreement in which Mr. Shoestock has attached? Does number

6    19 on the lead paint --

7        A.    I'm sorry, I don't understand your question,

8    because the one that you're referring to in the Exhibit 3

9    is unsigned by the buyers.

10        Q.    Correct.  The question is does number 19 on the

11    contract in which Mr. Shoestock faxed refer to where it

12    says attached hereto refer to this page, which is the

13    unnumbered page, property transfer notification

14    certification? Is that not what this is referring to?

15        A.    This certificate for which the buyer has signed

16    which is attached hereto.

17        Q.    It was attached with the fax, correct?  The fax

18    in which Mr. Shoestock sent has this page attached?

19        A.    Yes.

20                    MR. PELLEGRINI: The deposition is

21                concluded.  Thank you very much.

22                    THE WITNESS: Okay.

23                    (Deposition concluded)

959 MAIN STREET    PHILBIN & ASSOCIATES, INC.    (413) 733-1078
4TH FLOOR                                            Boston (413) 499-2231
SPRINGFIELD, MA 01103                                FAX (413) 734-1588

Serving the legal community of Massachusetts since 1947

49

1    COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF HAMPDEN

2

3            I, LAURIE A. MONAGHAN, a Notary Public within
     and for the Commonwealth of Massachusetts, do hereby
4    certify that I took the deposition of MARY-JANE DALMASO,
     pursuant to Rule 30 of the Federal Rules of Civil
5    Procedure, on April 26, 2006, at the Offices of Philbin &
     Associates, 959 Main Street, Springfield, Massachusetts.
6
             I further certify that the above named deponent
7    was by me first duly sworn to testify to the truth, the
     whole truth and nothing but the truth concerning her
8    knowledge in the matter of the case of MAARTEN N.
     PELLEGRINI vs. CENTURY 21, HAROLD DUPEE REALTORS, now
9    pending in the United States District Court for the
     District of Massachusetts.
10
             I further certify that the within testimony was
11   taken by me stenographically and reduced to typewritten
     form under my direction by means of COMPUTER ASSISTED
12   TRANSCRIPTION; and I further certify that said deposition
     is a true record of the testimony given by said witness.
13
             I further certify that I am neither counsel for,
14   related to, nor employed by any of the parties to the
     action in which this deposition was taken; and further,
15   that I am not a relative or employee of any attorney or
     counsel employed by the parties hereto, nor financially or
16   otherwise interested in the outcome of the action.

17           WITNESS my hand this 9th day of May, 2006.

18
             Laurie A. Monaghan
19           Notary Public
             Certified Shorthand Reporter
20           Registered Professional Reporter

21
     My commission expires
22   August 8, 2006

23

959 MAIN STREET        PHILBIN & ASSOCIATES, INC.        (413) 733-4078
4TH FLOOR                                                Statewide (413) 499-2251
SPRINGFIELD MA 01103                                     FAX: (413) 734-6588

Serving the legal community of Massachusetts since 1947

(Sample Disclosure Format for Target Housing Sales)

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

(i)—— Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

(ii)——Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

(i)——Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below)

_____

(ii)—— Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c)——Purchaser has received copies of all information listed above.

(d)——Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.

(e)——Purchaser has (check (i) or (ii) below):

(i)—— received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

(ii)—— waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f)——Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| Seller | Date | Seller | Date |
| Purchaser | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

misstated the statutory definition by limiting the 0-bedroom dwelling exception to housing where no children under 6 reside or are expected to reside. EPA and HUD have modified the definition to reflect the statutory language.

16. *0-bedroom dwelling* means any residential dwelling in which the living area is not separated from the sleeping area. Such term includes efficiencies, studio apartments, dormitory housing, military barracks, and rentals of individual rooms in residential dwellings.

In the preamble of the proposed rule, EPA and HUD clarified their interpretation of this term by identifying efficiencies, studio apartments, dormitory housing, military barracks, and other such housing in which the living area is unseparated from the sleeping area as types of dwellings that are not covered under the rule. EPA and HUD have added rentals of individual rooms in a residential dwelling to the types of transactions that would involve a 0-bedroom dwelling. All of these clarifications are included in the regulatory definition in the final rule's regulatory text.

*D. Changes to the Disclosure Requirements*

Section 1018(a)(1)(B) requires that "before the purchaser or lessee is obligated under any contract to purchase or lease the housing, . . .the seller or lessor shall. . .disclose to the purchaser or lessee the presence of any known lead-based paint or any lead-based paint hazards, in such housing, and provide any lead hazard evaluation report available to the seller or lessor."

EPA and HUD received more than 150 comments on their proposed requirements for such information disclosure, addressing both the proposed disclosure process and the issue of what information should be covered. In particular, recurring themes among the comments included: (1) The need for greater specificity regarding the necessary timing for disclosure activities; (2) concerns over which activities should constitute disclosure; and (3) what kinds of information should be disclosed under this rule. The following is a brief discussion of these key points and a summary of the regulatory requirements.

1. *Timing of disclosure events.* In addressing the need for greater clarity regarding the timing of disclosure activities, EPA and HUD have attempted to maximize the parties' flexibility in incorporating these requirements during negotiations. EPA and HUD believe that this flexibility is important given the

many types of transactions covered by these provisions and the existence of distinct local requirements and customs. Therefore, the final rule identifies only the latest point at which full disclosure must occur. Using the statute as a guide, EPA and HUD have identified this point as before the purchaser or lessee becomes obligated under any contract to purchase or lease the housing.

Some commenters raised the concern, however, that without additional clarification regarding how and when information must be disclosed, the final rule could cause unnecessary confusion regarding how the requirements will work in actual practice. After reviewing the framework set out in the proposed rule, EPA and HUD have revised and clarified the requirements in a number of ways. First, the final rule contains numerous minor changes to the wording of definitions and requirements to clarify that the rule does not require mass disclosure to all prospective purchasers, regardless of their degree of interest. Second, the rule requires that certain disclosure and acknowledgment language become part of the final sale or lease contract. In making these changes, EPA and HUD have considered the typical negotiation process involved in leasing and sales transactions.

During sales transactions, for example, purchasers often take the first step toward formalizing a sales agreement by providing a written offer to purchase the housing. If accepted and signed by the seller, this offer typically becomes the sales contract. The statute's mandate that disclosure and notification take place before the purchaser is obligated imposes a requirement on the seller to disclose information before accepting the purchaser's offer, thereby allowing the purchaser an opportunity to review the information and to possibly amend the offer. If a seller were to accept a purchaser's offer and obligate the purchaser before disclosing known information, such a seller would be in violation of Title X and this rule. Of course, the parties can always agree to conduct the disclosure activities in advance of contract discussions, provided that the final contract includes the signed and dated disclosure elements mandated by this rule.

In leasing transactions, the disclosure process is even simpler. While the parties are free to negotiate when the disclosure process occurs, lessors must provide the information and complete the disclosure portions of the lease (or attachment) before the lessee becomes obligated under a contract to lease the housing. By requiring that the disclosure information be included in or as an attachment to the lease, EPA and

HUD seek to ensure that the disclosure process automatically occurs during lease negotiations.

The requirement that the contract or an attachment include disclosure language fulfills two additional functions. First, the process of completing and signing these sections ensures that all parties are aware of their rights and obligations and are able to confirm that the appropriate actions have already occurred. Second, this disclosure language provides a clear record of compliance.

While sections 1018(a)(2) and (3) mandate lead warning language for all sales transactions, the inclusion of such language as an attachment to leases is not specifically mandated by Title X. EPA and HUD, however, believe that it is necessary to include the warning language in leases as well. Further, the completion and retention of disclosure and acknowledgment language is a necessary component of any effective, enforceable disclosure requirement for leasing transactions.

2. *Components of full disclosure.* EPA and HUD consider full disclosure to have occurred when the seller or lessor has provided the following items to the purchaser or lessee.

a. *A lead hazard information pamphlet approved by EPA.* As required by TSCA section 406, EPA has developed a lead hazard information pamphlet, entitled *Protect Your Family from Lead in Your Home*, and has made it available through government channels and private sources. EPA issued the final notice of the pamphlet's availability in the Federal Register of August 1, 1995 (60 FR 39167). In addition to providing detailed information on how to obtain copies (individually, in bulk, and as camera-ready reprints), the notice describes the process of developing the pamphlet, including considerable public review and comment.

The statute also allows States to develop their own lead hazard information pamphlets under section 406, provided that they obtain authorization and approval from EPA. Several States that already have disclosure provisions have expressed their desire to seek approval to use their own pamphlets in lieu of the Federal pamphlet. EPA and HUD encourage States interested in developing their own materials to seek approval of their pamphlets for distribution under the section 1018 regulations.

b. *Notice of the presence of known lead-based paint and/or lead-based paint hazards.* Sellers and lessors must disclose, based on their actual knowledge, whether the target housing

# TYPES OF AGENCY REPRESENTATION IN MASSACHUSETTS

## SELLER'S AGENT

When a seller engages in the services of a listing broker, that seller becomes the broker's client. This means the broker, and his/her subagents represent the seller. They owe the seller undivided loyalty, utmost care, disclosure, obedience to lawful instruction, confidentiality and accountability. They must put the seller's interest first and negotiate for the best price and terms for their client, the seller. (the seller may also authorize subagents to represent him/her in marketing the property to buyers).

## BUYER'S AGENT

When a buyer engages in the services of a broker then that broker becomes the broker's client. The broker owes the buyer undivided loyalty, utmost care, disclosure, obedience to lawful instruction, confidentiality and accountability. They must put the buyer's interest first and negotiate for the best price and terms for their client, the buyer. (The buyer may also authorize subagents to represent him/her in locating property).

## DISCLOSED DUAL AGENT

A broker can work for both the buyer and the seller on the same property provided the broker obtains the informed consent of both parties. The broker is then considered a disclosed dual agent. This broker owes the seller and the buyer a duty to deal with them fairly and honestly. In this type of agency relationship the broker does not represent either the seller or buyer exclusively and they cannot expect the broker's undivided loyalty. Also, undisclosed dual agency is illegal.

 

MASSACHUSETTS BOARD OF REGISTRATION OF REAL ESTATE BROKERS AND SALESPERSONS
# MANDATORY AGENCY DISCLOSURE – AGENCY RELATIONSHIP

The purpose of this disclosure is to enable you to make informed choices before working with a real estate
licensee. It must be provided at the first personal meeting that you have with an agent to discuss a specific
property. THIS IS NOT A CONTRACT. It is a disclosure notice for your information and protection. BE SURE TO
READ THE DESCRIPTIONS OF THE DIFFERENT TYPES OF AGENCY REPRESENTATION IN THIS
DISCLOSURE.

## CONSUMER INFORMATION

1.  Whether you are the buyer or the seller, you can choose to have the advice, assistance and representation of
    your own agent. Do not assume that a broker is acting on your behalf unless you have contracted with that
    broker to represent you.
2.  All real estate licensees must, by law, present properties honestly and accurately.
3.  If you are a seller you may authorize your listing agent to cooperate with agents from other firms to help sell
    your property. These cooperating agents may be subagents who work for the seller or buyer's agents.
4.  If you are the buyer you have the option of working with sellers' or buyers' agents. This decision will depend
    on the types of services you want from a real estate agent. A buyer should tell sellers' agents, including
    subagents, only what he/she would tell the seller directly.

## CONSUMER RESPONSIBILITY

The duties of a real estate licensee do not relieve the consumer of the responsibility to protect his/her own
interest. If you need advice for legal, tax, insurance or other matters it is your responsibility to consult a
professional in those areas.

## ACKNOWLEDGEMENT

I have provided this disclosure form to x/'aarten N. Pellegrini , NICOLA M PELLEGRINI

I have informed the above named consumer that I am a: (check one)    ☐ Seller's Agent    ☒ Buyer's Agent.

_Dick Shenton_                          _9056/08_
(Signature of Real Estate Agent)        (License Number)              (Date)

I have read this agency disclosure form IN ITS ENTIRETY, INCLUDING THE INFORMATION regarding
BUYER'S AGENT, SELLER'S AGENT and DISCLOSED DUAL AGENT. I understand that this form is for agency
disclosure and NOT A CONTRACT. It was provided to me by the agent named above.

_Maart n. Pellegr_                       _12-4-03_        Check Here: ☒ Buyer
(Signature of Consumer/s)                (Date)                       ☐ Seller

☐  As a Consumer, I recognize that I need not select any agency representations at this time. Therefore, I
    decline to sign this disclosure. Any additional reason for declining to sign:

_____
(Please print name of consumer and reason, if any.)





ORIGINAL

1              UNITED STATES DISTRIC COURT
                DISTRICT OF MASSACHUSETTS

2                CASE NO.   05CV30077-MAP

3

4    MAARTEN N. PELLEGRINI,

5          Plaintiff,

6    vs.

7    CENTURY 21, HAROLD DUPEE
     REALTORS,

8
           Defendant.

9

10
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
11   VIDEOTAPE
     DEPOSITION OF:      RICHARD SHOESTOCK
12
     DATE TAKEN:         December 28, 2006
13
     TIME:               COMMENCED AT 10:09 a.m.
14                       CONCLUDED AT 12:05 p.m.

15   PLACE:              432 S. Beach Street
                         Daytona Beach, Florida
16
     STENOGRAPHICALLY
17   REPORTED BY:        SANDRA NARUP
                         REGISTERED PROFESSIONAL REPORTER &
18                       FLORIDA PROFESSIONAL REPORTER
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
19

20

21

                     VOLUSIA REPORTING COMPANY
22                     432 SOUTH BEACH STREET
                  DAYTONA BEACH, FLORIDA 32114
23                       386-255-2150

24

25

| | | |
|---|---|---|
| 1 | stay for the winter and visit her brother and -- | 10:25:55 |
| 2 | Q.    That was around January '04? | 10:25:59 |
| 3 | A.    It was actually November of '04. | 10:26:05 |
| 4 | And, anyway, I got down here, and my | 10:26:14 |
| 5 | brother-in-law mentioned my background to -- my | 10:26:19 |
| 6 | engineering background to someone he knew.  And I | 10:26:24 |
| 7 | received an offer on a position down here which I | 10:26:28 |
| 8 | couldn't refuse, so we ended up staying down here. | 10:26:31 |
| 9 | Q.    Okay.  Would you ever consider working with | 10:26:37 |
| 10 | Century 21 again? | 10:26:47 |
| 11 | A.    I wouldn't consider working with -- in real | 10:26:49 |
| 12 | estate again at all, due to the fact that you have | 10:26:52 |
| 13 | to -- unless you were going to do it for a long time, | 10:26:55 |
| 14 | you have to create a customer base so that you can get | 10:26:59 |
| 15 | a lot of referrals.  It takes a long time to get your | 10:27:04 |
| 16 | name out there and obtain a lot of client base.  So, | 10:27:08 |
| 17 | actually, there isn't -- unless you do that, there | 10:27:15 |
| 18 | isn't really a steady income.  And I was extremely | 10:27:19 |
| 19 | used to a steady income. | 10:27:22 |
| 20 | And the other problem is that you have to | 10:27:28 |
| 21 | depend on people keeping their word and buyers and | 10:27:31 |
| 22 | sellers and the public.  That's difficult for them to | 10:27:36 |
| 23 | do.  They change their mind a lot. | 10:27:41 |
| 24 | Q.    Okay.  So you haven't discussed the | 10:27:44 |
| 25 | possibility of any future employment with any | 10:27:49 |

*VOLUSIA REPORTING COMPANY*

```
 1    individuals at Century 21?                              10:27:5
 2        A.   No.  I'm quite happy with what I'm doing       10:27:57
 3    right now.  And we intend to stay down in Florida due   10:28:00
 4    to the fact that the climate is much -- suited much     10:28:04
 5    better for my wife and her arthritis.                   10:28:08
 6        Q.   What were the discussions that you had with    10:28:19
 7    Mary Jane Delmaso before appearing for this             10:28:24
 8    deposition?                                             10:28:27
 9        A.   I -- I just basically told her that I had      10:28:29
10    received a copy of the subpoena and faxed her back a    10:28:33
11    copy of the two pages of the subpoena for her records.  10:28:38
12    And that was basically it.  And I told her what day     10:28:44
13    and time it was supposed to be.                         10:28:46
14        Q.   Nothing else discussed at all?                 10:28:50
15        A.   No, sir.                                       10:28:53
16        Q.   Were -- have you discussed with Mary Jane      10:29:00
17    Delmaso -- have you had any discussions with Mary Jane  10:29:04
18    Delmaso regarding this case at any time prior to this   10:29:08
19    latest deposition?                                      10:29:14
20        A.   No, sir.                                       10:29:15
21        Q.   She never asked you anything about your        10:29:24
22    disclosing information?  Did she ever ask you anything  10:29:26
23    about disclosing information?                           10:29:32
24        A.   Originally, when the suit was filed, we did    10:29:33
25    have -- when I was still up there, we had a meeting     10:29:39
```

