# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CIVIL ACTION NO. 05 - 30077 - MAP

|  |  |
|---|---|
| **MAARTEN N. PELLEGRINI and** | ) |
| **NICOLA M. PELLEGRINI,** | ) |
| *Plaintiffs* | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **CENTURY 21, HAROLD DUPEE** | ) |
| **REALTORS,** | ) |
| *Defendant* | ) |
|  | ) |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO NARROW ISSUES AT TRIAL

Plaintiff, Maarten Pellegrini (hereinafter "plaintiff") requests that the Court narrow contested factual issues to be presented at trial on the basis that the factual issues are: (1) without evidentiary support, and no reasonable jury could find on the issues; and (2) frivolous defenses. Now comes the defendant, Century 21, Harold Dupee Realtors (hereinafter "defendant"), and opposes plaintiffs' motion as follows:

**Alleged Unsupported Factual Issue #1: Plaintiff was provided with some other lead information pamphlet that is equivalent to the Property Transfer Lead Paint Notification**

Plaintiff contends that the defendant should be barred from raising the issue at trial that the plaintiff received the federal pamphlet, "Protect Your Family From Lead In Your Home," (See Exhibit 1) in that: (1) it conflicts with Century 21's answers to interrogatories and the 30(b)(6) testimony of Mary Jane Delmaso, (2) there is a specific certification form that must be endorsed for receipt of the federal pamphlet, and (3) the Commonwealth of Massachusetts has affirmed use of its own pamphlet in lieu of the federal disclosure.

Pursuant to 40 CFR §745.107(a)(1), "Disclosure requirements for sellers and lessors.", the seller shall provide the purchaser with an EPA-approved lead hazard information pamphlet, such as the EPA document entitled "Protect Your Family From Lead in Your Home" **or** an equivalent pamphlet that has been approved for use in that State by the EPA.

Contrary to plaintiff's assertion, this defense would not be frivolous. The underlying purpose of 40 CFR § 745.107(a)(1) is to ensure that the buyer is provided an "EPA-approved" lead hazard information pamphlet, and certainly plaintiff's receipt of "Protect Your Family From Lead in Your Home" would demonstrate compliance with this requirement.

In addition, there are facts to support the assertion that plaintiff received such a pamphlet. For example, in testifying at deposition, the plaintiff indicated that "[Mr. Shoestock] handed me a couple of pamphlets on how to clean up and how to work safely with lead, a small pamphlet, some little brochures." (Exhibit 2, Pellegrini Deposition, Page 19, lines 21-24)

Wherefore, as the motion raises a question of fact to be decided by a jury, the defendant respectfully opposes plaintiff's motion and requests that it be permitted to introduce evidence on this matter.

**Alleged Unsupported Factual Issue #2: Century 21 did not know, or should not have known, that Mr. Shoestock directly represented that he was exclusively the buyer's agent.**

**- and -**

**Alleged Unsupported Factual Issue #3: Century 21 was not knowledgeable, either directly or through reasonably available information, of Mr. Shoestock's activities with respect to the sale of the subject property.**

In defendant's opinion, although Factual Issue #3 is much broader in scope both Factual Issue #2 and Factual Issue #3 deal with the same issue. With respect to both arguments, plaintiff is asserting that the defendant has per se knowledge of the activities of Mr. Shoestock. As to

these issues, the plaintiff asserts that the defendant should not be allowed to claim that it was ignorant of any of Mr. Shoestock's activities with respect to the subject property.

Although the general rule of agency law is that an agent's knowledge is imputed to his principal, Riverdale Mills Corp. v. United States FAA, 417 F. Supp. 2d 167, 169 (2006), this general doctrine is limited to: (1) knowledge acquired in the transaction of the business of the agent's principal, and (2) knowledge which could properly be communicated to the agent's principal. Hoover v. Wise, 91 U.S. 308, 310 (1876). Furthermore, there is a distinction between an agent and an independent contractor, Graham v. Malone Freight Lines, 43 F. Supp. 2d 77, making the rule inapplicable in those situations.

With respect to Mr. Shoestock, it is defendant's contention that he was operating under an independent contractor agreement with the defendant. However, as it still may be determined that an employer and employee relationship existed, a question of fact to be decided by the jury, Trans Nat'l Commus. Inc. v. Overlooked Opinions, Inc., 877 F. Supp. 35, 44 (1994), see United States v. President & Fellows of Harvard College, 323 F. Supp. 2d 151, 170 (2004)(the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial), until that time, any knowledge of Mr. Shoestock should not be imputed on the defendant, and the defendant should be allowed to present evidence that it was not per se knowledgeable of all of Mr. Shoestock's activities, including any representations made to the plaintiff, which relate to the sale of the subject property.

