UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2007 NOV 30  A 11: 35

U.S. DISTRICT COURT
DISTRICT OF MASS.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
MAARTEN N. PELLEGRINI                *
    Plaintiff                              *
                                     *   Case Number:  05CV30077-MAP
                                     *
vs.                                  *
                                     *
CENTURY 21, HAROLD DUPEE             *
REALTORS,                            *
    Defendant                             *
                                     *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE PLAINTIFF FROM INTRODUCTION EVIDENCE OR ARGUING THAT THE "PTLPN" NEEDED TO BE ATTACHED TO THE P&S AGREEMENT AS A MATTER OF LAW**

Maarten N. Pellegrini ("Plaintiff") opposes Defendant's, Century 21, Harold Dupee Realtors ("Century 21") motion entitled "Defendant's Motion In Limine To Preclude Plaintiff From Introducing In Evidence Or Arguing That The Property Transfer Lead Paint Notification Needed To Be Attached To The Purchase And Sale Agreement Because Of A Matter Of Law" ("Motion To Preclude").

In support of Plaintiff's opposition, Plaintiff submits the following memorandum.

1

MEMORANDUM

The question before the Court is whether the language of the Standard Berkshire County Multiple Listing Service Purchase and Sale Agreement ("P&S Agreement") represents that the Property Transfer Lead Paint Notification ("PTLPN") is attached to the P&S Agreement. The pertinent language of the P&S Agreement is set forth in Paragraph 19: "the SELLER and Broker(s) have (a) provided to the BUYER the standard notification form from the Massachusetts Department of Public Health concerning lead paint, the certificate for which the Buyer has signed, which is attached hereto;..".

Century 21, in its Motion To Preclude, agrees with Plaintiff's argument that the accepted rules of grammar dictate that "when a comma is placed between the modifying clause and the antecedent phrase(s) immediately preceding it, the general rule holds that the clause applies not just to the phrase immediately preceding it, but to all the preceding phrases." See Motion to Preclude, page 2.

However, Century 21 wishes the Court not to apply this rule in this case since the verb "is" in the modifying clause "which is attached hereto" is singular, and consequently, the modifying clause must refer to only one document, namely the Certification (page 11 of the PTLPN). See Motion To Preclude pages 2-3.

The Court should reject Century 21's argument here on two grounds. First, Century 21's language interpretation that the modifying clause "which is attached hereto" refers to only **one** antecedent contradicts the standard grammatical rule that when a comma precedes the modifying clause it refers to **all** antecedents. Secondly, and more importantly, the Certification is *not* a separate document but is *included* in the PTLPN

2

(being page 11 of the PTLPN).  See Exhibit A, PTLPN page 1 (which states that "[t]his package must be given in full to meet state and federal requirements", and that "[t]his package *includes* a check list to certify that the prospective purchaser has been fully notified by the real estate agent [Emphasis Added]").  Therefore, **both** antecedents referred to in the P&S Agreement are contained in the single PTLPN document.  This invalidates Century 21's argument and makes clear why the verb "is", in the clause "which is attached hereto", and the comma before "which" can only refer to the PTLPN including the Certification page.  Indeed, the Magistrate Judge also finds that the language of the P&S Agreement "appears to require [the PTLPN] attachment".  See Magistrate Judge's Report and Recommendation page 17-18.

Finally, Century 21 argues that its language interpretation is consistent with 42 U.S.C. Section 4852d(a)(2) and "[t]hat the statute does not require that the pamphlet be attached to the purchase and sale agreement."  See Motion To Exclude page 3.

Plaintiff agrees that the standard federal disclosure pamphlet (i.e., "Protect Your Family From Lead In Your Home") is not required to be attached to the purchase and sale agreement (See Exhibit B, Federal Pamphlet, and Exhibit C, federal certification form).  However, as provided for under the EPA regulations (See Exhibit D, Federal Register, Rules and Regulations page 9071, 3rd column, second to last paragraph), Massachusetts uses the PTLPN in lieu of the default federal disclosure pamphlet.  In contrast to the standard federal disclosure pamphlet, the EPA approved PTLPN **does** include the certification page as part of it.  See Exhibit A, PTLPN.  Plaintiff contends that the EPA approved Massachusetts disclosure (i.e., the PTLPN) is required to be attached to the P&S Agreement in this case. .  The EPA bases its rules of acceptable **attachments** to

contracts on "information necessary for demonstrating full compliance". See Exhibit D, Federal Register, Rules and Regulations page 9072 3rd COLUMN center of page. Any attachment to the purchase and sale contract that does not satisfy this minimal "information necessary for demonstrating full compliance" is therefore an insufficient attachment for the purposes of compliance with the statute. Further, the wording of the P&S Agreement representing that the full PTLPN is attached is additional support for Plaintiff's contention.

Also, the Magistrate Judge found in his Report and Recommendation ("R&R") that the Plaintiff's signature on the certification page **was insufficient** to demonstrate full compliance by Century 21[1]. Plaintiff contends that the decision of the Magistrate supports Plaintiff's contention that the single page attachment to the P&S Agreement was insufficient "for demonstrating full compliance" in accordance with EPA approval. Clearly the EPA would **not approve** of a misrepresented certification page to be sufficient "information necessary for demonstrating full compliance".

Consequently, the only reasonable interpretation of the language of the P&S Agreement in this case is that the entire Massachusetts PTLPN, including the Certification, is attached to the P&S Agreement, and that Century 21's Motion To Preclude should be denied. Also, Plaintiff requests that the Court find that the attachment of the full PTLPN in this case was required as a matter of law.

---

[1] A reasonable reading of the Magistrates Judge's R&R indicates that his decision was based on Plaintiff's plausible explanation of his signature on the certification page, and Plaintiff's reasonable belief that the PTLPN was attached to the P&S Agreement. See R&R pages 12-13, and 17-18.