*VOLUSIA REPORTING COMPANY*

```
1    regarding that.                                            10:29:4:

2         Q.    And who was at that meeting?                    10:29:49

3         A.    Mary Jane Delmaso and Mr. Harold Dupee.         10:29:51

4         Q.    And was Ms. Frances Buckley there?              10:29:58

5         A.    I don't believe so.  No.                        10:30:0

6         Q.    And how did you first become aware of this      10:30:09

7    meeting?                                                   10:30:1:

8         A.    I was in the office, and Mr. Dupee asked me     10:30:1!

9    to join them in the conference room.                       10:30:1!

10        Q.    On that same day that he -- or, was it for a    10:30:2

11   later date that he informed you of there being a          10:30:2:

12   meeting scheduled?                                         10:30:3(

13        A.    It was later, after the paperwork for the       10:30:3:

14   suit was obtained.  I don't know how much later.          10:30:3!

15        Q.    Which paperwork are you referring to?           10:30:4:

16        A.    The original suit.                              10:30:4!

17        Q.    The -- have you read the original complaint?    10:30:5(

18   Are you referring to --                                    10:30:5:

19        A.    I don't -- no, I don't.  I have -- I read it    10:30:5:

20   originally when it first came out, but I do not have a    10:30:5(

21   copy or remember all of it.                                10:31:0:

22        Q.    Did Mr. Harold Dupee present you with that      10:31:0(

23   original complaint?                                        10:31:0!

24        A.    He let me read it.                              10:31:1(

25        Q.    And is that when he was instructing everyone    10:31:1:
```

*VOLUSIA REPORTING COMPANY*

| | | |
|---|---|---|
| 1 | that there would be a meeting called? | 10:31:17 |
| 2 | A.    The only ones that he instructed were Mary | 10:31:20 |
| 3 | Jane Delmaso and myself. | 10:31:25 |
| 4 | Q.    Okay.  So at that time is when he showed the | 10:31:29 |
| 5 | complaint.  Is that correct? | 10:31:34 |
| 6 | A.    Yes, sir. | 10:31:36 |
| 7 | Q.    And was the meeting -- was he scheduling the | 10:31:38 |
| 8 | meeting for that same date or was it for a couple of | 10:31:42 |
| 9 | days later?  Or, what is your general memory of that, | 10:31:45 |
| 10 | of that time frame? | 10:31:49 |
| 11 | A.    I believe it was a few days later. | 10:31:50 |
| 12 | Q.    And what were the discussions about at the | 10:31:57 |
| 13 | meeting itself? | 10:31:59 |
| 14 | A.    What the subpoena was for and what | 10:32:02 |
| 15 | transpired -- what transpired on the -- | 10:32:10 |
| 16 | Q.    The original meeting back when the original | 10:32:13 |
| 17 | complaint was received, that meeting with Mr. Dupee, | 10:32:19 |
| 18 | yourself and Ms. Delmaso, what were the -- what was | 10:32:23 |
| 19 | discussed at that meeting? | 10:32:28 |
| 20 | A.    As I recall, the discussions pertained to | 10:32:30 |
| 21 | what the subpoena or suit, lawsuit was about.  And | 10:32:36 |
| 22 | they, you know, asked -- they asked me if I had given | 10:32:42 |
| 23 | or passed out the lead paint package. | 10:32:45 |
| 24 | Q.    Who asked you that? | 10:32:59 |
| 25 | A.    One of the two of them. | 10:33:01 |

*VOLUSIA REPORTING COMPANY*

```
1       Q.    Do you recall who it was?                    10:33:04

2       A.    No, I don't.                                 10:33:05

3       Q.    I'm sorry?                                    10:33:08

4       A.    No, I do not.                                 10:33:09

5       Q.    I'm sorry.  We just had a noise here.  I just 10:33:10

6   wanted to apologize for that.                           10:33:14

7             And what did you say to them at that time?    10:33:22

8       A.    I informed them that I did provide the        10:33:25

9   pack -- the lead paint package to my client.            10:33:31

10      Q.    And there were no details?  Were there any    10:33:38

11  details in your answer?                                 10:33:45

12      A.    Well, I informed them that my client came to  10:33:49

13  the office the evening after we showed the property.    10:33:54

14  I was -- that particular evening, I was working the     10:33:59

15  evening shift, from five to seven o'clock, and that     10:34:04

16  they came in -- well, actually, you and Maarten came    10:34:09

17  in the office, and we were sitting there, discussing a  10:34:17

18  lot of different --                                     10:34:21

19      Q.    Me -- I'm Maarten, so I'm not who -- I just   10:34:21

20  wanted to be clear who you're referring to.  Could you  10:34:25

21  just use the names of the individuals of who -- of      10:34:28

22  your recollection of -- of what your answer was to Mr.  10:34:34

23  Dupee or Ms. Delmaso?                                   10:34:39

24      A.    I informed them that I gave the lead paint    10:34:41

25  package that evening, after the interest was shown in   10:34:45
```

*VOLUSIA REPORTING COMPANY*

| | | |
|---|---|---|
| 1 | the property. | 10:34:49 |
| 2 | Q.    Who did you give that to? | 10:34:57 |
| 3 | A.    Mr. Pellegrini. | 10:35:02 |
| 4 | Q.    Which Mr. Pellegrini?  There are three Mr. | 10:35:05 |
| 5 | Pellegrinis. | 10:35:09 |
| 6 | A.    Well, it wasn't -- Nicola was at the college | 10:35:10 |
| 7 | that evening.  And Maarten and -- and their father | 10:35:12 |
| 8 | were in the office, and I gave it to them before they | 10:35:19 |
| 9 | left. | 10:35:24 |
| 10 | Q.    Can you be more specific on how that was | 10:35:49 |
| 11 | done? | 10:35:52 |
| 12 | A.    Well, I always carried copies of the lead | 10:35:57 |
| 13 | paint package with me and I had it in my folder behind | 10:36:01 |
| 14 | the desk.  And before they left, I gave them that | 10:36:02 |
| 15 | package. | 10:36:10 |
| 16 | Now, the sheet that -- the last sheet of that | 10:36:14 |
| 17 | package is an unsigned sheet.  It's just a general | 10:36:16 |
| 18 | sheet that tells -- or, shows what you would be | 10:36:21 |
| 19 | signing.  Each property that is listed has a signed | 10:36:25 |
| 20 | sheet from the seller with their signatures on it. | 10:36:33 |
| 21 | Q.    Could you say that last part again? | 10:36:39 |
| 22 | A.    Yes, sir.  Each sheet, each lead paint sheet | 10:36:42 |
| 23 | for each property has a signed sheet pertaining to | 10:36:46 |
| 24 | that specific property signed by the seller. | 10:36:51 |
| 25 | Q.    So when you say lead paint sheet, are you | 10:36:57 |

```
 1   for all the properties were kept in the folders.    I      11:25:38
 2   also had client folders.                                   11:25:42
 3        Q.    So as a subcontractor, independent contractor   11:25:49
 4   with Century 21, could you explain what documents are      11:25:50
 5   you, as an independent contractor, required to             11:25:53
 6   maintain yourself?                                         11:25:58
 7        A.    I'm not required to maintain any documents.     11:25:59
 8        Q.    Are you aware of the deposition of Ms. Mary     11:26:04
 9   Jane Delmaso that took place earlier, a few months         11:26:10
10   ago?                                                       11:26:13
11        A.    No.   I'm aware that she gave a deposition,     11:26:13
12   but I have no information on that deposition.              11:26:16
13        Q.    She never spoke with you about what was         11:26:23
14   discussed at that deposition or her answers.   Is that     11:26:26
15   correct?                                                   11:26:30
16        A.    That is correct.                                11:26:30
17        Q.    If I told you that she stated that each         11:26:33
18   independent contractor was responsible for maintaining    11:26:37
19   their own records at certain points, would that            11:26:42
20   surprise you?                                              11:26:45
21        A.    No.                                             11:26:45
22        Q.    Is that contradictory to what you had stated,   11:26:48
23   that you're not required to maintain any documents?        11:26:52
24        A.    Each agent is required to keep whatever         11:26:56
25   documents he feels necessary.                              11:26:59
```

*VOLUSIA REPORTING COMPANY*

| | | |
|---|---|---|
| 1 | Q.   Well, is it a responsibility or is it | 11:27:0] |
| 2 | something that they feel that they can do if they | 11:27:0] |
| 3 | choose to, that -- | 11:27:1] |
| 4 | A.   Each agent is responsible to keep the records | 11:27:1] |
| 5 | that they want on their clients. | 11:27:1] |
| 6 | Now, the records for properties and -- are | 11:27:1] |
| 7 | kept in a file in the Century 21 file cabinet for -- | 11:27:2] |
| 8 | under the -- for the property.  Each agent keeps his | 11:27:2] |
| 9 | own records pertaining to his clients, such as | 11:27:3] |
| 10 | contacting clients. | 11:27:3] |
| 11 | Q.   So are you saying that Century 21 has custody | 11:27:4] |
| 12 | of these documents and they're also responsible for | 11:27:4] |
| 13 | these documents, and not you?  Is that -- | 11:27:4] |
| 14 | A.   Not necessarily. | 11:27:5( |
| 15 | Q.   I don't understand the answer.  Is the answer | 11:28:0( |
| 16 | not necessarily? | 11:28:0] |
| 17 | A.   That is correct.  I mean, I may have kept | 11:28:0] |
| 18 | some documents on clients in my own client folder that | 11:28:0] |
| 19 | didn't pertain to a property.  We did not keep folders | 11:28:1] |
| 20 | on all clients.  That's the agent's business.  We kept | 11:28:1] |
| 21 | folders on -- and records on all of the properties. | 11:28:2( |
| 22 | Q.   And were those within your custody and | 11:28:3] |
| 23 | control, the documents relative -- related to 56 | 11:28:3] |
| 24 | Liberty Street at any time? | 11:28:4( |
| 25 | A.   Those documents are kept in a folder -- | 11:28:4] |

```
 1   excuse me.  A file in a folder in the office of        11:28:44
 2   Century 21.                                            11:28:47
 3       Q.   Were they in your custody and control, or no? 11:28:51
 4       A.   They're in the Century 21 control.  They're   11:28:56
 5   not just my control.  It's for any agent interested in 11:29:01
 6   showing the property and trying to sell it to his      11:29:06
 7   client.                                                11:29:10
 8       Q.   Right.  So the question is, they're kept in   11:29:10
 9   Century 21's office.  We understand that.  But who's   11:29:14
10   control are they in?  Are they considered in Century   11:29:20
11   21's control, or are they considered in the agent      11:29:25
12   who's dealing with that particular property's control? 11:29:28
13   I don't -- I don't know how these --                   11:29:30
14       A.   It's under the control of Century 21.         11:29:32
15       Q.   And not you, you're saying?                   11:29:36
16       A.   Yes, sir.                                      11:29:38
17       Q.   (Inaudible) control?                           11:29:40
18       A.   Yes, sir.                                      11:29:43
19       Q.   What, if any -- do you feel that that         11:29:48
20   contradicts Mary Jane Delmaso, if she were state that  11:29:53
21   at certain times, the -- the agents are responsible,   11:29:59
22   which would mean that they are to maintain control of  11:30:03
23   certain documents?                                     11:30:06
24            MR. FAILLE:  I object, and don't answer that  11:30:06
25       question.  That's argumentative.                   11:30:08
```

```
 1           MR. PELLEGRINI:  Objection noted.  Could I      11:30:14
 2       hear the question back from the stenographer?  I     11:30:16
 3       would -- I wouldn't mind rephrasing that, if         11:30:20
 4       possible.                                            11:30:22
 5   (Thereupon the court reporter read back the pending
 6   question.)
 7           MR. PELLEGRINI:  Objection noted.  I still       11:30:47
 8       want an answer for --                                11:30:48
 9           MR. FAILLE:  Don't answer.                       11:30:49
10           MR. PELLEGRINI:  -- for the question.  If the    11:30:50
11       judge feels that it was objectionable, it can be     11:30:53
12       stricken from the record.  That's not a problem.     11:30:56
13       But I feel that it -- it shows some important        11:30:58
14       information.                                         11:31:05
15           MR. FAILLE:  It's argumentative.                 11:31:05
16           MR. PELLEGRINI:  Noted.  Thank you.              11:31:08
17           MR. FAILLE:  Mr. Shoestock, if you can answer    11:31:11
18       that convoluted question, go ahead.                  11:31:14
19   BY MR. PELLEGRINI:                                       11:31:19
20       Q.   I can -- I'll be happy to rephrase it, Mr.      11:31:19
21   Shoestock, if it's confusing.  I'm just trying to find   11:31:21
22   out if -- if Mary Jane Delmaso stated that -- that       11:31:26
23   contractors are to maintain their own documents.  And    11:31:31
24   you're telling me information contrary, so --            11:31:34
25       A.   No, I'm not telling you any information         11:31:36
```

*VOLUSIA REPORTING COMPANY*

```
 1   contrary.  Contractors are to -- are to keep whatever    11:31:40
 2   documents that they -- they feel they should keep on      11:31:42
 3   their clients.                                            11:31:45
 4       Q.   That's the problem.  You're saying that they     11:31:47
 5   feel they should keep, but she's stating that it's a      11:31:48
 6   requirement.                                              11:31:51
 7       A.   There is a requirement that --                   11:31:51
 8       Q.   Any knowledge of a requirement beyond their      11:31:51
 9   own -- what they feel they should keep, their own         11:31:57
10   feelings, is there any sort of requirement, either       11:32:00
11   placed on them by Century 21 or real estate law?         11:32:02
12       A.   There is no written requirements by Century     11:32:05
13   21 or real estate law to keep any specific documents.    11:32:10
14   The agents kept their own documents on all of their      11:32:14
15   clients for their own use and for their own -- because  11:32:18
16   they don't want someone else to get that information,    11:32:21
17   some other agent to get the information on that          11:32:23
18   client.  They'll lose the client.                        11:32:25
19            But, you know, the documents that may pertain  11:32:30
20   to the property are put into the property file,         11:32:33
21   whatever that may be, whether it be an offer.  If an     11:32:36
22   offer is made on the property by their client, that     11:32:39
23   offer gets placed into the property file and is kept     11:32:41
24   there.                                                   11:32:44
25       Q.   So are you saying that you never had custody   11:32:46
```

```
 1   or control of any documents related to 56 Liberty        11:32:49
 2   Street?                                                   11:32:56
 3       A.    Not for my -- not my own, no.  That is          11:32:56
 4   correct.  I'm stating that that -- those files on that    11:33:01
 5   property are the sole purpose -- the sole ownership of    11:33:05
 6   Century 21, and they're not to be removed from the        11:33:10
 7   office at any time.                                        11:33:12
 8       Q.    So your position is that Century 21 always      11:33:16
 9   maintained sole custody and control and that you never    11:33:20
10   had custody and control -- or, control of any             11:33:23
11   documents related to the property?  I just wanted to      11:33:28
12   clarify, yes or no?                                        11:33:31
13       A.    Yes, that's correct.  I can go into the file    11:33:32
14   and I can pull the file and I can look at the file,       11:33:37
15   get information on the property disclosure, but I         11:33:42
16   can't take the file out of the office for any purpose.    11:33:50
17   And I can add -- add anything to the file pertaining      11:33:52
18   to the property.                                           11:33:55
19       Q.    Okay.  Thank you.                                11:33:57
20            So the discussions with Mr. Dupee, the other     11:34:08
21   discussions were only related to logistics of            11:34:12
22   scheduling each of the depositions, or did you discuss    11:34:17
23   any other -- any other matters?                           11:34:19
24       A.    It pertained just to the logistics of the      11:34:24
25   deposition.                                                11:34:28
```

*VOLUSIA REPORTING COMPANY*

# STANDARD BERKSHIRE COUNTY MULTIPLE LISTING SERVICE PURCHASE AND SALE AGREEMENT

**1. PARTIES**

|  | **SELLER** | **BUYER** |
|---|---|---|
| Name(s): | | |
| Address: | | |

**2. DESCRIPTION:** Subject to the terms and conditions hereinafter set forth, the SELLER agrees to sell and the BUYER agrees to buy the following premises: SELLER'S real property located at _____ as more particularly described in a deed dated _____ and recorded in the _____ Berkshire County Registry of Deeds in Book _____, Page _____, or Land Court Certificate # _____ Assessor's Map # _____ Section # _____ Lot # _____ (the "Premises").