Wherefore, as the motion raises a question of fact to be decided by a jury, the defendant respectfully opposes plaintiff's motion and requests that it be permitted to introduce evidence on this matter.

**Alleged Unsupported Factual Issue #4: The facsimile, dated November 29, 2003, did not contain two (2) separate documents.**

Plaintiff asserts that the defendant should be barred from making a distinction between and denying plaintiff's description of the facsimile, dated November 29, 2003.  It is plaintiff's contention that the facsimile contained two documents: (1) a blank copy of a "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement", with a "Property Transfer Notification Certification" attached; and, (2) a "Massachusetts Association of Realtors Seller's Description of Property Form."

It is defendant's position that the facsimile actually contains three separate documents: (1) a "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement"; (2) a "Property Transfer Notification Certification"; and, (3) a "Massachusetts Association of Realtors Seller's Description of Property Form."

Although the "Property Transfer Notification Certification" is an attachment to the "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement," it is, in itself, a separate document.  This opinion is further supported by the language in 40 CFR §745.113, in which the Certification is identified as an *attachment* ("a document attached to another", Gilbert's Law Dictionary 22 (1997)).  Furthermore, although the Certification accompanies the Purchase and Sale Agreement, the two documents should not be read as a single document given that the language in the Purchase and Sale Agreement specifically identifies the Certificate as an attachement.

Wherefore, the defendant respectfully requests that it be permitted to make a distinction and deny plaintiff's description of this facsimile.

**Alleged Unsupported Factual Issue #5: The facsimile, dated December 1, 2003, did not contain two (2) separate documents.**

Plaintiff asserts that the defendant should be barred from making a distinction between and denying plaintiff's description of the facsimile, dated December 1, 2003. It is plaintiff's contention that the facsimile contained two documents: (1) a blank copy of a "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement", with a "Property Transfer Notification Certification" attached; and, (2) a "Mandatory Agency Disclosure – Agency Relationship" form.

Once again, it is defendant's position that the facsimile actually contains three separate documents: (1) a "Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement"; (2) a "Property Transfer Notification Certification"; and, (3) a "Mandatory Agency Disclosure – Agency Relationship" form.

Wherefore, for the same reasons set forth above in Alleged Unsupported Factual Issue #4, the defendant respectfully requests that it be permitted to make a distinction and deny plaintiff's description of this facsimile.

**Alleged Unsupported Factual Issue #6: Francis Buckley disclosed the Property Transfer Lead Paint Notification ("PTLPN") to the buyer's of the subject property.**

In referring to Defendant's seventh Contested Fact, as set forth in the Joint Pre-Trial Memorandum, the Plaintiff contends that "Century 21 wishes to raise the defense that Francis Buckley disclosed the PTLPN and thereby complied with the lead paint disclosure law." The contested fact is based on plaintiff's assertion that Francis Buckley did not disclose the Property Transfer Lead Paint Notification ("PTLPN") to the buyer's of the subject property.

Pursuant to 40 CFR §745.107(a)(1), the seller shall provide the purchaser an EPA-approved lead hazard information pamphlet. Pursuant to 42 USC §4852d(a)(1), this obligation is

placed on the seller of the subject property; however, when a seller enters into a contract with a real estate broker or agent, the Act explicitly dictates that the agent, acting on behalf of the seller, is responsible for "ensuring compliance" with the disclosure requirements. <u>Flowers v. ERA Unique Real Estate, Inc.</u>, 170 F. Supp. 2d 840, 843 (2001).

The defendant does not assert that Ms. Buckley personally *delivered* ("bring and hand over to the person who is to receive it", Oxford Dictionary of Current English 233 (2001, 3rd Ed.) the PTLPN to the buyers; however, the defendant does challenge plaintiff's assertion that Ms. Buckley did not *disclose* ("make known", Oxford Dictionary of Current English 253 (2001, 3rd Ed.) the PTLPN to the buyers.

In the Statement of Establish Facts, the plaintiff acknowledges that: (1) Frances Buckley acted as the seller's agent in this transaction; and (2) Richard Shoestock was acting as the agent of Maarten and Nicola Pellegrini. Of importance, the two both worked, in some capacity, at the offices of Century 21. As such, at issue is a question of agency law which must be decided by the jury.