4

Respectfully Submitted,

*[signature]* - *pro se*

Maarten N. Pellegrini, *pro se*
56 Liberty Street
North Adams, MA 01247

## CERTIFICATE OR SERVICE

I, Maarten N. Pellegrini, certify that on November 29, 2007 a copy of the above document was mailed by first class mail, postage prepaid, to counsel of record for Century 21 at the address below:

Andrew Lawendowski
Morrison Mahoney LLP
1500 Main Street, Suite 2400
P.O. Box 15387
Springfield, MA 01115-5387

*[signature]*
Maarten N. Pellegrini



# The Commonwealth of Massachusetts
Executive Office of Health and Human Services
Department of Public Health
Environmental Health
250 Washington Street, 7th Floor
Boston, MA 02108
(800) 532-9571

CHILDHOOD LEAD POISONING PREVENTION PROGRAM (CLPPP)
PROPERTY TRANSFER LEAD PAINT NOTIFICATION

Under Massachusetts and federal law, this notification package must be given to prospective purchasers of homes built before 1978. This package must be given in full to meet state and federal requirements. It may be copied, as long as the type size is not made smaller. Every seller and any real estate agent involved in the sale must give this package before the signing of a purchase and sale agreement, a lease with an option to purchase, or, under state law, a memorandum of agreement used in foreclosure sales. Sellers and agents must also tell the prospective purchaser any information they know about lead in the home. They must also give a copy of any lead inspection report, risk assessment report, Letter of Compliance or Letter of Interim Control. **This package is for compliance with both state and federal lead notification requirements.**

Real estate agents must also tell prospective purchasers that under the state Lead Law, a new owner of a home built before 1978 in which a child under six will live or continue to live must have it either deleaded or brought under interim control within 90 days of taking title. This package includes a check list to certify that the prospective purchaser has been fully notified by the real estate agent. This certification should be filled out and signed by the prospective purchaser before the signing of a purchase and sale agreement, a lease with an option to purchase or a memorandum of agreement used in a foreclosure sale. It should be kept in the real estate agent's files. After getting notice, the prospective purchaser has at least 10 days, or longer if agreed to by the seller and buyer, to have a lead inspection or risk assessment if he or she chooses to have one, except in cases of foreclosure sales. There is no requirement for a lead inspection or risk assessment before a sale. A list of private lead inspectors and risk assessors licensed by the Department of Public Health is attached and can also be found on the Childhood Lead Poisoning Prevention Program's website at www.mass.gov/dph/clppp.

Sellers and real estate agents who do not meet these requirements can face a civil penalty of up to $1,000 under state law; a civil penalty of up to $10,000 and possible criminal sanctions under federal law, as well as liability for resulting damages. In addition, a real estate agent who fails to meet these requirements may be liable under the Massachusetts Consumer Protection Act.

The property transfer notification program began in 1988 and has been very successful. It provides information you need to protect your child, or your tenants' child, from lead poisoning. Massachusetts has a tax credit of up to $1,500 for each unit deleaded. There are also a number of grants and no-interest or low-interest loans available for deleading. It's up to you to do your part toward ending lead poisoning.

PLEASE TAKE THE TIME TO READ THIS DOCUMENT. LEAD POISONING IS THE NATION'S LEADING ENVIRONMENTAL HAZARD AFFECTING CHILDREN. DON'T GAMBLE WITH YOUR CHILD'S FUTURE.
CLPPP Form 94-2, 6/30/94, Rev. 2/03

**What is lead poisoning? How do children become lead poisoned?**

Lead poisoning is caused by exposure to lead in the environment. It is most dangerous for children under six years old. In young children, too much lead in the body can cause permanent harm to the brain, kidneys, nervous system and red blood cells. Even at low levels, lead in children's bodies can slow growth and cause learning and behavioral problems. The main way children get lead poisoned is by swallowing lead paint dust. They do not have to chew on leaded surfaces or eat paint chips to become poisoned. Most childhood lead poisoning is caused by children's normal behavior of putting their hands or other things, such as toys, in their mouths. If their hands or these objects have touched lead dust, this may add lead to their bodies. Children can also be exposed to lead from such other sources as lead-contaminated soil or water, but these sources alone rarely cause lead poisoning. Lead can be found in soil near old, lead-painted houses. If children play in bare, leaded soil, or eat vegetables or fruit grown in such soil, or if leaded soil is tracked into the home and gets on children's hands or toys, lead may enter their bodies.

**What are the symptoms of lead poisoning? How is it detected?**

Most lead poisoned children have no special symptoms. The only way to find out if a child is lead poisoned is to have his or her blood tested. The Massachusetts Lead Law requires all children between 9 months and 3 years old to be screened annually for lead, and again at age 4 if living in a high-risk community. If your child has been exposed to lead, or if you do not know if your child under age six has been screened for lead, ask your child's doctor, other health care provider or your local board of health for a simple screening test of your child.

**What is the treatment for lead poisoning?**

Treatment of a lead poisoned child starts with finding and removing the lead hazards to which the child is exposed. This will include a lead inspection of the child's home, and if lead hazards are identified, deleading of the home. Medical treatment depends on the child's blood lead level and the child's response to the removal of the lead source. Parents will be taught about protecting their child from lead exposure. They will need to watch the child's progress through frequent blood tests. If necessary, the child may receive special drugs to help rid his body of excess lead. With this treatment, drugs are given daily for as long as several weeks. Sometimes this must be done more than once. A child who has been lead poisoned will need a lot of blood tests for a year or more. He or she should be tested for learning problems before starting school.

**Are children under six years old the only ones at risk of lead poisoning?**

No. Young children are usually more easily and seriously poisoned than older children or adults, but lead is harmful to everyone. Lead in the body of a pregnant woman can hurt her baby before birth. Older children and adults who live in older housing with lead paint hazards may become exposed to lead and could potentially develop lead poisoning through home renovation. Most lead poisoning in adults is caused by work-related exposure or home renovation. Even hobby supplies, such as stained glass, bullets and fishing sinkers, can expose people to lead. Lead poisoning in adults can cause high blood pressure, problems having children for both men and women, digestive problems, nerve disorders, memory loss and problems concentrating, and muscle and joint pain. Adults who have any of these symptoms and who have been exposed to lead should consider being screened for lead. Those who are regularly exposed to lead through their work are required by law to have their blood tested once a year for lead.