**3. PURCHASE PRICE:** For the Premises, BUYER shall pay the sum of ............................................................ _____
(the "Purchase Price") of which .................................................................................................... _____
has been paid this day as the initial deposit and .................................................................................. _____
will be paid within _____ days as an additional deposit and balance of............................................................ _____
is to be paid in cash, wired funds, or by certified or bank check at the Closing.

**3.1 Escrow:** All deposits are to be held by the Listing Broker _____ ("Escrow Agent") in a non-interest bearing escrow account, unless otherwise specified herein.

**4.   CONTINGENCY TERMS:** The following terms and dates apply to paragraphs 5, 6 and 7 as the case may be:

**4.1   Mortgage Terms:**   Amount:_____, Rate:_____, Type: **SELECT**  Points: _____, Years: _____.
**4.2   Mortgage Application Date:**..........................................................................within _____ days of signed acceptance by SELLER
**4.3   Mortgage Contingency Date:**.........................................................................within _____ days of signed acceptance by SELLER
**4.4   Inspection Contingency Date:**........................................................................within _____ days of signed acceptance by SELLER
**4.5   Septic System Inspection Date:** (if applicable).......................................within _____ days of signed acceptance by SELLER

**5.  MORTGAGE CONTINGENCY:** The BUYER'S obligations under this Agreement are contingent upon BUYER'S obtaining a written commitment letter from a conventional mortgage lender for a loan consistent with the contingency term used by the BUYER in purchasing the premises. Should the BUYER be unable to obtain such a commitment letter despite diligent efforts, BUYER may cancel this Agreement by written notice received by the Listing Broker or Seller's Attorney, no later than 5:00 p.m. on the Mortgage Contingency Date, whereupon all obligations of the parties under this Agreement shall cease and BUYER'S deposits shall be promptly returned in full. BUYER'S failure to (a) give such written notice or (b) make a good faith mortgage application by the Mortgage Application Date shall be a waiver of the BUYER'S right to cancel under this Paragraph. If the BUYER cancels the agreement, BUYER shall attach a copy of the mortgage denial to Buyer's cancellation notice.

**6. INSPECTION CONTINGENCY:** The BUYER'S obligations hereunder are contingent upon BUYER'S receipt, prior to 5:00 p.m. on the Inspection Contingency Date, of written home inspection reports on the Premises satisfactory to the BUYER. Such reports may, at Buyer's option and expense, including but not limited to: inspections for structural and mechanical matters, pests, including wood-boring insects, lead paint, asbestos, UFFI, radon gas, other hazardous substances, underground tanks, septic system, well water and environmental conditions. Should the results of any such test be unsatisfactory to BUYER, BUYER may cancel this Agreement by written notice received by the Listing Broker or Seller's Attorney no later than 5:00 p.m. on the Inspection Contingency Date, whereupon all obligations of the parties shall cease and BUYER'S deposits shall be promptly returned in full. BUYER'S failure to give such notice shall be a waiver of BUYER'S right to cancel under this Paragraph. The BUYER and Buyer's consultants shall have the right of access to the Premises for the purpose of conducting a home inspection, at reasonable times, upon twenty-four (24) hours advance notice to the Seller's Agent. In consideration of BUYER'S right to inspect and terminate, Buyer acknowledges that by accepting the deed Buyer accepts the condition of the Premises and releases the Seller, Seller's Agents and Buyer's Agents (which include the Selling and Listing Brokers), from any and all liability relating to any defects in the Premises including, without limitation, water seepage from any source.

**7. SEPTIC SYSTEM:**   The SELLER represents that the Premises **SELECT ONE** connected to a municipal sewer system. If the premise is not connected to a municipal sewer system, SELLER represents that the Premise is served by a septic system located entirely within the boundaries of the Premises, to the best of their knowledge. (See attached Septic System Addendum [Title 5]) The SELLER shall engage a licensed Septic Inspector to perform a System Inspection and to issue a Septic System Report (the "Report") and deliver the Report to the Buyer on or before the Septic System Inspection Date as defined in paragraph 4.5. Should the Report indicate that the system is a "failed system" as defined by Title 5 of the State Environmental Code (310 CMR 15.301), the BUYER may, within 3 days of receipt of report, cancel this Agreement, and all deposits shall be returned to the BUYER.

**8.  CLOSING DATE:** The Deed is to be delivered and the Purchase Price paid on _____ at 2:00 p.m. (the "Closing Date") at the appropriate Registry of Deeds or such other location within the county in which the Premises is located, as specified by BUYER.

Seller's Initials_____    Buyer's Initials _____    Pg 1 of 4
© MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE

Nov. 29. 2003  4:52PM    CENTURY 21 HAROLD DUPEE AGENCY                No.4354   P. 2

**9. POSSESSION:** Full possession **SELECT ONE** shall be delivered at the Closing Date. The premises shall be free of encroachments burdening the premises and of improvements that encroach on adjoining Premises, including buildings, septic systems, well and driveway, and has sufficient legal access to a public way.

**10. SURVEY:** SELLER represents that **SELECT ONE** new boundaries are being created by the sale of the Premises. If new boundaries are being created, SELLER shall deliver to BUYER at the Closing a survey of the Premises, in recordable form. The SELLER shall pay for the preparation and recording of the survey, unless otherwise provided herein.

**11. FIXTURES:** Included in this sale as part of the Premises, unless expressly excluded, are the usual fixtures belonging to SELLER and used in connection therewith including but not limited to, if any, furnaces, heaters, oil and gas burners and fixtures appurtenant thereto, built-in ranges, dishwashers and disposals, hot water heaters (if not rented), mantels, electric and other lighting fixtures, chandeliers, venetian blinds and window shades, attached mirrors, automatic door openers (with remote controls), installed air conditioners, wall brackets and hangers, built-in bookcases and shelving, all installed stair carpeting and wall to wall carpeting, drapery rods, curtain rods, plumbing and electrical covers, screens, screen doors, storm and other detached windows and doors, blinds, awnings, bathroom fixtures, towel bars, medicine cabinets, radio and television antennas, satellite dishes, fences, gates, hardy shrubs, and fire and burglar alarm systems. The following additional personal property is included: _____
Excluded items: _____

**12. ADJUSTMENTS:** Current real estate taxes, water rates, sewer use charges and fuel are to be apportioned as of the Closing Date. Rents are to be apportioned only for the month in which the closing occurs and only when collected by either party. Unpaid rents due SELLER from months prior to the month of the Closing Date, shall be the responsibility of the SELLER to collect. If the real estate tax rate is not set as of the Closing Date, the apportionment of real estate taxes shall be made on the basis of the tax assessed for the most recent preceding year, with a readjustment at the request of either party, when the amount of the current year's tax is set. If the amount of the tax is reduced by abatement, the rebate, less the reasonable cost of obtaining it, shall be apportioned between the parties.

**13. TITLE:** The Premises shall be conveyed by a good and sufficient quitclaim deed unless otherwise specified herein (accompanied by a Certificate of Title, if registered), conveying a good, clear record, marketable and insurable title, free of all encumbrances and exceptions, except:
   a) Real Estate Taxes assessed or to be assessed on the Premises to the extent that such taxes then are not yet due and payable.
   b) Betterment assessments, if any, which are not a recorded lien on the premises, as of the dated of this Agreement.
   c) Federal, state, and local laws, ordinances, by-laws, and rules regulating the use of land, particularly environmental, building, zoning, health, rent control, and condominium conversion laws, if any, applicable as of the date of this Agreement, provided that as of the Closing Date, the Premises may be used as of right for single family residential use or, if the Premises is/is not a single family residence, the Premises may be used as of right for _____
   d) Existing rights, if any, in party or partition walls; and
   e) Utility easements in the adjoining ways.

**14. USE OF PROCEEDS TO CLEAR TITLE:** To enable SELLER to make conveyance as herein provided, the SELLER may at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, all instruments so procured to be recorded simultaneously with the delivery of said deed or at such later time as shall be reasonably acceptable to BUYER, and provided further, with respect to discharges or mortgages from insurance companies, banks and credit unions, such discharges may be recorded within a reasonable time after the recording of the deed.

**15. EXTENSION:** If, after a reasonable and diligent effort, SELLER is unable to convey title or deliver possession of the Premises as required hereunder, upon notice by either party, prior to the Closing Date, this Agreement shall be automatically extended for 30 days (or if Buyer's mortgage commitment sooner expires to a date one business day before the expiration of such commitment). Seller shall remove all mortgages, attachments and other encumbrances incurred or assumed by SELLER which secure the payment of money, provided the total amount thereof does not exceed the Purchase Price, and SELLER shall use reasonable and diligent efforts to remove other defects in title, or to deliver possession as provided herein, or to make the Premises conform to the provisions hereof. At the end of the extended period, if all such defects have not been removed, or the SELLER is unable to deliver possession, or the Premises do not conform with the requirements of this Agreement, BUYER may elect to terminate this Agreement and to receive back all deposits, upon receipt of which all obligations of the parties hereto shall cease.

**16. STANDARDS:** Any title matter or practice arising under or relating to this Agreement which is the subject of a Title Standard or a Practice Standard of the Massachusetts Conveyancers Association shall be governed by said Standard to the extent applicable.

**17. WATER:** SELLER represents that the Premises **SELECT ONE** served by a municipal water system. If the Premises is not served by a municipal water system, SELLER represents that the Premises is served by either **SELECT ONE**. (if a well is present, it contains no defects known to SELLER)

**18. MASS. UFFI LAW:** The SELLER represents and warrants that Urea Formaldehyde Foam Insulation (UFFI) **SELECT ONE** present in the Premises and that UFFI has been declared by the Massachusetts Department of Public Health (DPH) to be a banned substance which may cause personal injury. If UFFI is or once was present in the Premises, BUYER acknowledges receipt of Mass. Disclosure Statement with a copy of the air quality test in possession of the SELLER, which is attached hereto and incorporated herein.

**19. LEAD PAINT LAW:** BUYER acknowledges that under Massachusetts Law, on homes constructed prior to 1978, and whenever a child under six (6) years of age resides in any premises in which paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said material so as to make it inaccessible to children under six (6) years of age. The BUYER

Seller's Initials_____    Buyer's Initials_____        Pg 2 of 4
© MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE

further acknowledges that, prior to the signing of this Agreement, the SELLER and Broker(s) have (a) provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, which is attached hereto; (b) informed the BUYER of the availability of inspections for dangerous levels of lead; and (c) verbally informed the BUYER of the possible presence of dangerous levels of lead and the provisions of the lead paint law and regulations, found in 105 CMR 460.100D. Notwithstanding, SELLER is under no obligation to the BUYER to remove lead paint, which may be present in the Premises.

**20. ASBESTOS:** The BUYER acknowledges that the Department of Public Health has issued regulations governing the maintenance, repair and removal of asbestos material by any owner of real property and that asbestos material is a common insulation material on heating pipes, boilers, and furnaces.

**21. RADON GAS:** Radon gas is a radioactive gas, which occurs naturally in certain areas and may accumulate in some buildings in a high enough concentration to be a potential health hazard.

**22. UNDERGROUND STORAGE TANKS:** The parties acknowledge that the Massachusetts Board of Fire Prevention has issued regulations governing the maintenance, repair, and removal of underground storage tanks to prevent and detect leakage of tank contents into surrounding soil and water supplies. The SELLER hereby discloses that to the best of Seller's knowledge, there **SELECT ONE** one or more underground storage tank(s) at the Premises. If there are one or more underground storage tank at the Premises, the SELLER further discloses that the tanks **SELECT ONE** been used within the past six (6) months exclusively for the storage of fuel oil for consumption of the Premises and to the best of the SELLER'S knowledge there has been no release or leakage of oil from such tank(s). If the Premises is not in compliance with 527 CMR 9.00 et.seq. and BUYER does not cancel this Agreement, pursuant to paragraph 6, BUYER shall be obligated to purchase the Premises and shall be deemed to have assumed the obligation to bring the Premises into compliance with 527 CMR 9.00 et. seq.

**23. CONDITION OF PREMISES AT CLOSING:** Upon delivery of the Deed, the Premises and all appliances therein and utilities serving the same shall be in their present condition, reasonable use and wear of same excepted. The Premises is to be left broom clean and all personal property and rubbish removed. With respect thereto, BUYER shall have the right to walk-through the Premises within twenty-four hours prior to the closing and if the sale is completed subsequent to said walk-through or if the walk-through is waived by BUYER, the foregoing condition of the Premises shall, as between the BUYER and SELLER and their representatives (if applicable), be conclusively presumed to be acceptable to BUYER regardless of condition.

**24. NOMINEE:** BUYER may require the conveyance to be made to another person, persons, or entity ("Nominee"), upon notification in writing delivered to SELLER at least five days prior to the Date of Closing. The appointment of a Nominee shall not relieve BUYER of any obligation hereunder. Any Note or mortgage or other document to be delivered from BUYER to SELLER shall be executed by or unconditionally guaranteed by BUYER, unless otherwise specified herein.

**25. CLOSING:** Simultaneously with the delivery of the deed, SELLER shall execute and deliver:
  a) Smoke Detector Certificate of Compliance;
  b) Wood Stove permit, where applicable
  c) Affidavits and indemnities with respect to parties in possession and mechanic's liens to induce buyer's title insurance company to issue lender's and owner's policies of title insurance without exception for those matters;
  d) A bill of sale for all personal property included as part of the sale, if requested by the BUYER.
  e) In the case of new construction, a Certificate of Occupancy and an assignment of any and all builder's, Sellers, or manufacturer's warranties on the Premises or on any appliances or other property included in the sale.
  f) FNMA Vendor's affidavit FNMA 1099;
  g) An affidavit, satisfying the requirements of Section 1445 of the Internal Revenue Code and regulation issued thereunder, which states, under penalty of perjury, the seller's United States taxpayer identification number, that the SELLER is not a foreign person, and the seller's address (the "1445 Affidavit");
  h) Internal Revenue Service Form W-8 or Form W-9, as applicable, with seller's tax identification number, and an affidavit furnishing the information required for the filing of Form 1099S with the Internal Revenue Service and stating SELLER is not subject to back-up withholding.

**26. RISK OF LOSS-INSURANCE AND DAMAGE PRIOR TO CLOSING:** Prior to the delivery of the Deed, the risk of loss shall be on the SELLER. SELLER shall continue to carry the fire and extended coverage insurance presently maintained on the buildings on the Premises (or, upon the written request of the BUYER, and at the buyer's expense, in such greater amount as BUYER may reasonably request). If the Premises is damaged by fire or other casualty prior to the Closing Date, and SELLER has not restored the Premises to their former condition, the BUYER has the option to take an assignment of SELLER'S insurance proceeds or terminate this Agreement. If BUYER elects to purchase, SELLER shall assign all insurance proceeds to BUYER and the Purchase Price shall be reduced by:
  a) the net amount of any insurance proceeds which a mortgagee has applied to the mortgage debt, less any amount reasonable expended by SELLER for partial renovation.
  b) the amount of any insurance proceeds received by SELLER; and
  c) any deductible amount under SELLER's insurance policy. SELLER will credit BUYER the amount of deductible toward purchase price.

**27. ACCEPTANCE OF DEED:** Acceptance of the deed by BUYER shall be a full performance and shall discharge every agreement and obligation herein except any agreements which by their terms are to be performed after the Closing.    THE BUYER FURTHER ACKNOWLEDGES THAT THE BUYER IS PURCHASING THE PREMISES 'AS IS' and BUYER has not relied upon any statements or representations, oral or written, regarding the condition or value, present or future, of the Premises made either by the SELLER or the Seller's Agents, which are not otherwise contained in this Agreement and that the Seller's Agents are acting exclusively upon behalf of the SELLER. All oral or written representations between the parties are merged herein. BUYER further acknowledges it is the BUYER'S responsibility prior to closing to obtain any and all governmental permits for any intended use of the Premises including, but not limited to, health or environmental department, planning or zoning board approvals. SELLER and SELLER'S representative(s) make no representations as to the adequacy of the Premises being conveyed for BUYER'S intended purposes, disclosed or undisclosed.

**28. MERGER:** The parties agree that this Agreement contains all of the terms and conditions of this transaction. It is mutually agreed that any oral or prior written representation made by either party prior to the execution of this Agreement is null and void. This Agreement shall be construed as a legal contract under seal and is binding upon the parties, and their respective heirs, successors, and assigns.

**29. SURVIVAL:** Notwithstanding any presumptions to the contrary, all covenants, conditions, and representations contained in this Agreement, which by their nature, implicitly or explicitly, involve performance in any particular manner after the Closing and delivery of the deed, or which cannot be ascertained to have been full performed until after the Closing and delivery of the deed, shall survive the Closing.

**30. TERMINATION:** In the event the BUYER terminates this Contract in accordance with the provisions herein relating to "Mortgage Contingency," "Risk of Loss Insurance," "Inspection Contingency," "Septic System Inspection", default by SELLER, or the failure of any contingency shown under special conditions, the Escrow Agent shall forthwith refund such deposit money together with accrued interest thereon (if applicable) to the BUYER.