In <u>Pellegrini v. Century 21</u>, 2007 U.S. Dist. LEXIS 54838, 24-25 (2007), the Court ruled that there was a genuine issue of material fact as to whether the intricate agency relationships warrants relief in either party's favor. Wherefore, as the motion raises a question of fact to be decided by a jury, the defendant respectfully opposes plaintiff's motion and requests that it be permitted to introduce evidence on this matter.

**Alleged Unsupported Factual Issue #7: The language of the purchase and sale agreement does not represent that the attachment to the purchase and sale agreement was the Property Transfer Lead Paint Notification ("PTLPN").**

Plaintiff contends that the language of the purchase and sale agreement represents that the PTLPN is attached. At issue is the following language: "… *the SELLER and Broker(s) have (a)*

*provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which BUYER has signed, which is attached hereto;"*.

<u>Insertion of Comma</u>:

Plaintiff asserts that, as a matter of customary language and contract law, the clause, "which is attached hereto", refers both to the certificate and the standard notification form. It is his position that the act of inserting the comma before "*which is attached hereto*" has no other purpose than to indicate the inclusion of the standard notification form. Nevertheless, as addressed in the Defendant's Motion in Limine (*see* Docket Entry No. 58, filed 11/09/2007) on this same issue, plaintiff's arguments ignore other standard rules of grammar. Aside from those grammatical rules addressed in the Defendant's Motion in Limine (i.e. pronouns and their antecedent must agree in number), the plaintiff also ignores the following:

The clause, "*which is attached hereto*", is a nonrestrictive relative clause (or adjective clause). A relative clause is a subordinate clause that contains a subject and verb, begins with a relative pronoun, and functions as an adjective. The clause is nonrestrictive when it is set off by a comma and introduces a new fact about the antecedent (whereas, restrictive clauses introduce an essential fact, without which the antecedent would be incomplete or undefined).

Furthermore, with respect to the use of *that* and *which*, *that* is generally used in restrictive clauses, and *which* is always used in nonrestrictive clauses. An exception to this rule is when the relative pronoun is preceded by a preposition, in which case *which* and not *that* should be used. For example, preceding the nonrestrictive relative clause, "*which is attached hereto*", in the purchase and sale agreement, is the restrictive relative clause, "*for which BUYER has signed*".

As the clause "*for which the BUYER has signed*" begins with a preposition, *which* and not *that* is used.

Although relative clauses can either be adjacent or nonadjacent to the antecedent, restrictive relative clauses generally stick to their antecedent as they constitute the strongest from of modification.  On the other hand, nonrestrictive relative clauses are easily moved away from their antecedent because they constitute a weaker form of modification and add non-defining information.

With respect to interpreting the meaning of "*the certificate for which BUYER has signed, which is attached hereto*", the restrictive relative clause, "*for which BUYER has signed*", introduces an essential fact about the certificate (i.e. the certificate signed by the buyer) and sticks with the antecedent, and the nonrestrictive clause, "*which is attached hereto*", merely gives additional information about the certificate (i.e. that the certificate is attached to the purchase and sale agreement) and is nonadjacent to the antecedent.

With respect to the contract language, both "*the certificate for which BUYER has signed*" and "*which is attached hereto*" both relate to the antecedent "*the certificate*".  The position of "*which is attached hereto*" is based on rules of subordination (i.e. some elements in a sentence are less important than others) and not for, as asserted by the plaintiff, purposes of providing any additional information about the standard notification form.

Omission of the Comma:

Plaintiff also argues that "it is obvious that, if the meaning of the Contract was for the certificate page of the standard notification to be the only attachment, a comma would not have been added to separate '*which is attached hereto*' from the immediately preceding antecedent '*the certificate [for which BUYER has signed]*'."

Nevertheless, the structure proposed by the plaintiff, "*the certificate for which BUYER has signed which is attached hereto*", contradicts the rule that non-restrictive clauses and phrases serving as adjectives or adverbs are set off with punctuation.

Prepositional Phrase:

In support his position, the plaintiff also cites <u>Tietema v. State</u>, 1996 WY 149, 926 P.2d 952 (1996)(in accordance with the traditional rules of grammatical construction, a comma preceding a prepositional phrase denotes that the phrase pertains to all antecedents). Nevertheless, this argument is inapplicable with respect to this motion in that "*which is attached hereto*" is not a prepositional phrase.