**What are the dangers of lead paint in homes, and when was it used?**

Lead paint in homes causes almost all childhood lead poisoning. Lead is so harmful that even a small amount of fine lead dust that cannot be seen can poison a child. Lead paint covered by layers of nonleaded paint can still poison children, especially when it is disturbed, such as through normal wear and tear, or home repair work. When such lead paint is on moving surfaces, such as windows, fine lead dust is released through normal use. This dust settles, where it can be easily picked up on children's toys and fingers. Household paint with poisonous (now illegal) levels of lead was in use in Massachusetts from the 1690s until 1978. In 1978, the U.S. government banned lead from house paint. Lead can be found in all types of pre-1978 homes: homes in cities, suburbs or the countryside; private housing and state or federal public housing; single-family and multi-family homes. The older the house, the more likely it is to contain lead paint. The older the paint, the higher the likely lead content.

**Can routine home repairs cause lead poisoning?**

There can be a danger of lead poisoning whenever painted surfaces inside or outside the home are scraped for repainting, or woodwork is stripped or removed, or windows or walls are removed. This is because lead paint is found in almost all Massachusetts homes built before 1978, and so many of Massachusetts' homes are old. Do not use power sanders, propane torches or heat guns to remove leaded paint, as these methods create a lot of lead dust and fumes. Temporarily move your family (especially children and pregnant women) out of the home while the work is being done and cleaned up, or at a minimum, tape up plastic sheets to completely seal off the work area. Get a lead inspection done, so that you will know which surfaces have lead paint and need extra care when preparing for and doing home repair work, and during cleanup afterwards. Do not do repairs in older homes without learning about safe ways to do the work to reduce the danger of lead dust. Hundreds of cases of childhood and adult lead poisoning result each year from do-it-yourself home projects.

**How does the owner of a home built before 1978 in which a child under six years old lives meet the requirements of the Massachusetts Lead Law?**

The first step is to have a lead inspection or risk assessment done. A licensed lead inspector will test the surfaces of the home for lead and give the owner a written report that states where there is lead in amounts considered a violation by state law, and record any lead hazards that must be corrected. A risk assessor, who is a specially licensed lead inspector, will do a lead inspection plus a risk assessment, during which he or she checks the home for the most serious lead hazards that must be fixed for interim control. (See question about interim control, below.) Only a licensed deleader may do high-risk work, such as removing lead paint or repairing chipping and peeling lead paint. Either a deleader, the owner or someone who works for the owner (an agent) can do certain other deleading and interim control tasks. (See next question.) An owner or agent must get special training to perform the deleading tasks they may do. After the work is done, the lead inspector or risk assessor returns to check the home. He or she may take dust samples to test for lead and makes sure the home has been properly cleaned up. If everything is fine, he or she gives the owner a Letter of Compliance or a Letter of Interim Control. After getting one of these letters, the owner must take reasonable care of the property, mainly by making sure there is no peeling lead paint.

**Can I do some of the deleading myself?**

In Massachusetts, the owner or someone who works for the owner (an agent) can do certain deleading activities. These include covering surfaces with certain materials; removing certain building parts; capping baseboards; installing vinyl siding on the exterior, and applying encapsulants. Encapsulants are special liquid coatings made to be long-lasting barriers over lead paint. Before any of these deleading tasks are done, the owner must first have a lead inspection done and whoever is going to do the work must get special training. Contact CLPPP for information about this training. In addition, owners or their agents can perform structural repairs and lead dust cleaning for interim control. Before doing this work, owners and agents should get and read CLPPP's interim control booklet.

**Is there financial help for deleading?**

There is a state income tax credit of up to $1,500 per unit for full deleading. A credit of up to $500 per unit is available for interim control work that also contributes to full deleading. There are also grants and no-interest, deferred loans, or low-interest loans available to eligible property owners. These funds are available through the U.S. Department of Housing and Urban Development, the Massachusetts Executive Office of Communities and Development, the Massachusetts Housing Finance Authority, local city and town community development planning departments, and banks.

**Does deleading improve the value of my property?**

Many homeowners have found that the benefits of deleading are not unlike the benefits of other home improvement projects. Replacement windows and doors can save the homeowner money because they are more energy efficient. Having a legally deleaded home, whether it is a single-family or multi-family, owner-occupied or rental unit, can make it easier to sell or rent, often at a better price.

**What surfaces must be deleaded for full compliance with the Massachusetts Lead Law?**

Owners of homes built before 1978 where children under six years of age live must have the following lead hazards corrected to get a Letter of Compliance:
  * any peeling, chipping or flaking lead paint, plaster or putty;
  * intact lead paint, other coating or putty on moveable parts of windows with sills five feet or less from the floor or ground and those surfaces that come in contact with moveable parts;
  * intact lead paint or other coating on "accessible mouthable surfaces." These surfaces generally include woodwork, such as doors, door jambs, stairs and stair rails, and window casings.

**What is interim control?**

Interim control is a set of temporary measures that property owners can take to correct urgent lead hazards, especially peeling or chipping lead paint and lead dust. These steps protect residents from lead poisoning until the home is fully deleaded. Homes in good condition may need little or no work to get interim control status. Owners then have up to two years before they have to fully delead the home. For that period, they are protected from strict liability under the state Lead Law should a child become lead poisoned in the home, as long as the home is maintained and the conditions for interim control are met. In addition to the repair of peeling and chipping lead paint and the cleaning of lead dust, other work may be necessary for interim control. This includes fixing water leaks or other damage that makes lead paint peel and chip; making window wells smooth and easy to clean; making windows work properly and deleading any badly chipping and peeling lead-painted surfaces.