**31. BUYER'S DEFAULT:** If the BUYER defaults, BUYER shall be liable to the SELLER in the amount of 10% of the purchase price, as liquidated damages, which shall be Seller's exclusive remedy in law or in equity. The deposits shall be applied to the payment of said liquidated damages.

**32. RELEASE OF DEPOSITS:** The deposits (which term shall include all interest earned, if any) made hereunder shall be held in escrow, subject to the terms of this Agreement and shall be duly accounted for at the time for performance of this Agreement. The deposits may not be released from escrow without the assent of both BUYER and SELLER. The recording of the deed to the Premises shall constitute such assent. In the event of any disagreement, the Escrow Agent shall retain the deposits pending written instructions by both the SELLER and BUYER, or by a court of competent jurisdiction. So long as Escrow Agent served in good faith, BUYER and SELLER each agrees to hold harmless Escrow Agent from damages, losses, or expenses, arising out of this Agreement or any action or failure to act, including reasonable attorney's fees, related thereto. BUYER and SELLER acknowledge that the Escrow Agent may be counsel or fiduciary to one of the parties and agree that Escrow Agent may continue to act as such counsel or fiduciary notwithstanding any dispute or litigation arising with respect to the deposits or Escrow Agent's duties.

**33. AGREEMENT TO MEDIATE DISPUTE OR CLAIMS:** Any dispute or claim arising out of or relating to this Agreement, the breach of this Agreement, or the brokerage services provided in relation to this Agreement shall be submitted to mediation in accordance with the Rules and Procedures of the Homesellers / Homebuyers Dispute Resolution System ("DRS"). Disputes and claims shall specifically include, without limitation, representations made by the SELLER, the BUYER, or the Broker(s) in connection with the sale, purchase, finance, condition, or other aspect of the Premises to which this Agreement pertains, including without limitation, allegations of concealment, misrepresentation, negligence and / or fraud. The mediation conference shall be held within 30 days from the date on which the mediator receives notice of the dispute. If the parties reach a settlement, they shall both sign a settlement agreement. If the parties cannot reach a mutually agreeable settlement, they may arbitrate or litigate the dispute without regard to the mediation procedure. The filing of a judicial action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies shall not constitute a waiver of the right to mediate under this paragraph, nor shall such filing constitute a breach of the duty to mediate. The provisions of this paragraph shall survive the closing.

**34. GOVERNING LAW:** This Agreement is to be governed by the substantive laws of the Commonwealth of Massachusetts.

**35. AGENCY:** BUYER and SELLER acknowledge that they have been provided with a completed copy of the 'Mandatory Agency Disclosure–Agency Relationship' form, as mandated by the Massachusetts Board of Registration of Real Estate Brokers and Salespersons.

**36. SPECIAL CONDITIONS / ADDENDA:** _____

**37. TERMINATION OF OFFER:** This offer is subject to acceptance by SELLER by _____, after which time this offer is void and terminated, and deposit paid by BUYER shall be returned.

**38. TIME:** Time is of the essence of all provisions of this agreement, unless otherwise specified elsewhere in this agreement. Any reference to "days" shall mean calendar days and is not intended to mean only business days.

**39. THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD, SEEK LEGAL COUNSEL:** Executed under seal by the Parties hereto as of the latter of all dates set forth below, and incorporating all provisions on pages 1 through 4, together with referenced additions, if any.

| SELLER: | DATE | BUYER: | DATE |
|---|---|---|---|
| SELLER: | DATE | BUYER: | DATE |
| SELLER's Attorney's Name | | BUYER's Attorney's Name | |

Seller's Initials_____ Buyer's Initials_____ Pg 4 of 4

© MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE

## PROPERTY TRANSFER NOTIFICATION CERTIFICATION

This form is to be signed by the prospective purchaser before signing a purchase and sale agreement or a memorandum of agreement, or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property built before 1978, for compliance with federal and Massachusetts lead-based paint disclosure requirements.

### Required Federal Lead Warning Statement:

Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

### Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

   (i)_____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

   (ii)___✓___ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

   (i)_____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (circle documents below).

Lead Inspection Report; Risk Assessment Report; Letter of Interim Control; Letter of Compliance

   (ii)_____ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Purchaser's or Lessee Purchaser's Acknowledgment (initial)

(c) _____ Purchaser or lessee purchaser has received copies of all documents circled above.

(d) _____ Purchaser or lessee purchaser has received no documents.

(e) _____ Purchaser or lessee purchaser has received the Property Transfer Lead Paint Notification.

(f) _____ Purchaser or lessee purchaser has (check (i) or (ii) below):

   (i)_____ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

   (ii)_____ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment (initial)

(g)___✓___ Agent has informed the seller of the seller's obligations under federal and state law for lead-based paint disclosure and notification, and is aware of his/her responsibility to ensure compliance.

(h)_____ Agent has verbally informed purchaser or lessee-purchaser of the possible presence of dangerous levels of lead in paint, plaster, putty or other structural materials and his or her obligation to bring a property into compliance with the Massachusetts Lead Law — either through full deleading or interim control — if it was built before 1978 and a child under six years old resides or will reside in the property.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

_James Corrigan. Giacoda_ 12/2/02

Seller James Horrigan executor / Date     Seller     Date

_____    _____    _____

Purchaser       Date     Purchaser     Date

_Frances V Buckley_ 12/02/02

Agent       Date     Agent     Date

Address of Property / Unit _____



MASSACHUSETTS
ASSOCIATION
of REALTORS®
REALTOR

CLPPP Form 94-3. 6/30/94. Rev 11/99



11

MASSFORMS™
Statewide Standard Real Estate Forms

Nov.29. 2003 4:55PM  CENTURY 21 HAROLD DUPEE AGENCY       NO.4354  P. 6

# MASSACHUSETTS ASSOCIATION OF REALTORS®
## SELLER'S DESCRIPTION OF PROPERTY

THE SELLER AUTHORIZES THE BROKERS OR SALESPERSONS TO PROVIDE
THE FOLLOWING INFORMATION TO PROSPECTIVE BUYERS.
THIS INFORMATION IS BASED UPON THE SELLER'S ACTUAL KNOWLEDGE AND IS NOT INTENDED AS
A GUARANTEE OF THE CONDITION OF THE PROPERTY OR THE CONTINUED
SATISFACTORY OPERATION OF ANY SYSTEM.



Property Address __56 Liberty St.  N. Adams,Ma.__

| YES | NO | UNKN | I. TITLE/ZONING/BUILDING/INFORMATION |
|-----|-----|------|---------------|
| | | | 1. Seller/Owner  James Horrigan,  executor   How long owned? _50+ years_ |
| | | | 2. How long occupied? _50+ years_  Approximate year built? _Unknown (1875)_ |
| ☐ | ☑ | ☐ | 3. Do you know of any title problems (for example, easements, use restrictions or lot line disputes)? If yes, please explain. |
| ☐ | ☐ | ☐ | a) Do you know of any easements, common driveways, or rights of way pertaining to the property? If yes, explain |
| | | | 4. Zoning classification of property |
| ☐ | ☑ | ☐ | 5. Do you know of any zoning problems/violations? Explain |
| ☐ | ☑ | ☐ | a) Is the current use nonconforming in any way? Explain |
| ☐ | ☑ | ☐ | 6. Do you know of any variances or special permits? Explain |
| ☐ | ☐ | ☑ | 7. Has any work been done on the property which required a permit? If yes, explain. |
| ☐ | ☐ | ☑ | a) Were permits obtained? |
| ☐ | ☐ | ☑ | b) Was the work approved by inspector? |
| ☐ | ☑ | ☐ | 8. Is the property in a flood zone or wetlands? Explain _____ (See Flood Zone disclosure Page 4) |

| YES | NO | UNKN | II. SYSTEM UTILITIES INFORMATION |
|-----|-----|------|---------------|
| | | | **DO YOU KNOW OF ANY CURRENT PROBLEMS WITH THE SYSTEMS LISTED BELOW? PLEASE EXPLAIN ANY WORK YOU HAVE HAD DONE.** |
| ☐ | ☑ | ☐ | 9. Has there ever been an underground fuel tank? If yes, has it been removed?_____ (See Hazardous Materials Disclosure Page 3) |
| ☐ | ☑ | ☐ | 10. HEATING SYSTEM: Problems? Explain |
| | | | a) Approximate date of last service |
| | | | b) Reason |
| | | | c) Identify any unheated rooms |
| | | | 11. DOMESTIC HOT WATER: Type_____ Age _?_ Problems? Explain _None_ |
| | | | Burners owned or rented? |
| ☐ | ☐ | ☐ | 12. SEWAGE SYSTEM: Problems? Explain |
| | | | Type: Municipal Sewer _✓_ Private_____ If private, describe type of system. |
| | | | (cesspool,septic tank, etc.) _____ Age |
| | | | Name of service company |
| | | | If private, date of last inspection_____ |
| ☐ | ☐ | ☐ | Did system fail inspection? |
| ☐ | ☐ | ☐ | Is system shared with other homes? |
| | | | Date it was last pumped _____ Frequency |
| ☐ | ☑ | ☐ | 13. PLUMBING SYSTEM: Problems/Leaks/Freezing? Explain |
| ☐ | ☑ | ☐ | a) Bathroom ventilation problems? Explain |
| | | | 14. DRINKING WATER SOURCE: Public _✓_ Private_____ If private: |
| | | | a) Location |
| | | | b) Age of pump |
| | | | c) Date last tested |
| ☐ | ☑ | ☐ | d) Any known problems with water quality/quantity? |
| ☐ | ☑ | ☐ | e) Is there a filtration system? Age/Type of filtration system |
| ☐ | ☑ | ☐ | f) Water quality problems? Explain |
| ☐ | ☐ | ☐ | g) Flow rate (gal.min)_____ Report: Attached _____ Not Attached_____ |
| ☐ | ☑ | ☐ | 15. ELECTRICAL SYSTEM: Problems? Explain |
| ☐ | ☑ | ☐ | 16. APPLIANCES: List appliances that are included _STOVE_ |
| | | | Any known problems? |
| | | | If yes, explain |
| | | | 17. SECURITY SYSTEM: None _N°_ Type_____ Age_____ Company_____ |
| | | | 18. AIR CONDITIONING: Central_____ Window_____ Other_____ None _✓_ |
| | | | Problems? Explain |

SELLER'S INITIALS _WMB_ / _JH_          BUYER'S INITIALS _____

1 of 3

## III. BUILDING/STRUCTURAL IMPROVEMENTS INFORMATION

| YES | NO | UNKN | |
|---|---|---|---|
| ☐ | ☑ | ☐ | **19. FOUNDATION:** Problems? Explain _____ |
| ☐ | ☑ | ☐ | **20. BASEMENT:** Water____ Seepage____ Dampness____ Explain amount, frequency, and location ____ |
| ☐ | ☑ | ☐ | a) Sump Pump? If yes, age____ location____ Problems? ____ |
| ☐ | ☑ | ☐ | **21. ROOF:** Problems? Explain ____ Location of leaks/problems ____ |
| ☐ | ☑ | ☐ | **22. CHIMNEY/FIREPLACE:** Date last cleaned____ Problems? ____ Wood/Coal/ Pellet Stove in compliance with installation regulations/code/bylaws?____ If not, explain ____ |
| ☐ | ☑ | ☐ | **23. FIRE/SMOKE DAMAGE:** History of damage, if any ____ |
| ☐ | ☑ | ☐ | **24. FLOORS:** Type of floors under carpet/linoleum? _wood_ Problems with floors (buckling, sagging, etc.)? Explain ____ |
| ☐ | ☑ | ☐ | **25. WALLS:** a) INTERIOR Walls: Problems? Explain ____ |
| ☐ | ☑ | ☐ | b) EXTERIOR Walls: Problems? Explain ____ |
| ☑ | ☐ | ☐ | **26. WINDOWS:** Original____ Replacement____ ✓ If replacement, age____ |
| ☐ | ☑ | ☐ | **27. INSULATION:** Does house have insulation? If yes, type____ Date installed _1 year_ Location _attic_ |
| ☐ | ☐ | ☑ | a) Has UFFI (Urea Formaldehyde Foam Insulation) ever been installed? If yes, location ____ |
| ☐ | ☐ | ☑ | b) Has testing for UFFI been performed? If yes attach report. (See UFFI disclosure Page 3) |
| ☐ | ☐ | ☐ | **28. ASBESTOS:** Do you know whether asbestos is present in exterior shingles, pipecovering or boiler insulation?____ |
| ☐ | ☐ | ☐ | a).Has material been encapsulated? If yes, explain how and when materials were encapsulated____ (See Asbestos disclosure Page 3) |
| ☐ | ☐ | ☑ | **29. LEAD PAINT:** Is lead paint present? If yes, locations (attach copy of inspection reports)____ If yes, describe abatement plan/interim controls, if any ____ |
| ☐ | ☐ | ☐ | a) Has paint been encapsulated? If yes, when and by whom? ____ (See Lead Paint disclosure Page 3) |
| ☐ | ☐ | ☑ | **30. RADON:** Has test for radon been performed? If yes attach copy ____ (See Radon disclosure Page 3) |
| ☐ | ☑ | ☐ | **31. INSECTS:** History of Termite/Insect/Pest Problems? If yes explain treatment and dates ____ (See Chlordane disclosure Page 3) |
| ☐ | ☐ | ☑ | **32. OTHER:** Building/structural problems, explain ____ |

## IV. CONDOMINIUM INFORMATION

| YES | NO | UNKN | |
|---|---|---|---|
| ☐ | ☐ | ☐ | **33.** If converted to condominium, are documents approved and recorded (Master/Unit deed etc.)? |
| ☐ | ☐ | ☐ | **34. PARKING:** Is parking space(s) included? If yes, are they deeded or common? ____ |
| ☐ | ☐ | ☐ | **35. CONDO FEES:** Current fees for Unit are $____ Heat included? Electricity included? |
| ☐ | ☐ | ☐ | **36. RESERVE FUND:** Has an advance payment been made to a condo reserve fund? If yes, how much $____ Is reimbursement expected? |
| ☐ | ☐ | ☐ | **37. CONDO ASSOC. INFO:** Is owners' association currently involved in any litigation? ____ If yes, explain____ |

## V. RENTAL PROPERTY INFORMATION

| YES | NO | UNKN | |
|---|---|---|---|
| ☑ | ☐ | ☐ | **38. NUMBER OF UNITS:** _1_ Have units been added/subdivided since original construction? If yes, have permits for new/added units been obtained?____ |
| | | | **39. RENTS:** Number of units occupied _0_ Rents paid $____ |
| ☐ | ☐ | ☐ | Any tenants without leases? Is owner holding last month's rent____ security deposit?____ If yes, has interest been paid?____ a) If security deposit held attach a copy of statements of condition. Attached____ Not Attached____ |

SELLER'S INITIALS ____    BUYER'S INITIALS ____

| | YES | NO | UNKN | VI. MISCELLANEOUS INFORMATION |
|---|---|---|---|---|
| 40. | ☐ | ☑ | ☐ | Water drainage problems? Explain_____ |
| 41. | ☐ | ☑ | ☐ | Do you know of any other problems which may affect the value or use of the property which may not be obvious to a prospective buyer?_____ |

## VII. EXPLANATORY MATERIAL

The following clauses are provided for descriptive purposes only. For detailed information, consult the Massachusetts Department of Public Health, the Massachusetts Department of Environmental Protection, or other appropriate agency, or your attorney.

**A. Flood Hazard Insurance Disclosure Clause**

The lender may require Flood Hazard Insurance as a condition of the mortgage loan if the lender determines that the premises is in a flood hazard zone.

**B. Chlordane Disclosure Clause (Question 47)**

Pesticide products containing chlordane were banned in Massachusetts on June 11, 1985, following a determination by the Department of Food and Agriculture that the use of chlordane may cause unreasonable adverse effects on the environment including a risk of cancer. Although existing data does not conclusively prove that significant health effects have occurred as a direct result of chlordane use, the long-term potential health risks are such that it is prudent public health policy, according to the Department, to eliminate the further introduction of chlordane into the environment.

**C. Urea-Formaldehyde Foam Insulation Disclosure Clause**

The buyer acknowledges that he has been advised that Urea Formaldehyde Foam Insulation (UFFI) has been declared by the Massachusetts Department of Public Health (DPH) to be a banned hazardous substance and that new installation is prohibited. Where UFFI was previously installed, the seller is required to advise the buyer (1) where such UFFI is located and, if known, when it was installed; (2) a copy of test results concerning the air level of formaldehyde, and (3) a copy of information from the DPH concerning UFFI and formaldehyde levels. Under certain circumstances the cost of removal may be reimbursed. Exposure to hazardous levels of formaldehyde may cause personal injuries, including headaches, nausea or cancer. The buyer acknowledges that he has been advised to consult the DPH or his attorney for further information.