Regulations:

Plaintiff's interpretation of the language of the Purchase and Sale Agreement contradicts the requirements set forth in 40 CFR §745.113(a). Pursuant to the Regulation, each contract to sell target housing shall include an attachment such as the "Property Transfer Notification Certification"; however, there is no requirement that the pamphlet be attached to the contract.

Wherefore, the defendant respectfully requests that the court reject plaintiff's interpretation of the language within Paragraph 19 of the Purchase and Sale Agreement.

**Alleged Unsupported Factual Issue #8: Between December 1, 2003 and the date Plaintiff entered into the purchase and sale agreement, Century 21 was not silent as to the Property Transfer Lead Paint Notification Lead Paint Notification ("PTLPN").**

Plaintiff asserts that there is no evidence in the record to support that the defendant informed plaintiff of the PTLPN at any time after December 1, 2003, and, as such, any testimony to the contrary should be eliminated from jury consideration.

In asserting this position the plaintiff refers to the 30(b)(6) deposition testimony of Mary Jane Dalmaso, which he claims contradicts any argument that Century 21 was not silent as to the

377382v1

PTLPN between December 1, 2003 and the date plaintiff entered into the purchase and sale agreement. However, the testimony referenced by the plaintiff (Dalmaso, page 35, lines 9-16), has nothing to do with the PTLPN, but instead deals with the Certificate ("So, it is Century 21's testimony that I received page 11 at three different times …").

In fact, Century 21 was not silent as to the PTLPN during the time period referenced by the plaintiff. During this period, the plaintiff received two Purchase and Sale Agreements. One with an offered purchase price of $75,000 and the second with an offered purchase price of $77,000. Paragraph 19 of these Purchase and Sale Agreements, both of which plaintiff initialled and signed, makes reference to the PTLPN. Furthermore, on December 4, 2003, the plaintiff signed a Property Transfer Notification Certification, which also makes reference to the PTLPN.

Wherefore, the defendant respectfully requests that it be permitted to introduce evidence on this matter.

> The Defendant,
> **CENTURY 21, HAROLD DUPEE**
> **REALTORS**
>
> By Its Attorneys,
> **Morrison Mahoney LLP**
>
> /s/ John G. Bagley
> John G. Bagley, Esquire, BBO# 026050
> Andrew P. Lawendowski, BBO# 656833
> 1500 Main Street, Suite 2400
> P.O. Box 15387
> Springfield, MA 01115-5387
> (413) 737-4373
> (413) 739-3125 (Fax)

377382v1

## <u>CERTIFICATE OF SERVICE</u>

     I, John G. Bagley, Esquire of Morrison Mahoney LLP, 1500 Main Street, Suite 2400, P.O. Box 15387, Springfield, Massachusetts 01115-5387, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and a paper copy will be sent to those indicated as non-registered participants on November 30, 2007 as indicated below:

Maarten N. Pellegrini, ProSe
56 Liberty Street
North Adams, MA  01247

                    /s/ John G. Bagley
                    John G. Bagley, Esquire
                    BBO# 026050



# Protect Your Family From Lead In Your Home

**EPA** United States Environmental Protection Agency

United States Consumer Product Safety Commission

United States Department of Housing and Urban Development

# Are You Planning To Buy, Rent, or Renovate a Home Built Before 1978?

**M**any houses and apartments built before 1978 have paint that contains high levels of lead (called lead-based paint). Lead from paint, chips, and dust can pose serious health hazards if not taken care of properly.



**OWNERS, BUYERS, and RENTERS** are encouraged to check for lead (see page 6) before renting, buying or renovating pre-1978 housing.

**F**ederal law requires that individuals receive certain information before renting, buying, or renovating pre-1978 housing:



**LANDLORDS** have to disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a disclosure about lead-based paint.



**SELLERS** have to disclose known information on lead-based paint and lead-based paint hazards before selling a house. Sales contracts must include a disclosure about lead-based paint. Buyers have up to 10 days to check for lead.



**RENOVATORS** disturbing more than 2 square feet of painted surfaces have to give you this pamphlet before starting work.

# IMPORTANT!

## Lead From Paint, Dust, and Soil Can Be Dangerous If Not Managed Properly

**FACT:** Lead exposure can harm young children and babies even before they are born.

**FACT:** Even children who seem healthy can have high levels of lead in their bodies.

**FACT:** People can get lead in their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

**FACT:** People have many options for reducing lead hazards. In most cases, lead-based paint that is in good condition is not a hazard.