Property owners interested in interim control must hire a licensed risk assessor. He or she will then decide what work, if any, needs to be done to get a Letter of Interim Control. The original Letter of Interim Control is good for one year. The property owner can have the home reinspected before the end of that year, and if all conditions are met, the home can be recertified for another year. By the end of the second year, the home must be deleaded, if a child under six still lives there, for the owner to remain free of strict liability.

**Does my family have to be out of the house during deleading or interim control work?**

Residents must be out of the house for the entire time that a deleader is doing deleading work inside a home, and for some of the deleading work by owners and their agents. Residents may stay at home, but out of the work area, while a deleader, property owner or owner's agent without a deleader's license does certain other deleading tasks, or such interim control work as structural repairs or lead dust cleaning. Residents who have been out of the house may not return until the deleading work that made it necessary for them to leave is complete, the home is cleaned up, and a lead inspector or risk assessor has checked and found this work has been properly done and dust samples have passed. For complete details, contact CLPPP.

**Are there any exemptions to the Massachusetts Lead Law?**

The Lead Law applies only to homes built before 1978 in which a child under six lives. Any home or apartment having fewer than 250 square feet of living space, or which is in a rooming house, is exempt, as long as no child under age six is living there. Finally, homes rented for 31 days or less for vacation or recreational purposes are also exempt, as long as there is no chipping or peeling lead paint in the home and the renter has received the Short-Term Vacation Rental Notification.

**What are the requirements of the state Lead Law if there is a lease with an option to buy?**

When there is a lease with an option to buy a home built before 1978 in effect, the owner of the property must have it deleaded or brought under interim control if a child under six lives there. If the tenant with an option to buy such a home proceeds to purchase it, he or she becomes responsible for meeting the requirements of the Lead Law if a child under six lives there after the purchase.

**How can I find out about how lead inspections, risk assessments and deleading should be done?**

All lead inspections, risk assessments and deleading must be done according to the Regulations for Lead Poisoning Prevention and Control, 105 Code of Massachusetts Regulations 460.000 and the Deleading Regulations, 454 CMR 22.00. For full information, homeowners may get these regulations at the State House Book Store, State House, Boston, MA 02133. The phone number is (617) 727-2834.

Lead inspectors and risk assessors licensed by the Department of Public Health have been trained and are experienced in using the state-approved methods for testing for lead paint. These methods are the following: use of a solution of sodium sulfide, a portable x-ray fluorescence machine or lab tests of paint samples removed from the home. Deleaders licensed by the Department of Labor and Workforce Development have been trained to use safe methods to prepare for and do deleading work, and clean up afterwards. They may delead using any of the following methods: removing paint, removing building parts, covering and encapsulating. When removing paint, they cannot use certain very dangerous methods, such as open flame burning, dry abrasive blasting or power sanding without a special vacuum attachment.

**How do I get a lead inspection or risk assessment?**

Included as part of this notification package is a listing of private licensed lead inspectors organized alphabetically, and private licensed risk assessors, similarly organized. Ask to see the inspector or risk assessor's license, to make sure it is current. You should arrange for the inspection or risk assessment as quickly as possible after deciding you want one. If you do have an inspection or risk assessment, you must give the seller a copy of the report.

**What is the best time to delead or undertake interim control?**

The best time to delead a home or bring it under interim control is when the home is vacant, so that residents will not be exposed to lead and household furnishings will not be contaminated with lead. In addition, it often is efficient, and reduces costs, to combine deleading with other repair work being done to a vacant home.

**What is a Letter of Compliance and a Letter of Interim Control?**

Under the state Lead Law, a Letter of Compliance is a legal letter that says either that there are no lead paint hazards or that the home has been deleaded. The letter is signed and dated by a licensed lead inspector. A Letter of Interim Control is a legal letter that says work necessary to make a home temporarily safe from lead hazards has been done. It is signed and dated by a licensed risk assessor. A Letter of Interim Control is good for one year, but can be renewed for one more year. The owner must fully delead the home and get a Letter of Compliance by the end of the second year if a child under six still lives there. The Lead Law does not require the removal of all lead paint from a home. An owner who gets a Letter of Compliance or Letter of Interim Control must take reasonable care to keep up the home, mainly by making sure there is no chipping or peeling lead paint. If an owner fails to take reasonable steps to maintain the home, he or she may become liable for damages to a child lead poisoned as a result of the owner's breach of that duty of reasonable care.

## RENTAL PROPERTY INFORMATION

**What liability do rental property owners have if they don't comply with the state Lead Law?**

If a property owner of a home built before 1978 in which a child under six lives fails to delead or bring the home under interim control, and a child is lead poisoned as a result, the property owner is strictly liable for all damages. An owner is not strictly liable for lead poisoning if a Letter of Compliance or Letter of Interim Control is in effect. Strict liability means owners may be liable even if they did not know lead paint was in the home. Since harm to the kidneys and blood cells, delays in growth, learning disabilities and emotional and behavioral disturbances resulting from lead poisoning can have life-long effects, monetary damages awarded against an owner responsible for a child's lead poisoning can be substantial. Failing to delead or bring under interim control a home to which the Lead Law applies is also an emergency public health matter, and can carry criminal penalties. An owner who is notified by a public agency of Lead Law violation in a property he or she owns, and who willfully fails to correct the dangerous conditions, is also subject to punitive damages, which are three times the actual damages found. These provisions are in addition to any other legal rights the lead-poisoned child may have.

**Can I avoid state Lead Law requirements by not renting to a family with children under six?**

The Massachusetts Lead Law makes it illegal to refuse to rent to families with children under six, or evicting or refusing to renew the lease of families with children under six, because of lead paint. Discrimination against families with young children is also a violation of the U.S. Fair Housing Act and the Massachusetts anti-discrimination statute. Parents cannot waive the rights of their children to live in lead-safe housing or agree to assume to risks of lead exposure. Owners who violate these laws face heavy penalties. The Massachusetts Commission Against Discrimination investigates and prosecutes cases of discrimination against families with children because of lead paint.
It is also illegal for lenders to deny financing because a home has lead paint, or because financing could trigger future duties under the Lead Law. This does not restrict the right of a lender to process or deny a mortgage application in accordance with accepted underwriting practices and criteria.