**D. Asbestos Disclosure Clause**

The United States Consumer Product Safety Commission has maintained that asbestos materials are hazardous if they release separate fibers which can be inhaled. Asbestos is a common insulation material on heating pipes, boilers, and furnaces. It may also be present in certain types of floor and ceiling materials, shingles, plaster products, cements and other building materials. The buyer may have the property professionally inspected for the presence of asbestos and if repair or removal of asbestos is desired, proper safety guidelines must be observed.

**E. Lead Paint Disclosure Clause**

Whenever a child under six years of age resides in any residential premises in which any paint, plaster or other accessible material contains dangerous levels of lead, the owner is required by law, to remove all said paint, plaster or cover with appropriate materials so as to make, in inaccessible to a child under six years of age. Consumption of lead is poisonous and may cause serious personal injury. Whenever such residential premises containing dangerous levels of lead undergoes a change of ownership, as a result, a child under six years of age will become a resident, the new owner is required by law to remove said paint, plaster or cover with appropriate materials so as to make it inaccessible to such child.

**F. Hazardous Materials Disclosure Clause**

In certain circumstances Massachusetts law can hold an owner of real estate liable to pay for the cost of removing hazardous or toxic materials from real estate and for damages resulting from the release of such materials, according to the Massachusetts Oil and Hazardous Material Release and Response Act, General Laws, Chapter 21E. The buyer acknowledges that he may have the property professionally inspected for the presence of, or the substantial likelihood of release of oil or hazardous material and such proof of inspection may be required as a prerequisite for financing the property.

**G. Radon Disclosure Clause**

Radon is an odorless, colorless, tasteless gas produced naturally in the ground by the normal decay of uranium and radium. Radon can lead to the development of radioactive particles which can be inhaled. Studies indicate the result of extended exposure to high levels of radon may increase the risk of developing lung cancer.

## VIII. ACKNOWLEDGEMENTS

Seller(s) hereby acknowledge that the information set forth above is true and accurate to the best of my (our) knowledge. I (we) further agree to defend and indemnify the broker(s) and any subagents for disclosure of any of the information contained herein. Seller(s) further acknowledge receipt of copy of Seller's Description of Property.

Seller _James Horrigan, executor_  Date _11-24-02_

James Horrigan, executor

Seller _____  Date _____

Buyer/Prospective Buyer acknowledges receipt of Seller's Description of Property. Buyer acknowledges that Broker has not verified the information herein and Buyer has been advised to verify information independently.

Buyer _____  Date _____

Buyer _____  Date _____

# CENTURY 21 HAROLD DUPEE, REALTORS
## 40 MAIN STREET (@ THE HOLIDAY INN)
### NORTH ADAMS, MA 01247
FAX:#(413)664-0075   TEL.#(413) 664-4941/743-3006

## FACSIMILE TRANSMITTAL SHEET

TO: MAARTEN PELLEGRINI          FROM: DICK SHOESTOCK

COMPANY:                        DATE: 12-1-03

FAX NUMBER:                     TOTAL NO. OF PAGES INCLUDING COVER: 1

PHONE NUMBER:                   SENDER'S REFERENCE NUMBER:

RE:                             YOUR REFERENCE NUMBER:

☒ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

PLEASE CALL ME FOR INSTRUCTIONS
ON WHERE TO INITIAL AND SIGN.
YOU MUST SIGN AND INITIAL WHERE
APPROPRIATE. IF BOTH BUYING, BOTH MUST
INITIAL & SIGN. I BELIEVE THE OFFER IS TOO
LOW. PRICE SHOULD BE AT $74,000.
                                            THANKS,
                                            DICK

**Dick Shoestock**
Sales Associate

**Harold Dupee, Realtors®**

40 Main Street at the Holiday Inn
North Adams, Massachusetts 01247
**Business** (413) 664-4941
Home (413) 743-3417
Cell (413) 652-2394

Each Office is Independently Owned And Operated

1-775-416-2844

The information contained in this fax message is confidential and intended for the use of the individual(s) named above. If you are not the recipient, you are hereby notified that any discrimination, distribution or copying of the communication is strictly prohibited.

If you have received this communication in error, please notify sender. Thank you!

# STANDARD BERKSHIRE COUNTY MULTIPLE LISTING SERVICE
# PURCHASE AND SALE AGREEMENT

**1. PARTIES**

|  | **SELLER** | **BUYER** |
|---|---|---|
| Name(s): | James Horrigan, Executor of the Estate | Nicolas Pellegrini |
|  | of Mr. Walter M. Bronson | Maarten Pellegrini |
| Address: | 106 Laurel Circle | 37 Granby Road |
|  | Absecon, NJ 08201 | Worcester, MA 01604 |

**2. DESCRIPTION:** Subject to the terms and conditions hereinafter set forth, the SELLER agrees to sell and the BUYER agrees to buy the following premises: SELLER'S real property located at __56 Liberty Street, North Adams, MA 01247__ as more particularly described in a deed dated _____ and recorded in the __Northern__ Berkshire County Registry of Deeds in Book __454__, Page __424__, or Land Court Certificate # _____ Assessor's Map # __79__ Section # _____ Lot # __63__ (the "Premises").

**3. PURCHASE PRICE:** For the Premises, BUYER shall pay the sum of ................................................................. | **$65,000.00**
(the "Purchase Price") of which ................................................................................................................................... | **$1,500.00**
has been paid this day as the initial deposit and ....................................................................................................... | **$5,000.00**
will be paid within **14** days as an additional deposit and balance of .................................................................... | **$58,500.00**
is to be paid in cash, wired funds, or by certified or bank check at the Closing.

**3.1 Escrow:** All deposits are to be held by the Listing Broker **Century 21 Harold Dupee, Realtors** ("Escrow Agent") in a non-interest bearing escrow account, unless otherwise specified herein.

**4. CONTINGENCY TERMS:** The following terms and dates apply to paragraphs 5, 6 and 7 as the case may be:

**4.1 Mortgage Terms:** Amount:__ $58,500__ . Rate:__ Prevailing __ Type: **Fixed**, Points: **0**, Years: **30**.
**4.2 Mortgage Application Date:**......................................................................................within **7** days of signed acceptance by SELLER
**4.3 Mortgage Contingency Date:**......................................................................within **30** days of signed acceptance by SELLER
**4.4 Inspection Contingency Date:**......................................................................within **14** days of signed acceptance by SELLER
**4.5 Septic System Inspection Date:** (if applicable)........................................within **NA** days of signed acceptance by SELLER

**5. MORTGAGE CONTINGENCY:** The BUYER'S obligations under this Agreement are contingent upon BUYER'S obtaining a written commitment letter from a conventional mortgage lender for a loan consistent with the contingency term used by the BUYER in purchasing the premises. Should the BUYER be unable to obtain such a commitment letter despite diligent efforts, BUYER may cancel this Agreement by written notice received by the Listing Broker or Seller's Attorney, no later than 5:00 p.m. on the Mortgage Contingency Date, whereupon all obligations of the parties under this Agreement shall cease and BUYER'S deposits shall be promptly returned in full. BUYER'S failure to (a) give such written notice or (b) make a good faith mortgage application by the Mortgage Application Date shall be a waiver of the BUYER'S right to cancel under this Paragraph. If the BUYER cancels the agreement, BUYER shall attach a copy of the mortgage denial to Buyer's cancellation notice.

**6. INSPECTION CONTINGENCY:** The BUYER'S obligations hereunder are contingent upon BUYER'S receipt, prior to 5:00 p.m. on the Inspection Contingency Date, of written home inspection reports on the Premises satisfactory to the BUYER. Such reports may, at Buyer's option and expense, including but not limited to: inspections for structural and mechanical matters, pests, including wood-boring insects, lead paint, asbestos, UFFI, radon gas, other hazardous substances, underground tanks, septic system, well water and environmental conditions. Should the results of any such test be unsatisfactory to BUYER, BUYER may cancel this Agreement by written notice received by the Listing Broker or Seller's Attorney no later than 5:00 p.m. on the Inspection Contingency Date, whereupon all obligations of the parties shall cease and BUYER'S deposits shall be promptly returned in full. BUYER'S failure to give such notice shall be a waiver of BUYER'S right to cancel under this Paragraph. The BUYER and Buyer's consultants shall have the right of access to the Premises for the purpose of conducting a home inspection, at reasonable times, upon twenty-four (24) hours advance notice to the Seller's Agent. In consideration of BUYER'S right to inspect and terminate, Buyer acknowledges that by accepting the deed Buyer accepts the condition of the Premises and releases the Seller, Seller's Agents and Buyer's Agents (which include the Selling and Listing Brokers), from any and all liability relating to any defects in the Premises including, without limitation, water seepage from any source.

**7. SEPTIC SYSTEM:**    The SELLER represents that the Premises **is** connected to a municipal sewer system. If the premise is not connected to a municipal sewer system, SELLER represents that the Premise is served by a septic system located entirely within the boundaries of the Premises, to the best of their knowledge. (See attached Septic System Addendum [Title 5]) The SELLER shall engage a licensed Septic inspector to perform a System Inspection and to issue a Septic System Report (the "Report") and deliver the Report to the Buyer on or before the Septic System Inspection Date as defined in paragraph 4.5. Should the Report indicate that the system is a "failed system" as defined by Title 5 of the State Environmental Code (310 CMR 15.301), the BUYER may, within 3 days of receipt of report, cancel this Agreement, and all deposits shall be returned to the BUYER.

**8. CLOSING DATE:** The Deed is to be delivered and the Purchase Price paid on __2/10/04__ at 2:00 p.m. (the "Closing Date") at the appropriate Registry of Deeds or such other location within the county in which the Premises is located, as specified by BUYER.

Seller's Initials_____    Buyer's Initials_____    **Pg 1 of 4**

© MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE

**9. POSSESSION:** Full possession **free of all tenants and occupants** shall be delivered at the Closing Date. The premises shall be free of encroachments burdening the premises and of improvements that encroach on adjoining Premises, including buildings, septic systems, well and driveway, and has sufficient legal access to a public way.

**10. SURVEY:** SELLER represents that **no** new boundaries are being created by the sale of the Premises. If new boundaries are being created, SELLER shall deliver to BUYER at the Closing a survey of the Premises, in recordable form. The SELLER shall pay for the preparation and recording of the survey, unless otherwise provided herein.

**11. FIXTURES:** Included in this sale as part of the Premises, unless expressly excluded, are the usual fixtures belonging to SELLER and used in connection therewith including but not limited to, if any, furnaces, heaters, oil and gas burners and fixtures appurtenant thereto, built-in ranges, dishwashers and disposals, hot water heaters (if not rented), mantels, electric and other lighting fixtures, chandeliers, venetian blinds and window shades, attached mirrors, automatic door openers (with remote controls), installed air conditioners, wall brackets and hangers, built-in bookcases and shelving, all installed stair carpeting and wall to wall carpeting, drapery rods, curtain rods, plumbing and electrical covers, screens, screen doors, storm and other detached windows and doors, blinds, awnings, bathroom fixtures, towel bars, medicine cabinets, radio and television antennas, satellite dishes, fences, gates, hardy shrubs, and fire and burglar alarm systems. The following additional personal property is included: _____
Excluded items: _____

**12. ADJUSTMENTS:** Current real estate taxes, water rates, sewer use charges and fuel are to be apportioned as of the Closing Date. Rents are to be apportioned only for the month in which the closing occurs and only when collected by either party. Unpaid rents due SELLER from months prior to the month of the Closing Date, shall be the responsibility of the SELLER to collect. If the real estate tax rate is not set as of the Closing Date, the apportionment of real estate taxes shall be made on the basis of the tax assessed for the most recent preceding year, with a readjustment at the request of either party, when the amount of the current year's tax is set. If the amount of the tax is reduced by abatement, the rebate, less the reasonable cost of obtaining it, shall be apportioned between the parties.

**13. TITLE:** The Premises shall be conveyed by a good and sufficient quitclaim deed unless otherwise specified herein (accompanied by a Certificate of Title, if registered), conveying a good, clear record, marketable and insurable title, free of all encumbrances and exceptions, except:
    a) Real Estate Taxes assessed or to be assessed on the Premises to the extent that such taxes then are not yet due and payable.
    b) Betterment assessments, if any, which are not a recorded lien on the premises, as of the dated of this Agreement.
    c) Federal, state, and local laws, ordinances, by-laws, and rules regulating the use of land, particularly environmental, building, zoning, health, rent control, and condominium conversion laws, if any, applicable as of the date of this Agreement, provided that as of the Closing Date, the Premises may be used as of right for single family residential use or, if the Premises is/is not a single family residence, the Premises may be used as of right for **Z-family residence** _____
    d) Existing rights, if any, in party or partition walls; and
    e) Utility easements in the adjoining ways.

**14. USE OF PROCEEDS TO CLEAR TITLE:** To enable SELLER to make conveyance as herein provided, the SELLER may at the time of delivery of the deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, all instruments so procured to be recorded simultaneously with the delivery of said deed or at such later time as shall be reasonably acceptable to BUYER, and provided further, with respect to discharges or mortgages from insurance companies, banks and credit unions, such discharges may be recorded within a reasonable time after the recording of the deed.  .

**15. EXTENSION:** If, after a reasonable and diligent effort, SELLER is unable to convey title or deliver possession of the Premises as required hereunder, upon notice by either party, prior to the Closing Date, this Agreement shall be automatically extended for 30 days (or if Buyer's mortgage commitment sooner expires to a date one business day before the expiration of such commitment). Seller shall remove all mortgages, attachments and other encumbrances incurred or assumed by SELLER which secure the payment of money, provided the total amount thereof does not exceed the Purchase Price, and SELLER shall use reasonable and diligent efforts to remove other defects in title, or to deliver possession as provided herein, or to make the Premises conform to the provisions hereof. At the end of the extended period, if all such defects have not been removed, or the SELLER is unable to deliver possession, or the Premises do not conform with the requirements of this Agreement, BUYER may elect to terminate this Agreement and to receive back all deposits, upon receipt of which all obligations of the parties hereto shall cease.

**16. STANDARDS:** Any title matter or practice arising under or relating to this Agreement which is the subject of a Title Standard or a Practice Standard of the Massachusetts Conveyancers Association shall be governed by said Standard to the extent applicable.

**17. WATER:** SELLER represents that the Premises **is** served by a municipal water system. If the Premises is not served by a municipal water system, SELLER represents that the Premises is served by either **SELECT ONE**. (if a well is present, it contains no defects known to SELLER)

**18. MASS. UFFI LAW:** The SELLER represents and warrants that Urea Formaldehyde Foam Insulation (UFFI) **is not** present in the Premises and that UFFI has been declared by the Massachusetts Department of Public Health (DPH) to be a banned substance which may cause personal injury. If UFFI is or once was present in the Premises, BUYER acknowledges receipt of Mass. Disclosure Statement with a copy of the air quality test in possession of the SELLER, which is attached hereto and incorporated herein.

**19. LEAD PAINT LAW:** BUYER acknowledges that under Massachusetts Law, on homes constructed prior to 1978, and whenever a child under six (6) years of age resides in any premises in which paint, plaster or other accessible material contains dangerous levels of lead, the owner of said premises must remove or cover said material so as to make it inaccessible to children under six (6) years of age. The BUYER

Dec. 1. 2003 6:43PM    CENTURY 21 HAROLD DUPEE AGENCY    No.4395    P. 3

further acknowledges that, prior to the signing of this Agreement, the SELLER and Broker(s) have (a) provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, which is attached hereto; (b) informed the BUYER of the availability of inspections for dangerous levels of lead; and (c) verbally informed the BUYER of the possible presence of dangerous levels of lead and the provisions of the lead paint law and regulations, found in 105 CMR 460.100D. Notwithstanding, SELLER is under no obligation to the BUYER to remove lead paint, which may be present in the Premises.

**20. ASBESTOS:** The BUYER acknowledges that the Department of Public Health has issued regulations governing the maintenance, repair and removal of asbestos material by any owner of real property and that asbestos material is a common insulation material on heating pipes, boilers, and furnaces.

**21. RADON GAS:** Radon gas is a radioactive gas, which occurs naturally in certain areas and may accumulate in some buildings in a high enough concentration to be a potential health hazard.