**FACT:** Removing lead-based paint improperly can increase the danger to your family.

If you think your home might have lead hazards, read this pamphlet to learn some simple steps to protect your family.

# Lead Gets in the Body in Many Ways

**Childhood lead poisoning remains a major environmental health problem in the U.S.**

**People can get lead in their body if they:**

◆ Breathe in lead dust (especially during renovations that disturb painted surfaces).

◆ Put their hands or other objects covered with lead dust in their mouths.

◆ Eat paint chips or soil that contains lead.

**Lead is even more dangerous to children under the age of 6:**

◆ At this age children's brains and nervous systems are more sensitive to the damaging effects of lead.

◆ Children's growing bodies absorb more lead.

◆ Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.

**Even children who appear healthy can have dangerous levels of lead in their bodies.**

**Lead is also dangerous to women of childbearing age:**

◆ Women with a high lead level in their system prior to pregnancy would expose a fetus to lead through the placenta during fetal development.



2

## Lead's Effects

It is important to know that even exposure to low levels of lead can severely harm children.

### In children, lead can cause:

- ◆ Nervous system and kidney damage.

- ◆ Learning disabilities, attention deficit disorder, and decreased intelligence.

- ◆ Speech, language, and behavior problems.

- ◆ Poor muscle coordination.

- ◆ Decreased muscle and bone growth.

- ◆ Hearing damage.

While low-lead exposure is most common, exposure to high levels of lead can have devastating effects on children, including seizures, unconsciousness, and, in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults too.

### In adults, lead can cause:

- ◆ Increased chance of illness during pregnancy.

- ◆ Harm to a fetus, including brain damage or death.

- ◆ Fertility problems (in men and women).

- ◆ High blood pressure.

- ◆ Digestive problems.

- ◆ Nerve disorders.

- ◆ Memory and concentration problems.

- ◆ Muscle and joint pain.



**Lead affects the body in many ways.**

3

## Where Lead-Based Paint Is Found

**In general, the older your home, the more likely it has lead-based paint.**

**Many homes built before 1978 have lead-based paint.** The federal government banned lead-based paint from housing in 1978. Some states stopped its use even earlier. Lead can be found:

- ◆ In homes in the city, country, or suburbs.
- ◆ In apartments, single-family homes, and both private and public housing.
- ◆ Inside and outside of the house.
- ◆ In soil around a home. (Soil can pick up lead from exterior paint or other sources such as past use of leaded gas in cars.)

## Checking Your Family for Lead

**Get your children and home tested if you think your home has high levels of lead.**

**To reduce your child's exposure to lead, get your child checked, have your home tested (especially if your home has paint in poor condition and was built before 1978), and fix any hazards you may have.** Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect high levels of lead. Blood tests are usually recommended for:

- ◆ Children at ages 1 and 2.
- ◆ Children or other family members who have been exposed to high levels of lead.
- ◆ Children who should be tested under your state or local health screening plan.

Your doctor can explain what the test results mean and if more testing will be needed.

4

# Identifying Lead Hazards

**Lead-based paint** is usually not a hazard if it is in good condition, and it is not on an impact or friction surface, like a window. It is defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter, or more than 0.5% by weight.

**Deteriorating lead-based paint (peeling, chipping, chalking, cracking or damaged)** is a hazard and needs immediate attention. It may also be a hazard when found on surfaces that children can chew or that get a lot of wear-and-tear, such as:

◆ Windows and window sills.

◆ Doors and door frames.

◆ Stairs, railings, banisters, and porches.

**Lead from paint chips, which you can see, and lead dust, which you can't always see, can both be serious hazards.**

**Lead dust** can form when lead-based paint is scraped, sanded, or heated. Dust also forms when painted surfaces bump or rub together. Lead chips and dust can get on surfaces and objects that people touch. Settled lead dust can re-enter the air when people vacuum, sweep, or walk through it. The following two federal standards have been set for lead hazards in dust:

◆ 40 micrograms per square foot ($\mu g/ft^2$) and higher for floors, including carpeted floors.

◆ 250 $\mu g/ft^2$ and higher for interior window sills.

**Lead in soil** can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. The following two federal standards have been set for lead hazards in residential soil:

◆ 400 parts per million (ppm) and higher in play areas of bare soil.

◆ 1,200 ppm (average) and higher in bare soil in the remainder of the yard.

The only way to find out if paint, dust and soil lead hazards exist is to test for them. The next page describes the most common methods used.