**If I am considering buying a pre-1978 house to rent out, and a child under six lives in one of the apartments, should I have at least that unit and common areas inspected for lead now?**

Yes. If there are children under six living in such an apartment and the apartment does not have a Letter of Compliance or Letter of Interim Control, buyers should find out whether or not the apartment has lead hazards and will have to be brought into compliance with the state Lead Law. This information will be important in deciding whether to buy the property and at what price. As noted above, new owners have 90 days from the date of taking title to have such an apartment deleaded or brought under interim control. Therefore, they should arrange deleading or interim control work to begin as soon as possible after taking title, to be sure the work is done within 90 days.

**Can a landlord delay a tenancy to bring a home into compliance with the state Lead Law?**

A landlord who will be deleading a home or bringing it under interim control may delay the start of the tenancy up to 30 days. This can be done as long as a lease between the landlord and the new tenant does not exist. During this delay period, the new tenants are responsible for their living expenses. If there is a signed lease, however, the landlord is responsible for temporary housing during relocation necessary for deleading work.

**Must a landlord arrange temporary housing for a tenant while a rental home is being deleaded?**

Under the state Lead Law, tenants have to be relocated for the time that certain deleading work is taking place inside the home. They may not return until that work is done, the home is cleaned up, and a licensed lead inspector or risk assessor checks and finds it is fine for residents to move back in.
The landlord and tenant are responsible for working out an acceptable plan for alternative housing if it is necessary. The landlord may move the tenant to another place to live, which may be another house, apartment, motel or hotel. The landlord is responsible for paying the tenant's reasonable moving costs and any temporary housing costs over and above the rent of the home being deleaded. During the time the home is being deleaded, the tenant remains responsible for paying the normal rent they would pay for this period as their share of the cost of temporary housing. The Lead Law states the temporary housing must not cause undue economic or personal hardship to the tenant.

**What is tenant notification?**

The goal of the federal and state requirements for tenant notification is to help reduce lead poisoning by giving all tenants of homes built before 1978 information about lead in their home. The

7

program also educates tenants and landlords about the dangers of lead poisoning, its prevention, and the Massachusetts Lead Law. Tenant notification applies to all tenants, whether or not they have a child under six living with them.

Before renting a home, landlords, managing agents or any real estate agent involved in the rental must give new tenants copies of any existing lead forms for the home. These include lead inspection reports, risk assessment reports, a Letter of Compliance (no matter how old) or a Letter of Interim Control. If the landlord or agent does not have any or all of these forms for the home, he or she simply does not give them. In addition, the landlord or agent must give new tenants the Tenant Lead Law Notification. This form addresses lead poisoning, specific prevention tips for parents, the requirements of the Lead Law and an explanation of the lead forms. Attached to the Tenant Lead Law Notification is the Tenant Certification form. This is to be filled out and signed by both the tenant and the landlord or agent. Each party gets a copy to keep. **These forms have been approved to satisfy both state and federal lead notification requirements.** Landlords or agents may choose to include the Tenant Lead Law Notification/Tenant Certification form in a written lease, instead of using a separate form.

Landlords and agents who fail to carry out their tenant notification obligations are liable for all damages caused by their failure to do so, and are subject to a fine of up to $1,000.

## INSURANCE INFORMATION

**How can an owner of rental housing in Massachusetts built before 1978 get insurance to cover potential lead liability?**

The answer depends on the number of units that the property owner wishes to insure, and whether the property owner lives in the building for which insurance is sought. An owner-occupant who insures four or fewer units may be covered by homeowners insurance. Generally, the property owner who is not an owner-occupant will need to get commercial liability insurance, as will an owner-occupant who wishes to insure more than four units.

Homeowners insurance may be available from several different sources: the regular, "admitted" market, the FAIR Plan or the "surplus lines" market. The regular, "admitted" market is the usual market for insurance. The FAIR Plan offers homeowners insurance to property owners unable to find coverage in the regular market. The "surplus lines" market is a less regulated, and generally more expensive market. It provides insurance to those who cannot find coverage elsewhere.

Under state Division of Insurance regulations, if an insurer in the regular market decides to write homeowners insurance on rental housing for which a Letter of Compliance or Letter of Interim Control is in effect, the insurer must provide coverage of lead paint liability arising from those premises. **Neither the state Lead Law nor the insurance regulations require a regular market insurer to write liability insurance, including homeowners insurance, on a particular property.** If a Letter of Compliance or Letter of Interim Control is in effect for only part of a property, the coverage for lead liability will extend to only that part of the property. Such insurance will also apply to any common areas covered by the Letter of Compliance or Letter of Interim Control. It will not, however, extend to injuries resulting from gross or willful negligence. The FAIR Plan's coverage of lead liability is subject to the same regulations that apply to the regular market.

An insurer in the regular market, or the FAIR Plan, may ask the property owner to prove that there is a Letter of Compliance or a Letter of Interim Control for the home sought to be insured. Once the proof is provided, coverage for lead liability will apply as of the date of the Letter. If the Fair Plan determines that a given property is eligible for insurance, or if a regular market insurer elects to insure certain premises, either may exclude lead liability coverage on any part of the property it ensures to which no Letter of Compliance or Letter of Interim Control applies. If either the Fair Plan or a regular market insurer uses such an exclusion, it must offer the owner of the premises the chance to buy back

the excluded coverage. There is an additional charge for the lead liability "buyback" coverage. The amount of this charge is regulated by the Division of Insurance.

In the surplus lines market, there is no requirement to cover lead liability arising from premises to which a Letter of Compliance or Letter of Interim Control applies. Surplus lines insurers generally exclude coverage of lead liability, do not offer the buyback coverage, and charge higher prices than the regular market.