**22. UNDERGROUND STORAGE TANKS:** The parties acknowledge that the Massachusetts Board of Fire Prevention has issued regulations governing the maintenance, repair, and removal of underground storage tanks to prevent and detect leakage of tank contents into surrounding soil and water supplies. The SELLER hereby discloses that to the best of Seller's knowledge, there **are not** one or more underground storage tank(s) at the Premises. If there are one or more underground tanks at the Premises, the SELLER further discloses that the tanks **SELECT ONE** been used within the past six (6) months exclusively for the storage of fuel oil for consumption of the Premises and to the best of the SELLER'S knowledge there has been no release or leakage of oil from such tank(s). If the Premises is not in compliance with 527 CMR 9.00 et.seq. and BUYER does not cancel this Agreement, pursuant to paragraph 6, BUYER shall be obligated to purchase the Premises and shall be deemed to have assumed the obligation to bring the Premises into compliance with 527 CMR 9.00 et. seq.

**23. CONDITION OF PREMISES AT CLOSING:** Upon delivery of the Deed, the Premises and all appliances therein and utilities serving the same shall be in their present condition, reasonable use and wear of same excepted. The Premises is to be left broom clean and all personal property and rubbish removed. With respect thereto, BUYER shall have the right to walk-through the Premises within twenty-four hours prior to the closing and if the sale is completed subsequent to said walk-through or if the walk-through is waived by BUYER, the foregoing condition of the Premises shall, as between the BUYER and SELLER and their representatives (if applicable), be conclusively presumed to be acceptable to BUYER regardless of condition.

**24. NOMINEE:** BUYER may require the conveyance to be made to another person, persons, or entity ("Nominee"), upon notification in writing delivered to SELLER at least five days prior to the Date of Closing. The appointment of a Nominee shall not relieve BUYER of any obligation hereunder. Any Note or mortgage or other document to be delivered from BUYER to SELLER shall be executed by or unconditionally guaranteed by BUYER, unless otherwise specified herein.

**25. CLOSING:** Simultaneously with the delivery of the deed, SELLER shall execute and deliver:

a) Smoke Detector Certificate of Compliance;
b) Wood Stove permit, where applicable
c) Affidavits and Indemnities with respect to parties in possession and mechanic's liens to induce buyer's title insurance company to issue lender's and owner's policies of title insurance without exception for those matters;
d) A bill of sale for all personal property included as part of the sale, if requested by the BUYER.
e) In the case of new construction, a Certificate of Occupancy and an assignment of any and all builder's, Sellers, or manufacturer's warranties on the Premises or on any appliances or other property included in the sale.
f) FNMA Vendor's affidavit FNMA 1099;
g) An affidavit, satisfying the requirements of Section 1445 of the Internal Revenue Code and regulation issued thereunder, which states, under penalty of perjury, the seller's United States taxpayer identification number, that the SELLER is not a foreign person, and the seller's address (the "1445 Affidavit");
h) Internal Revenue Service Form W-8 or Form W-9, as applicable, with seller's tax identification number, and an affidavit furnishing the information required for the filing of Form 1099S with the Internal Revenue Service and stating SELLER is not subject to back-up withholding.

**26. RISK OF LOSS-INSURANCE AND DAMAGE PRIOR TO CLOSING:** Prior to the delivery of the Deed, the risk of loss shall be on the SELLER. SELLER shall continue to carry the fire and extended coverage insurance presently maintained on the buildings on the Premises (or, upon the written request of the BUYER, and at the buyer's expense, in such greater amount as BUYER may reasonably request). If the Premises is damaged by fire or other casualty prior to the Closing Date, and SELLER has not restored the Premises to their former condition, the BUYER has the option to take an assignment of SELLER'S insurance proceeds or terminate this Agreement. If BUYER elects to purchase, SELLER shall assign all insurance proceeds to BUYER and the Purchase Price shall be reduced by:

a) the net amount of any insurance proceeds which a mortgagee has applied to the mortgage debt, less any amount reasonable expended by SELLER for partial renovation.
b) the amount of any insurance proceeds received by SELLER; and
c) any deductible amount under SELLER's insurance policy. SELLER will credit BUYER the amount of deductible toward purchase price.

**27. ACCEPTANCE OF DEED:** Acceptance of the deed by BUYER shall be a full performance and shall discharge every agreement and obligation herein except any agreements which by their terms are to be performed after the Closing. THE BUYER FURTHER ACKNOWLEDGES THAT THE BUYER IS PURCHASING THE PREMISES 'AS IS' and BUYER has not relied upon any statements or representations, oral or written, regarding the condition or value, present or future, of the Premises made either by the SELLER or the Seller's Agents, which are not otherwise contained in this Agreement and that the Seller's Agents are acting exclusively upon behalf of the SELLER. All oral or written representations between the parties are merged herein. BUYER further acknowledges it is the BUYER'S responsibility prior to closing to obtain any and all governmental permits for any intended use of the Premises including, but not limited to, health or environmental department, planning or zoning board approvals. SELLER and SELLER'S representative(s) make no representations as to the adequacy of the Premises being conveyed for BUYER'S intended purposes, disclosed or undisclosed.

**Seller's Initials**____________________ **Buyer's Initials**____________________ **Pg 3 of 4**

© MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE

Dec. 1. 2003 6:44PM CENTURY 21 HAROLD DUPEE AGENCY No.4395 P. 4

**28. MERGER:** The parties agree that this Agreement contains all of the terms and conditions of this transaction. It is mutually agreed that any oral or prior written representation made by either party prior to the execution of this Agreement is null and void. This Agreement shall be construed as a legal contract under seal and is binding upon the parties, and their respective heirs, successors, and assigns.

**29. SURVIVAL:** Notwithstanding any presumptions to the contrary, all covenants, conditions, and representations contained in this Agreement, which by their nature, implicitly or explicitly, involve performance in any particular manner after the Closing and delivery of the deed, or which cannot be ascertained to have been full performed until after the Closing and delivery of the deed, shall survive the Closing.

**30. TERMINATION:** In the event the BUYER terminates this Contract in accordance with the provisions herein relating to "Mortgage Contingency," "Risk of Loss Insurance," "Inspection Contingency," "Septic System Inspection", default by SELLER, or the failure of any contingency shown under special conditions, the Escrow Agent shall forthwith refund such deposit money together with accrued interest thereon (if applicable) to the BUYER.

**31. BUYER'S DEFAULT:** If the BUYER defaults, BUYER shall be liable to the SELLER in the amount of 10% of the purchase price, as liquidated damages, which shall be Seller's exclusive remedy in law or in equity. The deposits shall be applied to the payment of said liquidated damages.

**32. RELEASE OF DEPOSITS:** The deposits (which term shall include all interest earned, if any) made hereunder shall be held in escrow, subject to the terms of this Agreement and shall be duly accounted for at the time for performance of this Agreement. The deposits may not be released from escrow without the assent of both BUYER and SELLER. The recording of the deed to the Premises shall constitute such assent. In the event of any disagreement, the Escrow Agent shall retain the deposits pending written instructions by both the SELLER and BUYER, or by a court of competent jurisdiction. So long as Escrow Agent served in good faith, BUYER and SELLER each agrees to hold harmless Escrow Agent from damages, losses, or expenses, arising out of this Agreement or any action or failure to act, including reasonable attorney's fees, related thereto. BUYER and SELLER acknowledge that the Escrow Agent may be counsel or fiduciary to one of the parties and agree that Escrow Agent may continue to act as such counsel or fiduciary notwithstanding any dispute or litigation arising with respect to the deposits or Escrow Agent's duties.

**33. AGREEMENT TO MEDIATE DISPUTE OR CLAIMS:** Any dispute or claim arising out of or relating to this Agreement, the breach of this Agreement, or the brokerage services provided in relation to this Agreement shall be submitted to mediation in accordance with the Rules and Procedures of the Homesellers / Homebuyers Dispute Resolution System ("DRS"). Disputes and claims shall specifically include, without limitation, representations made by the SELLER, the BUYER, or the Broker(s) in connection with the sale, purchase, finance, condition, or other aspect of the Premises to which this Agreement pertains, including without limitation, allegations of concealment, misrepresentation, negligence and / or fraud. The mediation conference shall be held within 30 days from the date on which the mediator receives notice of the dispute. If the parties reach a settlement, they shall both sign a settlement agreement. If the parties cannot reach a mutually agreeable settlement, they may arbitrate or litigate the dispute without regard to the mediation procedure. The filing of a judicial action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies shall not constitute a waiver of the right to mediate under this paragraph, nor shall such filing constitute a breach of the duty to mediate. The provisions of this paragraph shall survive the closing.

**34. GOVERNING LAW:** This Agreement is to be governed by the substantive laws of the Commonwealth of Massachusetts.

**35. AGENCY:** BUYER and SELLER acknowledge that they have been provided with a completed copy of the 'Mandatory Agency Disclosure–Agency Relationship' form, as mandated by the Massachusetts Board of Registration of Real Estate Brokers and Salespersons.

**36. SPECIAL CONDITIONS / ADDENDA:** <u>Subject to seller obtaining license to sell from Berkshire County Probate Court. Subject to being sold "as is" as of 12/3/03 with no additional work done on the premises.</u>

**37. TERMINATION OF OFFER:** This offer is subject to acceptance by SELLER by <u>5:00 PM on 12/3/03</u>, after which time this offer is void and terminated, and deposit paid by BUYER shall be returned.

**38. TIME:** Time is of the essence of all provisions of this agreement, unless otherwise specified elsewhere in this agreement. Any reference to "days" shall mean calendar days and is not intended to mean only business days.

**39. THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD, SEEK LEGAL COUNSEL:** Executed under seal by the Parties hereto as of the latter of all dates set forth below, and incorporating all provisions on pages 1 through 4, together with referenced additions, if any.

| | | | |
|---|---|---|---|
| **SELLER: James Horrigan, Executor** | **DATE** | **BUYER: Nicolas Pellegrini** | **DATE** |
| **SELLER: Estate of Walter M. Bronson** | **DATE** | **BUYER: Maarten Pellegrini** | **DATE** |
| **SELLER's Attorney's Name** | | **BUYER's Attorney's Name** | |

Seller's Initials_____    Buyer's Initials_____    Pg 4 of 4

© **MULTIPLE LISTING SERVICE OF THE BERKSHIRE COUNTY BOARD OF REALTORS® INC - BY CENTURY 21 HAROLD DUPEE**

## PROPERTY TRANSFER NOTIFICATION CERTIFICATION

This form is to be signed by the prospective purchaser before signing a purchase and sale agreement or a memorandum of agreement, or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property built before 1978, for compliance with federal and Massachusetts lead-based paint disclosure requirements.

### Required Federal Lead Warning Statement:

Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

### Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i)_____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

_____

    (ii)__✓__ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

    (i)_____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (circle documents below).

    Lead Inspection Report; Risk Assessment Report; Letter of Interim Control; Letter of Compliance

    (ii)_____ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Purchaser's or Lessee Purchaser's Acknowledgment (initial)

(c) _____ Purchaser or lessee purchaser has received copies of all documents circled above.

(d) _____ Purchaser or lessee purchaser has received no documents.

(e) _____ Purchaser or lessee purchaser has received the Property Transfer Lead Paint Notification.

(f) _____ Purchaser or lessee purchaser has (check (i) or (ii) below):

    (i)_____ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii)_____ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment (initial)

(g)___✓___ Agent has informed the seller of the seller's obligations under federal and state law for lead-based paint disclosure and notification, and is aware of his/her responsibility to ensure compliance.

(h)_____ Agent has verbally informed purchaser or lessee-purchaser of the possible presence of dangerous levels of lead in paint, plaster, putty or other structural materials and his or her obligation to bring a property into compliance with the Massachusetts Lead Law — either through full deleading or interim control — if it was built before 1978 and a child under six years old resides or will reside in the property.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | |
|---|---|---|
| _James Horrigan, executor_ 12/2/02 | _____ | _____ |
| Seller James  Horrigan  executor | Seller | Date |
| | | |
| Purchaser / Date | Purchaser | Date |
| _Moucers V Buidly_ 12/02/02 | _____ | _____ |
| Agent / Date | Agent | Date |

Address of Property / Unit _____





MASSACHUSETTS ASSOCIATION of REALTORS®

REALTOR

MASSFORMS™
Statewide Standard Real Estate Forms

MASSACHUSETTS BOARD OF REGISTRATION OF REAL ESTATE BROKERS AND SALESPERSONS
# MANDATORY AGENCY DISCLOSURE – AGENCY RELATIONSHIP

The purpose of this disclosure is to enable you to make informed choices before working with a real estate licensee. It must be provided at the first personal meeting that you have with an agent to discuss a specific property. THIS IS NOT A CONTRACT. It is a disclosure notice for your information and protection. BE SURE TO READ THE DESCRIPTIONS OF THE DIFFERENT TYPES OF AGENCY REPRESENTATION IN THIS DISCLOSURE.

## CONSUMER INFORMATION

1. Whether you are the buyer or the seller, you can choose to have the advice, assistance and representation of your own agent. Do not assume that a broker is acting on your behalf unless you have contracted with that broker to represent you.
2. All real estate licensees must, by law, present properties honestly and accurately.
3. If you are a seller you may authorize your listing agent to cooperate with agents from other firms to help sell your property. These cooperating agents may be subagents who work for the seller or buyer's agents.
4. If you are the buyer you have the option of working with sellers' or buyers' agents. This decision will depend on the types of services you want from a real estate agent. A buyer should tell sellers' agents, including subagents, only what he/she would tell the seller directly.

## CONSUMER RESPONSIBILITY

The duties of a real estate licensee do not relieve the consumer of the responsibility to protect his/her own interest. If you need advice for legal, tax, insurance or other matters it is your responsibility to consult a professional in those areas.

## ACKNOWLEDGEMENT

I have provided this disclosure form to _____

I have informed the above named consumer that I am a: (check one)    ☐ Seller's Agent    ☐ Buyer's Agent

_____        _____        _____
(Signature of Real Estate Agent)        (License Number)        (Date)

I have read this agency disclosure form IN ITS ENTIRETY, INCLUDING THE INFORMATION regarding BUYER'S AGENT, SELLER'S AGENT and DISCLOSED DUAL AGENT. I understand that this form is for agency disclosure and NOT A CONTRACT. It was provided to me by the agent named above.

                                                      Check Here:  ☐ Buyer
_____        _____                   ☐ Seller
(Signature of Consumer/s)        (Date)

☐ As a Consumer, I recognize that I need not select any agency representations at this time. Therefore, I decline to sign this disclosure. Any additional reason for declining to sign:

_____
(Please print name of consumer and reason, if any.)

Ⓡ        **MULTIPLE LISTING SERVICE OF BERKSHIRE COUNTY BOARD OF REALTORS® INC – Pg 1 of 2**        

# *Wyoming State Law Library*

Go    Advanced Search · Simple Search · Batch Citator | Help | Ex

**Previous Case** | **Top Of Index** | **This Point in Index** | **Citationize** | **Next Case** | **Print Only**

Wyoming Supreme Court Cases

## WAID v. STATE
### 2000 WY 15
### 996 P.2d 18
### Case Number: 98-20
### Decided: 02/08/2000
### Supreme Court of Wyoming

Cite as 2000 WY 15, 996 P 2d 18

PAUL WAID and JO WAID; NORM SANTESSON and JO SANTESSON; WAID SERVICES, INC.; RICHARD SALCIDO and DEBORAH SALCIDO; and TED ADAMS and DONNA ADAMS, Appellants (Plaintiffs),

v.

STATE OF WYOMING, by and through the DEPARTMENT OF TRANSPORTATION; and BURLINGTON NORTHERN RAILROAD COMPANY, Appellees (Defendants).

### Appeal from the District Court of Washakie County, Honorable Gary P. Hartman, Judge.

S. Joseph Darrah and Joseph E. Darrah of Darrah & Darrah, P.C., Powell, Wyoming; and Brad Smith, Cody, Wyoming, **representing appellants**.

William U. Hill, Attorney General; John W. Renneisen, Deputy Attorney General; Thomas C. Wilson, Senior Assistant Attorney General; and Jennifer A. Cudworth, Assistant Attorney General, Cheyenne, Wyoming, **representing appellee** State, by and through the Department of Transportation.

John A. Coppede of Sundahl, Powers, Kapp & Martin, Cheyenne, Wyoming. representing appellee Burlington Northern Railroad Company.

### Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

* Retired November 2, 1998.

**THOMAS**, Justice.

[¶1] Paul Waid, Jo Waid. Norm Santesson, Jo Santesson, Waid Services, Inc., Richard Salcido, Deborah Salcido, Ted Adams, and Donna Adams (collectively the Waid group) appeal from a summary judgment entered in favor of the Wyoming Department of Transportation (WYDOT) and Burlington Northern Railroad Company (Burlington) in an action for inverse condemnation. Specifically, the Waid group contests the ruling, upon which the district court premised the summary judgment, that Wyo. Stat. Ann. § 1-26-516 (Lexis 1999) requires a permanent taking for inverse condemnation. As we analyze this statute, a permanent taking is not required, but the district court's grant of summary judgment can be, and it is, affirmed on other grounds. The Waid group failed to satisfy the time limit for filing a claim against WYDOT, as set forth in Wyo. Stat. Ann. § 1-39-113 (Michie 1988). The record demonstrates that there is no causal connection between Burlington's activities and any damage to the Waid group lands. nor does Burlington come within the category of one conducting activities on adjacent land for purposes of inverse condemnation under the statute. The Findings of Fact and Order Granting Defendants' Motions for Summary Judgment is affirmed.