5

# Checking Your Home for Lead

**Just knowing that a home has lead-based paint may not tell you if there is a hazard.**

You can get your home tested for lead in several different ways:

◆ A paint **inspection** tells you whether your home has lead-based paint and where it is located. It won't tell you whether or not your home currently has lead hazards.

◆ A **risk assessment** tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards.

◆ A combination risk assessment and inspection tells you if your home has any lead hazards and if your home has any lead-based paint, and where the lead-based paint is located.

Hire a trained and certified testing professional who will use a range of reliable methods when testing your home.



◆ Visual inspection of paint condition and location.

◆ A portable x-ray fluorescence (XRF) machine.

◆ Lab tests of paint, dust, and soil samples.

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency (see bottom of page 11) for more information, or call **1-800-424-LEAD (5323)** for a list of contacts in your area.

**Home test kits for lead are available, but may not always be accurate.** Consumers should not rely on these kits before doing renovations or to assure safety.

6

## What You Can Do Now To Protect Your Family

**If you suspect that your house has lead hazards, you can take some immediate steps to reduce your family's risk:**



◆ **If you rent, notify your landlord of peeling or chipping paint.**

◆ **Clean up paint chips immediately.**

◆ **Clean floors, window frames, window sills, and other surfaces weekly.** Use a mop or sponge with warm water and a general all-purpose cleaner or a cleaner made specifically for lead. REMEMBER: NEVER MIX AMMONIA AND BLEACH PRODUCTS TOGETHER SINCE THEY CAN FORM A DANGEROUS GAS.

◆ **Thoroughly rinse sponges and mop heads after cleaning dirty or dusty areas.**



◆ **Wash children's hands often, especially before they eat and before nap time and bed time.**

◆ **Keep play areas clean.** Wash bottles, pacifiers, toys, and stuffed animals regularly.

◆ **Keep children from chewing window sills or other painted surfaces.**

◆ **Clean or remove shoes before entering your home to avoid tracking in lead from soil.**



◆ **Make sure children eat nutritious, low-fat meals high in iron and calcium,** such as spinach and dairy products. Children with good diets absorb less lead.

7

# Reducing Lead Hazards In The Home

**Removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.**

**Always use a professional who is trained to remove lead hazards safely.**



In addition to day-to-day cleaning and good nutrition:

◆ You can **temporarily** reduce lead hazards by taking actions such as repairing damaged painted surfaces and planting grass to cover soil with high lead levels. These actions (called "interim controls") are not permanent solutions and will need ongoing attention.

◆ To **permanently** remove lead hazards, you should hire a certified lead "abatement" contractor. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not permanent removal.

Always hire a person with special training for correcting lead problems—someone who knows how to do this work safely and has the proper equipment to clean up thoroughly. Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

Once the work is completed, dust cleanup activities must be repeated until testing indicates that lead dust levels are below the following:

◆ 40 micrograms per square foot ($\mu$g/ft$^2$) for floors, including carpeted floors;

◆ 250 $\mu$g/ft$^2$ for interior windows sills; and

◆ 400 $\mu$g/ft$^2$ for window troughs.

Call your state or local agency (see bottom of page 11) for help in locating certified professionals in your area and to see if financial assistance is available.

8

## Remodeling or Renovating a Home With Lead-Based Paint

Take precautions before your contractor or you begin remodeling or renovating anything that disturbs painted surfaces (such as scraping off paint or tearing out walls):



◆ **Have the area tested for lead-based paint.**

◆ **Do not use a belt-sander, propane torch, high temperature heat gun, dry scraper, or dry sandpaper** to remove lead-based paint. These actions create large amounts of lead dust and fumes. Lead dust can remain in your home long after the work is done.

◆ **Temporarily move your family** (especially children and pregnant women) out of the apartment or house until the work is done and the area is properly cleaned. If you can't move your family, at least completely seal off the work area.

◆ **Follow other safety measures to reduce lead hazards.** You can find out about other safety measures by calling 1-800-424-LEAD. Ask for the brochure "Reducing Lead Hazards When Remodeling Your Home." This brochure explains what to do before, during, and after renovations.

If you have already completed renovations or remodeling that could have released lead-based paint or dust, get your young children tested and follow the steps outlined on page 7 of this brochure.