Since the FAIR Plan does not provide commercial liability insurance, property owners who need to get such coverage (as opposed to homeowners insurance) must get it from either the regular market or the surplus lines market. Commercial liability insurance from the surplus lines market, like homeowners insurance from that market, usually will exclude coverage of lead liability, will not include the buyback option, and will cost more than regular market coverage.

While a regular market insurer can decline to write commercial liability insurance on a given property, once such an insurer decides to write such coverage, it must then insure lead liability arising from any part of the property covered by a Letter of Compliance or Letter of Interim Control. If such an insurer chooses to insure a property, it may exclude coverage of lead liability on any part of the premises for which no Letter of Compliance or Letter of Interim Control is in effect. If such insurer applies such an exclusion, it must offer the property owner the opportunity to buy back the excluded coverage. The lead liability insurance regulations described above as applicable to regular market homeowners insurance also apply to commercial liability insurance from the regular market.

Owners of rental housing should try to get coverage for lead liability, whether they have met the requirements of the Lead Law or not, by seeking regular market coverage through insurance agents, or by contacting direct writing companies that are listed in the telephone directory, before resorting either to the FAIR Plan or the surplus lines market.

**If I own and occupy a single-family house, does my homeowners insurance cover lead liability?**

Under the state lead liability insurance regulations, coverage of lead liability cannot be excluded from regular market and FAIR Plan homeowners insurance policies on single-family owner-occupied homes. Instead, lead liability coverage is included in such policies. However, a family member covered by a homeowners policy cannot make a lead liability claim against another family member covered by the same policy. The requirements of the lead liability insurance regulations do not apply to homeowners coverage from the surplus lines market.

**How are new owners affected by the lead liability insurance regulations?**

If a buyer of rental housing built before 1978 meets the state Lead Law's requirements and gets a Letter of Compliance or Letter of Interim Control within 90 days after becoming the owner, then, under certain conditions, they will be able to get coverage for lead liability for the period they owned the property before they deleaded or brought it under interim control. This will happen if a regular market insurer chooses to provide liability coverage on the property. Such an insurer is required to provide lead liability coverage to a new owner who obtains a Letter of Compliance or Letter of Interim Control within 90 days after becoming the owner of the property. Such coverage will go back to the time that the new owner took title to the property, unless the liability insurance went into effect some time after the taking of title. In the latter case, the coverage of lead liability will extend back to the time that the liability insurance held by the new owner first went into effect on the premises. The rule for new owner lead liability insurance coverage for the FAIR Plan is the same as for the regular market. These special rules for lead liability insurance for new owners do not apply to insurance from the surplus lines market.

*********

**What happens next?**

That's up to you. At this point, you should be well informed about lead poisoning, the effects of lead hazards in the home, and your responsibilities under the Massachusetts Lead Law. In the past, the Department of Public Health has had to devote its childhood lead poisoning resources to provide services to the thousands of Massachusetts children who were poisoned, as well as to providing services to children whose blood lead levels are elevated, to prevent them from becoming lead poisoned. Between the Department's work and the preventive deleading carried out by property owners, we have been successful at reducing the number of lead poisonings among young children in Massachusetts. All of us at the Department are hopeful that we will continue that partnership, in which the correction of lead hazards in the homes of young children *before* those children are lead poisoned is so important.

**Where can I get more information on lead poisoning?**

Massachusetts Department of Public Health
Childhood Lead Poisoning Prevention Program (CLPPP)
(For more copies of this form, and full range of information on owners' and tenants' rights and responsibilities under the state Lead Law, financial help for owners, safe renovation work, and soil testing)
www.mass.gov/dph/clppp
617-753-8400, 1-800-532-9571

Massachusetts Department of Labor/
Division of Occupational Safety
 (List of licensed deleaders)
 www.mass.gov/dos
617-626-6962

Massachusetts Housing Finance Agency
(Get the Lead Out loan program information)
www.masshousing.com
617-854-1000

U.S. Environmental Protection Agency
Region 1 (New England)
(Information about federal laws on lead)
http://www.epa.gov/region1
617-918-1524

National Lead Information Center
(lead poisoning information or lead in consumer products)
www.epa.gov/lead or 1-800-424-LEAD

U.S. Consumer Product Safety
Commission (Info about lead in consumer products
www.cpsc.gov or 1-800-638-2772

## PROPERTY TRANSFER NOTIFICATION CERTIFICATION

This form is to be signed by the prospective purchaser before signing a purchase and sale agreement or a memorandum of agreement, or by the lessee-prospective purchaser before signing a lease with an option to purchase for residential property built before 1978, for compliance with federal and Massachusetts lead-based paint disclosure requirements.

**Required Federal Lead Warning Statement:**
Every purchaser of any interest in residential property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
   (i)_____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).
   _____
   (ii)_____ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
(b) Records and reports available to the seller (check (i) or (ii) below):
   (i)_____ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (circle documents below).
   Lead Inspection Report; Risk Assessment Report; Letter of Interim Control; Letter of Compliance
   (ii)_____ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's or Lessee Purchaser's Acknowledgment** (initial)
(c) _____ Purchaser or lessee purchaser has received copies of all documents circled above.
(d) _____ Purchaser or lessee purchaser has received no documents.
(e) _____ Purchaser or lessee purchaser has received the Property Transfer Lead Paint Notification.
(f) _____ Purchaser or lessee purchaser has (check (i) or (ii) below):
   (i)_____ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
   (ii)_____ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
(g)_____ Agent has informed the seller of the seller's obligations under federal and state law for lead-based paint disclosure and notification, and is aware of his/her responsibility to ensure compliance.
(h)_____ Agent has verbally informed purchaser or lessee-purchaser of the possible presence of dangerous levels of lead in paint, plaster, putty or other structural materials and his or her obligation to bring a property into compliance with the Massachusetts Lead Law -- either through full deleading or interim control -- if it was built before 1978 and a child under six years old resides or will reside in the property.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| Seller | Date | Seller | Date |
|---|---|---|---|
| Purchaser | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

CLPPP Form 94-3, 6/30/94, Rev. 9/02

11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.

## Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

*Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.*

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):

    (i) \_\_\_\_\_ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    (ii) \_\_\_\_\_ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller (check (i) or (ii) below):

    (i) \_\_\_\_\_ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    _____

    (ii) \_\_\_\_\_ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)

(c) _____ Purchaser has received copies of all information listed above.

(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home*.

(e) Purchaser has (check (i) or (ii) below):

    (i) \_\_\_\_\_ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii) \_\_\_\_\_ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)

(f) _____ Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| Seller | Date | Seller | Date |
|---|---|---|---|
| Purchaser | Date | Purchaser | Date |
| Agent | Date | Agent | Date |

misstated the statutory definition by limiting the 0-bedroom dwelling exception to housing where no children under 6 reside or are expected to reside. EPA and HUD have modified the definition to reflect the statutory language.

16. *0-bedroom dwelling* means any residential dwelling in which the living area is not separated from the sleeping area. Such term includes efficiencies, studio apartments, dormitory housing, military barracks, and rentals of individual rooms in residential dwellings.

In the preamble of the proposed rule, EPA and HUD clarified their interpretation of this term by identifying efficiencies, studio apartments, dormitory housing, military barracks, and other such housing in which the living area is unseparated from the sleeping area as types of dwellings that are not covered under the rule. EPA and HUD have added rentals of individual rooms in a residential dwelling to the types of transactions that would involve a 0-bedroom dwelling. All of these clarifications are included in the regulatory definition in the final rule's regulatory text.

### D. Changes to the Disclosure Requirements

Section 1018(a)(1)(B) requires that "before the purchaser or lessee is obligated under any contract to purchase or lease the housing, . . . the seller or lessor shall. . .disclose to the purchaser or lessee the presence of any known lead-based paint or any lead-based paint hazards, in such housing, and provide any lead hazard evaluation report available to the seller or lessor."

EPA and HUD received more than 150 comments on their proposed requirements for such information disclosure, addressing both the proposed disclosure process and the issue of what information should be covered. In particular, recurring themes among the comments included: (1) The need for greater specificity regarding the necessary timing for disclosure activities; (2) concerns over which activities should constitute disclosure; and (3) what kinds of information should be disclosed under this rule. The following is a brief discussion of these key points and a summary of the regulatory requirements.

1. *Timing of disclosure events.* In addressing the need for greater clarity regarding the timing of disclosure activities, EPA and HUD have attempted to maximize the parties' flexibility in incorporating these requirements during negotiations. EPA and HUD believe that this flexibility is important given the many types of transactions covered by these provisions and the existence of distinct local requirements and customs. Therefore, the final rule identifies only the latest point at which full disclosure must occur. Using the statute as a guide, EPA and HUD have identified this point as before the purchaser or lessee becomes obligated under any contract to purchase or lease the housing.

Some commenters raised the concern, however, that without additional clarification regarding how and when information must be disclosed, the final rule could cause unnecessary confusion regarding how the requirements will work in actual practice. After reviewing the framework set out in the proposed rule, EPA and HUD have revised and clarified the requirements in a number of ways. First, the final rule contains numerous minor changes to the wording of definitions and requirements to clarify that the rule does not require mass disclosure to all prospective purchasers, regardless of their degree of interest. Second, the rule requires that certain disclosure and acknowledgment language become part of the final sale or lease contract. In making these changes, EPA and HUD have considered the typical negotiation process involved in leasing and sales transactions.

During sales transactions, for example, purchasers often take the first step toward formalizing a sales agreement by providing a written offer to purchase the housing. If accepted and signed by the seller, this offer typically becomes the sales contract. The statute's mandate that disclosure and notification take place before the purchaser is obligated imposes a requirement on the seller to disclose information before accepting the purchaser's offer, thereby allowing the purchaser an opportunity to review the information and to possibly amend the offer. If a seller were to accept a purchaser's offer and obligate the purchaser before disclosing known information, such a seller would be in violation of Title X and this rule. Of course, the parties can always agree to conduct the disclosure activities in advance of contract discussions, provided that the final contract includes the signed and dated disclosure elements mandated by this rule.

In leasing transactions, the disclosure process is even simpler. While the parties are free to negotiate when the disclosure process occurs, lessors must provide the information and complete the disclosure portions of the lease (or attachment) before the lessee becomes obligated under a contract to lease the housing. By requiring that the disclosure information be included in or as an attachment to the lease, EPA and HUD seek to ensure that the disclosure process automatically occurs during lease negotiations.

The requirement that the contract or an attachment include disclosure language fulfills two additional functions. First, the process of completing and signing these sections ensures that all parties are aware of their rights and obligations and are able to confirm that the appropriate actions have already occurred. Second, this disclosure language provides a clear record of compliance.

While sections 1018(a)(2) and (3) mandate lead warning language for all sales transactions, the inclusion of such language as an attachment to leases is not specifically mandated by Title X. EPA and HUD, however, believe that it is necessary to include the warning language in leases as well. Further, the completion and retention of disclosure and acknowledgment language is a necessary component of any effective, enforceable disclosure requirement for leasing transactions.

2. *Components of full disclosure.* EPA and HUD consider full disclosure to have occurred when the seller or lessor has provided the following items to the purchaser or lessee.

a. *A lead hazard information pamphlet approved by EPA.* As required by TSCA section 406, EPA has developed a lead hazard information pamphlet, entitled *Protect Your Family from Lead in Your Home*, and has made it available through government channels and private sources. EPA issued the final notice of the pamphlet's availability in the Federal Register of August 1, 1995 (60 FR 39167). In addition to providing detailed information on how to obtain copies (individually, in bulk, and as camera-ready reprints), the notice describes the process of developing the pamphlet, including considerable public review and comment.