[¶2] In the Brief of Appellant, filed on behalf of the Waid group, the issues are articulated in this way:

> A. Did the District Court err in holding that defendants could defeat claims for inverse condemnation of a flooding easement, brought under W.S. § 1-26-516, by showing that they could take steps to prevent recurrence of flooding in the future without submitting evidence to support that claim?

> B. Did the District Court err in granting summary judgments to all defendants on the issue of the taking of personal property without the Defendants submitting evidence in support of their motion?

> C. Could the District Court have granted summary judgment on any of the other bases on which Defendants sought summary judgment?

[¶3] This Statement of the Issues is found in the Brief of Appellee Burlington Northern Railroad Company:

> 1. Whether the district court properly granted summary judgment against the Appellants on their inverse condemnation claims where the evidence showed the claims were based on two isolated instances of temporary flooding?

> 2. Whether the district court properly granted summary judgment against the Appellants on their inverse condemnation claim where the landowners as a matter of law failed to show that their properties were damaged for a public use?

> 3. Whether a landowner can maintain an inverse condemnation claim against a party for allegedly inversely acquiring a property right for which it did not possess the power to acquire directly through an eminent domain proceeding?

> 4. Whether this Court should affirm the district court's summary judgment against the Appellants on their inverse condemnation claims where the evidence failed to show that this Appellee's activities were the proximate cause of the Appellants' alleged damages?

[¶4] In the Brief of Appellee State of Wyoming, By and Through the Department of Transportation, the issues are stated to be:

> 1. Whether the district court was correct in granting summary judgment to Appellee State of Wyoming by finding that Appellants failed to show a permanent taking because Appellants' claims were based on a very few isolated instances of temporary flooding which served no public service.

> 2. Whether Appellants' claim was timely filed under the Wyoming Governmental Claims Act pursuant to case authority and stipulated to by all parties when Appellants discovered they had a cause of action as early as the early 1980s and no later than 1987 when the alleged first flood occurred.

[¶5] This statement of arguments appears in the Reply Brief of Appellants:

> Plaintiffs are not required to demonstrate permanent taking or public purpose in accordance with W.S. § 1-26-516.

[¶6] Appellants have timely filed their claims.

[¶7] The State cannot re-characterize appellant's claims in order to apply an otherwise inapplicable cause of action because appellants have proffered evidence of intentional conduct.

[¶8] The Waid group owns property lying to the east of U.S. Highway 20, which runs north and south along the

west border of that property. Burlington owns a railroad track bed west of U.S. Highway 20, and operates trains upon that track. Upper Hanover Irrigation District (Upper Hanover) and Lower Hanover Canal Association (Lower Hanover) operate two irrigation systems that furnish water for agricultural use in the vicinity. In the early years of the 1980's, WYDOT raised the elevation of the highway by approximately ten feet. At the time the highway was raised, both WYDOT and Burlington replaced their existing culverts in that area with new culverts of the same size.

[¶9] In July of 1987, a severe rain storm dropped three inches of water on and around the Waid group property in only about an hour. Faced with the deluge, Upper Hanover and Lower Hanover discharged water into Durkee Draw, a drainage that lies between U.S. Highway 20 and the Waid group property. The culvert under the highway could not accommodate all the water and carry it under the road, while the elevation of the road prevented water from passing over the top of the road. The water flowed to the east instead, flooding the Waid group property and causing extensive damage. A similar event occurred in May of 1993, which resulted in further damage to the Waid group property. A third flood threatened to occur in July 1994, but, on that occasion, Upper Hanover diverted water into an additional ditch. That diversion limited the flow into Durkee Draw, and the highway culvert was able to accommodate the water that then went down Durkee Draw.

[¶10] The Waid group filed claims with Upper Hanover, Lower Hanover, and WYDOT in February of 1995, pursuant to the Wyoming Governmental Claims Act, Wyo. Stat. Ann. §§ 1-39-101 through 1-39-120 (Michie 1988). On March 31, 1995, the Waid group filed a complaint in the district court alleging inverse condemnation pursuant to Wyo. Stat. Ann. § 1-26-516 and asserting real and personal property damage together with diminution in value. Named as defendants in the action were Upper Hanover, Lower Hanover, Burlington, and WYDOT. Voluminous pleadings followed, including discovery, after which the district court granted summary judgment in favor of all the defendants. Preferring not to defend the appeal in this case, Upper Hanover and Lower Hanover settled with the Waid group, and the Waid group pursued this appeal against Burlington and WYDOT.

[¶11] Recently, we have summarized our process for the review of summary judgments granted pursuant to W.R.C.P. 56 in this way:

> Our standard for the review of summary judgments is well established:
>
> "When a motion for summary judgment is before the supreme court, we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did he. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.'" Reno Livestock Corporation v. Sun Oil Company (Delaware), Wyo., 638 P.2d 147, 150 (1981). See also, Blackmore v. Davis Oil Company, Wyo., 671 P.2d 334, 336 (1983).
>
> "A summary judgment should only be granted where it is clear that there are no issues of material facts involved and that an inquiry into the facts is unnecessary to clarify the application of law. Johnson v. Soulis, Wyo., 542 P.2d 867 (1975). A material fact is one which has legal significance. Johnson v. Soulis, supra. It is a fact which would establish a defense. Wood v. Trenchard, Wyo.[,] 550 P.2d 490 (1976). After the movant establishes a prima facie case the burden of proof shifts to the opposing party who must show a genuine issue of material fact, Gennings v. First Nat'l Bank of Thermopolis, Wyo., 654 P.2d 154 (1982), or come forward with competent evidence of specific facts countering the facts presented by the movant. Matter of the Estate of Brosius, Wyo., 683 P 2d 663 (1984). The burden is then on the nonmoving party to show specific facts as opposed to general allegations. 10 Wright & Miller, Federal Practice and Procedure: Civil § 2727, p. 538. The material presented must be admissible evidence at trial. Conclusory statements are not admissible. Bancroft v. Jagusch, Wyo., 611 P 2d 819 (1980). We give the party defending the motion the benefit of any reasonable doubt." Roth v. First Security Bank of Rock Springs, Wyoming, Wyo., 684 P 2d 93, 95 (1984).

Mercado v. Trujillo, 980 P 2d 824, 825-26 (Wyo. 1999).

[¶12] We examine this record from the point of view most favorable to the party who opposed the motion, giving that party the benefit of all favorable inferences that may fairly be drawn from the record. Davis v. Wyoming Medical Center, Inc., 934 P 2d 1246, 1250 (Wyo. 1997). The record review has satisfied this Court that there is no genuine issue as to any material fact that would have the effect of establishing or refuting an essential element of the claim or defense asserted by the parties. Century Ready-Mix Co. v. Campbell County School Dist., 816 P.2d 795, 799 (Wyo. 1991) (quoting Doud v. First Interstate Bank of Gillette, 769 P.2d 927, 928 (Wyo. 1989)). We then determine whether the prevailing parties were entitled to judgment as a matter of law. In evaluating entitlement to judgment as a matter of law, we apply our rule that if the summary judgment can be upheld, under the record presented, upon any proper legal theory, we do so. Century Ready-Mix Co., 816 P.2d at 799; Reeves v. Boatman, 769 P.2d 917, 918 (Wyo. 1989).

[¶13] We turn initially to the rationale articulated by the district court for the grant of summary judgment to WYDOT and Burlington. In the course of its Findings of Fact and Order Granting Defendants' Motions for Summary Judgment, the district court ruled that a permanent taking was a necessary element of a claim for inverse condemnation. The court invoked Goodman v. United States, 113 F.2d 914, 917 (8th Cir. 1940) in support of that determination. In Goodman, the United States Court of Appeals for the Eighth Circuit held that temporary flooding did not constitute a taking for purposes of presenting a claim under inverse condemnation. Indeed that is an accurate reading of Goodman, but this doctrine is not viable in Wyoming because of subsequent legislation and precedent making Goodman, its progenitors, and any progeny inapplicable with respect to inverse condemnation actions in Wyoming.

[¶14] In 1981, the Wyoming Eminent Domain Act, Wyo. Stat. Ann. §§ 1-26-501 through 1-26-516 (Lexis 1999), became law. The final section of the Wyoming Eminent Domain Act was entitled "Action for inverse condemnation," and it provides:

> When a person possessing the power of condemnation takes possession of or damages land in which he has no interest, or substantially diminishes the use or value of land, due to activities on adjoining land without the authorization of the owner of the land or before filing an action of condemnation, the owner of the land may file an action in district court seeking damages for the taking or damage and shall be granted litigation expenses if damages are awarded to the owner.

[¶15] Wyo. Stat. Ann. § 1-26-516 (emphasis added). The Wyoming Eminent Domain Act encompasses the entire subject of eminent domain, and abrogates any earlier contrary decisions. L.U. Sheep Co. v. Board of County Com'rs of County of Hot Springs, 790 P.2d 663, 669 (Wyo. 1990).

[¶16] When this Court is tasked with the interpretation of a statute, we initially invoke this rule of statutory interpretation:

> We endeavor to interpret statutes in accordance with the Legislature's intent. We begin by making an "inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.'" Parker Land and Cattle Company v. Wyoming Game and Fish Commission, 845 P.2d 1040, 1042 (Wyo. 1993) (quoting Rasmussen v. Baker, 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute in pari materia.

[¶17] State Dept. of Revenue and Taxation v. Pacificorp, 872 P 2d 1163, 1166 (Wyo. 1994). We have followed that rule consistently since it was articulated. Flores v. Flores, 979 P.2d 944, 946 (Wyo. 1999); Cargill v. State, Dept. of Health, Div. of Health Care Financing, 967 P 2d 999, 1001 (Wyo. 1998); Hill v. Value Recovery Group, L.P., 964 P.2d 1256, 1258 (Wyo. 1998); State ex rel. Wyoming Workers' Safety and Compensation Div. v. Bruhn, 951 P 2d 373, 376 (Wyo. 1997). It is clear from the plain language of Wyo. Stat. Ann. § 1-26-516 that our legislature intended to allow recompense to an owner of property not only for permanent takings, but also for damage or diminution in value. The Waid group alleged all three of these premises for compensation in the complaint that was filed. We hold that, under the statute, no permanent taking is required in order for the Waid group to maintain the action for inverse condemnation. This ruling leads to a consideration of whether this Court can affirm the grant of summary judgment for WYDOT and Burlington under any other proper legal theory.

[¶18] The summary judgment in favor of Burlington can be upheld on the basis of the statutory language. The record discloses that U.S. Highway 20 runs along the western border of the Waid group property, and the railroad line lies to the west of the highway, separated from the Waid group property by U.S. Highway 20. The critical

phrase in the inverse condemnation statute is "due to activities on adjoining land without the authorization of the owner of the land or before filing an action of condemnation." Wyo. Stat. Ann. § 1-26-516. That phrase is set off by commas, and is separated from the preceding language by a comma leading to a grammatical interpretation that the legislature intended the phrase as a modifier for all preceding phrases. If the initial comma were not present, the language would properly be construed as modifying only the immediately preceding phrase. Tietema v. State, 926 P 2d 952, 954 (Wyo. 1996).

[¶19] The rule with respect to a modifier, like this adverbial clause, is perhaps best stated in 2A Sutherland Statutory construction § 47.33 at 270 (5th ed. 1992):

> Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is "the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence." Thus a proviso usually is construed to apply to the provision or clause immediately preceding it. The rule is another aid to discovery of intent or meaning and is not inflexible and uniformly binding. Where the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent.

[¶20] Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.

[¶21] (Footnotes omitted and emphasis added.) This proposition was quoted and applied in a dissenting opinion in Battlefield, Inc. v. Neely, 656 P.2d 1154, 1165 (Wyo. 1983) (Thomas, J., dissenting), and it was relied upon as authoritative in Tietema, 926 P.2d at 954.

[¶22] In a different grammatical context we said, speaking to the significance of the placement of a comma:

> The application of commonly accepted rules of grammar would indicate that, by the proviso found in § 12-6-102(a), which reads,
>
> "[n]o adult shall transport, or have in his possession or control, any alcoholic liquor or malt beverage, with the intent of furnishing the same to any minor, while operating or occupying a motor vehicle,"
>
> the legislature intended the phrase "while operating or occupying a motor vehicle" to modify the word "adult." Since the phrase is set off by a comma, it is a dangling elliptical clause unless it is assumed to refer to "adult," which is the subject of the main clause. J. Hodges & M. Whitten, Hodge's College Handbook (7th ed. 1972). In contrast, if the comma were not there, the phrase would modify the word "minor." While it is true that a court does not sit as a "panel of grammarians" to review statutes, neither is the judiciary permitted to regard ordinary principles of English prose as irrelevant when construing a statute. Flora v. United States, 362 U.S. 145, 150, 80 S.Ct. 630, 633, 4 L.Ed.2d 623, reh. denied 362 U.S. 972, 80 S.Ct. 953, 4 L.Ed.2d 901 (1960). Individual members of this court have previously noted this concept. Battlefield, Inc. v. Neely, 656 P.2d 1154 (Wyo. 1983) (Thomas, J., dissenting); Matter of Voss' Adoption, 550 P.2d 481 (Wyo. 1976) (Guthrie, C.J., dissenting, with whom McClintock, J., joined). See also Kindler v. Anderson, 433 P 2d 268 (Wyo. 1967).

State v. Denhardt, 760 P 2d 988, 990 (Wyo. 1988).

[¶23] Burlington emphasizes that the geography of the area forecloses a conclusion that it engaged in activity on land adjoining the Waid group property, and for that reason it is not a proper defendant in an inverse condemnation proceeding. We are satisfied that the legislature intended to enact the requirement that the defendant take, damage, or diminish by "activities on adjoining land without the authorization of the owner of the land or before filing an action of condemnation." Wyo. Stat. Ann. § 1-26-516. The summary judgment in favor of Burlington is affirmed because it did not conduct activities on adjoining land. Indeed, scenarios can be visualized in which it would be desirable to permit an inverse condemnation when the activities were conducted on a non-adjoining parcel, but the consequences of that situation appropriately should be addressed to the legislature rather than to this Court.

[¶24] In addition, the circumstances of the flooding disclosed by the record appear to make it impossible for the proximate cause of the flooding to have been the culvert under the Burlington track. The water was blocked by the culvert under U.S. Highway 20, and the water backed up from that point. The actions of Upper Hanover and Lower Hanover in releasing water down Durkee Draw in the instance of a natural deluge could not have been reasonably anticipated by either WYDOT or Burlington, thus suggesting that neither owed a duty to the Waid group. We point to these as further bases for the grant of the summary judgment to Burlington, but our decision rests upon the construction of the statute.

[¶25] We turn then to the claim of inverse condemnation against WYDOT, and we begin with the proposition that the Waid group and the State agree that the time limits for filing claims set forth in the Wyoming Governmental Claims Act, Wyo. Stat. Ann. §§ 1-39-101 through 1-39-120, apply to a claim against the State for inverse condemnation. Both parties rely upon Wyoming State Highway Dept. v. Napolitano, 578 P 2d 1342, 1349 (Wyo.), appeal dismissed 439 U S. 948 (1978), which predates both the Wyoming Governmental Claims Act and the Wyoming Eminent Domain Act. Even though reliance on Napolitano may be misplaced, we agree with the parties that the time limits articulated in Wyo. Stat. Ann. § 1-39-113 apply. The relevant part of the statute provides:

> (a) No action shall be brought under this act against a governmental entity unless the claim upon which the action is based is presented to the entity as an itemized statement in writing within two (2) years of the date of the alleged act, error or omission, except that a cause of action may be instituted not more than two (2) years after discovery of the alleged act, error or omission, if the claimant can establish that the alleged act, error or omission was:
>
> (i) Not reasonably discoverable within a two (2) year period; or
>
> (ii) The claimant failed to discover the alleged act, error or omission within the two (2) year period despite the exercise of due diligence.