**If not conducted properly, certain types of renovations can release lead from paint and dust into the air.**



9

## Other Sources of Lead





**While paint, dust, and soil are the most common sources of lead, other lead sources also exist.**

◆ **Drinking water.** Your home might have plumbing with lead or lead solder. Call your local health department or water supplier to find out about testing your water. You cannot see, smell, or taste lead, and boiling your water will not get rid of lead. If you think your plumbing might have lead in it:

• Use only cold water for drinking and cooking.

• Run water for 15 to 30 seconds before drinking it, especially if you have not used your water for a few hours.

◆ **The job.** If you work with lead, you could bring it home on your hands or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.

◆ Old painted **toys** and **furniture.**

◆ Food and liquids stored in **lead crystal** or **lead-glazed pottery or porcelain.**

◆ **Lead smelters** or other industries that release lead into the air.

◆ **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture.

◆ **Folk remedies** that contain lead, such as "greta" and "azarcon" used to treat an upset stomach.





10

# For More Information

**The National Lead Information Center**



Call **1-800-424-LEAD (424-5323)** to learn how to protect children from lead poisoning and for other information on lead hazards. To access lead information via the web, visit **www.epa.gov/lead** and **www.hud.gov/offices/lead/**.

**EPA's Safe Drinking Water Hotline**

Call **1-800-426-4791** for information about lead in drinking water.

**Consumer Product Safety Commission (CPSC) Hotline**



To request information on lead in consumer products, or to report an unsafe consumer product or a product-related injury call **1-800-638-2772**, or visit CPSC's Web site at: **www.cpsc.gov.**

**Health and Environmental Agencies**

Some cities, states, and tribes have their own rules for lead-based paint activities. Check with your local agency to see which laws apply to you. Most agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for your local contacts on the Internet at **www.epa.gov/lead** or contact the National Lead Information Center at **1-800-424-LEAD.**

---

For the hearing impaired, call the Federal Information Relay Service at **1-800-877-8339** to access any of the phone numbers in this brochure.

---

11

# EPA Regional Offices

Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

**EPA Regional Offices**

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)

> Regional Lead Contact
> U.S. EPA Region 1
> Suite 1100 (CPT)
> One Congress Street
> Boston, MA 02114-2023
> 1 (888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)

> Regional Lead Contact
> U.S. EPA Region 2
> 2890 Woodbridge Avenue
> Building 209, Mail Stop 225
> Edison, NJ 08837-3679
> (732) 321-6671

**Region 3** (Delaware, Maryland, Pennsylvania, Virginia, Washington DC, West Virginia)

> Regional Lead Contact
> U.S. EPA Region 3 (3WC33)
> 1650 Arch Street
> Philadelphia, PA 19103
> (215) 814-5000

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)

> Regional Lead Contact
> U.S. EPA Region 4
> 61 Forsyth Street, SW
> Atlanta, GA 30303
> (404) 562-8998

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)

> Regional Lead Contact
> U.S. EPA Region 5 (DT-8J)
> 77 West Jackson Boulevard
> Chicago, IL 60604-3666
> (312) 886-6003

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas)

> Regional Lead Contact
> U.S. EPA Region 6
> 1445 Ross Avenue, 12th Floor
> Dallas, TX 75202-2733
> (214) 665-7577

**Region 7** (Iowa, Kansas, Missouri, Nebraska)

> Regional Lead Contact
> U.S. EPA Region 7
> (ARTD-RALI)
> 901 N. 5th Street
> Kansas City, KS 66101
> (913) 551-7020

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)

> Regional Lead Contact
> U.S. EPA Region 8
> 999 18th Street, Suite 500
> Denver, CO 80202-2466
> (303) 312-6021

**Region 9** (Arizona, California, Hawaii, Nevada)

> Regional Lead Contact
> U.S. Region 9
> 75 Hawthorne Street
> San Francisco, CA 94105
> (415) 947-4164

**Region 10** (Alaska, Idaho, Oregon, Washington)

> Regional Lead Contact
> U.S. EPA Region 10
> Toxics Section WCM-128
> 1200 Sixth Avenue
> Seattle, WA 98101-1128
> (206) 553-1985

# CPSC Regional Offices

Your Regional CPSC Office can provide further information regarding regulations and consumer product safety.

**Eastern Regional Center**
Consumer Product Safety Commission
201 Varick Street, Room 903
New York, NY  10014
(212) 620-4120

**Western Regional Center**
Consumer Product Safety Commission
1301 Clay Street, Suite 610-N
Oakland, CA  94612
(510) 637-4050

**Central Regional Center**
Consumer Product Safety Commission
230 South Dearborn Street, Room 2944
Chicago, IL  60604
(312) 353-8260

# HUD Lead Office

Please contact HUD's Office of Healthy Homes and Lead Hazard Control for information on lead regulations, outreach efforts, and lead hazard control and research grant programs.