The statute also allows States to develop their own lead hazard information pamphlets under section 406, provided that they obtain authorization and approval from EPA. Several States that already have disclosure provisions have expressed their desire to seek approval to use their own pamphlets in lieu of the Federal pamphlet. EPA and HUD encourage States interested in developing their own materials to seek approval of their pamphlets for distribution under the section 1018 regulations.

b. *Notice of the presence of known lead-based paint and/or lead-based paint hazards.* Sellers and lessors must disclose, based on their actual knowledge, whether the target housing

**9072** Federal Register / Vol. 61, No. 45 / Wednesday, March 6, 1996 / Rules and Regulations

is known to contain lead-based paint and/or lead-based paint hazards. EPA and HUD received many comments on the types of information under consideration for disclosure under these requirements. Many of the commenters expressed concern that the proposed rule was too vague about what constituted "known information." For example, did EPA and HUD intend for the disclosure requirements to distinguish between information already in the possession of the seller or lessor and information that could be obtained only by some further investigation or inference? Several commenters described this distinction in terms of actual knowledge (knowledge stemming from existing facts and information) versus constructive knowledge (knowledge that could be inferred or obtained by further inquiry). An expectation that the property owners meet a constructive standard for knowledge could create an implied testing requirement.

While the Agencies hope to encourage lead hazard evaluation and reduction efforts through all of their regulatory and non-regulatory programs, neither Agency believes that Congress intended to mandate additional lead hazard evaluation activities in private housing. EPA and HUD believe that Congress intended to limit the disclosure obligation to actual knowledge. The final rule, therefore, embraces an actual knowledge standard as well. With this clear standard, property owners and their agents will be able to take affirmative steps to comply fully with the rule and be confident that they have met the requirements of the law and its implementing regulations. EPA and HUD believe that such finality is a necessary part of this regulation, given the diverse makeup of the regulated community.

c. *Provision of records and reports on lead-based paint and/or lead-based paint hazards available to the seller or lessor.* As mandated by section 1018(a)(1)(B), sellers and lessors must "provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor." EPA and HUD have interpreted "available evaluation reports" to mean records and reports that pertain to lead-based paint and/or lead-based paint hazards in the target housing and that are in the possession of the seller or lessor or that are reasonably obtainable by the seller or lessor at the time of the disclosure.

During the proposed rule phase, EPA and HUD requested comment regarding the disclosure of known lead-based paint and/or lead-based paint hazards in other units within target housing. EPA and HUD received both supporting and opposing comments on this requirement. Opponents argued that distinct dwelling units can have very different painting histories, making information on one unit an unreliable indicator of other units. Proponents argued that regardless of differences that may exist, the painting histories of different units in a building are usually similar enough to provide valuable information for individuals considering whether lead hazard exposure precautions are prudent.

EPA and HUD believe that information and reports on other units in the target housing are directly relevant to prospective purchasers and lessees if the information stems from evaluation or reduction efforts in the target housing as a whole. In large multifamily properties, evaluations do not necessarily examine every dwelling unit in the housing. Rather, inspectors or risk assessors examine a representative sample of the dwelling units and apply the findings to the housing as a whole. While such evaluations might not include data on a specific unit, the fact that the evaluation was designed to provide information on the housing as a whole makes the report's findings relevant.

The proposed rule also requested comment on whether sellers and lessors should have to disclose information on past elevated blood-lead levels in other occupants of target housing. Based on the comments and further deliberation, EPA and HUD decided against requiring disclosure of medical information for several reasons. As commenters pointed out, lead exposure, elevated blood-lead levels, or lead poisoning may come from sources other than lead-based paint hazards in the housing. Where elevated blood-lead levels were determined to stem from lead-based paint hazards in the housing, the follow-up environmental assessment activities in the affected person's housing will likely generate more germane records regarding lead-based paint exposure hazards in the housing.

Commenters also questioned whether disclosure requires the actual transfer of all documentation from the seller or lessor, or whether simply making the information accessible for the purchaser's or lessee's evaluation is adequate. Based on the mandate in section 1018(a)(1)(B), EPA and HUD believe that Congress clearly intended for purchasers and lessees to receive their own copies of the records and reports available to the seller or lessor. Therefore, the seller or lessor remains obligated to provide copies of all relevant materials to the purchaser or lessee.

d. *Completed Lead Warning Statement and acknowledgment language, attached to the sales or lease contract.* This information, set out in 24 CFR 35.92 and 40 CFR 745.113, documents the disclosure and acknowledgment process, and serves as the primary confirmation tool for all parties in ensuring full compliance with the regulatory requirements. This information is especially important in cases where purchasers or lessees conduct contract negotiations through their own representatives (requiring sellers, lessors, or their agents to provide documents to the representative instead of the purchaser or lessee). In such cases, the attachment provides a record that sellers, lessors, and agents can use to confirm that purchasers and lessees have received the necessary disclosure materials.

The proposed rule required the use of disclosure forms as attachments to each contract to purchase or lease target housing. These forms would have served as the key mechanisms for documenting compliance with the requirements. EPA and HUD carefully considered the merits of each element, limiting the rule to information necessary for demonstrating full compliance.

The final rule includes some changes to the information that must be included in the contract. Where the proposed rule required that sellers and lessors use federally developed disclosure forms, the final rule provides greater flexibility for negotiating parties to develop their own language, provided that it contains the mandated elements. EPA and HUD eliminated the requirement that parties use a single form. Instead, the final rule mandates only the information elements that must be included without mandating specific formats or forms.

This flexibility is especially important to States that have developed, or are considering developing, their own disclosure requirements. During the comment period, several States requested that the final rule provide flexibility for States to merge their forms with the Federal form, eliminating unnecessary duplication. Under the final rule, States and jurisdictions will be able to make changes to the format as necessary to retain consistency with State and local laws and customs.

The following is a discussion of the required elements.

(i) *Seller, agent, and purchaser requirements.* The final rule requires that each contract to sell target housing include an attachment containing specific disclosure and acknowledgment