[¶26] Early in the course of pleading their case, the Waid group conceded that claims for damage arising out of the 1987 flood were time barred. They contend, however, that the recurrence in 1993 started the time limit to run again, and gave them two years from that incident in which to file the statutory claims. This contention does not comport with the plain language of the statute, in which the time for filing a claim is measured not from the date damage occurs, but from the date on which the "act, error or omission" occurs, or when it is discovered by a claimant. For purposes of this case, it may be assumed that the Waid group had no suspicion that anything was amiss with respect to the highway until water inundated the property in 1987.[1] There can be no doubt, however, that the Waid group discovered the "act, error or omission" which provided the basis of the claim of inverse condemnation no later than the date of the 1987 flood. The situation had not changed by 1993, and although that flood caused additional damage, there was no new "act, error or omission," or a fresh discovery of such that would cause the statutory time period to start anew. It is clear that the two year time for filing claims under the statute began to run in July 1987, and it had expired by the time the Waid group filed claims with WYDOT in February 1995.

## Footnotes

[1] In the initial complaint, the Waid group asserted that area residents requested a larger culvert when the State raised the level of the highway. The record, however, does not identify which area residents made that request, and, for that reason, we are willing to assume that no members of the Waid group were among them. We summarize our holding by reiterating the proposition that an action for inverse condemnation under Wyo. Stat. Ann. § 1-26-516 does not require demonstration of a permanent taking by a claimant. The plain language of the statute, however, makes it applicable only to conduct on adjoining land. The requirement that a claim be presented pursuant to the procedure established by the Wyoming Governmental Claims Act is applicable to inverse condemnation actions, and the claim must be filed within two years of the "act, error or omission" giving rise to the claim. The Findings of Fact and Order Granting Defendants' Motions for Summary Judgment is affirmed, albeit upon different grounds than those presented by the district court.

## Citationizer© Summary of Documents Citing This Document

| Cite Name | Level | | |
|---|---|---|---|
| **Wyoming Supreme Court Cases** | | | |
| Cite | Name | | Level |
| 2001 WY 6, 1, P 3d 13, | RAWLINSON v  CHEYENNE  BOARD OF PUBLIC UTILITIES | | |
| 2004 WY 143, 1-0 P 3d 1238, | LANKFORD v  CITY OF LARAMIE | | |
| 2005 WY 54, 1 10 P 3d 875, | LAURENCE and JUDI LAUGHTER  LANE AND LAURA FILLINIM  and O D AND ROSANNE OWENS V  BOARD OF COUNTY COMMISSIONERS FOR SWEETWATER COUNTY, WYOMING | | Cited |
| 2006 WY 37, 131 P 3d 399, | R  MICHAEL REED and ICIA REED V  LESLIE E  CLONINGER  JR , Co-Trustee and STANLEY SHEPPARD  Co-Trustee of the Carl M  Burgener Family Living Trust Fund, COX AND FISHER, INC   a Wyoming corporation, KENNETH JONES, MELVIN C  PARKER, JANET L  PARKER, and SHOSHONE IRRIGATION DISTRICT | | Discussed |

## Citationizer: Table of Authority

| Cite Name | Level | |
|---|---|---|
| **Wyoming Supreme Court Cases** | | |
| Cite | Name | Level |
| 1897 WY 18, 50 P  819, 7 Wyo  117, | Rasmussen v  Baker | Cited |
| 1967 WY 52, 433 P 2d 268, | Kindler v  Anderson | Cited |
| 1975 WY 55, 542 P 2d 867, | Johnson v  Soulis | Cited |
| 1976 WY 36, 550 P 2d 481, | Matter of Voss' Adoption | Cited |
| 1976 WY 40, 550 P 2d 490, | Wood v  Trenchard | Cited |
| 1978 WY 35, 578 P 2d 1342, | Wyoming State Highway Dept  v  Napolitano | Cited |
| 1980 WY 49, 611 P 2d 819, | Bancroft v  Jagusch | Cited |
| 1981 WY 133, 638 P 2d 147, | Reno Livestock Corp  v  Sun Oil Co  (Delaware) | Cited |
| 1982 WY 120, 654 P 2d 154, | Gennings v  First Nat  Bank of Thermopolis | Cited |
| 1983 WY 3, 656 P 2d 1154, | Battlefield, Inc  v  Neely | Discussed |
| 1984 WY 65, 683 P 2d 663, | Matter of Estate of Brosius | Cited |
| 1984 WY 70, 684 P 2d 93, | Roth v  First Sec  Bank of Rock Springs, Wyo | Cited |
| 1988 WY 107, 760 P 2d 988, | State v  Denhardt | Cited |
| 1989 WY 56, 769 P 2d 917, | Reeves v  Boatman | Cited |
| 1990 WY 39, 790 P 2d 663, | L U  Sheep Co  v  Board of County Com'rs of County of Hot Springs | Cited |
| 1993 WY 10, 845 P 2d 1040, | Parker Land and Cattle Co  v  Wyoming Game and Fish Com'n | Cited |
| 1994 WY 41, 872 P 2d 1163, | State Dept  of Revenue and Taxation v  Pacificorp | Cited |
| 1996 WY 149, 926 P 2d 952, | Tietema v  State | Cited |
| 1997 WY 43, 934 P 2d 1246, | Davis v  Wyoming Medical Center  Inc | Cited |
| 1997 WY 161, 951 P 2d 373, | State ex rel  Wyoming Workers' Safety and Compensation Div  v  Bruhn | Cited |
| 1999 WY 79, 980 P 2d 824, | Mercado v  Trujillo | Cited |
| 1999 WY 56, 979 P 2d 944, | Flores v  Flores | Cited |
| 1998 WY 115, 964 P 2d 1256, | Hill v  Value Recovery Group, L P | Cited |
| 1998 WY 137, 967 P 2d 999, | Cargill v  State, Dept  of Health, Div  of Health Care Financing | Cited |

# OSCN
### THE OKLAHOMA STATE COURTS NETWORK

| Home | Courts | Court Dockets | Legal Research | Calendar | Help | |
| Previous Case | Top Of Index | This Point in Index | Citationize | Next Case | Print Only |

## Tietema v. State
### 1996 WY 149
### 926 P.2d 952
### Case Number: 95-271
### Decided: 11/15/1996
### Supreme Court of Wyoming

Cite as: 1996 WY 149, 926 P.2d 952

John E. TIETEMA, Jr.,

Appellant (Defendant),

v.

The STATE of Wyoming,

Appellee (Plaintiff).

### Appeal from District Court, Park County, Hunter Patrick, J.

Sylvia Lee Hackl, State Public Defender; Kenneth M. Koski, Deputy Public Defender; and Deborah Cornia, Appellate Counsel, **for appellant**.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; and John D. Harjehausen, Student Director, Prosecution Assistance Program, **for appellee.**

### Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN,* and LEHMAN, JJ.

* Chief Justice at time of oral argument.

**LEHMAN**, Justice.

[¶1]    In this case we are asked to answer the certified question of "[w]hether `possession' under WYO. STAT. § 12-6-101(b) (Supp. 1995) must occur on `any street or highway or in any public place'? In other words, whether `on any street or highway or in any public place' is an element of the offense of possession of alcoholic or malt beverages."

[¶2]    We answer the question in the negative.

### FACTS

[¶3]    On December 17, 1994, officers from the Park County Sheriff's Department responded to a report at a private residence where a party was being held. Outside the residence, an officer observed beer bottles and several plastic red cups on the ground by the garage. Inside the garage, officers observed several cups on the

floor, a beer keg and an opened bottle of whiskey approximately half full. During questioning, appellant John E. Tietema, Jr. admitted to drinking beer, and alcohol smelled on his breath. An individual living at the residence admitted that he was having a "party" in the garage.

[¶4]    Tietema was issued a citation for underage possession of alcohol and being under the influence of alcohol in violation of W.S. 12-6-101(b). The county court dismissed the under-the-influence count, and a trial was held regarding the count charging Tietema with possession of alcohol. On March 20, 1995, the county court issued its order concluding that, as a matter of law, possession under W.S. 12-6-101(b) could occur on private property and that "on any street or highway or in any public place" was not an element of the offense of possession of alcoholic or malt beverages.

[¶5]    After sentencing on March 27, 1995, Tietema appealed the judgment and sentence to the district court. Pursuant to W.R.A.P. 11, the district court certified to this court the question of whether "possession" under W.S. 12-6-101(b) must occur on "any street or highway or in any public place." The district court reserved to itself the issues raised by Tietema concerning constructive possession of alcohol and sufficiency of the evidence.

### DISCUSSION

[¶6]    Section 12-6-101(b) provides:

> (b) Any person under the age of twenty-one (21) years who has any alcoholic or malt beverage in his possession or who is drunk or under the influence of alcoholic liquor, malt beverages or a controlled substance on any street or highway or in any public place is guilty of a misdemeanor. This subsection does not apply to possession of alcoholic or malt beverages by a person under the age of twenty-one (21) years:
>
> > (i) When making a delivery of alcoholic or malt beverages pursuant to his employment;
> >
> > (ii) Who is in the physical presence of his parent or legal guardian;
> >
> > (iii) When dispensing or serving alcoholic or malt beverages or otherwise working in a dispensing room pursuant to his employment, if the person was at least nineteen (19) years of age on the effective date of this act. This paragraph does not apply to persons otherwise authorized to serve alcoholic or malt beverages under paragraph (v) of this subsection;
> >
> > (iv) Who is a licensee under this title; or
> >
> > (v) When serving alcoholic or malt beverages pursuant to his employment in a restaurant which holds a license to serve alcoholic or malt beverages, if the person is at least eighteen (18) years of age.

Tietema contends that the plain meaning of the language in the statute requires "possession" to occur on any street or highway or in any public place, i.e., "possession" cannot occur on private land. The State, on the other hand, asserts that possession of alcoholic or malt beverages by anyone under the age of twenty-one is prohibited regardless of location, public or private, except in those instances specifically exempted in subsections (i) through (v).

[¶7]    This court's primary focus when interpreting a statute is the determination of the legislature's intent upon enactment. In re Honeycutt, 908 P.2d 976, 978 (Wyo. 1995); Coones v. F.D.I.C., 894 P.2d 613, 616 (Wyo. 1995); Halpern v. Wheeldon, 890 P 2d 562, 564 (Wyo. 1995). We construe a statute as a whole with ordinary and obvious meaning applied to words as they are arranged in paragraphs, sentences, clauses and phrases to express the intent of the legislature. In re Honeycutt, at 978; Wyoming Ins. Guar. Ass'n v. Woods, 888 P 2d 192, 197 (Wyo. 1994). If a statute is clear and unambiguous, we will give effect to the plain and ordinary meaning of the words and will not resort to rules of statutory construction. In re Honeycutt, at 978; Lancto v. City of Rawlins, 802 P 2d 800, 802 (Wyo. 1995). We will resort to extrinsic aids of statutory interpretation to determine the legislature's intent only if we find the statute to be ambiguous. In re Honeycutt, at 978; Lancto, at 803.

[¶8]    In construing the language

> [a]ny person under the age of twenty-one (21) years who has any alcoholic or malt beverage in his
> possession or who is drunk or under the influence of alcoholic liquor, malt beverages or a controlled
> substance on any street or highway or in any public place is guilty of a misdemeanor[,]

we find that two independent misdemeanor offenses are included: 1) any person under twenty-one years of age is
prohibited from possessing alcoholic or malt beverages, regardless of location; and 2) any person under twenty-
one years of age is prohibited from being drunk or under the influence of alcoholic liquor, malt beverages or a
controlled substance on any street or highway or in any public place.

[¶9]    The bases for this conclusion are threefold. First, the prohibition against possession of alcoholic or malt
beverages is set apart from the prohibition against being drunk or under the influence of alcoholic liquor, malt
beverages or a controlled substance by the disjunctive use of the word "or." We have addressed the effect of the
use of the word "or" previously, stating:

> Webster defines "or" as a function word to indicate (1) an alternative between different or unlike things,
> states or actions; (2) choice between alternative things, states or courses. The word "or" is ordinarily used
> as a disjunctive generally corresponding to "either" as "either this or that." Where two clauses or phrases
> are expressed in the disjunctive, they are coordinate and either is applicable to any situation to which its
> terms relate. Generally, use of the disjunctive indicates alternatives and requires separate treatment of
> those alternatives, hence a clause following a disjunction is considered inapplicable to the subject matter
> of the preceding clause.

Olsten Staffing Serv., Inc. v. D.A. Stinger Serv., Inc., 921 P.2d 596, 600 (Wyo. 1996) (quoting Matter of Voss'
Adoption, 550 P.2d 481, 485 (Wyo. 1976)). Because the misdemeanor possession clause is set apart from the
misdemeanor of being drunk or under the influence clause by a disjunctive "or," the language "on any street or
highway or in any public place" only concerns the misdemeanor under the influence clause. The plain meaning of
the language concerning possession is that no one under the age of twenty-one may possess alcoholic or malt
beverages, regardless of location.

[¶10]    The second basis for our conclusion rests upon the fact that no comma precedes the prepositional phrase
"on any street or highway or in any public place." In accordance with traditional rules of grammatical construction,
a comma preceding a prepositional phrase denotes that the phrase pertains to all antecedents; the corollary of
such rule is that when a comma does not precede a prepositional phrase, the phrase applies only to the
immediately preceding antecedent and to no others. See 2A Sutherland Statutory Construction § 47.33 (Supp.
1982). The absence of a comma, combined with the use of the disjunctive "or," leads us to the conclusion that the
legislature intended the phrase "on any street or highway or in any public place" to apply only to the antecedent
"or who is drunk or under the influence of alcoholic liquor, malt beverages or a controlled substance."

[¶11]    Further, we note that from 1953 to 1979, a comma did indeed precede the prepositional phrase at issue.
By removal of the comma in 1979, the legislature intended to clarify that the prepositional phrase applied only to
the antecedent immediately preceding. Wetering v. Eisele, 682 P 2d 1055, 1061 (Wyo. 1984) (we assume
legislature does not intend futile acts and that its amendment of a statute indicates some change in existing law
was intended); see Op. Wyo. Att'y Gen. No. 91-003 (June 27, 1991) (analyzing the interplay between the
grammatical structure and legislative history of the statute).

[¶12]    The third basis for our conclusion is that the legislature enunciated specific exemptions to the
misdemeanor of possession in subsections (i) through (v). These five exemptions are the only qualifiers for
possession of alcoholic or malt beverages by a person under the age of twenty-one. If the legislature had
intended possession on private property to be exempted, it would have so stated.

### CONCLUSION

[¶13]    We answer the certified question in the negative; possession of alcoholic or malt beverages by any person
under the age of twenty-one is antithetical to W.S. 12-6-101(b), regardless of location. Accordingly, "on any street
or highway or in any public place" is not an element of the misdemeanor offense of possession.

## Citationizer© Summary of Documents Citing This Document

| Cite Name | Level | |
|---|---|---|
| **Wyoming Supreme Court Cases** | | |
| Cite | Name | Level |
| 1999 WY 174, 991 P.2d 249, | Almada v. State | Cited |
| 2000 WY 15, 996 P.2d 18, | WAID v. STATE | Cited |
| 2000 WY 150, 12 P.3d 677, | MURPHY v. STATE CANVASSING BOARD | Cited |
| 1999 WY 133, 985 P.2d 612, | Palato v. State | Cited |
| 2000 WY 140, 6 P.3d 1287, | CAMPBELL COUNTY SCH DIST v. CATCHPOLE | Cited |
| 2001 WY 91, 33 P.3d 107, | IN THE MATTER OF THE BOARD OF COUNTY COMMISSIONERS, SUBLETTE COUNTY | Cited |
| 2001 WY 100, 33 P.3d 172, | IN THE MATTER OF THE TERMINATION OF PARENTAL RIGHTS TO JH v. HOT SPRINGS DEPARTMENT OF FAMILY SERVICES | Cited |
| 2002 WY 125, 53 P.3d 1088, | BP AMERICA PRODUCTION COMPANY v. MADSEN | Cited |
| 2003 WY 134, 78 P.3d 241, | YEAGER v. FORBES | Cited |

## Citationizer: Table of Authority

| Cite Name | Level | |
|---|---|---|
| **Wyoming Supreme Court Cases** | | |
| Cite | Name | Level |
| 1976 WY 36, 550 P.2d 481, | Matter of Voss' Adoption | Cited |
| 1984 WY 57, 682 P.2d 1055, | Wetering v. Eisele | Cited |
| 1994 WY 148, 868 P.2d 192, | Wyoming Ins. Guar Ass'n v. Woods | Cited |
| 1995 WY 49, 892 P.2d 800, | Lancto v. City of Rawlins | Cited |
| 1995 WY 19, 890 P.2d 562, | Halpern v. Wheeldon | Cited |
| 1995 WY 62, 894 P.2d 613, | Coones v. F.D.I.C | Cited |
| 1996 WY 91, 921 P.2d 596, | Olsten Staffing Services, Inc v. D.A. Stinger Services, Inc., | Cited |
| 1995 WY 212, 908 P.2d 976, | In re Honeycutt | Cited |