**U.S. Department of Housing and Urban Development**
Office of Healthy Homes and Lead Hazard Control
451 Seventh Street, SW, P-3206
Washington, DC  20410
(202) 755-1785

This document is in the public domain. It may be reproduced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following the advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

U.S. EPA Washington DC 20460
U.S. CPSC Washington DC 20207
U.S. HUD Washington DC 20410

EPA747-K-99-001
June 2003

13

# Simple Steps To Protect Your Family From Lead Hazards

## If you think your home has high levels of lead:

◆ Get your young children tested for lead, even if they seem healthy.

◆ Wash children's hands, bottles, pacifiers, and toys often.

◆ Make sure children eat healthy, low-fat foods.

◆ Get your home checked for lead hazards.

◆ Regularly clean floors, window sills, and other surfaces.

◆ Wipe soil off shoes before entering house.

◆ Talk to your landlord about fixing surfaces with peeling or chipping paint.

◆ Take precautions to avoid exposure to lead dust when remodeling or renovating (call 1-800-424-LEAD for guidelines).

◆ Don't use a belt-sander, propane torch, high temperature heat gun, scraper, or sandpaper on painted surfaces that may contain lead.

◆ Don't try to remove lead-based paint yourself.

Recycled/Recyclable
Printed with vegetable oil based inks on recycled paper (minimum 50% postconsumer) process chlorine free.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Cae No. 05CV300077-KPN

MAARTEN N. PELLEGRINI and
NICOLA M. PELLEGRINI,

Plaintiffs

v.

CENTURY 21, HAROLD DUPEE
REALTORS,

Defendant

DEPOSITION OF: MAARTEN PELLEGRINI, taken
before MYREL J. WILLIAMS, Notary Public and Court
Reporter, pursuant to the applicable
Massachusetts Rules of Civil Procedure, at the
LAW OFFICES OF DONALD E. PHILLIPS, 1414 Main
Street, Springfield, Massachusetts, on March 21,
2006.

Myrel J. Williams
Certified Shorthand Reporter -1393S95

1    APPEARANCES:

2

3    FOR THE DEFENDANT:

4    LAW OFFICES OF DONALD E. PHILLIPS

5    1414 Main Street

6    Springfield, MA  01144

7    (413) 730-6350

8         BY:  RICHARD F. FAILLE, ESQ.

9

10    FOR THE PLAINTIFF:

11    MAARTEN N. PELLEGRINI

12    56 Liberty Street

13    North Adams, MA  01247

14    (774) 364-0081

15         BY: MAARTEN N. PELLEGRINI

16

17    ALSO PRESENT:  Gerald Pellegrini

18

19

20

21

22

23

24

```
 1                        I N D E X

 2
        W I T N E S S            DIRECT CROSS REDIRECT RECROSS
 3
        Maarten Pellegrini  *4
 4

 5

 6

 7

 8       * By Mr. Faille
        ** By Mr. Pellegrini
 9

10

11      E X H I B I T S :                      P A G E :

12      Exhibit 1, notification certification....17
        Exhibit 2, CLPP lead paint notification..18
13      Exhibit 3, purchase and sale agreement...22
        Exhibit 4, inspection....................26
14      Exhibit 5, document......................30

15

16

17

18

19

20

21

22

23

24
```

1  paint and real estate and that was probably

2  around -- I don't remember the exact date but it

3  was after February 2004.

4      Q.      Did Mr. Shoestock tell you about t...

5  lead paint law on or about December 4th 2003?

6      A.      That's vague.  I don't understand

7  what you mean.

8      Q.      Did you have any discussions with

9  Mr. Shoestock concerning lead paint on or around

10  the time you signed Exhibit 1?

11      A.      Nothing beyond general discussions.

12      Q.      Tell me what you said and what he

13  said.

14      A.      I recall him saying it's not an

15  issue unless you open and close windows and

16  create dust and there is a good chance there's

17  probably lead paint on the property because it's

18  old.  But as far as talking about the specific

19  laws, it was not my understanding that Dick

20  was -- his job was not specifically to tell me

21  about those laws.  He just handed me a couple

22  pamphlets on how to clean up and how to work

23  safely with lead, a small pamphlet, some little

24  brochures.